UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
01 AUG 22 PM 5: 36
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
AUG 22 2001

| | | |
|---|---|---|
| LINDA STOUT, et al., | ) | |
| Plaintiffs, | ) | |
| and | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Intervenor, | ) | |
| vs. | ) | CV 65-J-396-S |
| JEFFERSON COUNTY BOARD OF EDUCATION, et al., | ) | |
| Defendants. | ) ) | |

## ORDER

Pending before the court are six motions[1] seeking transfers to various schools as set out in the petitions. On September 8, 1971 an "Amended Order" was entered by the Honorable Sam C. Pointer, U.S. District Judge. This order established the goal of 75% majority/25% minority student population for the respective schools affected by the order.

---

[1] Two of these motions were filed by Lee H. Walker.

758

Said order also specified its enforcement, beginning the first day of classes for the 1971-1972 school year, the reporting provisions and rules governing transfers of the students.

On September 15, 2000, a Consent Order in this matter was entered where, among other matters, the Jefferson County Board of Education ("Board") acknowledged that it had failed to strictly enforce provisions of the 1971 Order regarding transfers of students. Said September 2000 Consent Order signed by the Board's attorney stated:

> In particular, the Board acknowledges that it has failed to conduct, or to cause school officials to conduct: (a) a thorough analysis of the compliance of applications for intra-district transfers with provisions of applicable Orders limiting the grounds for such transfers . . . (b) an analysis of the cumulative impact on student desegregation, at each school, of approved applications for intra-district transfers; or (c) adequate training of administrative personnel to assure compliance with such obligations.

(Consent Order, p.9).

In April of 2001, seven months after the Board entered into this Consent Order, Pat Wade, Director of Student Services, on behalf of the Board, sent out "Student Transfer Information" to school principals specifying transfer guidelines. (Board Ex. 1). The guidelines were not finalized until July 24, 2001, after "negotiations" with the United States Department of Justice ("DOJ") ended. (DOJ Ex. 1). These guidelines fail to define the term "exceptional and compelling personal hardship." That term, found in the 1971 order, is used for determining transfers under §IV(e).

This April 2001 information was disseminated to principals who were told, for the first time, to "please remind parents"that the Board would not receive any transfer applications later than August 1, 2001. (Board Ex. 1). However, the Board provided no mechanism for disseminating this information to the parents "other than through the

2

principals." Petitioners state that they were unaware of this deadline, had not been made aware of any deadlines, and quite to the contrary had been informed throughout the 2000-2001 school year they should not be concerned because their children would be transferred.

The Board's report filed with the court on February 27, 2001 reflects transfer approvals based on various reasons. Some of these reasons are in direct contradiction to the guidelines adopted by the Board on July 24, 2001, a draft of which was disseminated to principals in April of 2001 and <u>after</u> the September 14, 2000 Court Order where the Board committed to strictly enforce applicable court orders.

Some of the reasons given for transfers were: "sibling transfer," "stability of student," "parent's desire," "peer pressure," "plans to move back, does not want to move later," "grandmother employed by school," "aunt teaches at school," "works well with teachers at school," "closest school," "building new house," "emotional discomfort of child at old school," "we are leaving private school," "[Subject School] right down the road from house," "children have friends at school," "live in the city limits," "member of football team," and finally the understatement that the transfer applicant was **"confused by school zones."**

The court finds that many transfers already approved by the Board are not in compliance with the 1971 Court Order. Further, Pat Wade, Director of Student Services, the decision-maker with regard to transfers, informed the court that she is uncertain how

3

to define the term "compelling hardship."[2] Obviously, even after September 15, 2000, the Board has approved transfers based on city limits, at least one of the approved reasons given to the Board.

Pursuant to the 1971 court order §IV(e) hardship transfers "shall be made on a non-discriminatory basis for non-racial reasons." The reasons stated by the DOJ and Board for denying the transfers with which petitioners are concerned is that the Majority/Minority ratio of 75%/25% has been met with the previously approved transfers. The court is unaware of the reasons given for denying said transfers other than the one given in court: to meet the 75%/25% Majority/Minority ratio. The court finds the reasons given by the DOJ and Board denying these transfers violate §IV(e) of the 1971 Order, in that the reasons are apparently based on race. The only objection the parties voiced concerning these petitioners, was that the Majority/Minority ratio would be affected and the petitioner Willcutt did not have a hardship. However, that transfer was requested due to hardship. Hardship decisions can not be based on racial reasons according to §IV(e).

