# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LINDA STOUT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **and** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **Plaintiff-Intervenor,** | ) | **2:65-cv-0396-MHH** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JEFFERSON COUNTY BOARD** | ) | |
| **OF EDUCATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SUPPLEMENTAL REPORT TO THE COURT REGARDING MATTERS RELATING TO FORMATION OF THE GARDENDALE CITY SCHOOL SYSTEM

_____

On February 20, 2015, the parties were provided the opportunity to appear before the Court to discuss the current status of this longstanding desegregation case.  At that conference, the parties discussed the planned operation of the newly formed Gardendale City Board ("Gardendale") of Education and the status of negotiations between the Jefferson County Board of Education and Gardendale. Counsel for the Hoover City Board of Education, who also represents Gardendale, was in attendance and able to comment on the separation.  At that time, both

Gardendale and Jefferson County were waiting on the State Superintendent to resolve several fundamental, threshold issues which, in the Jefferson County Board's view, would have better enabled the parties and the Court to evaluate the proposed separation's impact on desegregation in the County System.

That decision has now been rendered. However, on the most important issues (relating to facilities and attendance), the State Superintendent effectively deferred a permanent decision pending the outcome of further negotiations. Because the Court was clear that further delay in bringing this matter before the Court would be a matter of significant concern, the Jefferson County Board of Education files this supplemental report for the purpose of soliciting the Court's advice and direction as to whether, and under what conditions, an orderly transfer of operational control of the schools in Gardendale may occur.

(a)

*Historical Overview of the Gardendale School System*
*Formation and Negotiation Process*

The following chronology provides an outline of key events in history of the Gardendale School System and attendant separation negotiations:

5-14-13        Dr. Ira Harvey submits financial feasibility report
               to Gardendale City Council

| | |
|---|---|
| 8-26-13 | Report regarding economic impact of school system formation on property values submitted to Gardendale City Council by Dr. Keivan Deravi |
| 10-10-13 | Dr. Ira Harvey presents "Review of Financial Feasibility" to Gardendale City Council |
| 11-12-13 | Gardendale property tax increase approved |
| 3-3-14 | Ordinance 2014-007 (establishing a city school system, a board of education, and providing for appointment of members of the board) adopted |
| 3-11-14 | Gardendale City Board of Education (GCBOE) holds initial organizational meeting |
| 4-1-14 | Gardendale Board members sworn in |
| 6-24-14 | Dr. Patrick Martin introduced as GCBOE Superintendent (to begin service 8/1/14) |
| 10-7-14 | Initial meeting between Superintendents and attorneys for Jefferson County and Gardendale Boards of Education |
| 10-8-14 | Joint Press Release regarding negotiations issued |
| 10-21-14 | Second meeting between parties |
| 11-18-14 | Joint Petition filed with State Superintendent of Education identifying disagreements and requesting review and resolution |
| 11-25-15 | State Superintendent of Education acknowledges petition and establishes submission format |
| 12-12-14 | Initial submissions filed with State Superintendent of Education |

| 12-15-14 | GCBOE announces intention to adopt an open door attendance policy (terms to be released when separation negotiations with the JCBOE are completed) |
|----------|-----------------------------------------------------------------------------------------------------------------------------------------------------------|
| 12-19-14 | Parties submit replies to initial position statements |
| 1-30-15 | State Department of Education conducts mediation |
| 2-3-15 | Supplemental submissions regarding Section 16-8-20 filed |
| 2-3-15 | Preliminary Decision rendered by State Superintendent of Education |
| 2-20-15 | Parties submit responses to Preliminary Decision |
| 2-26-15 | Final Decision rendered by State Superintendent of Education |
| 3-2-15 | Amended Final Decision rendered by State Superintendent of Education |
| 3-5-15 | Meeting between both parties per directive of State Superintendent of Education |
| 3-6-15 | Joint request for clarification of decision sent to State Superintendent of Education by the parties[1] |

Unless preempted by an order from this Court, the parties are expected to appear before the State Superintendent on March 31, 2015, to provide a status report regarding the progress of their negotiations.

---

[1] See joint letter from Drs. Craig Pouncey and Patrick Martin dated March 6, 2015, attached as Exhibit A.

