1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ALABAMA
2         SOUTHERN DIVISION

3

4

5    LINDA STOUT, et al.,              CV-65-MHH-396-S

6         Plaintiffs,                  November 10, 2015

7    vs.                               Birmingham, Alabama

8    JEFFERSON COUNTY BOARD OF
     EDUCATION, et al.,                10:00 a.m.
9
          Defendants.
10
     * * * * * * * * * * * * * * * * * * * * * * * * *
11

12        REPORTER'S OFFICIAL TRANSCRIPT OF
                    HEARING
13

14   BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
          UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22

23   COURT REPORTER:
     Teresa Roberson, RMR
24   Federal Official Court Reporter
     1729 Fifth Avenue North, Ste 325
25   Birmingham, Alabama  35203

```
1                    * * * * *

2                A P P E A R A N C E S

3                    * * * * *

4    Monique Lin-Luse
     NAACP Legal Defense & Educational Fund, Inc.
5    40 Rector Street, Fifth Floor
     New York, New York  10006
6

7    U.W. Clemon
     White, Arnold & Dowd
8    2025 Third Avenue North
     Suite 500
9    Birmingham, Alabama  35203

10   Veronica Percia
     United States Department of Justice
11   Civil Rights Division
     601 D Street NW
12   Washington, DC  20579

13

14   Stephen Rowe
     Adams & Reese
15   1901 6th Avenue North
     Suite 3000
16   Birmingham, Alabama  35203

17

18   Donald Sweeney
     Bradley, Arant, Boult, Cummings
19   One Federal Place
     1819 Fifth Avenue North, Seventh Floor
20   Birmingham, Alabama  35203

21

22   Whit Colvin
     Carl Johnson, Jr.
23   Bishop, Colvin, Johnson & Kent
     1910 First Avenue North
24   Birmingham, Alabama  35203

25
```

* * * * *

P R O C E E D I N G S

* * * * *

THE COURT:  All right.  We are here this morning in case number 65-396.  This is Stout vs. Jefferson County Board of Education.

The Court received a request from counsel for the City of Gardendale to meet with counsel for all the parties to discuss the status of their work on trying to develop information that would allow the private plaintiffs and the United States to evaluate Gardendale's proposal for separation from the Jefferson County School System.

So, why don't I begin, please, with counsel for the City of Gardendale and hear from you.

MR. ROWE:  Thank you, Your Honor.  Steve Rowe appearing for City of Gardendale.  Just as a prefatory matter:  The last time this group gathered, Giles Perkins was standing here for the City of Gardendale; shortly after that hearing, he was diagnosed with a serious health matter and he's had to cut back on his practice substantially.  He sends his best regards.

THE COURT:  I hate to hear that.

MR. ROWE:  It's actually looking much better for him now than it was from the beginning, but still he's -- with chemotherapy and so forth, he's not able to maintain a

1    full practice.

2          THE COURT:  Please give him my best.

3          MR. ROWE:  I will.  In a nutshell, you know, we're

4    here because it is the hope of Gardendale and its aim to

5    have any issues that are raised regarding its plan of

6    separation decided in time for it to separate by the next

7    school year which would be 2015-2016.

8          In order to do that, we have to --

9          THE COURT:  2016-2017.

10         MR. ROWE:  Yes, Your Honor, I misspoke.  Thank

11   you.  In order to do that, we have to have an agreement or

12   an order of the Court or we have to resolve the issues in

13   time for that to happen, which will be no later than April,

14   May of next year.

15         We had a call -- I had a conference call yesterday

16   discussing these issues since we have been seeking to find

17   out, since we issued our plan in March, what the issues

18   were.  And, of course, the other parties can speak for

19   themselves on what those issues are.

20         But I think that the summary of our call yesterday

21   was that, and maybe I'm a hopeful optimist, I talked to the

22   parties about resolution, and I think there's -- there's

23   value in seeking to reach a resolution without spending a

24   whole lot of money on experts and court time, but that

25   remains to be seen whether that can be done.

1    And as Judge Clemon suggested yesterday during our

2    call, and I fully agree, I think the other parties do, that

3    we need to get a date, get some dates on your calendar for a

4    hearing and have a plan in process, and if the parties are

5    able to reach an agreement that is acceptable to the Court

6    in that time, then the hearing wouldn't be necessary.