Furthermore the court finds, and all parties agree, that the requested transfers were all based on non-racial reasons.[3] Under the 1971 Order, a student may transfer "(1) from

---

[2]The statement to the court in this respect is, in and of itself, evidence of the Board's failure to comply with the September 2000 Consent Order by which the Board undertook to adequately train its administrative personnel to assure compliance.

[3]The requests were made by both majority and minority applicants.

any school which has a 75% or higher enrollment of students of his own race; or (2) to any school which has less than 25% enrollment of students of his own race; or (3) between schools where the effect is to reduce the difference between the white-to-black student ratios of the two schools." (§IV(a)). Obviously these transfers are governed by race of the applicant. The second method of transfer is through hardships which determinations expressly can not be based on race. (§IV (e)).

Failure to set up guidelines for implementation and compliance with the 1971 Court Order in compliance with the September 2000 Consent Order, until July 24, 2001, approximately three weeks before the start of the new school year and applying these new guidelines to only **some** transfer requests and not those reviewed earlier is a violation of the 1971 Order and the 2000 Consent Order. Proper compliance would include a deadline for filing all transfer requests so that the Board could ascertain the relative degree of hardship among the applicants while complying with the 1971 .5% limitation on hardship transfers.

The court has reviewed the petitions. The first petition concerns affected students who live in the city limits of Irondale, specifically those living within Rock Ridge, Heritage Place, Hamby Avenue, and parts of Alton neighborhoods. Petitioners state that students from these areas were "routinely granted transfers or allowed to attend without transfers" and that the recent transfer denials are causing "great mental anguish." Many students from these areas are already attending these schools. As the Board has already

approved other requests for transfer based on reasons such as "children have friends at school," "stability of student" and "city limits" the court finds that for the school year 2001-2002 these movants and attached signatory petitions should be and hereby are **GRANTED**.

All of the other petitions, to which none of the parties objected, are also **GRANTED**. The only objection to these motions was made by the DOJ concerning Theresa Willcutt's petition. Her husband and one child are living in a separate home as a result of the strict enforcement of lines which have not been enforced for 31 years. As the "confused about school zones" was adequate for the Board's earlier approval of a transfer request, so is the Willcutt's situation, therefore, that petition is also **GRANTED**.

Parties to this action Linda Stout, DOJ, and the Board are further ordered to formulate a plan to implement the 1971 Order in a logical and reasonable fashion. Said plan shall include obtaining input from cities within the school system regarding changed city limits, annexations and monetary contributions. Said plan should reference the recent 2000 census data. The Board informed the court that it was in the process of creating a demographic map with Alabama Power but that map would not be ready for another year. The court assumes that at least part of that project's underlying data came from the recent census.

The parties should also formulate guidelines with respect to the definition of "exceptional and compelling hardship," being mindful that the definition must be based

6

on non-discriminatory bases and motivation. (See 1971 Order §IV(e)). The plan should also include time limits for transfer applications, notification procedure for parents regarding the time limits, and a system to review the applications as a collective whole, with results and appeal processes. The City of Irondale is invited to meet with the parties concerning this plan, but the burden is on the actual parties. The court shall review said plan at a hearing set for November 30, 2001 at 9:00 a.m.[4] The purpose of said hearing shall be to ascertain compliance with court orders in time to ensure a fair and orderly zoning and transfer process prior to the beginning of the school year, 2002-2003.

It is important to note that this order only applies to the 2001-2002 school year. The court also encourages the parties, who after 30 years now want to strictly enforce the 1971 Order, to possibly revisit the goals and motivation of the original litigation to see if the 1971 Order is an adequate method of implementation.

**DONE** and **ORDERED** this ___22___ day of August, 2001.

Inge P. Johnson
United States District Judge

---

[4]The City of Irondale appeared at the hearing through its City Attorney and Mayor.