(b)

*Areas of Disagreement Between the Parties*
*and the Posture of Proceedings Before the*
*State Superintendent of Education*

Following an initial meeting between the parties on October 17, 2014, the

parties identified three critical threshold issues with respect to which agreement

was not likely to be reached.  Early submission of those issues to the State

Superintendent of Education was deemed advisable because the disposition of

other issues was thought to be dependent in whole or in part on their outcome.  The

issues were jointly framed and presented by the parties for determination by the

State Superintendent of Education in a jointly filed petition:[2]

1.    <u>Provision of Equivalent Facilities</u>

The Jefferson County Board of Education has requested
payment of $33,187,500 from the Gardendale Board of
Education in order to provide equivalent facilities for
students residing in areas that have heretofore been
included within the Gardendale Schools' attendance
zones, but that are not within Gardendale city limits. The
Gardendale Board declined to make any payment to the
Board but has proposed a 12-year transitional attendance
plan that would allow all students now attending schools
in Gardendale to continue attending Gardendale school
through graduation.

---

[2] The petition is attached as Exhibit B.

2.     Provision of Services to Gardendale Residents attending
       the William E. Burkett Multi-Handicapped Center

       The Gardendale Board of Education has requested that
       students attending the William E. Burkett Multi-
       Handicapped Center ("the Burkett Center") be allowed to
       remain as that school until their eligibility for services
       expires under federal law, and that tuition for such
       students be paid by the Gardendale Board.  The Jefferson
       County Board proposes that the Gardendale Board
       assume responsibility for its residents who attend the
       Burkett Center effective with the transfer of operational
       control of school facilities, with transitional support to be
       offered by the County Board.

3.     September Payroll

       The Jefferson County Board has proposed that the
       Gardendale Board assume all payroll obligations for
       Gardendale Board employees incurred on or after the
       transfer date (July 1, 2015).  The Gardendale Board has
       proposed that the County Board assign funds allocated to
       the County Board from the Foundation Program in an
       amount equal to all salaries and benefits of state earned
       and federal employees assigned to Gardendale Schools as
       of the transfer date for the balance of the current fiscal
       year (i.e., through September of 2015).

The parties' positions regarding their disagreements are more fully

developed and set forth in their submissions to the State Superintendent (See

Exhibits C1- C8, attached).  The County Board contended that Gardendale should

pay its share of the cost to replace the facilities being taken by Gardendale.[3]  The

---

[3] *See* Ala. Code §16-8-20 (1975)(city annexing county school may not assume control of same until it
reaches agreement regarding assumption of existing indebtedness and provision of same or equivalent
school facilities for children in school district not annexed or made a part of the city school district); Ala.

Gardendale Board denied that it had any obligation under §16-8-20 or any other provision or principle of law to pay for such facilities, but agreed to assume the indebtedness referable to other school buildings as contemplated by §16-8-20. Gardendale further argued that its obligations would be fully met by implementing the transitional plan it characterized as an "open door" attendance policy.

Though not the centerpiece of its position before the State Superintendent, the Jefferson County Board's arguments were based in part on concerns relating to the adverse impact of Gardendale's formation on desegregation in the County system.[4] At least as it relates to the County Board's bid to secure funding to provide equivalent facilities for displaced County residents, the statutory and equitable justification for securing such funding under state law mirrors the federal constitutional imperative that underlies the *Stout* decree: Municipal school systems may be permitted to operate only if they can do so without adversely affecting the County system's ability to provide equivalent facilities and educational opportunities to its students, and to thereby meet its desegregation obligations to those students.

Op. Atty. Gen. No. 92-00364 (recognizing application of §16-8-20 to formation of new school districts); Chism v. Jefferson County, et al., 954 So.2d 1058 (Ala. 2006)(same)(dissenting opinion). *See also* State v. Atkins, 439 So.2d 128 (Ala. 1983)(cost of providing substitute facilities is the measure of damages when a governmental agency takes public property that has been adapted to a special use).

[4] The Board informed Dr. Bice of the status of matters in this case by letter of January 26, 2015, attached as Exhibit D.