7    But the hearing dates will cause us to do what we

8    need to do in that regard as well.

9    Let me just briefly tell you what's happened since

10   the last time we were here.  There's been a substantial

11   amount of information swapped.  After the school year

12   started in September, there was a trip made to the

13   Gardendale schools by the parties, actually the individual

14   plaintiffs were not able to attend that, but everyone at the

15   Department of Justice and its expert and Gardendale and its

16   expert and the county all walked through and asked questions

17   of various people in the Gardendale schools in September.

18   We've had the call yesterday and documents swapped

19   and that's probably, you know, that summarizes what has

20   happened.

21   So, we're not exactly sure at this point what the

22   points of dispute, should we say, you know, are there

23   particular items that we could address and change in our

24   plan that would make it acceptable or is it just purely no

25   possible way to resolve the matter.  So I think that's an

1  outstanding question at this point.

2         Are there any other issues that Your Honor was

3  hoping that I would address?

4         THE COURT:  I think that's a good introduction to

5  the issues that are before the Court.

6         Let me hear from counsel for the other parties

7  involved and then we'll probably circle back.

8         MR. ROWE:  Thank you.

9         THE COURT:  Thank you, Mr. Rowe.  All right.  Why

10 don't I hear from counsel for Jefferson County, please.

11        MR. COLVIN:  Yes, Your Honor, Whit Colvin for the

12 Jefferson County School Board.

13        As Mr. Rowe said, there's been a good bit of

14 information swapped up to this point.  Jefferson County is

15 in the position of, we're really responding to requests more

16 than anything else, at this point, it's not our plan, and so

17 we're cooperating to the extent that we can.

18        We have received a request from Gardendale for

19 updated information for this school year and we're currently

20 in the process of processing that and preparing those

21 reports so we can get those to them.

22        There are no real concerns that are

23 schedule-related for us at this point except that there are

24 some windows that we will need to reach, I think, before

25 moving forward, if there is a separation.

1      We don't want to be too squeezed for time at the

2  beginning of the school year, for example, simply because

3  it's -- having been through this several times, it's a

4  difficult process and there's a lot mechanically to be done,

5  once the decision is made to separate and permission is

6  given.

7      So, out of respect for the other thirty thousand

8  kids that we are going to have left, we do hope that

9  whatever schedule we end up working out and the Court ends

10 up approving, will afford Jefferson County sufficient time

11 to not have to shut down all of its other operations just to

12 devote to a changeover, if there is one.

13     THE COURT:  Sure.  If I remember correctly, when

14 we were discussing potential separation for the 2015-2016

15 school year, it seemed like July 1st was an absolute cut

16 off, so thinking backwards from there is what we would have

17 to do, if the Court felt like it had a record before it that

18 would allow it to either -- to approve a separation, the

19 Court has questions about the global situation in Jefferson

20 County, that we've discussed before, that we'll need to

21 address before we can even cross that bridge.

22     MR. COLVIN:  Yes, Your Honor.  July 1 is that

23 traditional date that we have seen in other school

24 separations and that is a date that has worked in the past,

25 and I think the one that we contemplated for the 15-16

1   school year, as you say, Your Honor.

2           THE COURT:  Okay.

3           MR. COLVIN:  I think that's it for now.  But we're

4   happy to answer questions as they arise through the course

5   of these proceedings as well.

6           THE COURT:  Thank you, Mr. Colvin.  Let me hear

7   please from counsel for the private plaintiffs.

8           MS. LIN-LUSE:  Good morning, Your Honor.  Monique

9   Lin-Luse for the private plaintiffs.

10          We are today in support of our counsel, our

11  colleagues here, asking for a period of more formal

12  discovery is what we think as plaintiffs, definitely start

13  looking for a scheduling order from the Court to sort of

14  provide a little more structure to this process.

15  Understanding that, you know, July 1 is an important date,

16  but also given the gravity and importance of the issues

17  here, we would like to see about six months of formal

18  discovery, particularly to have enough time for expert

19  reports, depositions that need to take place, and then also

20  accounting for lost time at the end of the year.  In

21  particular, our expert has a very full calendar and, in

22  fact, was unable to attend with the other parties.  However,

23  plaintiff's counsel has visited the schools previously prior

24  to our last hearing date and then some thereafter or our

25  last conference date.