(c)

*The State Superintendent's Rulings*

In a "Preliminary Decision on the Petition for Adjudication of Disputed

Separation Issues Jointly Submitted by the Gardendale City Board of Education

and the Jefferson County Board of Education"[5] issued on February 6, 2015, the

State Superintendent of Education addressed the three issues that had been

presented to him for determination:

<u>Answer to First Question</u>

> The Jefferson County Board relies on Ala. Code §16-8-20 as authority for claiming that a payment should issue from the Gardendale City Board. Although the creation of a new city school system is not directly addressed by the statute, the principle behind the statute, which makes financial obligations run with the land and facilities for which the financial obligations were occurred or to which they can reasonably be allocated, is a sound one, and should be recognized in this particular situation. Otherwise, the Gardendale City Board would receive a windfall at the expense of the Jefferson County Board.
>
> For this reason, and pursuant to this office's authority to review the actions and orders of count and city boards of education and the parties' Joint Petition for Adjudication of Disputed Separation Issues, the Gardendale City Board shall pay to the Jefferson County Board the sum of **$8,108,555.10**. That amount is based upon this office's determination of the proper allocation and balancing of resources between the two school systems, considering certain mitigating factors, including: (i) the period of

---

[5] The Preliminary Decision is attached as Exhibit E.

time that Gardendale schools, including Gardendale High School, have served students currently in the Gardendale attendance zone; and (ii) the adoption of the Open Door Attendance Policy proposed by the Gardendale City Board, as modified herein.[6]

Answer to the Second Question

This matter has been resolved by the parties since the submission of the joint Petition for Adjudication of Disputed Separation. Specifically, pursuant to the parties' respective submissions, the Gardendale City Board shall be responsible for the education of any Gardendale resident currently attending the William E. Burkett Multi-Handicapped Center.

Answer to the Third Question

By creating a separate school system, the Gardendale City Board assumed the obligation of paying the salaries and benefits of its employees, and it is not entitled to any portion of 2015 Foundation Program funds paid to the Jefferson County Board.

Dr. Bice prefaced his preliminary decision with an invitation to the parties to offer comments thereupon, and both did.[7] Both boards objected to the State Superintendent's proposed ruling on the question of payment for replacement

---

[6] The calculation made by the State Superintendent was based on an allocation of county warrant (grant) proceeds that were used to fund the construction of capital improvements to county schools in the City of Gardendale, adjusted by depreciation "credits." These credits were based, in part, on an administratively imposed extension (and modification) of the Gardendale Board's so-called open door attendance policy. The State Superintendent also decreed that a pro rata share of the County's 21.9 mill district tax be paid to Gardendale for every County student that attends a Gardendale school. The State Superintendent encouraged the parties to "work out the terms of payment to the Jefferson County Board and any issues related to the implementation of the Open Door Attendance Policy, as modified, among themselves" and to ask for assistance from his office if they were unable to do so.

[7] See Exhibits C7 and C8, attached.

facilities.  Gardendale objected because a charge was imposed at all.  The County

Board objected because the charge was not sufficient to provide replacement

facilities for the students displaced by the separation.  The County Board noted,

however, that had correct enrollment data been used, the methodology applied by

the State Superintendent to avoid what *he* characterized as a "windfall" to the

Gardendale Board at the expense of the County Board, a significantly higher

payment would have been due the County Board.

Gardendale also objected to the extended "open door" attendance policy

imposed in the preliminary decision as unduly burdensome and invasive of its

planning and decision-making prerogatives.  Drawing from its unfavorable

experience in attempting to implement a similar arrangement when Trussville

formed a separate system, the County Board objected to the protracted attendance

plan as educationally and administratively undesirable.

Gardendale further objected to the State Superintendent's decision to require

the City Board to fund its own payroll for the initial month of its operation based

on a tepid contention that such an approach was unfair and inconsistent with

agreements that had been reached in other separation cases around the state.

The State Superintendent's determination that placed responsibility for educating *all* Gardendale residents on the Gardendale Board appeared to have been settled, as it was based on the accurate and uncontested finding that the Gardendale Board had agreed (following the parties' initial submissions) to assume responsibility for educating its residents who had attended the Burkett Center.[8]

On February 26, 2015, the State Superintendent issued what was described as a final decision on the disputed separation issues.[9] The State Superintendent left intact his initial ruling regarding the so-called September payroll issue (the "Third Question"), but removed the payment of 8.1 million dollars as a precondition to Gardendale's "mov[ing] forward with its separation from the Jefferson County Board." He nonetheless reserved the right to determine at an unspecified later date whether and in what amount such a payment would be required.