1    So basically where we stand is that we have still
2  have -- continue to have concerns regarding the separation
3  and think at this point that it's time to move into a more
4  structured process.
5    And I'd be happy to answer any other questions
6  that the Court may have.
7    THE COURT:  Who is your expert?
8    MS. LIN-LUSE:  Our expert is Dr. Leonard Stevens.
9    THE COURT:  What is the nature of his expertise?
10   MS. LIN-LUSE:  Dr. Stevens is a -- he is an expert
11 in desegregation and particularly looking at the impact to
12 the education of students, which is also analysis of faculty
13 and staff assignment, student assignment.  He's been an
14 expert in desegregation cases for many decades, almost forty
15 years.
16   THE COURT:  In what systems has he worked?
17   MS. LIN-LUSE:  So, he has worked, actually, within
18 the litigation with the State of Alabama and the State
19 Department of Education he's involved in, he's involved in
20 the St. Martin Parish in Louisiana, he was involved in
21 desegregation of the Cleveland schools, so cases throughout
22 the southeast as well as -- the north as well.
23   THE COURT:  Have you all discussed what you have
24 in mind in terms of formal discovery and have you all
25 discussed a proposed scheduling order yet?

1    MS. LIN-LUSE:  No, Your Honor, the parties have
2  not come together with a proposed scheduling order.
3    THE COURT:  Have you been able to get most of the
4  information that you have requested informally so far?
5    MS. LIN-LUSE:  Yes.  However, concerns have been
6  expressed to us by members of the community and members of
7  our class that we would think would need additional, have
8  come just in the past several weeks, that we think would
9  need additional discovery that probably would be better
10  suited for a more formal discovery process.
11    THE COURT:  Okay.  Thank you, Ms. Lin-Luse.
12    MS. LIN-LUSE:  Thank you.
13    THE COURT:  Let me hear from counsel for the
14  United States.
15    MS. PERCIA:  Good morning, Your Honor.  Veronica
16  Percia on behalf of the United States.
17    So, since we last met, we've reviewed Gardendale's
18  separation plan and we've also reviewed dated and
19  information provided by Jefferson County, specifically
20  regarding students in schools that are likely to be impacted
21  by the split.
22    We have also retained experts, one is Matt
23  Cropper, who is an expert tomographer, I think you're
24  familiar with him from Huntsville and Fred Berg who is a
25  facilities expert.

1        As part of our assessment, as counsel mentioned,

2   we visited, along with our facilities expert, eleven schools

3   in and around Gardendale, toured each of the schools and

4   their grounds and interviewed principals and other members

5   of the school staff and administration.

6        After reviewing information we have so far, we do

7   have concerns, pretty specific concerns, about the

8   desegregation implications of the split.  In particular the

9   impact that the separation will have on -- it's being called

10  transitioned zone students, so those students that are

11  currently attending Gardendale schools but live outside the

12  city limits would have to be rezoned to different Jefferson

13  County schools.

14       We have been trying to get a handle on what the

15  world might look like in the aftermath of a split, if it

16  were to go forward as proposed, and that's really the work

17  that we've been doing.

18       I'm happy to sort of describe the methodology that

19  we have been using and some of our more specific concerns,

20  if you think that is helpful at this point.

21       Otherwise, if it's better for the Court and the

22  parties, we were actually anticipating maybe a time for some

23  more discovery, formal or not, we have not had any problem

24  getting information that we've needed and asked for.

25       And we would like the opportunity to more formally

1  detail those concerns, perhaps in briefing, if that is

2  helpful for the Court.

3      But we're amenable to whatever makes the most

4  sense to the parties at this point.

5      THE COURT:  Okay.  Why don't you just give me an

6  overview, please, of the United States' concerns based on

7  the valuation of the information that's been provided to the

8  United States to date.

9      MS. PERCIA:  Sure.  So Gardendale, particularly

10  Gardendale High School, is a pretty extraordinary facility

11  and an educational hub for Jefferson County as far as we

12  understand it.  And there are a number of students that come

13  into Gardendale from various communities, not only that are

14  zoned there for explicit desegregation reasons, but who also

15  come in to the school to use the really state-of-the-art

16  facilities and some of its programs from surrounding areas.