The State Superintendent ordered the "open door" attendance policy proposed by Gardendale (modified to include siblings of currently enrolled

---

[8] The Jefferson County Board had opposed Gardendale's proposal that the County Board retain responsibility for serving its residents who attended the Burkett Center. The severe nature of their disabilities requires a considerably greater commitment of financial and personnel resources and exposes service providers to greater liability under the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq. Moreover, available space and resources at the Burkett Center are finite; the Burkett Center has a waiting list of County students who would be most appropriately served in that setting. Gardendale acknowledged those limitations and affirmed that it would "be prepared, on July 1, 2015, to provide specialized services for those of its students who require specialized education services." (Exhibit C4, p. 5).

[9] Attached as Exhibit F.

students and career tech students at Gardendale High School) to be implemented for the 2015-16 school year. He also directed the parties to resume negotiations with regard to long term issues not addressed by the "immediate [i.e., short term] resolutions" prescribed in the order as well as matters relating to implementation of the open door policy in the 2015-16 school year (including but not limited to transportation and financial issues). Finally, even though Gardendale seemed to have agreed to accept responsibility for educating its students with exceptionalities, and without significant explanation or elaboration, Dr. Bice permitted Gardendale residents who were already enrolled at the Burkett Center to remain enrolled for at least the 2015-16 school year "unless a different arrangement is negotiated between the boards or [s] otherwise directed by this office." The Gardendale Board was ordered to "bear any financial responsibility for the education of [such] students."

The parties were directed to report to the State Superintendent on March 31, 2015 regarding the progress of negotiations and to identify any remaining unresolved issue(s) as to which additional assistance from the State Superintendent would be required to obtain resolution,[10] and were further directed to advise this Court of the decision.[11]

---

[10] On March 2, 2015, the State Superintendent issued an amended final decision that effectively expunged references in the decision of February 26, 2015 to the parties' failure to negotiate in good faith. See Exhibit G, attached.

The parties, including superintendents, board members, and attorneys met on March 5, 2015.  Their superintendents held a follow up meeting on March 6, 2015. Those meetings did not produce agreement on any major substantive issue, but led to a joint letter to the State Superintendent requesting a meeting with his representative(s) for the purpose of clarifying the precise meaning and intent underlying his (amended) final decision.[12]

(d)

*Governing Legal Standards*

As a "splinter district," the Gardendale Board of Education bears the burden of establishing by clear and convincing evidence that its withdrawal from the Jefferson County School System will not impede the progress of the district as a whole in achieving unitary status.  That burden is not met by merely demonstrating that percentages of students and staff in the newly formed district will compare to those of the County system or that the separation is not motivated by a desire to avoid the impact of the desegregation order.  Neither may the splinter district simply rely on a professed desire to improve the quality of the public educational program that is available to its students.  Even if that objective is unquestioned, if

---

[11] Counsel for the Gardendale City Board of Education did so by letter shortly after receipt of the decision.

[12] The joint letter is attached as Exhibit A.

enhancements in the quality of education to any students would be "purchased only at the price of a substantial adverse effect upon the viability of the county system [,] [t]he District Court, with its responsibility to provide an effective remedy for segregation in the entire city-county system, [may] not properly allow the city to make its part of the system more attractive where such a result would be accomplished at the expense of the children remaining in the county."[13]