17      There are basically a few groups of students, sort

18  of north, west and south of Gardendale that are going to

19  need to be rezoned as a result of the split.  And they'll

20  probably, according to our experts' analysis, and this is

21  something that he did by looking at certain common criteria

22  that a lot of school districts use when they need to rezone,

23  things like school utilization, obviously geography,

24  transportation times and feeder patterns, the most likely

25  result of the separation is that students will be going

1    either to Mortimer Jordan High School, which is north of

2    Gardendale, or Minor High School, which is north or

3    southwest of Gardendale.

4           Mortimer Jordan is actually almost an equally

5    lovely facility.  It's pretty extraordinary.  They are both

6    really more like colleges than high schools.  I would have

7    loved to go to high school there.  And they're something to

8    be seen.

9           Mortimer Jordan, we didn't know until we visited,

10   how extraordinary that facility is, but it's essentially

11   identical to Gardendale in terms of the facility and the

12   educational opportunities for students there.

13          Approximately two-thirds of white students in the

14   transition zone would likely be zoned to Mortimer Jordan

15   based on geography and transportation times.

16          I can go into a little bit more of the specifics,

17   but I'll just stick with the flyover.

18          Only about twenty-seven percent of black students

19   live in the transition zone would likely be zoned to

20   Mortimer Jordan.  The majority of black students, about

21   seventy-five percent of them, would likely be zoned for

22   Minor High School.

23          Minor High School is a starkly different

24   experience in terms of the kind of educational opportunities

25   that are available to the students there in the facility

itself.  The facility was built in 1988 and is more or less
consistent with a twenty-five plus year old facility.

        In terms of the kind of education that the
students are getting there, we would like to do a lot more
information-gathering to give the Court a really clear
picture of what goes on.  But there are some stark
differences.  Students at Mortimer Jordan and Gardendale,
for instance, the graduation rate there is about ninety-two
to ninety-six percent, which is well above -- the state
average is about seventy-four.

        Students at Minor High School, the graduation rate
is about sixty-six percent.

        And in addition, Minor High School is an
eighty-nine percent black high school and, as I said,
Mortimer Jordan is ninety percent white.

        In the aftermath of the split, if you remove
Gardendale, it looks like the majority of white students are
going to be rezoned to a predominately white high school
that is essentially equivalent in terms of the facility and
educational opportunities, the majority of black students
will be rezoned to a predominantly black high school that is
not a comparable facility along really any criteria.

        So, we're concerned about that at the high school
level.

        My colleague has done more work on the middle

1 school level, but there are implications that look very

2 similar along those lines.

3     So that is sort of how we narrowed our focus and

4 we'd like to do a little bit more discovery along those

5 lines.

6     In addition, you know, Gardendale has been used

7 explicitly for desegregation reasons by the county, there is

8 a group of students in North Smithfield that have been zoned

9 to Gardendale explicitly for desegregation reasons and so

10 the fact of the removal of that high school and that

11 extraordinary facility from the system is something that

12 implicates desegregation.

13     We haven't seen in Gardendale's proposed plan a

14 way to resolve these concerns, so we wanted to take this

15 opportunity to point some of those out and we would be happy

16 to articulate those in more detail for the Court and for the

17 parties so they can respond.

18     THE COURT: Okay. Thank you, Ms. Percia. I think

19 your remarks make the Court feel like it would be beneficial

20 for the Court to visit Gardendale High School, Mortimer

21 Jordan and Minor High School, it probably makes sense for

22 the Court to visit a couple elementary schools in the feeder

23 patterns for those schools and middle schools.

24     So if you all will talk amongst yourselves,

25 please, I don't know whether all of you feel like you want

1   to be present for that, you certainly are welcome to be

2   present, but the Court will make arrangements with counsel

3   to make those site visits.

4           In addition, the information that Ms. Percia is

5   highlighting about outcomes from the various schools are

6   going to be significant to the Court's analysis, so all of

7   the parties need to be evaluating that information and

8   deciding how they want to present that information to the

9   Court.

10          Along those lines, information about the types of

11  courses available at the different schools are going to be

12  important.  The Court wants to have information about the

13  availability of AP courses, if there are special programs

14  at, for example, Gardendale that aren't available at

15  Mortimer Jordan or Minor, and if there are special programs

16  that are available in some of the feeder schools for

17  Gardendale that aren't available at other schools, the Court

18  will want to know about that.