---

[13] Wright v. Council of City of Emporia, 407 U.S. 451, 468 (1972)(approving district court's finding that withdrawal of city system could increase white county district students' enrollment in private academies and thereby encourage return from such academies to new city system; noting that existence of better equipped and located schools in city system may evidence perpetuation of enforced racial segregation; affirming court's conclusion that "departure of city's students, its leadership, and its financial support, together with the possible loss of teachers to the new system, would diminish the chances that transition to unitary schools in the county would prove successful); Stout v. Jefferson County Board of Education, 466 F.2d 1213 (5th Cir. 1972)(affirming district court's injunction against formation of Pleasant Grove splinter district where city system failed to conform to county wide desegregation plan; affirming principle that desegregation obligations are not relaxed simply because action is motivated by innocent intentions); Ross v. Houston Independent School District, 559 F.2d 937 (5th Cir. 1977)(applying Wright, Scotland Neck, and Stout decisions in holding that the effect, not the purpose of formation is the focus of judicial inquiry and that potential demographic shifts caused by formation [e.g., white flight or return of private school students to the newly formed public system] as well as the timing of formation decisions are relevant considerations; requiring splinter district as a precondition to separate operation to formulate and file precise policy positions on all significant aspects of school district operations (e.g., interdistrict pupil assignments, including transportation; curriculum composition and control; teacher employment, discharge, assignment, and transfer; financing and taxation; school building construction; utilization, and closing procedures; special educational initiatives and programs [e.g., magnet schools], school administrative operations, and the nature of its ongoing relationship and interaction with the parent district); Lee v. Chambers County Board of Education, 849 F.Supp. 1474 (1994)(enjoining operation of Valley, Alabama, school system [even with retention of then current attendance zones extending beyond the Valley city limits] based, inter alia, on failure of city system to undertake a comprehensive study of the financial impact of its separation on the county system, the relative advantages enjoyed by city systems in raising revenue, the lack of municipal political accountability to residents of the county district who would continue to attend city schools, the increased costs and inefficiencies created by the separate operation of the city and county systems, the city system's failure to offer any financial guarantees to ensure equitable treatment of county students, the need for the court to assume an inappropriate level of involvement in resolving conflicts required to conclude separation and in supervising operational and administrative matters rather than focusing on resolution of desegregation objectives).

*The Jefferson County Board's Position*

Historically, the County Board has not opposed the approval of splinter districts in this forum. While the County Board has never encouraged or endorsed the withdrawal of any city from the County system (and does not here), petitions for court approval have heretofore been filed by the separating board of education[14] after the terms of separation agreements have either been reached or substantially reached. In those cases, the County Board has taken a neutral position in response to what have largely been pro forma submissions. However, the special circumstances surrounding the Gardendale case have required the County Board to reevaluate its position and to look to this Court for assistance in achieving a constitutionally acceptable solution to the special problems that have impeded resolution of this case. The analysis applied by the Court may, in turn, provide helpful guidance to other cities and school boards contemplating a similar course.

The Jefferson County School System is at a crossroads. Although important work remains to be done, the County Board believes it is positioned to make significant progress toward achieving unitary status. But the Board faces

---

[14] See doc. 811 (Leeds) and doc. 878 (Trussville).

headwinds in meeting that obligation, including a changing demographic picture that has been accelerated by school system separations and annexations, and which, if unabated, could eventually leave it a resegregated system.[15]

In Jefferson County, splinter districts have historically been predominantly Caucasian and comparatively affluent. If approved, Gardendale will be the twelfth municipal district to operate in Jefferson County. At least four other cities in Jefferson County (Fultondale, Irondale, Pleasant Grove, Clay) have taken some form of official initiative to establish an independent system since 1965. Of the twelve active municipal systems operating in the County, seven (including Gardendale) are splinter districts (Hoover, Homewood, Vestavia, Trussville, Leeds, Midfield, Gardendale). If Mountain Brook is added to the roster, these systems include the most revenue rich (per capita) systems in the state, serve the wealthiest students in the state, and feature some of the top performing public schools (by a variety of measures) in the state. They are widely perceived as offering a superior public education experience and are magnets for families who can afford to pay the "tuition" represented by comparatively high property values

---

[15] *See* The Nation, May 15, 2014, "How a 'New Secessionist' Movement is Threatening to Worsen School Segregation and Widen Inequalities." (attached as Exhibit H) (documenting racial disparities between the City of Gardendale's general population and the composition of the Jefferson County district's student population; featuring Gardendale as a case study in a trend that "cracks apart well established, broadly defined educational communities into ever more narrow and ever more racially homogenous ones, "and that" threaten[s] to exacerbate resource disparities between wealthy and poor communities and sweep away any remnants of desegregation.")

and dedicated ad valorem taxes. City systems in Jefferson County (and elsewhere in Alabama) have benefitted directly from those revenues, and have taken advantage of their municipal governments' considerable taxing and borrowing abilities to meet shortfalls and special needs, and to provide enhanced academic and extracurricular offerings.