19          The Court also wants to have as specific

20  information as possible about the ways in which Gardendale

21  has been used to promote the goals of the Singleton order in

22  this case and the constitutional mandate of the

23  desegregation principles that animate this action.

24          The Court believes that it is appropriate to have

25  a period of formal discovery.  Within seven days, the Court

1  would like to have a proposed scheduling order from the

2  parties for a formal period of discovery.

3         Ms. Percia, the briefing that you mentioned, my

4  initial reaction is that it might be more productive to

5  provide that briefing after you all have done some of this

6  formal discovery and have some more concrete statistical

7  information that you can provide to the Court.

8         Does that sound like a good approach to you?

9         MS. PERCIA:  Yes, that is what we were hoping for.

10         THE COURT:  So, include in that proposed

11  scheduling order a briefing schedule for the parties to

12  present some of this information to the Court.

13         What sort of discussions have you all had, if any,

14  with respect to the concerns that Jefferson County had

15  expressed about the potential loss of the Gardendale High

16  School System without any sort of financial remuneration for

17  loss of that facility?  Mr. Colvin.

18         MR. COLVIN:  Your Honor, we really, at this point,

19  we really haven't had further discussions about that

20  particular issue.

21         THE COURT:  Okay.

22         MR. COLVIN:  That still -- it still seems to be a

23  threshold issue that the parties just have no agreement at

24  all on and we have not attempted to reach middle ground.

25         But I think that is because we have been focusing

1  more on gathering information and allowing the parties who

2  weren't parties to this earlier discussions to be able to

3  take a position on the things that they need to.

4      THE COURT:  That's fine.  I just wanted to see

5  if -- Mr. Rowe, is that consistent with your evaluation of

6  what you all have been doing?

7      MR. ROWE:  Yes, Your Honor.  I think the financial

8  end of it is somewhat tied up in the plan, you know, so that

9  in our plan, we had a thirteen year transition period where

10  the students who had been coming to Gardendale would

11  continue to come to Gardendale.

12      And we've informally, at least I have informally

13  discussed with Judge Clemon, perhaps, even a modification of

14  that to make it look more like what the settlement agreement

15  that was worked out in the Vestavia case years ago when he

16  was the lawyer in that case, and we haven't -- beyond just

17  about what I just said, we haven't had much discussion about

18  that.

19      But I think that would impact -- say if we were

20  able to reach an agreement that was satisfactory to the

21  parties here, that we would continue to take certain

22  students outside of Gardendale City Limits, as we proposed

23  or a different program that everyone could agree on, then

24  that would affect the potential need for money to change

25  hands because perhaps the existing schools have capacity to

1  take the students.  I hear the concern about Minor, and I'm

2  not -- I'm not sure but I think most of those students would

3  be the North Smithfield students which would be the -- most

4  likely to be the ones that would be the subject of a

5  Vestavia-like settlement agreement, if that was something

6  that the parties were interested in and the Court would

7  approve it.

8          So, you know, sorry for the long-winded response,

9  but it's one thing if you're thinking of, well, no students

10  other than, you know -- right now, we've got three thousand,

11  roughly three thousand students that are in the Gardendale

12  School System:  High school and the middle school and the

13  two elementary schools.  And about twenty-three hundred of

14  them are in the city limits.  So about seven hundred are

15  outside the city limits.

16          So what we're talking about is what happens to

17  those kids.  About four hundred of those are the Mount Olive

18  kids, I presume a lot of those would be going to Mortimer

19  Jordan because that's the closest high school.  North

20  Smithfield is about one hundred thirty kids, say one hundred

21  fifty or less.  Brookside, two hundred forty, so the

22  Brookside and Mount Olive would be the ones that I'm

23  presuming on a global basis would be closer to Mortimer

24  Jordan, I may be wrong about some of those, but just

25  globally.

1    So I think that these issues, if we could work out

2  some agreement that would be satisfactory to the parties

3  that the North Smithfield students would continue to come to

4  Gardendale, then that may take away some of the issues that

5  we're talking about and also might impact the need for more

6  facilities.

7    We notice that in the recent data that was given

8  to us after the school year started, that the number of

9  students in the system went down a little bit.