By contrast, the resources that are available to the County Board for providing comparable educational services are more limited and are less easily tapped. Unlike city systems, county systems have no governmental "godfather" that can be depended on to fill funding gaps or to supplement revenue shortfalls. County commissions have some authority to impose sales taxes for the benefit of schools, but that authority must be exercised for the benefit of all school systems in the county, and county commissions are politically accountable to all school districts within the county.

County systems are thus required to meet the challenge of educating students with a shrinking ad valorem tax base (caused by municipal school system formation and annexation) and with fewer and less reliable revenue generating tools to secure the funds necessary to compete with municipal districts for top-flight facilities, personnel, and other educational resources. When revenues are made available to county systems, they must be used prudently and strategically to

meet the needs of as many students as possible for as long as possible.  Educational

programs must be carefully established or consolidated, student attendance zones

structured, and facilities themselves sited and built to ensure, to the extent possible,

that all county students have reasonable access to a full range of educational

opportunities.  New facilities are often built in the largest city in the attendance

zone at the behest of city officials with the expectation if not the promise of

receiving ongoing, long-term municipal support of the school and, by extension, of

the school system.

Such was the case when a once-in-a-lifetime initiative on the part of the

Jefferson County Commission led to the adoption of a county wide sales tax that

was pledged to support the issuance and sale of warrants to underwrite a county

wide school construction and capital improvement program that benefitted all

school systems in the county.[16]  A $51,000,000.00 state-of-the-art educational

showplace[17] was built (with this Court's approval)[18] on the site of the then existing

Gardendale High School to serve students in the feeder pattern (attendance zone), a

---

[16] The funds secured through that action were hard won.  The sales tax ordinance was approved only by a 3-2 vote, and the validity of the ordinance was challenged in an action that was eventually rejected by the Alabama  Supreme Court.  Chism v. Jefferson County, 954 So.2d 1058 (Ala. 2006).

[17] More than $58,000,000.00 has been expended on capital improvements to Gardendale schools over the last 8 years.

[18] See doc. 959 (Board's Motion for Approval of Zone Line Modification and Construction Projects) and doc. 960 (Court's Order of May 26, 2009 approving same).

significant portion of which lies outside the city limits of Gardendale, and much of which has remained largely unchanged since this Court's 1971 order.[19]

Not surprisingly, the decision to build on the existing campus was made with the encouragement and approval of Gardendale City officials and was logical. The campus was (and is) centrally located within the attendance zone. The campus was easily served by established bus transportation routes and was convenient to other school facilities in the feeder pattern and the larger region it serves.[20] The decision to stay put made the acquisition of less centralized, less suitable, and more expensive property unnecessary. The new school was also built to accommodate future growth, and currently operates at well below full capacity.

The construction projects in Gardendale were not built in isolation, but were coordinated with other projects that were made possible by the warrant issue and related tax levy. For example, newly reconstructed Corner and Mortimer Jordan High Schools were located in the far northern and northwestern reaches of the County District. They were strategically sited partly in anticipation of population growth in the area, but also with the location of the new Gardendale High School

---

[19] See doc. 230 (Order of September 8, 1971).

[20] Consistent with its function as a hub for north central Jefferson County, Gardendale High School continues to house a regional "career technical academy" that draws students from schools throughout the County system.

in mind.  The loss of Gardendale without constructing a replacement facility to serve the north central part of the County district would result in the students who are displaced by the system formation (a significant portion of the student populations of Bragg Middle and Gardendale High Schools) being reassigned elsewhere.  Gardendale has suggested[21] that some students (in particular, those living on the northern side of the Gardendale zone, and who are overwhelmingly Caucasian) who would otherwise have attended Gardendale High School could simply be reassigned to attend other schools such as Corner or Mortimer Jordan.  However, both of those schools are considerably farther from the current Gardendale attendance zone than is Gardendale High School, and both have predominantly Caucasian student populations.