10   So, you know, I'm not sure, you think that might

11  mean there's a little bit more capacity than there was if

12  the number had gone up.  That is a real general statement,

13  so it might not be true.

14   So those are the -- Whit is exactly right, we

15  haven't had any discussions about money.  But I think it's

16  because we don't know the details of the plan, but we're

17  ready to have those discussions.

18   THE COURT:  Okay.  I'm just trying to make sure I

19  understand what work has and has not been done over the past

20  few months since we last had a conference in the case.

21   MR. ROWE:  Thank you.

22   THE COURT:  Thanks.

23   MS. LIN-LUSE:  Your Honor, if I may.

24   THE COURT:  Yes, ma'am.

25   MS. LIN-LUSE:  I wanted to add, make sure I

address two additional points.

One is, if going to do site visits, I think it would be important to go to Fultondale High, which is to the southeast of Gardendale, it also has a dramatic difference from the other facilities in Gardendale, including even Minor to the west or Center Point to the further east.

THE COURT:  Do you know when Fultondale was constructed, by any chance?

MS. LIN-LUSE:  I do.  I have it in my notes back there.  However, it's older than Minor and the other schools that were built on the same funds.

Additionally, I wanted to raise -- to make sure the Court was aware that not only are we concerned about student assignment and share the same concerns that the Department of Justice has raised with regard to what the impact would be on the desegregative capacity of Jefferson County with the separation of Gardendale, but also concerned about faculty and staff assignment and the impact that the shift will have on the ability to address issues that Jefferson County still has with regard to faculty and staff assignment.

One of the things that I think is important to highlight is that because -- not only is it the impact of the students that are there, but it also limits the ability to have further desegregation, so it's not even where it is

1  now, but given its geographic location, we would like to see

2  an improvement on faculty and staff assignment in the

3  Gardendale schools and the schools surrounding it, and by

4  the removal of the separation of Gardendale, that limits the

5  capacity to make those strides forward that we would be

6  working with Jefferson County to address.

7        THE COURT:  You touched on something that the

8  Court, I believe, addressed early on in our discussions but

9  remain a significant concern for the Court, and that is the

10  Court doesn't want to get so focused on the Gardendale issue

11  that it loses perspective on the bigger Jefferson County

12  issue, the Court has to be concerned with the desegregation

13  goals over all for Jefferson County.

14        And looking, for example, at the joint report that

15  the parties made to the Court, it's document 998, this was

16  provided to the Court in February of this year, on Page 9,

17  there's a chart that shows the student population by race

18  across the district and that chart illustrates that the

19  percentage composition of Jefferson County, of the student

20  population of Jefferson County, has changed pretty

21  dramatically from 2002 until 2014.

22        And the Court can perhaps -- there's at least a

23  correlation in part between the decrease in the number of --

24  the percentage of Caucasian students within the Jefferson

25  County system and the increase of African-American -- the

percentage of African-American students within the Jefferson
County system with the Cahaba Heights annexation, which
occurred in 2002, the creation of the Leeds system, which
occurred in 2003, and the creation of the Trussville system,
which occurred in 2005.

And the Court maintains its concern that as long
as Jefferson County is having to address splinter districts
than separate from the system, it's difficult to see how the
Court can accomplish its directive from the U.S. Supreme
Court that the Federal Court is suppose to leave the
business of monitoring these school systems but for school
systems to be able to achieve a declaration of unitary
status, the school system can't always be dealing with a
moving target.  And that's part of the Court's more global
concern in Jefferson County.

The Court feels like the parties should pay close
attention to the U.S. Supreme Court decision in City of
Emporia and some of the remarks that are made in Stout I and
Stout II, Judge Albritton's decision in the Lee case where
Judge Albritton was examining splinter district issues, are
instructive in this situation.  And when the parties are
briefing, the Court wants the parties to make sure they pay
special attention to that authority and give the Court their
guidance on how they think that those -- that authority
weighs on the Court's decision with respect to Gardendale

1   and with respect to the more comprehensive issue of

2   Jefferson County's ability to obtain a declaration of

3   unitary status.  You know, this is a 1965 case and I believe

4   in Brown II that the Supreme Court told the courts that we

5   were suppose to accomplish desegregation quickly.  And I

6   don't think the Supreme Court would view our work here in

7   2015 as a quick resolution of desegregation issues.