The situation is even less palatable for students on the southern end of the current Gardendale zone.  That area includes most of the African-American students in the Gardendale zone who live outside the City of Gardendale.  For those students, the choice would be between an even longer travel time to Corner or Mortimer Jordan or reassignment to either Minor or Fultondale High Schools.  Minor is an adequate facility, but as a school that was originally constructed more than twenty-five years ago,  is not comparable in terms of physical plant and

---

[21] See Exhibit C4. Gardendale Submission to State Superintendent of December 19, 2014.

amenities to Gardendale, Center Point, Hueytown, and other high schools

constructed with the County grant funds.  Moreover, the student body is comprised

almost entirely of African-American students.  Fultondale High School is not even

marginally comparable to Gardendale High School in terms of the age, condition,

and size of its physical plant.  Moreover, it harkens back to the former dual system,

having at one time operated as a de jure all black school (New Castle School).  In

this context, reassigning African-American students from (and for whom) a deluxe

educational facility was built and judicially sanctioned to Fultondale High School

sends an unacceptable message that could impede progress toward attaining

unitary status.[22]

From the County Board's perspective, the solution to the constitutional

dilemma created by Gardendale's belated bid for independence is the same one that

is contemplated by state law:  Gardendale should be permitted to operate if—but

not until—it contributes a fair share of the cost required to construct facilities for

residents of the unincorporated portion of the Gardendale attendance zone that are

equivalent in quality to those that it proposes to appropriate from them.

---

[22] Wright v. Council of City of Emporia, 407 U.S. 451 (1972)(Existence of better equipped and more
favorably located schools in city, and corresponding existence of less attractive formerly all black schools
in county may indicate perpetuation of enforced racial segregation).

The construction of an accessible replacement facility to serve displaced Gardendale attendance zone residents and other area students would comport with state law and would substantially mitigate if not eliminate the disparity in facilities and services that would otherwise be created by simply allowing Gardendale to commandeer the high school and other Gardendale schools.  It would preserve the broad range of desegregative tools and approaches that are currently available to the County Board as a result of the new construction (e,g, possible consolidation of school populations, transfer availability, magnet programs) and that would continue to be available with a replacement facility of like quality and character.  Finally, it would permit students of all races in this region to attend a school dedicated to meeting *their* needs, rather than a distant school that is identified with communities with which they have no natural ties.

By contrast, Gardendale's transition plan is, at best, a palliative that does nothing to meet the long term needs of County students in the region.  The plan itself is nowhere clearly or comprehensively defined and, although it is characterized as an "open door" attendance policy, no official policy has ever been formally adopted by the Gardendale Board.[23]  Gardendale's transitional attendance

---

[23] Under Alabama law, the establishment of school board policy is governed by statute.  ALA. CODE §16-1-30 (1975).  No policy of the kind envisioned by the statute has been approved by the Gardendale Board.  Instead, the Gardendale Board has announced an *intention* to adopt an attendance policy, the terms of

plan appears to "grandfather" students who are attending schools in the current Gardendale Zone, but not their siblings or those who move into the area, leaving the County Board to determine how and where to educate them—without a reasonably accessible facility for doing so.

County students who would be permitted to remain in Gardendale schools under the Gardendale Board's conceptual plan would be left with the choice of attending Gardendale as "outsiders" or traveling many miles to a school in a different attendance zone with which they have no connection. Those who elect to remain in Gardendale schools will be "represented" by City officials who will operate a school system that was created to serve City residents and, by necessary implication, to exclude non-residents. Moreover, under its plan, Gardendale's operation would be subsidized by reassigning County ad valorem and average daily membership (ADM) funds allocable to those students to the Gardendale Board. Thus, although both state and federal law contemplate financial support flowing from the City system to the County system to maintain operational

---

which will not be released until the negotiation process has been completed. See Exhibit G, attached. *See* Ross v. Houston Indep. Sch. Dist., 559 F.2d 937 (5th Cir. 1977)(Splinter district's obligation under desegregation order is to formulate precise policy positions on all significant facets of school district operation; duty is not met by filing judicial stipulation of intent to assume a proper role in the desegregation of the combined geographic area of the affected districts).

parity,[24] Gardendale's position and proposal, if approved, would reverse the process:  County residents would be required to bear the full cost of building a replacement facility and to underwrite the formation of the Gardendale system through reassignment of students and corresponding tax and foundation program funds.  In short, the Gardendale school system will get on its feet by standing on the backs of County students.