8           So I just ask the parties to keep all of that in

9   mind as they're doing their work.

10          Mr. Sweeney, I see you're here for the City of

11  Hoover.

12          MR. SWEENEY:  Yes, ma'am.  The parties are engaged

13  in, I think, very constructive dialogue.  I have proposed a

14  scheduling order last week that the parties are going to

15  discuss today.  To finalize, one of the suggestions is that

16  if there is a necessity of having a trial, which we're very

17  optimistic won't happen, but that we were proposing that we

18  suggest a two-day block around March 21st with the hope that

19  Your Honor could make a decision in early April in order for

20  Hoover to make the necessary adjustments of student zones

21  and faculty assignments.  But with that objective, I wonder

22  if it would be permissible for the Court, with the Court, if

23  we provide a scheduling order that the parties have agreed

24  to within the next week, as you have asked in the Stout

25  case.

1          THE COURT:  That would be terrific, Mr. Sweeney,

2   if you all please work on that.  The Court will look forward

3   to receiving that submission.

4          Mr. Sweeney, a question about the reports that the

5   City of Hoover provided for 2015, I think those were by and

6   large comprehensive.  The one thing that seemed to be

7   missing from the 2015 report was the class count report, is

8   that material that the City of Hoover is still planning to

9   provide to the Court?

10          MR. SWEENEY:  Yes, ma'am.  And I advised the

11   parties that that should be available at the end of this

12   week.  I'm tracking the same submittal that was provided

13   last year, they're in the process of assembling that data

14   now.

15          THE COURT:  Okay.  Very good.  Is there anything

16   else from the United States or from the private plaintiffs

17   with respect to the City of Hoover?

18          MS. KING:  No, Your Honor.  I just want to echo

19   what Mr. Sweeney said, that we have been working very

20   productively together and I think we will be on track to

21   provide the Court with a scheduling order.

22          THE COURT:  Great.

23          MS. LIN-LUSE:  Your Honor, I would only clarify, I

24   think at this point the plaintiffs are interested, as we

25   presented to the Court the last time we were here, in first

addressing the student assignment issues that are sort of

the most pressing and important for us to address, and so

hopefully our scheduling order will be focused in on getting

that proposal addressed.

What I would like to see as opposed to a full

comprehensive consent decree, that we may want to focus in

on student assignment, as that is an issue that has been

worked on and negotiated, and we can address other issues to

do that as well, but as we move forward on that particular

issue, it's important to all of the parties and creates the

most change that will take place within the district.

THE COURT:  Okay.  Well, I will probably need from

the parties is some more specifics about the concerns that

the private plaintiffs have, any concerns that the United

States has, so that the Court has a little bit of background

before engaging in more formal conversation with the parties

about the work that you all have been doing.

If you all can perhaps provide a little bit of a

summary to the Court to give me some context to evaluate the

information that you will provide as time progresses, that

would be great.

All right.  Is there anything else that any of the

parties would like to bring to the Court's attention at this

time?

MS. PERCIA:  I would just add, Your Honor, that I

1  agree with Ms. Lin-Luse that it's worth visiting Fultondale.

2  We visited that school as well for utilization reasons and

3  in our analysis, we don't know what it would look like --

4       THE COURT:  Well, let the parties get together,

5  please, and you all propose a list of schools for the Court

6  to visit.  And then we will coordinate with you all on a

7  time and procedure for doing that.

8       All right.  Thank you very much for your time this

9  morning.  I look forward to working with you all in the case

10  more.

11       I just remembered something.  The way that the

12  parties present transfer information to the Court only

13  allows the Court to do -- it doesn't allow us to get into

14  the specifics of where people are coming from, you know,

15  where they're going, so we have a report that we used in the

16  Huntsville case that gives the Court more details to be

17  better educated about what those transfer numbers mean.

18       Katie will supply one of those reports to you all

19  and would like to request that that transfer information be

20  made available to the Court for Jefferson County in that

21  fashion.

22       Thank you.

23            (COURT ADJOURNED)

24

25

C E R T I F I C A T E

     I hereby certify that the foregoing is a correct
transcript from the record of proceedings in the
above-referenced matter.


_____
Teresa Roberson, RPR, RMR