*Conclusion*

Courts have denied city school systems the right to separate from parent systems even in the face of documented educational failures or breakdowns in political accountability between city residents and County School Boards.[25]  Here, although Gardendale representatives have occasionally incanted the obligatory "local control" mantra in justification of their initiative, no bona fide complaint has been made regarding the quality of the educational services or facilities that have been provided by the County Board to Gardendale residents.[26]  Similarly, no

---

[24] See fn. 3, *supra*.  *See also* Lee v. Chambers Co. Bd. of Educ., 849 F.Supp. 1474 (M.D. Ala. 1994)(citing, *inter alia*, proposed city system's failure to undertake study of financial impact of city formation on county school system and its failure to offer financial guarantees to county system as grounds for enjoining operation of city system).

[25] Wright v. Council of City of Emporia, 407 U.S. 451 (1972).

[26] Tellingly, Gardendale commissioned two studies prior to appointing its board of education, neither of which addressed or found any educational deficiency in the County's educational programs.  A feasibility study performed by Dr. Ira Harvey was based on the premise that Gardendale had been given an extraordinary "gift" in the form of a new, debt-free high school.  The other study, performed by Dr. Keivan Deravi, evaluated the economic impact of forming a separate school system, and focused on a

community in Jefferson County has had a stronger voice in the administration and operation of Jefferson County Schools than has Gardendale. Gardendale has supplied a number of members to the County Board, and several of those board members have also served as or have had close family ties with Gardendale city leaders. Indeed, the City of Gardendale has been home to a plethora of the area's public officials, judges, religious, civic, and business leaders for many years, and many of the County system's best teachers and administrators have lived in Gardendale and served in Gardendale schools. The loss of that substantial base of leadership, support, and influence militates even more strongly against leaving disenfranchised County students to fend for themselves.[27]

In light of the foregoing considerations, and given the unpredictable outcome of proceedings now pending before the State Superintendent of Education, the County Board asks the Court to accept the State Superintendent's

projected increase in residential property values. Thus, county students will be displaced not to permit city residents to achieve otherwise unattainable educational goals, but to increase the net worth of Gardendale property owners as part of a municipal economic stimulus plan. What is more, the quality of education in Gardendale itself could well suffer under a separate regime. Without County students to buttress its ad valorem base and state "Foundation Program" funding, it is likely that existing educational programs (and instructional staff) would have to be eliminated. Stated differently, "borrowing" County students may well be necessary for the City system to even *maintain* the educational status quo, at least in the near term. Thus, County students would be expected not only to provide financial subsidies to the City system, but to sustain its educational offerings.

[27] *See* <u>Wright v. Council of City of Emporia</u>, 407 U.S. 451, 463 (1972)(Citing with approval district court finding that "the departure of the city's students, its leadership, and its financial support, together with the possible loss of teachers to the new system, would diminish the chances that transition to unitary schools in the county would prove 'successful.'").

invitation to modify his order if and as appropriate to ensure that the formation and proposed operation of the Gardendale Board of Education does not result in a denial of equal educational opportunity to any student, adversely affect the ability of the County Board to provide such opportunities to its students, or impede the progress of the County district as a whole toward attainment of unitary status.

Respectfully submitted this 12th day of March, 2015.

*s/ Whit Colvin*
Whit Colvin (ASB-3137-C51G)
Carl Johnson (ASB-5997-O78C)
Attorneys for Jefferson County Board of Education

Bishop, Colvin, Johnson & Kent, LLC
1910 First Avenue North
Birmingham, Alabama 35203
Phone : (205) 251-2881
Fax: (205) 254-3987
whitcolvin@bishopcolvin.com
carljohnson@bishopcolvin.com

# CERTIFICATE OF SERVICE

I electronically filed the foregoing Supplemental Report with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this 12th day of March, 2015:

JOYCE WHITE VANCE
United States Attorney
1801 4th Avenue North
Birmingham, AL   35203

SHARON D. KELLY
Assistant United States Attorney
1801 4th Avenue North
Birmingham, AL   35203

THOMAS A. FALKINBURG
SHAHEENA A. SIMONS
NATANE SINGLETON
VERONICA PERCIA
United States Department of Justice
Civil Rights Division
Educational Opportunities Section
Patrick Henry Building
Washington, DC 20530
Educational Fund, Inc.

DONALD B. SWEENEY, JR.
Bradley, Arant, Boult & Cummings
1819 Fifth Avenue North
Birmingham, AL 35203

MONIQUE LIN-LUSE
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

*s/ Whit Colvin*