# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LINDA STOUT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Intervenor,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:65-cv-00396-MHH** |
| | ) | |
| **JEFFERSON COUNTY BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **GARDENDALE CITY BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |

## MEMORANDUM OPINION AND ORDER

"[T]he future of our world revolves around public education. There's nothing more important that we do" than "educat[ing] our children." (Doc. 1124, p, 180). That proposition, offered by a member of the Gardendale Board of Education, is perhaps the one point on which all of the parties in this school desegregation case agree. The proposition is sound. In its landmark decision in *Brown v. Board of Education*, the United States Supreme Court recognized that

1

public education is critical for the welfare of our nation's children. The Supreme Court stated that public education:

> is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

347 U.S. 483, 493 (1954).

Each of the parties in this case—the parents who serve as the private plaintiffs, the United States, the Jefferson County Board of Education, and the Gardendale Board of Education—is trying to secure the best public education for the students whom the party serves. Though they share the same goal, the parties' strategies for accomplishing the goal are at odds.

Many citizens in the City of Gardendale prefer a municipal public school system to the county-wide system under which the four public schools in the Gardendale community currently operate. Through a grassroots effort, those citizens persuaded the Gardendale City Council to create the Gardendale Board of Education. The Gardendale Board of Education then selected a superintendent, and the superintendent has formulated a plan for Gardendale's four schools to separate from the Jefferson County public school district. The Gardendale Board has asked the Court to approve the superintendent's plan of separation. This opinion resolves the Gardendale Board's motion to separate. (Doc. 1040).

The Court's role in assessing Gardendale's proposed separation from the Jefferson County public school system is limited. For purposes of this school desegregation action, the Court is not concerned with the wisdom of separation generally or the extent to which Gardendale can fund and successfully operate a separate public school system. While certain financial issues touch upon the constitutional analysis that the Court must undertake, it is the task of the school boards and the citizens to whom the boards are accountable to wrestle with fiduciary and financial questions. The Court defers to local decision-makers on matters that do not implicate the Court's desegregation order.

The Court's desegregation order is designed to remedy the injury that institutionalized racial segregation causes. The Supreme Court's holding in *Brown* is simple and unaffected by the passage of time: when black public school students are treated as if they are inferior to white students, and that treatment is institutionalized by state or municipal action, the resulting stigma unconstitutionally assails the integrity of black students. That racial stigma is intolerable under the Fourteenth Amendment. That was true in 1954, and it is true today. The Fourteenth Amendment still requires equal protection of school children under the law. State and municipal action that "generates a feeling of inferiority" in African-American children and treats the students and their parents as second-class citizens violates the Fourteenth Amendment and jeopardizes those

families' equal right to pursue a public education and all of the opportunities that stem from public education. 347 U.S. at 494.

That injury prompted the Supreme Court to hold in *Brown* that separate white and black schools are inherently unequal. That injury compelled the Supreme Court's mandate in *Green v. County School Board of New Kent County, Virginia* that all vestiges of racial segregation in public schools must be eliminated "root and branch." 391 U.S. 430, 438 (1968). And that injury led the Supreme Court to prohibit a municipal separation in *Wright v. Council of City of Emporia* because, under the circumstances, the message of inferiority conveyed by the proposed separation could not "have escaped the Negro children in the county" and that message was likely to have an "adverse psychological effect" on black students. 407 U.S. 451, 466 (1972).

The Gardendale Board argues that "things have changed" since the Supreme Court decided *Brown*, *Green*, and *Wright*, that federal courts are "'tired of school desegregation litigation,'" and that "courts must open their eyes to the conditions of the present when they consider" whether the purported burdens that federal court enforcement of desegregation decrees places "on federalism and the Tenth Amendment are still justified." (Doc. 1097, pp. 17, 18 (quoting 1 Ronna Greff Schneider, *Education Law* § 5:10 (Westlaw 2016 update)), 30). The Gardendale Board urges the Court to focus its constitutional analysis on a series of decisions

that the United States Supreme Court has issued since 1991 and to relegate to the annals of history "older decisions like *Green* and *Wright*" and "their aged progeny like *Ross* [*v. Houston Independent School District*, 559 F.2d 937 (5th Cir. 1977)] and *Stout* [*v. Jefferson County Board of Education*, 466 F.2d 1213 (5th Cir. 1972)]." (Doc. 1097, pp. 17, 30). By logical extension, *Brown v. Board of Education,* issued in 1954, must fall into the category of civil rights opinions that the Gardendale Board considers out of date.

The Court disagrees with the Gardendale Board's attempt to minimize and compartmentalize early school desegregation decisions. Those decisions are relevant and important in their own right, and those opinions supply the constitutional underpinnings for every school desegregation opinion that has followed. All of the school desegregation decisions that the United States Supreme Court and the Eleventh Circuit Court of Appeals have issued are binding on this Court, meaning that the Court must follow the precedent that those opinions establish.

Therefore, to shed light on the complexity of the issues surrounding Gardendale's motion and to gauge just how much "things have changed" in public education in Jefferson County since 1971, this opinion traces the precedent that the Supreme Court and the Eleventh Circuit Court of Appeals have established from 1954 to the present. That precedent supplies the legal framework for the Court's

analysis of Gardendale's motion to separate. The details of the school desegregation opinions count; short quotes carved from opinions and presented out of context do not adequately convey the holdings in those decisions. The Court supplies that context to help the members of the Gardendale Board, the members of the Jefferson County Board, and the citizens impacted by this decision understand the rationale for the Court's decision.[1]

Because the development of the law of public school desegregation is intertwined with the procedural and factual background of this case, the Court will weave the two together before stating its findings of fact and conclusions of law. The Court examines this material with an eye toward answering a significant question that Gardendale's separation effort presents, namely what becomes of African-American students zoned for decades to a particular feeder pattern for purposes of desegregation when federal oversight nears an end.

---

[1] During the bench trial in this case, the Court reviewed the Gardendale Board's website. A section of the webpage devoted to this case stated: "In this [brief], we remind the Court and the parties what the law is and how it affects the decision to go forward." (*See* Gardendale Board of Education website December 2, 2016 home page, Appendix A). In their briefs, counsel for the Gardendale Board told only part of the story. In one of those briefs, counsel for the Gardendale Board assert that the plaintiffs have "sidestep[ped] the current state of the caselaw" and "stroll[ed] through a historical (but incomplete) recounting of this case's procedural history." (Doc. 1104, p. 7). It is fair to say that each party has highlighted the aspects of the record and the case law which each hopes will drive the Court's decision in this matter. Advocates routinely do that. Though it is a lengthy exercise, the Court has endeavored to provide a balanced description of the relevant aspects of the record and the case law. Because of the size of the record, this opinion does not mention every piece of evidence that the parties introduced at trial or every aspect of the case's procedural history, but the opinion attempts to summarize as much of the evidence and procedural history as possible.

**PROCEDURAL AND FACTUAL BACKGROUND**

**1954: *Brown v. Board of Education* – Separate is Inherently Unequal**

The story of school desegregation begins with the United States Supreme Court's decision in *Brown v. Board of Education of Topeka*. The students in that action sought "the aid of the courts in obtaining admission to the public schools of their community on a nonsegregated basis." 347 U.S. at 487. Chief Justice Warren explained that in the years following the adoption of the Fourteenth Amendment, black and white schools had "been equalized, or [were] being equalized, with respect to buildings, curricula, qualifications and salaries of teachers, and other 'tangible' factors." *Id.* at 492. Therefore, to determine whether state laws that required or permitted segregation of public school students according to race violated the Fourteenth Amendment, the Supreme Court had to examine "the effect of segregation itself on public education." *Id.*

To evaluate the effect of racial segregation on public education, the Supreme Court examined a series of sociological studies. Those studies were entitled "Effect of Prejudice and Discrimination on Personality Development," "Personality in the Making," "The Psychological Effects of Enforced Segregation: A Survey of Social Science Opinion," "What are the Psychological Effects of Segregation Under Conditions of Equal Facilities?," "Educational Costs, in

Discrimination and National Welfare," "The Negro in the United States," and "An American Dilemma." *See* 347 U.S. at 494 n. 11.

Based on these studies, the Supreme Court concluded that racially separate facilities are "inherently unequal" because of the adverse psychological impact that segregated schools have on African-American children. 347 U.S. at 495. Extending to public elementary and secondary schools the rationale that it had applied in cases concerning institutions of higher learning, the Supreme Court held that separating black students "from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* at 494. Citing findings from the district court, the Supreme Court added: "The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group." *Id.*

### 1955: *Brown II* – Desegregation "With All Deliberate Speed"

In *Brown II*, the Supreme Court considered how best to implement the principles that the Court articulated in *Brown I*. The Supreme Court assigned to local school authorities the "primary responsibility for elucidating, assessing, and solving" the problems associated with desegregation and instructed lower federal courts "to consider whether the action of school authorities constitutes good faith

implementation of the governing constitutional principles." *Brown v. Bd. of Educ.*, 349 U.S. 294, 299 (1955) (*Brown II*).  The Supreme Court directed district courts to fashion equitable remedies that would provide admission to public schools "on a racially nondiscriminatory basis with all deliberate speed."  *Id.* at 301.

**June 1965: Mr. Stout Sues the Jefferson County Board of Education**

Ten years after the Supreme Court directed federal courts to act "with all deliberate speed" to desegregate public schools, the Jefferson County system remained racially segregated. On June 4, 1965, Linda Stout's father filed a complaint and a motion for preliminary injunction in which he asked this Court, on behalf of his daughter and a class of African-American public school students, to desegregate the Jefferson County public school system.  (Doc. 2; Doc. 3; Doc. 1118, ¶ 3).[2]

A few weeks later, this Court issued an injunction that prohibited the Jefferson County Board of Education and the individual board members "from requiring segregation of the races in any school under their supervision" and ordered public schools in the Jefferson County system to admit students "on a racially non-discriminatory basis with all deliberate speed" in accordance with

---

[2] The pleadings in this action became automated in 2000.  (*See* Doc. 735).  Many of the records that precede 2000 do not have docket numbers.  The Court has placed in the electronic record the original complaint and motion for preliminary injunction.  (*See* Docs. 2, 3).  Other than the complaint and the motion for preliminary injunction, the Court refers to pre-2000 records by the filing date on the manual docket sheet.  The manual docket sheet appears at Doc. 1 in the electronic docket.

*Brown II*. (June 24, 1965 Injunction and Order, p. 1, cited in Doc. 1, p. 2). In the opinion that accompanied the injunction, the Court found that "[w]hile there is no official or record designation of any [] schools [in the Jefferson County public school system] as white or Negro, the evidence is undisputed that no Negro pupil has ever attended a school attended by white pupils in the county system." (*Id.* at p. 2). Similarly, the Court found that "[n]o Negro teacher has ever been assigned to a school attended by white pupils, nor has any white teacher ever been assigned to a school attended only by Negro pupils." (*Id.*). The Court explained that of the 63,000 students in the Jefferson County public school system, 45,000 were white, and 18,000 were black. The school system employed 2,268 teachers, 600 of whom were black. (June 24, 1965 Memorandum Opinion, p. 2, cited in Doc. 1, p. 2. A copy of the June 24, 1965 memorandum opinion is attached as Appendix B).

Citing a 1963 opinion from the Fifth Circuit Court of Appeals, this Court stated that the Jefferson County Board of Education was responsible for "initiating desegregation" and concluded:

> in this case the only failure to discharge its "burden of initiating desegregation" which may be ascribed to the Board has been inaction on the part of [the] Superintendent and Board in giving notice to students, parents, teachers, and other appropriate school personnel calculated to inform them of the rights of Negro parents and pupils to apply for transfer to schools attended by white pupils.

(June 24, 1965 Memorandum Opinion, p. 3, citing *Armstrong, et al. v. Bd. of Educ. of City of Birmingham, Jefferson Cty., Ala., et al.*, 323 F.2d 333 (5th Cir. 1963)).[3] The Court questioned whether a black student had standing to challenge the Board's assignments of teachers and administrators and "expressly disclaim[ed] the expression of any opinion" in that regard. (June 24, 1965 Memorandum Opinion, p. 3).

The Court gave the Jefferson County Board of Education one week to submit a plan "to make an immediate start in the desegregation of the schools of the Jefferson County public school system" by "effectively provid[ing] for the carrying into effect . . . of the Alabama Pupil Placement Law as to all school grades without racial discrimination . . . ." (June 24, 1965 Injunction and Order, pp. 1-2, cited in Doc. 1, p. 2). The Alabama Pupil Placement Law authorized black students to apply to transfer to a school attended by white students. (June 24, 1965 Memorandum Opinion, p. 3). Thus, this Court placed the burden of desegregation on black students.

**July 1965: The United States Intervenes as a Plaintiff**

On July 12, 1965, the United States Attorney General filed a motion to intervene as a plaintiff. (Doc. 1, p. 2 - July 12, 1965 motion). The Court granted

---

[3] Alabama was part of the Fifth Circuit Court of Appeals until 1981 when Alabama joined Georgia and Florida in the new Eleventh Circuit Court of Appeals. Decisions that the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981 are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

the motion and added the United States as a plaintiff in this action. (Doc. 1, p. 2 - July 12, 1965 docket order).[4]

## 1965-1968: Jefferson County's Freedom of Choice Desegregation Plan

To fulfill its obligation to desegregate the elementary, middle, and high schools in the Jefferson County public school system, the Jefferson County School Board adopted a "freedom of choice" plan. On July 23, 1965, this Court approved the plan. (Doc. 1, p. 5 - July 23, 1965 docket order). The plan, which the Jefferson County Board submitted "as directed and ordered" but without "consent or agree[ment]," called for black students entering the first grade to report to black schools to register. (June 30, 1965 desegregation plan, p. 1, cited in Doc. 1, p. 2). White students entering the first grade were to report to white schools to register. Students could then apply for a transfer to any elementary school "whether formerly attended only, or predominantly, by White children, or only by Negro children." (*Id.* at p. 7, cited in Doc. 1, p. 2).

The private plaintiffs and the United States challenged the Board's plan in the Fifth Circuit Court of Appeals. (Doc. 1, p. 5 - August 5 & August 11, 1965 docket entries). In August 1965, the Fifth Circuit vacated the plan and remanded

---

[4] The United States remains an intervenor-plaintiff in this action. The Court has substituted new private plaintiffs for Mr. Stout because Mr. Stout's claim is moot; his child no longer is enrolled in a public elementary, middle, or high school in Jefferson County. Mr. Lonnell Carter, Ms. Alfornia Carter, Ms. Sandra Ray, Mr. Ricky Reeves, and Ms. Alene Reeves now represent African-American children who currently attend schools in the Jefferson County public school system. (*See* Doc. 1023, p. 4; Doc. 1024).

the case to this Court for further proceedings.  (Doc. 1, p. 5).  The freedom of choice plan went through a number of revisions and a number of appeals between the fall of 1965 and 1968.  (Doc. 1, pp. 5-8).

## May 1968: *Green* – Eliminating Racial Segregation in Public Education "Root and Branch"

In *Green v. County School Board of New Kent County, Virginia*, the Supreme Court explained that anyone who thought the mandate of the *Brown* decisions concerned only race-neutral public school admissions was mistaken.  The Supreme Court stated:

> It is of course true that for the time immediately after Brown II the concern was with making an initial break in a long-established pattern of excluding Negro children from schools attended by white children.  The principal focus was on obtaining for those Negro children courageous enough to break with tradition a place in the 'white' schools.  Under Brown II that immediate goal was only the first step, however. The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about . . . .

391 U.S. at 435-36 (citation omitted).

In *Green*, the Supreme Court considered whether a "freedom-of-choice" desegregation plan fulfilled a public school district's constitutional obligation to admit students "on a non-racial basis" per *Brown II*.  391 U.S. at 431-32.  The Court found that the freedom-of-choice plan impermissibly shifted the responsibility for desegregation from the defendant school board to black students and their parents.  *Id.* at 441-42.  The Supreme Court added that a public school

13

system must not only admit students on a non-racial basis but also "abolish its dual, segregated system" altogether. *Id.* at 437.[5]

Writing for a unanimous court, Justice Brennan explained that segregation was firmly embedded in every aspect of the school systems at issue in *Brown*:

> Racial identification of the system's schools was complete, extending not just to the composition of student bodies at the two schools but to every facet of school operations—faculty, staff, transportation, extracurricular activities and facilities. In short, the State, acting through the local school board and school officials, organized and operated a dual system, part 'white' and part 'Negro.'

391 U.S. at 435. Penning the words that became the litmus test for public school desegregation, Justice Brennan stated that school boards that had operated "state-compelled dual systems" were "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id.* at 437-38. The Supreme Court admonished: "The constitutional rights of Negro school children articulated

---

[5] The Court draws attention to this aspect of the *Green* decision because the Gardendale Board, in its briefs and in its evidentiary presentation at trial, emphasized the fact that the student bodies of the public schools in the Gardendale zone have been integrated since the early 1970s. (*See, e.g.,* Doc. 1097, p. 2 ("This dispute is not about segregation. There have not been white schools and black schools by law in Jefferson County since Lyndon B. Johnson was president, and nothing [the Gardendale Board] proposes would change that."); *see also* Doc. 1124, pp. 7, 19-20, 22, 28, 248-49). Gardendale did establish at trial that by 1976, none of the Gardendale schools was entirely segregated by race; there were no separate black and white schools in the Gardendale zone. (Doc. 1124, pp. 19-20). Like the school board in *Green* that argued that it had satisfied the command of the *Brown* decisions by opening the doors of white schools to black students, the Gardendale Board misunderstands the scope of the constitutional obligation to desegregate public schools. As the Supreme Court explained in *Green*, allowing black students to attend white schools is "only the first step." *Green v. Cty. Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 436 (1968).

in *Brown I* permit no less than this; and it was to this end that *Brown II* commanded school boards to bend their efforts." 391 U.S. at 438.[6]

The Supreme Court found that the defendant school system had deliberately perpetuated an unconstitutional dual system by waiting ten years after the *Brown II* decision to adopt even a freedom-of-choice plan to begin the work of desegregation, "compound[ing] the harm of such a system." 391 U.S. at 438. The Supreme Court held that such delays were "no longer tolerable." *Id.* (citing *Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218, 234 (1964)).

The Supreme Court instructed public school systems to "transition to a unitary, nonracial system of public education" and abolish "'the [former] system of segregation and its effects.'" 391 U.S. at 436, 440 (quoting *Bowman v. Cty. Sch. Bd. of Charles City Cty.*, 382 F.2d 326, 333 (4th Cir. 1967) (Sobeloff, J., concurring)). The Supreme Court reminded lower courts that they had "'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past *as well as bar like discrimination in the future.*'" *Green*, 391 U.S. at 438 n. 4 (quoting *Louisiana v. United States*, 380

_____

[6] Citing a treatise, the Gardendale Board argues that *Green* was a misguided departure from the holdings in the *Brown* decisions. (Doc. 1097, p. 25, n. 18 (citing Lino A. Graglia, *Disaster by Decree: The Supreme Court's Decisions on Race and the Schools*, 67-89 (1976)). The language of the *Brown* and *Green* decisions reveals a Supreme Court frustrated by the recalcitrance of lower courts and public school districts. In each opinion from *Brown I* to *Green*, the Supreme Court provided greater detail about the constitutional mandate for public school desegregation. Because the Supreme Court and the Eleventh Circuit have relied upon *Green* in virtually every public school desegregation decision that the courts have issued since 1968, the Court feels comfortable following *Green* in this case.

U.S. 145, 154 (1965)) (emphasis added). The Supreme Court held that public school systems could use a freedom-of-choice plan if "it offer[ed] real promise of . . . desegregation[,]" but "if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable." 391 U.S. at 440-41.

**1968-1969: Jefferson County Continues to Implement Freedom of Choice**

On March 7, 1969, this Court overruled a motion in which the United States and the private plaintiffs asked the Court for an order directing the Jefferson County School Board "to adopt and implement a plan of pupil assignments, based on criteria other than freedom of choice." (Doc. 1, p. 10 - March 7, 1969 order).

**October 1969: *Alexander* – Deliberate Speed is Not Fast Enough**

In October 1969, more than 15 years after *Brown I*, the United States Supreme Court issued a short *per curiam* opinion. Citing its decision in *Green*, the Supreme Court stated:

> The question presented is one of paramount importance, involving as it does the denial of fundamental rights to many thousands of school children, who are presently attending Mississippi schools under segregated conditions contrary to the applicable decisions of this Court. Against this background the Court of Appeals should have denied all motions for additional time because continued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under

explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.

*Alexander v. Holmes Cty. Bd. of Educ.*, 396 U.S. 19, 20 (1969) (citing *Green*, 391 U.S. at 438-39, and *Griffin*, 377 U.S. at 234).

## December 1969: *Singleton* – The Move from Freedom of Choice to Zoning

In the wake of *Alexander*, the Fifth Circuit consolidated appeals in thirteen school desegregation cases, including this case, and examined the desegregation efforts in the thirteen school districts. *Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969). The Fifth Circuit held that "[b]ecause of *Alexander* [], each of the cases here . . . must be considered anew, either in whole or in part, by the district courts[,]" and the Fifth Circuit reminded the lower courts that the *Alexander* decision "sent the doctrine of deliberate speed to its final resting place." 419 F.2d at 1216.

The Fifth Circuit explained to the district courts that "converting to a unitary system involved basically the merger of faculty and staff, students, transportation, services, athletic and other extra-curricular school activities" in white and black schools. 419 F. 2d at 1216. The Court of Appeals directed all of the school districts, including Jefferson County, to develop desegregation plans that addressed student assignment, faculty and staff, transportation, and school construction and site selection. The plans had to contain majority-to-minority

transfer provisions that would allow students to transfer from a school where their race was in the majority to a school where their race was in the minority. *Id.* at 1217-18. To give black parents a voice in the school districts, the Fifth Circuit directed district courts to "suggest the advisability of biracial advisory committees to school boards in those districts having no Negro school board members." *Id.* at 1217 n. 2.

The Court of Appeals held that the desegregation plan that Jefferson County had presented in the consolidated appeal did not "reflect any substantial change" from a plan that the Court of Appeals had previously rejected, and the Fifth Circuit directed Jefferson County to comply with *Alexander*. 419 F.2d at 1219. The Fifth Circuit ordered Jefferson County and the other districts to implement their desegregation plans by February 1, 1970. *Id.* at 1217; (Doc. 1118, ¶ 8).

## December 22, 1969: Homewood Initiates Separation from the Jefferson County School System

Less than one month after the Fifth Circuit issued its opinion in *Singleton*, the City of Homewood formed a municipal board of education. (Doc. 1, p. 17 - June 8, 1970 motion, attachment C). Before Homewood formed a municipal board of education, there were three elementary schools and a junior high school in the Homewood feeder pattern. Historically, these four schools educated white children. Another school in the Homewood feeder pattern, Rosedale School,

historically educated black students in grades 1-12.  White high school students living in the City of Homewood attended Shades Valley High School, which was located outside of Homewood's city limits.  (Doc. 1, p. 17 - June 8, 1970 Memorandum of Law).

The Homewood Board of Education and the Jefferson County Board of Education executed an agreement in February 1970 pursuant to which Jefferson County agreed to transfer to Homewood the schools located in the City of Homewood that educated white children.  (Doc 1, p. 17 - June 8, 1970 motion, attachment C, ¶ 1).  The agreement called for the City of Homewood to convey the Rosedale School to the Jefferson County school system.  (*Id.*, attachment C, ¶ 3).  Jefferson County converted the Rosedale School to a "curriculum center." As of June 1970, 10% of the student population of the Homewood public school system was black; 26% of the Jefferson County student population was black. (Doc 1, p. 17 - June 8, 1970 Brief, p. 12).[7]

_____

[7] Before the Supreme Court issued *Brown I* in 1954, four cities operated municipal school systems in Jefferson County: Birmingham, Bessemer, Fairfield, and Tarrant.  Mountain Brook began its municipal school system in Jefferson County in 1958. (Doc 1126, p. 28.)  One more city formed a municipal system before Homewood separated.  The Pleasant Grove City Council passed a resolution creating a municipal school board on August 5, 1969, the same day that this Court adopted a desegregation plan for Jefferson County and ordered that the plan be implemented during the 1969-70 academic school year.  This Court initially approved the operation of the Pleasant Grove system subject to a desegregation order, but the Court eventually dismantled the Pleasant Grove school system and transferred the schools in the system back to the Jefferson County Board of Education because the Pleasant Grove School Board violated the Court's desegregation order.  (Doc. 1, p. 17 - June 8, 1970 Memorandum of Law, p. 8; Doc. 1, p. 19 - July 30, 1970 docket entry; Doc. 1, p. 24 - September 27, 1971 docket entry).  The Court has not included the Pleasant Grove system in the discussion of splinter districts in this

## May 4, 1970: Vestavia Hills Initiates Separation from the Jefferson County School System

The Vestavia Hills City Council formed a municipal board of education on May 4, 1970. (Doc 1, p. 17 - June 8, 1970 motion, attachment C). Before Vestavia formed a municipal board of education, there was one elementary school and one junior high school in Vestavia. Through the 1970-71 academic year, the elementary school had no black students. Two percent of the student population in the junior high school was black, but none of those black students resided within Vestavia's municipal limits. Specifically, the junior high served 1,559 white students and 13 black students. High school students living in the City of Vestavia Hills attended Berry High School which was located outside of Vestavia's city limits. (Doc. 1, p. 17 - June 8, 1970 Memorandum of Law, pp. 15-16; Doc 1, p. 20 - 1970-71 Jefferson County School Enrollment Report).

## June-July 1970: This Court Approves Three Municipal Splinter Districts

The United States filed motions in which it asked this Court to add the Homewood Board of Education and the Vestavia Hills Board of Education as defendants in this action. (Doc. 1, p. 17 - June 8, 1970 motions). This Court conducted a two-day evidentiary hearing concerning the motions. (Doc. 1, p. 18 - July 1, 1970 docket entries). The Court held a supplemental hearing

---

opinion because of the short tenure of that municipal system; however, the consequence imposed for a violation of this Court's orders is relevant for purposes of the Court's analysis of Gardendale's motion to separate.

concerning the Vestavia Hills school system. (Doc. 1, p. 18 - July 23, 1970 docket entry).

On July 13, 1970, the Court entered an order in which it added the Homewood municipal system as a party defendant and set desegregation requirements for that municipal system. (Doc. 1, p 18 - July 13, 1970 docket order). The order required the Homewood school system to "take affirmative steps to eliminate all vestiges of the dual system" that had existed in Jefferson County and to address all of the *Green* factors as they pertained to the Homewood system. The Court ordered the municipal district to allow majority-to-minority transfers, and the Court retained jurisdiction over the Homewood system to ensure compliance with the desegregation order. (Doc. 1, p. 18 - July 13, 1970 docket order).

The Court added the Vestavia Hills Board of Education as a party defendant on July 23, 1970. (Doc. 1, p. 19 - July 23, 1970 docket order). The Court "enjoin[ed] the Vestavia Hills Board of Education and [its] members from failing to provide equal educational opportunity to all students residing in [the Vestavia Hills] system without regard to race . . . ." (Doc. 1, p. 19 - July 23, 1970 docket order). The Court retained jurisdiction over the Vestavia Hills Board of Education "for the purpose of assuring implementation" of the Court's order. (Doc. 1, p. 19 - July 23, 1970 docket order).

Midfield schools were operational by 1971.  (Doc. 1, p. 21 - July 1, 1971 motion concerning transfer of properties from Jefferson County to Midfield).

## April 1971: *Swann* – Supreme Court Approves Non-Contiguous Zoning and Rejects Racial Ratios

In *Swann v. Charlotte-Mecklenburg Board of Education*, the Supreme Court "defin[ed] in more precise terms than heretofore the scope of the duty of school authorities and district courts in implementing Brown I and the mandate to eliminate dual systems and establish unitary systems at once."  402 U.S. 1, 5 (1971).[8]  The Supreme Court emphasized that in the 17 years since it had issued *Brown I*, the Court had not "deviated in the slightest degree from that holding or its constitutional underpinnings[,]" but "[d]eliberate resistance of some to the Court's mandates ha[d] impeded the good-faith efforts of others to bring school systems into compliance."  *Id.* at 11, 13.  Moreover, the desegregation process had:

> been rendered more difficult by changes since 1954 in the structure and patterns of communities, the growth of student population, movement of families, and other changes, some of which had marked impact on school planning, sometimes neutralizing or negating remedial action before it was fully implemented.

*Id.* at 14.

---

[8] The Supreme Court decided that it should provide more concrete guidance about public school desegregation in part because the Fifth Circuit had heard 166 appeals in desegregation cases between December 1969 and September 1970.  *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 14 n. 5 (1971).

Examining generally the role that equitable principles should play in school desegregation, the Supreme Court stated that lower courts should use equitable remedies "to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution[,]" but courts should exercise their equitable powers "only when local [school] authority defaults." 402 U.S. at 16. When a district court invokes equitable principles to fashion a remedy, the remedy must be "reasonable, feasible and workable[,]" but the Supreme Court provided no rigid requirements for a particular remedy. *Id.* at 31. The Supreme Court explained:

> in seeking to define the scope of remedial power or the limits on remedial power of courts in an area as sensitive as we deal with here, words are poor instruments to convey the sense of basic fairness inherent in equity. Substance, not semantics, must govern, and we have sought to suggest the nature of limitations without frustrating the appropriate scope of equity.

*Id.*

Turning from general principles to specific concerns, the Supreme Court addressed the topic of school construction. The Court found that school boards had used school construction to thwart desegregation. The Supreme Court held:

> In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown*, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white

suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight. In devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system. When necessary, district courts should retain jurisdiction to assure that these responsibilities are carried out.

402 U.S. at 21.

The Supreme Court then turned from the topic of school construction to the topic of racial demographics of student populations and examined four aspects of student assignments: racial ratios, racially identifiable schools within a district that also operates desegregated schools, non-contiguous zoning as a means of desegregation of student populations, and bussing to facilitate desegregation. With respect to racial quotas, the Court rejected the use of arbitrary quotas designed to create racial balance within schools. 402 U.S. at 25. The Court stated: "Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional

violations[,]" but the Court explained that racial balancing was not the purpose of school desegregation. *Id.*

With respect to racially identifiable schools, the Supreme Court explained that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." 402 U.S. at 24. Rather, "the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." *Id.* at 26. When a district court monitors a school district that includes schools "that are all or predominately of one race," the school boards:

> have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

*Id.* The Court added that in districts with schools that are predominantly white or black, a voluntary majority-to-minority transfer provision in a desegregation order "is an indispensable remedy for those students willing to transfer to other schools in order to lessen the impact on them of the state-imposed stigma of segregation." *Id.* To "be effective, such a transfer arrangement must grant the transferring student free transportation and space must be made available in the school to which he desires to move." *Id.* at 26-27.

With respect to zoning, the Supreme Court acknowledged "the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city." 402 U.S. at 25. The Supreme Court recognized that in the absence of a constitutional violation and a history of state-facilitated racial discrimination in public schools, it might be desirable to implement neighborhood school zones. But in a system that was obligated to eliminate a dual system, "the pairing and grouping of noncontiguous school zones is a permissible tool and such action is to be considered in light of the objectives sought." *Id.* at 28. Finally, the Supreme Court held that transportation assistance was a necessary companion to non-contiguous zoning. The Supreme Court left to district courts the task of deciding when bussing was appropriate in a particular public school district. *Id.* at 29-31.

At the conclusion of the *Swann* opinion, the Supreme Court offered guidance about the role that courts should play when, after a public school district achieved unitary status per *Green* and *Alexander*, student populations once again became racially identifiable. That role, the Supreme Court explained, depends on the cause of public school re-segregation. Where the mobility of members of a community causes re-segregation, "[n]either school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been

accomplished and racial discrimination through official action is eliminated from the system." 402 U.S. at 31-32. But when evidence demonstrates "that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools," then a court may intervene. *See id.*at 32. The same holds true for municipal action.

## July 1971: *Stout I*

In the wake of the *Swann* decision, the Fifth Circuit vacated the desegregation plan in this case and ordered this Court to comply with *Swann*'s mandate. *Linda Stout, et al. v. Jefferson Cty. Bd. of Educ.*, 448 F.2d 403, 404 (5th Cir. 1971). The Court of Appeals directed this Court to adopt a desegregation plan that would govern not only the Jefferson County public school system but also the post-1965 municipal districts within Jefferson County. *Id.* (directing this Court to "implement a student assignment plan for the 1971-72 school term" which "encompasses the entire Jefferson County School District as it stood at the time of the original filing of this desegregation suit").

The Fifth Circuit authorized this Court to refuse to recognize splinter districts that "'hinder vindication of federal constitutional guarantees.'" 448 F.2d at 404 (quoting *N. Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971)). The Fifth Circuit stated:

where the formation of splinter districts, albeit validly created under state law, have the effect of thwarting the implementation of a unitary school system, the district court may not, consistent with the teachings of [*Swann*], recognize their creation.

448 F.2d at 404. Explaining that it was concerned not only with discriminatory intent but also with disruptive effects, the Fifth Circuit stated: "The process of desegregation shall not be swayed by innocent action which results in prolonging an unconstitutional dual system. The existence of unconstitutional discrimination is not to be determined solely by intent." *Id.* at 404 n. 2. Finally, the Fifth Circuit instructed this Court to "implement fully" the Fifth Circuit's *Singleton* decision as the decision relates to "desegregation of faculty and other staff, majority to minority transfer policy, transportation, school construction and site selection, and attendance outside system of residence[,]" and the Fifth Circuit mandated annual reporting from the school boards subject to this Court's supervision. *Id.* at 404.

## September 1971 *Singleton* Order

To comply with the Fifth Circuit's instructions, this Court ordered Jefferson County, Homewood, Vestavia Hills, and Midfield to "collaborate in preparing a uniform desegregation plan" that would apply to all of the school systems. (Doc. 1, p. 21 - July 22, 1971 docket entry). The Court adopted a uniform desegregation plan on September 8, 1971. (Doc. 1, p. 22 - September 8, 1971 docket entry). The Court described the order as a plan for desegregation of public schools "grounded on the division of [Jefferson] County into mandatory,

28

generally contiguous, attendance zones." (December 3, 1971 Memorandum Opinion, p. 1, cited in Doc. 1, pp. 26-27). With the exception of "majority-to-minority" transfers and other narrow classes of transfers, attendance at schools other than a student's zoned school was prohibited under the order. (*Id.*). The September 1971 order has governed Jefferson County's efforts to meet its constitutional obligations for the past 45 years.

The September 1971 order addresses student assignments, school construction, attendance zones and alteration of zone lines, and transfers among the Jefferson County public schools and schools in the municipal public school systems in Jefferson County that formed after the *Stout* lawsuit began. (Doc. 226). The Gardendale zone was one of the 20 attendance zones created in the order. (Doc. 226, p. 2). There have been no significant modifications of the Gardendale attendance zone since the Court defined the zone in the September 1971 order. (Doc. 1118, ¶ 18).[9]

The September 1971 order establishes criteria for municipal school systems that wish to separate from the Jefferson County system. Under a heading titled "Separate Systems," the order states:

---

[9] Shortly after the Court entered the September 1971 order, there was a dispute concerning Gardendale's zone lines. That dispute ultimately was resolved by stipulation of the parties. (Doc. 1, p. 25 - October 21, 1971 docket entry). The Court revised the zone lines again in August 1972. (*See* p. 40, below).

(a)     For those systems receiving students from an unincorporated area of Jefferson County and having complete responsibility for educating all students residing in the area for all grades, the Jefferson County board or the tax collector for Jefferson County shall pay to such system the ad valorem school taxes collected from the area for which the separate system is responsible.   Where two or more systems are educating students at different grades for the same area, the systems affected shall attempt to negotiate an agreement regarding the division of ad valorem school taxes; and if negotiations fail, this court retains jurisdiction to resolve these financial questions.

(b)     Based upon future annexations and increasing population, each of the separate systems affected by this order shall have a continuing obligation to provide space for students transferring into the separate system until the ratio of blacks enrolled in the separate system is the same as the ratio of blacks enrolled in all schools in Jefferson County serving the area of the county affected by this order.[10]

(c)     If, after the date of this order, any part of the area now under the jurisdiction of the county board is hereafter placed in another school system (whether by annexation of current municipalities having separate school systems, or by the establishment of new school systems by current or future municipalities), the municipal system shall make sufficient space available for black students from the county system in such number that, added to the number of black students included in the

---

[10] At the bench trial in this case, there was a good deal of discussion about the extent to which Section b applies to splinter districts formed after the implementation of the September 1971 order, i.e., municipal systems other than Homewood, Midfield, and Vestavia.   Given its obligation to reconcile the provisions of the order, the Court finds that Section b applies only to Homewood, Midfield, and Vestavia.   Section b was designed to minimize white flight from the Jefferson County district to these three splinter districts by requiring the splinter districts to mirror the racial composition of the Jefferson County district.   Section c contains a similar stabilizing requirement for splinter districts formed after September 1971.

Neither Section b nor Section c is grounded in the specific ratio imposed.   Both sections are intended to dissuade white flight from the Jefferson County district to predominantly white municipal splinter districts whether white flight is the product of individual choice or annexation. This is made evident by the last sentence of Section c which states that the ratio requirement applies only to "municipal systems with a black student percentage less than the percentage of black students then in the county system."   (Doc. 226, p. 9).

annexation or the new school zone, equals one-third of the white students included in the annexation or new school zone. This requirement shall only be imposed on municipal systems with a black student percentage less than the percentage of black students then in the county system.

(d)     The Homewood, Midfield, Pleasant Grove and Vestavia boards shall be required to attain a minimum of 25% black faculty and a minimum of 25% black staff. If further black teachers or staff are required by any of such systems at the time of this order, such systems must first evaluate any black teachers or staff designated by the county board for possible employment, must then evaluate any black teachers or staff requesting to be employed, and must consider new applicants only after fully evaluating the first classes. Any new school systems formed in Jefferson County after this order shall be required to attain the percentage of black faculty and black staff members that exists in the county system at the time of the formation of the new system, and shall offer to retain all teachers and staff assigned to schools at such time which are to be within the area of the new system.

(Doc. 226, pp. 8-9).[11]

---

[11] The *Singleton* order also provides that:

> On or before the first day of classes for the 1971-72 school year, each of the several boards of education affected by this order shall reassign its faculty and its staff so that the white-black ratio of staff and of faculty assigned to each school is substantially the same as the ratio for staff and for faculty in the system as a whole. These ratios shall be recomputed annually until relieved by the court upon application of the parties. Each such board (and the boards of systems hereafter created in Jefferson County) shall promulgate non-racial objective criteria to be filed with the court and served on the parties by October 1, 1971 (or within 90 days from the date of formation of a new school system). The non-racial objective criteria adopted by the school system shall be used for employment (once the initial requirement specified in [section] V(d) [of this order] is attained), assignment, promotion and dismissal. Evaluations using the criteria shall be preserved by the various systems.

(Doc. 226, p. 9).

The September 1971 order contains a provision governing majority-to-minority transfers.  The order states:

(a)   With the approval of the board of education (or both boards, where between systems) a student may transfer - -

    (1)   <u>from</u> any school which has a 75% or higher enrollment of students of his own race; or

    (2)   <u>to</u> any school which has less than 25% enrollment of students of his own race; or

    (3)   <u>between</u> schools where the effect is to reduce the difference between the white-to-black student ratios of the two schools.

Such transfers shall be on a space-available basis; but the board of education receiving the student shall not be allowed to refuse transfers under this paragraph to students of one race where a greater number of transfers has been allowed by it for students of another race.  A certificate showing the current enrollment of black and white students from the principal of the sending school in (1) and (3) above and from the principal of the receiving school in (2) and (3) above shall accompany the transfer request and be retained by the board.

(Doc. 226, p. 7) (emphasis in original).[12]

The September 1971 order requires the boards of education affected by the order to file with the Court reports in February and October of each year containing

_____

[12] This provision conflicts with *Swann* with respect to the "space-available" language.  As noted above, in *Swann*, the Supreme Court held that "space must be made available" in a school to which a student wishes to transfer.  (*See* p. 25, above).

information concerning the race of students and teachers in each district and transfers. (Doc. 226, pp. 10-11).[13]

**June 1972: *Wright* – Courts may Enjoin Splinter Districts that Have the Effect of Impeding the Process of Dismantling the Parent District's Segregated Public School System**

In *Wright v. Council of City of Emporia*, 407 U.S. 451 (1972), the Supreme Court examined a district court's ability to prevent a municipal separation where, though the student population of the municipal splinter district would be desegregated, the creation of the district would negatively impact the county public school system's ability to obtain a dissolution of a desegregation order. The circumstances surrounding the constitutional issue in *Wright* were similar to the circumstances surrounding Gardendale's attempted separation.

The community of Emporia was dissatisfied with the way in which county was distributing the proceeds of a sales tax to the public schools in the community. Consequently, in 1967, the community formed the City of Emporia, and the city assumed the responsibility under state law to educate the children living within its municipal boundaries. The city fulfilled this responsibility by implementing a sharing agreement with the county pursuant to which the children in the City of Emporia attended county schools, but the city contributed to the

---

[13] On March 3, 2006, the Court entered an order eliminating the February reporting requirement for the Jefferson County Board of Education. (Doc. 923). Consistent with the Court's March 2006 order, the Jefferson County Board has filed annual reports with the Court in October of each year. (Docs. 932, 948, 956, 961, 966, 975, 978, 984, 999, 1033, 1106).

schools' finances, and the city was involved in selecting the county school superintendent.  407 U.S. at 454-55.

The county school system had been under federal court oversight since 1965 because the public schools in the county had been segregated by law.  After the Supreme Court issued the *Green* opinion, the private plaintiffs in *Wright* asked the district court to take additional steps to eliminate the vestiges of segregation from the county's schools.  Two weeks after the district court entered a desegregation order, the city informed the county that the county's plans for the schools in the city were unacceptable, and the city indicated that it intended to begin operating the schools located within the city.  Before making the decision to separate, representatives of the city neither met with representatives of the county to discuss concerns about the court-ordered student assignment plan nor approached the district court.  407 U.S. at 456-57.[14]  When the county refused to cooperate in the separation, the city turned to the state board of education.  The state board tabled the request because of the pending federal action.  *Id.* at 457.

The record demonstrated that under the existing arrangement in which the county schools and city schools were paired, the student population of the school system was 34% white and 66% black.  If the city were allowed to separate, the

---

[14] The Supreme Court pointed out that the district court already had modified the plan at the county's request and had stated that "it would be 'delighted to entertain motions for amendment of the [desegregation] plan at any time.'"  *Wright*, 407 U.S. at 469 n. 14.  The city's failure to take advantage of this opportunity indicated an effort to avoid the desegregation plan altogether.

student populations for the city's schools would be 48% white and 52% black while the student population of the county schools would be 28% white and 72% black. 407 U.S. at 464. The city had pledged to operate the municipal schools on a unitary basis, combining white and black students at every grade level. The district court enjoined the operation of the city system because the municipal system would frustrate implementation of the county desegregation order. *Id.* at 457-58. The Fourth Circuit Court of Appeals reversed, and the Supreme Court accepted the case for review. *Id.* at 459.

Much like the Gardendale Board, the City of Emporia argued that because it had the right under state law to create a municipal school system, the district court could enjoin its effort to operate a municipal school system only if the state law that authorized separation was invalid, the municipal boundaries were drawn to exclude black students, or the city committed an independent constitutional violation. 407 U.S. at 459. The Supreme Court rejected the city's argument. The Supreme Court held that the constitutional violation pursuant to which the district court could issue an injunction was the county's operation of a public school system segregated by law, a public school system of which the city "had always been a part." *Id.* The Supreme Court stated that because "the city and the county constituted but one unit for the purpose of student assignments during the entire time that the dual system was maintained, they were properly treated as a single

unit for the purpose of dismantling that system." *Id.* at 459-60. The Court found that the city's disagreement with the district court's plan for a unitary school system prompted the city's decision to separate, and, "[u]nder these circumstances, the power of the District Court to enjoin Emporia's withdrawal from that system need not rest upon an independent constitutional violation." *Id.* at 459. The Supreme Court stated that if the proposed separation "would impede the dismantling of the dual system, then a district court, in the exercise of its remedial discretion, may enjoin [the separation] from being carried out." *Id.* at 460.

The Supreme Court also rejected the Fourth Circuit's proposition that a district court should identify the "dominant purpose" of a municipal separation to determine whether the separation was permissible. The Supreme Court held that such an exercise was "as irrelevant as it [was] fruitless." 407 U.S. at 462. The Supreme Court explained that the "existence of a permissible purpose cannot sustain an action that has an impermissible effect." *Id.*

The Supreme Court favorably cited appellate decisions in this case and in *Lee v. Macon County Board of Education*, 448 F.2d 746 (1971), in which the Fifth Circuit held that a district court could not approve a splinter district that would have a substantial adverse effect on the desegregation of the county public school system. 407 U.S. at 462. The Supreme Court held that these decisions properly focused not on the motivation for or purpose of the separation "but on the effect of

the action upon the dismantling of the dual school systems involved." *Id.* The Supreme Court stated that if government officials attempted to separate from a district that was attempting to fulfill its obligations under a desegregation order, the effort to separate "must be judged according to whether it hinders or furthers the process of school desegregation." *Id.* at 460.[15]

The Supreme Court provided instructions for the analysis of motions for municipal separations. First, "a court supervising the process of desegregation" does not "exercise its remedial discretion responsibly where it approves a plan that, in the hope of providing better 'quality education' to some children, has a substantial adverse effect upon the quality of education available to others." 407 U.S. at 463.

Second, a district court may look beyond the racial statistics offered by the separating school system and consider collateral effects of a municipal separation. In *Wright*, the district court properly considered the fact that the Emporia school system probably would be more white than the city indicated because white students in private schools in the city probably would enroll in the public school system while the county system would be more black because white students in the county system would withdraw and attend private schools. 407 U.S. at 464-65.

_____

[15] In *United States v. Scotland Neck City Board of Education*, the Supreme Court held that these principles concerning splinter districts applied with equal force to state legislative action and local government action. 407 U.S. 484, 488-89 (1972).

But "[j]ust as racial balance is not required in remedying a dual system, neither are racial ratios the sole consideration to be taken into account in devising a workable remedy." *Id.* at 465.[16]  Therefore, a district court also should consider the quality and siting of the schools in the proposed municipal system, and if the schools within the municipal boundaries were in better condition than the schools that would remain in the county system, then the disparities "may in themselves indicate that enforced racial segregation has been perpetuated." *Id.*

Finally, a district court should consider the timing of the decision to separate and the message that separation would send to black students impacted by the proposed separation. 407 U.S. at 465-66.   In *Wright*, the city decided to break from the county following a court order that would have mandated integration of the student bodies of the city's schools.  The Supreme Court stated that "[t]he message of this action, coming when it did, cannot have escaped the Negro children in the county." *Id.* at 466.  Relying on *Brown I*, the Supreme Court reiterated that separating black children from their white contemporaries "'solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.'" *Id.* (quoting *Brown I*, 347 U.S. at 494).  The Supreme Court held that

[16] On this point, the Supreme Court reiterated that "'the constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.'" 407 U.S. at 464 (quoting *Swann*, 402 U.S. at 24, and noting at n. 12 that in *Swann*, the desegregation order that the Supreme Court approved "provided for student bodies ranging from 9% Negro to 38% Negro").

the district court "could rationally have concluded that the same adverse psychological effect was likely to result from Emporia's withdrawal of its children from the Greensville County system." 407 U.S. at 466. This effect existed even though the city had pledged to operate its schools on a unitary basis.

The Supreme Court conferred on district courts primary responsibility for evaluating all of the relevant factors relating to separation because "[t]he weighing of these factors to determine their effect upon the process of desegregation is a delicate task that is aided by a sensitivity to local conditions, and the judgment is primarily the responsibility of the district judge." 407 U.S. at 466 (citing *Brown II*, 349 U.S. at 299).

The Supreme Court recognized that in the realm of public education, a desire for local control was understandable: "Direct control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society . . . ." 407 U.S. at 469. But the Supreme Court accepted the district court's finding that city leaders would be able to exert influence over important decisions in the county district without separating. *Id.* The Supreme Court also recognized the possibility that the city might be able to operate a municipal district after a unitary system in the county had "been established and accepted." *Id.* at 470.

Four justices dissented from the majority opinion in *Wright*. Those justices concluded that the record before the district court did not indicate that the city's

operation of a separate system would have jeopardized the county's ability to fulfill its obligations under the desegregation plan. If it had, wrote Chief Justice Burger, he would unhesitatingly have joined in the majority opinion. 407 U.S. at 471-83 (Burger, C.J., dissenting, joined by Blackmon, Powell, and Rehnquist, JJ.).

**August 1972: Gardendale Zone Lines Adjusted**

In August 1972, the Court revised the Gardendale, Graysville, and Minor zones based on the Court's finding that:

> [t]hese three zones located in the northcentral portion of the county [] reflected during the 1971-1972 school year abnormal disparity in the student populations from that which the racial composition of the area would suggest. Two of the schools . . . had student bodies which were 85% and 92% black [] by the end of the year while several of the schools were over 85% white.

(August 25, 1972 order, pp. 3-4, cited in Doc. 1, p. 30). The Court noted that it was "mindful of its obligation to see that a plan is adopted which promises realistically a desegregated learning opportunity now." (*Id.* at p. 4).

**August 1976: *Stout II***

In 1976, this case made another trip to the Fifth Circuit Court of Appeals. The Jefferson County Board of Education had been operating under the 1971 *Singleton* order for nearly five years. The Fifth Circuit noted that in those five years, "great progress" had been made, "aided by increasing good faith and mutual confidence on all hands, for which the parties are to be commended." *Stout v. Jefferson Cty. Bd. of Educ.*, 537 F.2d 800, 801 (5th Cir. 1976).

The issue before the appellate court was narrow. The Fifth Circuit considered whether this Court could leave three schools in the Wenonah feeder pattern segregated by race in light of Judge Pointer's finding that the Court "could devise no effective remedy" to cure the situation. 537 U.S. at 801. The issue, the Fifth Circuit stated, was "close and troubling." *Id.* at 802. Judge Pointer had attempted to assign students from the white school to the two black schools, but the white students had refused to attend the black schools. Moreover, a geographic barrier, "rather than [] the segregative act of any authority" was responsible for the segregation of the schools. *Id.* The Jefferson County Board of Education had accomplished much of "the uprooting" of its former dual system that the 1971 desegregation order required, and "a unitary system [was] operating." *Id.*

The Fifth Circuit acknowledged that Judge Pointer rejected the proposal that the United States put forward for desegregating the Wenonah schools in part because he feared white flight and a situation that would produce less, not more, desegregation. The Fifth Circuit, noting the deference that it had given Judge Pointer over the years because of his effective efforts to resolve complex local desegregation issues, held that Judge Pointer could take white flight into account when choosing between alternative "permissible plans." 537 F.2d at 802 ("We have found no authority declaring that in choosing between various permissible

41

plans a chancellor may not elect one calculated to minimize white boycotts."). The Fifth Circuit stated, "[i]n so concluding, our guiding lights are the trial court's conclusions that the Jefferson County system has been effectively desegregated and is unitary and that these three one-race schools are the products of geography and demography alone." *Id.* at 803.

In other words, although the three schools at issue were racially identifiable, the student populations of other schools in the Jefferson County system were desegregated. The Fifth Circuit recognized that the extent of desegregation was limited "as a matter of practicality" because "well over four thousand white students reside in the predominantly white neighborhoods east of Shades Mountain," 537 F.2d at 802 n. 1; however, the Fifth Circuit noted that the Constitution does not require racial quotas or racial balancing at each of the schools in a district. *Id.* at 803. "'[A] balance must be reached, one unquestionably subtle in its implications: while school system segregation must be actively disestablished, racial quotas for student population are not to be instituted.'" *Id.* (quoting *Carr v. Montgomery Cty. Bd. of Educ.*, 337 F.Supp. 1123, 1133 (M.D. Ala. 1974)).

Throughout the *Stout II* opinion, the appellate court made clear that it affirmed the district court reluctantly. The Fifth Circuit signaled that its decision might have been different were it not for the fact that some of the schools in

Jefferson County had desegregated student populations. 537 F.2d at 802 (noting that the holding was based on the particular circumstances before it and that the holding was "[n]ot without reservations"). The Fifth Circuit expressed its disapproval of the state of affairs in the Wenonah area in the final passages of the decision but recognized that young students in the area would receive relief in high school. The Fifth Circuit wrote:

> The unfortunate presence of these three one-race schools, serving just over 1100 total pupils, in a desegregated system serving many thousands, is to be deplored. But they are the result of demography; the system as a whole is desegregated and the overwhelming majority of all students attend such facilities; and finally, even the students of these schools will be exposed to complete desegregation at the high school level.

*Id.* at 803.

The Fifth Circuit held that in light of the one-race schools in Wenonah and other conditions in the Jefferson County system, this Court had to continue to oversee the county system and consider implementation of additional desegregation practices. The Fifth Circuit stated:

> partly in view of the presence of such conditions in the system, we conclude that [the Jefferson County system] must continue under the scrutiny and surveillance of the district court. And in view of their existence it would be appropriate, though we do not require it, for the district court to give especial and renewed consideration to the possibility of broadening and making more attractive its existing majority-to-minority transfer procedures and to the possibility of enriching and strengthening the curriculum to magnet levels in the Roosevelt and Gaston facilities themselves.

537 F.2d at 803.

## September 1977: *Ross* – The Fifth Circuit Says No to a Splinter District

In *Ross*, the Fifth Circuit said no to a splinter district in Texas. For a number of years, the parent district, the Houston Independent School District, had operated under a series of desegregation orders. The district court entered the operative desegregation order in 1970. As of 1970, the student population of the Houston district was 44% white, 39.4% black, and 16.6% Hispanic. *Ross*, 559 F.2d at 939. Just under 89% of the 8,000 students in the proposed splinter district were white; 6.2% of the students were black, and 4.9% were Hispanic. *Id.*

Citizens in a community in the middle of Houston began organizing the proposed splinter district the year after the operative desegregation order was entered, and in 1973, the splinter district filed a notice of intent to implement the splinter district and a stipulation in which the splinter district reported that it was "interested solely in providing quality education for the students of its district[.]" 559 F.2d at 940. The Houston district and the United States opposed the separation, arguing that the separation would impede the desegregation of the Houston district. *Id.*

After the parties maneuvered through the complex "procedural matrix" in the case, the case made its way to the Fifth Circuit Court of Appeals. The Fifth

Circuit began its analysis of the proposed separation by pointing out that "the entire area comprised within" the Houston district had been subject to a desegregation decree, and the Houston district had not "been adjudicated to have achieved a unitary status . . . ." 559 F.2d at 942. Therefore, "the fundamental issue" in the case had to "be framed as assessing the impact" of separation on the desegregation process in the Houston district. *Id.* "[T]he legality" of the splinter district's status under state law did "not control the impact of the" proposed separation "on the court's objective of creating a unitary school district" in Houston. *Id.* The Fifth Circuit noted that the mere effort to separate "had an obviously disquieting effect upon the sensitive community relations in Houston which must be maintained intact" if the relief sought through the Houston desegregation order "[was] to be accomplished." *Id.* at 943.

Citing *Stout II*, the Fifth Circuit held that this Court had properly evaluated a proposed municipal separation by "look[ing] at the entirety of the system subject to the court's order to determine what needed to be done to assure the achievement of a unitary system" and then determining "whether the creation of the separate system would interfere with the process of desegregation." 559 F.2d at 944. The Fifth Circuit explained that for a district court to make this assessment, the proposed splinter district must first "establish what its operations will be." *Id.* The proposed district:

must express its precise policy positions on each significant facet of school district operation. For example, it should state how it plans to work with [the parent district] regarding interdistrict pupil assignments, including transportation; curriculum composition and control; teacher employment, discharge, assignment and transfer; financing and taxation; school building construction, utilization and closing procedures; special district-wide efforts such as the magnet school program; administration; and any other areas of public school operations or support which the district court may specify as pertinent to the accomplishment of its underlying desegregation order.

*Id.* And, "[e]ven after this definitive statement has been made, the burden remains on [the splinter district] to establish that its implementation and operation will meet the tests outlined for permitting newly created districts to come into being for parts of districts already under an ongoing court desegregation order." *Id.* at 945. The Fifth Circuit remanded the case to the district court to conduct the full separation analysis.

## May 1988: Hoover Separates from Jefferson County

On May 27, 1988, the Hoover City Board of Education and the Jefferson County Board of Education executed an agreement to transfer to Hoover the responsibility for and operation of seven public schools located within the City of Hoover. (Doc. 4, pp. 10-21 in Case 16-mc-199).[17] Over the years, Hoover has

---

[17] The Hoover system is part of the *Stout* action. On February 3, 2016, at the Court's direction, the Clerk of Court created a miscellaneous CM/ECF case number for purposes of filings concerning the Hoover school district. (*See* Doc. 1 in Case No. 2:16-cv-199). The Court did not sever the Hoover system from the original Jefferson County school desegregation action, *Stout v. Jefferson County Bd. of Educ.*, Case No. 2:65-cv-396-MHH. The miscellaneous case docket is for administrative purposes to allow the parties, the public, and the Court easier access to relevant entries in the docket regarding the Hoover school district.

annexed a number of communities into the city. Those annexations have reduced the percentage of under-18 African-American residents of Hoover. (Doc. 1126, pp. 44-46; Doc. 1132-4).[18]

## 1989: *Missouri v. Jenkins* – The Supreme Court Considers an Ambitious Desegregation Plan

In April 1990, the United States Supreme Court issued the first of three opinions in *Missouri v. Jenkins*, a case involving what appears to be the most ambitious desegregation plan that the Supreme Court has examined. 491 U.S. 274 (1989). In that case, following a trial that lasted seven months, the district court found that the State of Missouri and the Kansas City Missouri School District had operated a school system segregated by law and that the segregation "ha[d] caused a system wide *reduction* in student achievement" within the district. *Jenkins v. Missouri*, 639 F. Supp. 19, 24 (W.D. Mo. 1985) (emphasis in original).

The district court offered no particularized findings of fact regarding the nature or extent of the reduction in student achievement, especially as the reduction pertained to black students within the district. *Missouri v. Jenkins*, 515

---

[18] There are matters pending before this Court regarding the Hoover district. Consequently, the Court will limit its remarks regarding that municipal school district.

U.S. 70, 74-75 (1995).[19]  Similarly, the district court did not tailor a remedy to the injury that black students had suffered because of the segregated school system.  Instead, the district court ordered the school district to implement a wide range of educational programs at all of the 68 schools in the district, even though only 25 of the schools were racially identifiable.  *Id.* at 75.  The programs included a comprehensive magnet program pursuant to which every middle school and high school in the Kansas City district and half of the elementary schools in the district became magnet schools.  *Id.* at 76-77.[20]  The programs seemed to be successful: after two academic years, the district received a AAA classification, the highest classification that the Missouri State Board of Education awarded.  *Id.* at 75.

The district court aimed to improve the quality of education throughout the Kansas City district as a means of attracting Caucasian students into the school system.  The city school system was nearly 70% African-American, and the district court determined that rezoning within the municipal district would "increase the instability" of the district and "reduce the potential for

---

[19] The Supreme Court summarized the history of the litigation regarding the Kansas City public school district in its third decision in that case.  This Court will cite primarily to the last opinion in the case to provide the Supreme Court's most recent perspective on that litigation.

[20] "'Magnet schools,' as generally understood, are public schools of voluntary enrollment designed to promote integration by drawing students away from their neighborhoods and private schools through distinctive curricula and high quality." *Missouri v. Jenkins,* 495 U.S. 33, 40 n. 6 (1990) (*Jenkins II*).

desegregation." 639 F. Supp. at 38. The suburban public school systems that surrounded the city had higher populations of Caucasian students than did the Kansas City system. During the trial in the case, the district court examined the suburban districts and did not find an interdistrict constitutional violation. Consequently, the district court could not compel, by court order, students in the suburban districts to attend one of the city schools, but the district court hoped that the specialized programs that the city schools offered and substantial capital improvements designed to make the school facilities in the Kansas City district comparable to the facilities in the suburban districts would attract families from the suburban districts and cause parents of Caucasian children to voluntarily enroll their children in the Kansas City schools. 515 U.S. at 76-77.

The case made its first trip to the Supreme Court for the high court to evaluate the district court order awarding attorney's fees to the attorneys for the plaintiffs. In making its evaluation, the Supreme Court noted that the district court had ordered the State of Missouri and the Kansas City school district to invest $260 million in capital improvements and $200 million in magnet programs in the municipal school system. 491 U.S. at 276 (*Jenkins I*). The Supreme Court affirmed the fee award.

**1991: *Dowell* – School Desegregation is Not a Matter of Semantics; It is a Matter of Good Faith**

In *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237 (1991), the Supreme Court examined a municipal public school district that had complied in good faith with a desegregation decree for a reasonable period of time and had successfully desegregated the student populations in the district's public schools. The school board sought dissolution of the desegregation decree. The private plaintiffs opposed the effort. *Id.* at 240.

In 1963, an Oklahoma district court had found that Oklahoma City's housing and public schools were intentionally segregated by law. The district court entered a desegregation order, and the school district attempted to meet the demands of the order by rezoning the schools within the district. Over time, the district court concluded that rezoning was not an adequate remedy for the constitutional injury. In 1972, the court imposed a more complex desegregation plan. 498 U.S. at 240-41. After the school district operated under the complex plan for five years, the district court found that the school board had successfully desegregated the student populations of the schools within the public school system and that the district court, on the record of good faith conduct before it, had no reason to anticipate that termination of federal court oversight would "result in the dismantlement of the [desegregation plan] or any affirmative action by the [school board] to undermine the unitary system so slowly and painfully accomplished over the 16 years during

which the cause ha[d] been pending before th[e] court." *Id.* at 241 (internal quotation marks omitted).

In the years after the district court found that the school district had complied in good faith with the court's desegregation plan, white families had abandoned the public school district, causing black students to have to be bussed farther from their homes to maintain desegregated student populations in the district's public schools. By 1984, "demographic changes" had produced "greater burdens on young black children." 498 U.S. at 242. "In an effort to alleviate this burden and to increase parental involvement, the Board adopted the Student Reassignment Plan[.]" *Id.* Under that plan, younger black students would attend neighborhood schools, and older black students would be bussed to white schools. The plan also provided the option of majority-to-minority transfers, and the school board appointed an equity officer. *Id.*

The private plaintiffs attempted to challenge the revised desegregation plan. The Supreme Court considered whether the original desegregation decree provided a framework under which the district court could examine the new zoning plan or whether the district court must make a fresh start and decide whether the new zoning plan, in its own right, violated the Fourteenth Amendment.

Before reaching the constitutional issue in the case, the Supreme Court observed that lower courts had used the term "unitary" inconsistently when discussing public school desegregation. Citing a decision from the relatively new Eleventh Circuit Court of Appeals by way of example, the Supreme Court stated:

> Some [courts] have used [the term "unitary"] to identify a school district that has completely remedied all vestiges of past discrimination. . . . Other courts, however, have used "unitary" to describe any school district that has currently desegregated student assignments, whether or not that status is solely the result of a court-imposed desegregation plan. In other words, such a school district could be called unitary and nevertheless still contain vestiges of past discrimination. That there is such confusion is evident in *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403 (CA11 1985), where the Court of Appeals drew a distinction between a "unitary school district" and a district that has achieved "unitary status." The court explained that a school district that has not operated segregated schools as proscribed by *Green v. New Kent County School Board, supra,* and *Swann v. Charlotte–Mecklenburg Bd. of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), "for a period of several years" is unitary, but that a school district cannot be said to have achieved "unitary status" unless it "has eliminated the vestiges of its prior discrimination and has been adjudicated as such through the proper judicial procedures." *Georgia State Conference, supra,* at 1413, n. 12.

498 U.S. at 245 (citations omitted). The Supreme Court held that the labels "dual" and "unitary" were not particularly helpful. The Fourteenth Amendment is the crux of the matter, and the Fourteenth Amendment commands that public school boards operate systems in which students are not intentionally segregated by race. *See id.* at 245-46.

The Supreme Court determined that the district court's 1977 finding that "the Oklahoma City School District was being operated in compliance with the . . . Fourteenth Amendment, and that it was unlikely that the school board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved." 498 U.S. at 247. The Supreme Court held that after a district court finds that a public school district has eliminated the vestiges of segregation, complied with a desegregation decree in good faith for a reasonable period of time, and demonstrated that the school board will continue to avoid future constitutional violations, the district court must dissolve the desegregation decree and return full control of the school district to the local school board. Local control, the Supreme Court stated, "allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local school needs." *Id.* at 248.

In deciding whether to dissolve a desegregation decree, the Supreme Court wrote, a "district court need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future." 498 U.S. at 249. Rather, "in deciding whether to modify or dissolve a desegregation decree," a district court should consider evidence of "the school board's compliance with previous court orders" and of the school board's "good faith" in complying with the desegregation decree. *Id.*

The Supreme Court remanded the *Dowell* case to the district court for a determination of whether the school district "had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." 498 U.S. at 249-50. In making the determination, the Supreme Court instructed the district court to consider not only student assignments but all of the *Green* factors. *Id.* at 250.

After determining "whether the Board was entitled to have the decree terminated," the Supreme Court instructed, the district court "should proceed to decide the [private plaintiffs'] challenge to the [Student Reassignment Plan]." 498 U.S. at 250. The Supreme Court explained that a school district that has been released from a desegregation order "no longer requires court authorization for the promulgation of policies and rules regulating matters such as assignment of students and the like, but it of course remains subject to the mandate of the Equal Protection Clause of the Fourteenth Amendment." *Id.* Thus, according to the Supreme Court, "appropriate equal protection principles" should govern the district court's evaluation of the school district's Student Reassignment Plan if the school district "was entitled to have the decree terminated . . . ." *Id.*

## 1992: *Freeman* – A District Court Must Restore Local Control After a School District Remedies a Constitutional Violation

In *Freeman v. Pitts*, the United States Supreme Court reiterated that a federal court's "end purpose" in a public school desegregation case is "to remedy

the [constitutional] violation and, in addition, to restore [to] state and local authorities" the control of their public schools.  503 U.S. 467, 489 (1992). "Returning schools to the control of local authorities at the earliest practicable date is essential to restore [local authorities'] true accountability in our governmental system." *Id.* at 490.

The Supreme Court also explained in *Freeman* that "the *Green* factors need not be a rigid framework."  503 U.S. at 493.  District courts must "inquire whether other elements ought to be identified, and [] determine whether minority students [a]re being disadvantaged in ways that require[] the formulation of new and further remedies to ensure full compliance with the court's decree." *Id*. at 492.

Finally, in *Freeman*, the Supreme Court held that federal courts do not have to try to correct racial imbalances in public schools that are caused by demographic change rather than state or municipal action.  The Supreme Court stated:

> Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once *de jure* segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

503 U.S. at 495.

**June 1995: *Jenkins III* – Reining in an Expensive and Intrusive Desegregation Plan**

In 1995, 18 years into the federal court's supervision of the Kansas City public school district, the *Jenkins* case made its third trip to the United States Supreme Court and produced a 5-4 decision that set limits on the equitable remedies that the district court had fashioned. 515 U.S. at 73. The State of Missouri challenged orders from the district court that required the state to continue to fund remedial educational programs and to fund salary increases for faculty and staff in the Kansas City district. *Id.* at 80. The Supreme Court reiterated that "a desegregation remedy 'is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct'" and "to eliminate the racial identity of the schools within the affected school district" by integrating a school's students, faculty, and administrators and providing equitable facilities, extracurricular activities, and transportation to black students. *See id.* at 87-90 (quoting *Milliken v. Bradley*, 418 U.S. 717, 746 (1974)). The Supreme Court concluded that the challenged orders exceeded the district court's remedial authority for a number of reasons.

The Supreme Court held that the district court's continued effort to make Kansas City public schools equal to or better than their suburban counterparts to attract non-minority students to the city schools exceeded the specific injury that

the district court had identified, namely a reduction in student achievement and the existence of racially identifiable schools within the Kansas City system. The Supreme Court explained that the district court could not fashion an inter-district remedy because the district court did not find that the differences in the racial composition of the student populations of the Kansas City schools and the student populations of the schools in the surrounding suburbs were "'caused by official activity of any sort.'" 515 U.S. at 93-94 (quoting *Milliken I*, 418 U.S. at 757 (Stewart J., concurring)). An inter-district remedy could withstand scrutiny only if the record demonstrated that state or local officials "'had contributed to the separation of the races.'" 515 U.S. at 92 (quoting *Milliken I*, 418 U.S. at 755 (Stewart, J. concurring)).[21]

---

[21] In her concurring opinion, Justice O'Connor offered examples of the types of conduct that might warrant an inter-district remedy. She explained:

> In the paradigmatic case of an interdistrict violation, where district boundaries are drawn on the basis of race, a regional remedy is appropriate to ensure integration across district lines. So, too, where surrounding districts contribute to the constitutional violation by affirmative acts intended to segregate the races— *e.g.*, where those districts "arrang[e] for white students residing in the Detroit District to attend schools in Oakland and Macomb Counties," *Milliken I* of course permits interdistrict remedies in these instances of interdistrict violations. Beyond that, interdistrict remedies are also proper where "there has been a constitutional violation within one district that produces a significant segregative effect in another district." Such segregative effect may be present where a predominantly black district accepts black children from adjacent districts, or perhaps even where the fact of intradistrict segregation actually causes whites to flee the district, for example, to avoid discriminatorily underfunded schools—and such actions produce regional segregation along district lines. In those cases, where a purely intradistrict violation has caused a significant interdistrict segregative effect, certain interdistrict remedies may be appropriate. Where, however, the segregative effects of a district's

The Supreme Court also found that the district court's continued effort to make the Kansas City schools attractive to students in the surrounding suburbs was too far removed from the task of eliminating racially identifiable schools within the municipal district. Moreover, because the district court had made no specific findings regarding the nature of the reduction in achievement by minority students in the Kansas City district and the extent to which that reduction was related to *de jure* segregation, the district court could not continue to pursue "academic goals unrelated to the effects of legal segregation" because doing so, without consideration of the extent to which the goals of the quality education plan already had been accomplished, unjustifiably postponed the municipal district's ability to operate without federal court supervision. 515 U.S. at 100-102.[22]

---

constitutional violation are contained within that district's boundaries, there is no justification for a remedy that is interdistrict in nature and scope.

515 U.S. at 109-10 (O'Connor, J., concurring) (alteration provided by *Jenkins III*).

[22] In its principal brief in support of its motion for separation, the Gardendale Board urges the Court to cabin the holdings of *Green*, *Wright*, and *Scotland Neck*, and apply instead the principles that the Supreme Court enunciated in *Dowell*, *Freeman*, *Jenkins III*, *Parents Involved in Community Schools v. Seattle School District*, 551 U.S. 701 (2007), and *Shelby County v. Holder*, 133 S. Ct. 2612 (2013). (Doc. 1097, pp. 17-30). The Court has discussed the *Dowell*, *Freeman*, and *Jenkins III* opinions extensively because those three opinions are in the vein of traditional public school desegregation cases that pertain to districts like Jefferson County that have operated under a federal desegregation order. (*See* pp. 47-58, above). The Court does not pause long over the *Parents Involved* and *Shelby County* opinions. *Parents Involved* concerns two public school districts, one of which was neither racially segregated by law nor subject to a federal desegregation order, and the other of which had been released from federal oversight. 551 U.S. at 712, 720-21. Despite the fact that neither district was constitutionally compelled to

58

## 2001: *Duval County* – Affirming a District Court Order Terminating Federal Oversight of a Public School District

In *N.A.A.C.P., Jacksonville Branch v. Duval County School*, the Eleventh Circuit affirmed a district court decision that terminated federal oversight of a large public school district in Florida. 273 F.3d 960 (11th Cir. 2001). The schools in the district had been operating under a consent agreement that the parties had negotiated in 1990 when the district eliminated mandatory bussing and non-contiguous zoning in favor of local attendance zones. During the nearly two decades in which the district adhered to non-contiguous school zones, the student bodies of virtually all of the 142 schools in the district were integrated; only 18 schools remained racially identifiable. When the district reverted to local zones, the student populations in many of the schools became racially segregated again. Consequently, the consent decree called for implementation of voluntary desegregation tools like magnet programs and majority-to-minority transfers. In addition to instituting programs to promote racial desegregation of the student bodies of the district's schools, the consent agreement set goals for achieving racial

---

address racial disparities in student assignments, both districts adopted student assignment plans in an effort to achieve racial balance in the districts' schools apparently for the sake of balance alone. The record in *Parents Involved* contained no evidence that enabled the Supreme Court to identify a pedagogic concept related to diversity of student bodies that would allow a finding that the diversity policy advanced specific educational goals. *Id.* at 722-29. The Supreme Court repeated its holding in *Freeman* that "[r]acial balance is not to be achieved for its own sake." 551 U.S. at 729-30 (quoting *Freeman*, 503 U.S. at 494). *Shelby County* is a voting rights decision that is remotely relevant only because it addressed civil rights remedies that initially were implemented decades ago. The Court discusses Gardendale's argument regarding the *Shelby County* opinion below.

balance in faculty and staff, transportation, extracurricular activities, and facilities—essentially all of the *Green* factors. *Id.* at 962-64. The consent agreement was designed to provide "a roadmap to the end of judicial supervision" of the district. *Id.* at 963.

Five years after the school board first implemented the terms of the consent agreement, the board filed a motion for a declaration of unitary status. Two years of hearings and briefing followed. 273 F.3d 964-65. The district court issued an exhaustive opinion that provided the basis for the court's finding that the board "had fulfilled its constitutional obligation to eliminate the vestiges of *de jure* segregation" and had desegregated the schools in the district "in good faith and to the extent practicable." *Id.* at 965.

The Eleventh Circuit began its evaluation of the district court's declaration of unitary status with a discussion of the legal framework for the review. The Court of Appeals stated:

> School boards that formerly operated a *dual* school system, in which black students attended one set of schools and white students another, have been "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a *unitary* system in which racial discrimination would be eliminated root and branch."
>
> . . .
>
> To be entitled to the end of federal court supervision, a formerly dual school system must be able to prove that it has (1) complied in good faith with the desegregation decree, and (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable.

. . .

Since the Board operated *de jure* segregated schools in the past, there is a presumption that any current racial disparities in these areas are the result of its past unlawful conduct. *Keyes v. School Dist. No. 1,* 413 U.S. 189, 208–09, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The Board "bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior violation." *Freeman,* 503 U.S. at 493, 112 S.Ct. 1430.

. . .

If a school board can prove that . . . factors [which are not the result of segregation] have substantially caused current racial imbalances in its schools, it overcomes the presumption that segregative intent is the cause, and there is no constitutional violation. Where there is no constitutional violation, a school board is under no duty to remedy racial imbalances.

. . .

Furthermore, even when remedying the effects of *de jure* segregation, the Constitution does not require rigid racial ratios. . . . [A] complete return to local control of school systems is the ultimate goal of all judicial supervision because "[f]rom the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination," and desegregation decrees "are not intended to operate in perpetuity."

273 F.3d at 965-67 (footnotes and internal citations to *Green, Freeman,* and other

Supreme Court and Eleventh Circuit opinions omitted).

Applying these standards, all of the judges on the appellate panel agreed

that the evidentiary record demonstrated that the school district, through its good

faith efforts, had earned a declaration of unitary status under all but one of the

*Green* factors. For example, the court of appeals unanimously observed that the school board had "aggressively recruited black faculty and staff" and had achieved the goal established in the consent agreement for racial diversity of faculty and staff. 273 F.3d at 967.[23]

With respect to student assignments, two of the three appeals court judges concluded that the school board had successfully implemented and funded a robust magnet program to try to maintain racially diverse student bodies in the years following the elimination of non-contiguous school zones and bussing. 273 F.3d at 967-68, 974. To the extent that racially identifiable schools remained in the core of the district, the majority agreed with the district court's finding that the school board had not "contributed to or perpetuated the [] imbalance in any way," and the school board had "made enormous efforts to counter the effects of past discrimination and present-day choices by parents." *Id.* at 971. The majority held that the school board had "eliminated the vestiges of *de jure* segregation to the extent practicable" and that the board was "not responsible for the segregative effects of external forces over which [the board] ha[d] no control." *Id.* at 974.[24]

---

[23] Generally speaking, a school board has far more control over its hiring decisions than it has over the private decisions that families make about the neighborhoods in which they choose to live.

[24] Judge Barkett dissented from the majority's determination that the school board had eliminated the vestiges of *de jure* segregation to the extent practicable and had acted in good

Turning to the issue of good faith, the Eleventh Circuit reiterated that to achieve a declaration of unitary status, a school board must have "'in good faith fully and satisfactorily complied with, and shown a commitment to, the desegregation plan.' Failure to do so can justify continued judicial supervision of a desegregation decree." 273 F.3d at 974 (quoting *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cty., Fla.*, 244 F.3d 927, 942 (11th Cir. 2001)). The majority found that the school board had not violated the consent agreement, had "consulted extensively" with the private plaintiffs about the district's magnet program, and had "vigorously encourag[ed] a race neutral distribution of students throughout the system." 273 F.3d at 974. The board also had strategically built new schools in areas that would promote an increase in the desegregation of the district's schools because the areas were conducive to "black student mobility" and "naturally integrated housing patterns." *Id.* at 976.

Thus, because the majority concluded that the school district had eliminated to the extent practicable the vestiges of *de jure* segregation and had demonstrated, in good faith, its willingness to continue those efforts after the termination of federal oversight, the Eleventh Circuit affirmed the district court's decision to end federal supervision of the district. The *Duval County* opinion ends on this cautionary note:

---

faith with respect to student assignments. Judge Barkett's analysis appears at pages 977-91 of the *Duval County* decision.

none should read more into this judgment than it contains. With its implementation, the Duval County school system may be out of the courthouse, but it is not out of the reach of the Constitution, the Bill of Rights, and the laws of this land. Nothing in this judgment authorizes conduct contrary to these laws. The Board, and the people of Duval County who, in the end, govern their school system, must be aware that the door through which they leave the courthouse is not locked behind them. They will undoubtedly find that this is so if they fail to maintain the unitary system we conclude exists today.

273 F.3d at 976-77.

## August 2001: The Court Revises the Transfer Provision in the 1971 Desegregation Order

In August 2001, this Court found that "many student transfers for the 2001-02 school year that had been approved by the [Jefferson County] Board were not in compliance with the 1971 Court Order." (Doc. 780, p. 1). The Court ordered the parties to formulate new guidelines regarding Jefferson County's transfer policy. (Doc. 780). Under the amended procedure, only three types of transfers are available: racial desegregation transfers, employee transfers, and hardship transfers. (Doc. 998, p. 8).

## February 2003: Vestavia Annexes Cahaba Heights

In 2003, the City of Vestavia Hills annexed the Jefferson County community of Cahaba Heights. At the time, Cahaba Heights was a community of nearly 5,000 people, and it was predominantly white. As of the 2000 census, Cahaba Heights was 95% Caucasian. (Doc. 1126, p. 30). Jefferson County lost

900 residents under the age of 18 as a result of the annexation. (Doc. 1126, p. 93).

**June 2003: Leeds Separates from the Jefferson County School District**

On June 13, 2003, the Court entered an order approving the operation of the City of Leeds school district for the 2003-04 school year. (Doc. 824). At the time, both Leeds and Jefferson County had an under-18 black population of approximately 15%. (Doc. 1126, pp. 41-42).

**July 2004: Modification of Transfer Options to Comply with the No Child
         Left Behind Act**

In 2002, Congress passed the No Child Left Behind Act (NCLBA). That Act contained provisions which required public school boards to permit students attending a Title I school "identified for school improvement" to transfer to a school that is not identified for improvement. The Act also required public school boards to request a modification of desegregation orders where necessary to permit No Child Left Behind transfers. (Doc. 906, pp. 1-2). In July 2004, this Court approved Jefferson County's proposal to allow NCLB transfers from Brighton Middle School, the only Title I school in need of improvement that year, to various schools, none of which was in the Gardendale High School feeder pattern. (Docs. 868, 869).

**May 2005: Trussville Separates from the Jefferson County School District**

On May 2, 2005, the Court entered an order approving the operation of the Trussville school district. (Doc. 899). As of the 2000 census, 15% of the under-18 student population in Jefferson County was African-American; 1.3% of the under-18 student population in Trussville was African-American. (Doc. 1126, pp. 41-42). By 2010, 37% of the under-18 student population in Jefferson County was African-American; 8.2% of the under-18 student population in Trussville was African-American. (Doc. 1126, p. 43). Over the years, Trussville has annexed quite a few communities within Jefferson County and an area within St. Clair County. (Doc. 1132-6).

Trussville's separation capped three significant withdrawals of Caucasian communities from the Jefferson County public school system between 2000 and 2005. There were no municipal separations from the Jefferson County district between 1990 and 2000. During that decade, the Caucasian population in Jefferson County increased 2.5%. (Doc. 1126, pp. 29-30). In 2000, the student population in the Jefferson County school district was 75% white and 23% African-American. (Doc. 1126, p. 17). The separation of the Leeds and Trussville municipal systems from Jefferson County in 2003 and 2005, respectively, and Vestavia's annexation of Cahaba Heights in 2003 contributed to significant demographic shifts in Jefferson County. (Doc. 1126, p. 17). The Leeds and Trussville separations caused a 3% increase in Jefferson County's African-

American student population and a corresponding 3% decrease in the district's Caucasian student population.  (Doc. 1126, p. 41).  By 2015, the student population in the Jefferson County school district was 43% white and 47% African-American.  The following chart illustrates the impact of the municipal separations over the years:

**Jefferson County School District - 2000 to 2015**
**Enrollment by Race and Ethnicity**

| | 2000 Number | Percent | 2005 Number | Percent | 2010 Number | Percent | 2015 Number | Percent |
|---|---|---|---|---|---|---|---|---|
| **Total** | 40726 | 100.00% | 35834 | 100.00% | 35860 | 100.00% | 35988 | 100.00% |
| **White (Non-** | 30804 | 75.64% | 21811 | 60.87% | 18321 | 51.09% | 15629 | 43.43% |
| **Black (Non-** | 9354 | 22.97% | 12861 | 35.89% | 15304 | 42.68% | 17017 | 47.29% |
| **Hispanics (any race)** | 350 | 0.86% | 906 | 2.53% | 1794 | 5.00% | 2899 | 8.06% |

(Doc. 1131-6, p. 14).

## August 2005:  Students Attend Gardendale Schools via NCLB Transfers

In 2005, Brighton Middle, Erwin Elementary School (grades 3-6), Center Point Elementary School (K-2), and Fultondale Elementary School (K-6) were designated as NCLB schools in need of improvement.  (Doc. 906, p. 3).  The Court allowed students in sixth grade at Erwin Elementary and Fultondale Elementary to transfer to Bragg Middle School (12 students maximum, six of whom had to be from Erwin Elementary).  (Doc. 906, p. 4).  The Court allowed students in grades

K-5 at Fultondale Elementary to transfer to Snow Rogers Elementary School. (Doc. 906, p. 4).[25]

## August 2007: Students Attend Gardendale Schools Via NCLB Transfers

Brighton Middle and Fultondale Elementary made adequate yearly progress and were not required to offer transfer options under the NCLBA for the 2007-08 school year. (Doc. 942, p. 2). Erwin Elementary and Center Point Elementary remained in need of improvement. (Doc. 942, p. 2). The Court allowed students in sixth grade at Erwin Elementary to transfer to Bragg Middle (12 maximum). (Doc. 942, p. 3; Doc. 943). The Court allowed Center Point students to transfer to various non-Gardendale schools. (Doc. 942, p. 3; Doc. 943).

## August 2008: NCLB Transfers to Gardendale Schools

Erwin Elementary and Center Point Elementary remained in need of improvement in 2008. (Doc. 954). The Court allowed students in sixth grade at Erwin Elementary to transfer to Bragg Middle (12 maximum) for the 2008-09 academic year. (Doc. 954, p. 3; Doc. 955). The Court allowed students from Center Point Elementary (K-2) and from grades 3-5 at Erwin Elementary to transfer to Snow Rogers Elementary. (Doc. 954, p. 3; Doc. 955). This modification was the result of Paine Primary School and Paine Intermediate School (previous receiving schools for Center Point and Erwin Elementary grades 3-5)

---

[25] The Court approved an identical transfer scheme in 2006. (Docs. 930, 931).

splintering off as part of the Trussville municipal school system. (Doc. 954, p. 3, n. 1).

## 2009-2010: Construction of Gardendale High School

In 2010, Jefferson County built a new facility to house Gardendale High School. The $51 million facility was funded with the proceeds of a one-cent sales tax that the Jefferson County Commission imposed in 2004. (Doc. 1127, p. 134; Doc. 1128, p. 158; Doc. 1131-24, pp. 77-79). The Jefferson County Commission holds the debt on the new high school. (Doc. 1128, pp. 157-59).

Before the high school was built, there was debate about whether the facility should be located in Gardendale or Fultondale. (Doc. 1124, pp. 165-66).[26] Ultimately, at the urging of Gardendale residents, the Jefferson County Board decided to build the new high school within the municipal boundary of the City of Gardendale. (Doc. 1127, p. 135-36; Doc. 1128, pp. 117-18).[27]

To fulfill its obligations under the desegregation order, Jefferson County had to propose the new high school site to the private plaintiffs and the United States. The private plaintiffs and the United States agreed on the location with the

---

[26] Fultondale High School occupies a building that previously housed an all-black high school. The building is one of the oldest in the Jefferson County School system and is in poor condition. The Court visited Fultondale High School on April 14, 2016.

[27] Historically, a resident of Gardendale has served as a member of the Jefferson County Board of Education. Currently, the president of the Jefferson County board is a Gardendale resident. (Doc. 1128, p. 95). Thus, the citizens of Gardendale have always had a voice on the Jefferson County Board of Education.

understanding that Jefferson County would house a regional career tech program in the new facility that would draw students from across the county. (Doc. 1124, p. 163; Doc. 1127, pp. 135-36; Doc. 1128, p. 78; Doc. 1129-10, p. 2).[28] Jefferson County designed the Gardendale high school facility to educate many more students than the high school students who reside in the City of Gardendale. (Doc. 1127, p. 136).

The career tech program at Gardendale High is part of a district-wide effort to increase diversity in Jefferson County high schools. The Jefferson County Board has placed different career tech programs at different high schools throughout the district to encourage high school students to enroll in programs outside of their zoned high schools. (Doc. 1131-17; *see also* Doc. 1127, pp. 142-43). The career tech programs function as magnet programs for vocational skills, thereby fostering opportunities for voluntary desegregation. (Doc. 1127, pp. 135-39; Doc. 1128, p. 34).

Students from five different Jefferson County high school zones currently attend Gardendale High School to participate in the career tech program. (Doc. 1127, p. 136; Doc. 1129-8). Many of those students come from one-race or hyper-

---

[28] In May 2009, based on a joint motion from the private plaintiffs, the United States, and the Jefferson County Board of Education, the Court approved Jefferson County's motion for permission to build the new high school in the City of Gardendale. (Doc. 1124, p. 159; *see also* Doc. 959, pp. 5-8; Doc. 959-2; Doc. 960).

segregated schools.[29]   The career tech program attracts the students to a better-integrated student body.  (Doc. 1127, pp. 136-37).  In some instances, the county's career tech programs also attract students whose race is in the minority at the regional facility.  (Doc. 1131-18).  Students graduate from Gardendale's career tech programs with credentials that allow them to enter the work force immediately after graduation.  (Doc. 1127, p. 138).

The only compliment that any Gardendale board member who testified in this matter could muster for the $50+ million high school facility is that it has nice curb appeal.   (Doc. 1124, pp. 100-01).   Dr. Craig Pouncey, the current superintendent of the Jefferson County school system, testified that the high school is "the epitome of one of the best high schools anyone could ever hope for" and "an asset to any community."  (Doc. 1127, p. 134).  Based on the Court's 2016 visit to the high school, the Court credits Dr. Pouncey's testimony.   As

---

[29] The following Jefferson County high schools are predominantly white: Corner High, Mortimer Jordan High, and Oak Grove High.   The following Jefferson County high schools are predominantly black: Center Point High and Minor High.  (Doc. 1129-2).  To date, the parties have not agreed on a particular mathematical definition for the terms "predominantly black" and "predominantly white."  *See e.g., Duval County*, 273 F.3d at 962 n. 4 ("By agreement of the parties, an identifiably black school has a student body over 75% black."); *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cty., Fla.*, 244 F.3d 927, 935 n. 15 (11th Cir. 2001) (explaining that the district court "designated any school with a black/white ratio varying plus or minus 20 points from a 20/80 ratio as being 'racially identifiable' or 'racially imbalanced,'" and noting that because "the parties agree on what constitutes a racially identifiable school, we shall accept their definition for purposes of this case and this case only. We pass no judgment on the correctness of this definition.").

The Court uses these terms to denote schools where students of one race constitute a substantial majority of the school's student population.

photographs in the record demonstrate, Gardendale High School is an outstanding facility that offers state-of-the-art educational tools, particularly in the vocational areas of auto tech, welding, and graphic arts. (*See* Doc. 1127, p. 138; Doc. 1132-9, pp. 11-12).

It would cost the Jefferson County Board $55 million to build a new regional facility to replace Gardendale High School, and it would take at least two years to build the new facility. (Doc. 1127, pp. 137-38).

**2010 : Status of the Jefferson County School District and the Gardendale High School Feeder Pattern on the Eve of Gardendale's Separation Planning**

Historically, the Jefferson County Board of Education has operated one of the largest public school systems in the state of Alabama. (Doc. 1118, ¶ 24). The Jefferson County public school district sprawls across north-central Alabama, occupying a significant portion of Jefferson County's geographic boundaries. As of 2010, 11 municipal school systems also operated within Jefferson County. The municipal systems are clustered in a crescent swath that stretches from the south-western area of Jefferson County to the north-eastern part of the county. The following map depicts the 12 public school systems in Jefferson County:



(Doc. 1131-7, p. 58; Doc. 1118, ¶¶ 20-22).

The Jefferson County public school district is organized into 13 feeder patterns that are home to 56 schools. The following map identifies the 13 school zones in the Jefferson County public school system:



(Doc. 1131-6, p. 66).

As the map above illustrates, the Gardendale zone sits in the north-central section of Jefferson County. The zone consists of Gardendale High School, Bragg Middle School, Gardendale Elementary, and Snow Rogers Elementary. According to census data, as of 2010, Gardendale had just under 14,000 residents, 88.4% of whom were Caucasian and 8.6% of whom were African-American. (Doc. 1131-6, p. 21; 2010 Census Data, Appendix C). As of 2010, the racial composition of the student populations of the four schools in the Gardendale zone was as follows:

|                        | **Black** | **White** |
|------------------------|-----------|-----------|
| Gardendale Elementary  | 20.10%    | 74.67%    |
| Snow Rogers Elementary | 4.17%     | 94.27%    |
| Bragg Middle           | 20.52%    | 76.79%    |
| Gardendale High        | 22.60%    | 74.98%    |

(Doc. 966-1).

In 2010, students who lived outside of Gardendale's municipal limits were responsible for much of the racial diversity in the Gardendale feeder pattern, particularly in the middle school and the high school. At the middle school level, students from the unincorporated community of Mount Olive, the Town of Brookside, the City of Graysville, and the unincorporated community of North Smithfield/Greenleaf Heights join students from Gardendale Elementary and Snow Rogers to form the student bodies for Bragg Middle School and Gardendale High School. (Doc. 1124, p. 37; Doc. 1125, pp. 111, 167-68, 174-75). For elementary school, most of the students from the community of Mount Olive attend Mount Olive Elementary School;[30] most of the students from the town of Brookside and the City of Graysville attend Brookville Elementary; and the students from the

---

[30] Currently, some students who live in the Mount Olive area are zoned for the Mortimer Jordan feeder pattern; some are zoned for the Gardendale High zone. (Doc. 1124, p. 260). According to data reported by Gardendale's school superintendent, as of the fall of 2015, Mount Olive Elementary School's student population consisted of 292 Caucasian students and eight African-American students. (Doc. 1131-23, p. 2).

community of North Smithfield attend Fultondale Elementary. (Doc. 1125, pp. 174-79, 248).

The community of Mount Olive, the town of Brookside, and the City of Graysville are contiguous to the City of Gardendale. The community of North Smithfield is not contiguous to Gardendale; North Smithfield sits just to the north of the City of Birmingham. (Doc. 1129-9). North Smithfield is an African-American community. When it issued the September 1971 desegregation order in this case, the Court zoned elementary-aged students from North Smithfield for Fultondale elementary to help desegregate the Fultondale feeder pattern. The Court zoned middle school and high school students from North Smithfield for Bragg Middle and Gardendale High to desegregate the Gardendale feeder pattern. (Doc. 1124, pp. 35, 37; Doc. 1125, pp. 167-68).[31]

**July 2011: NCLB Transfers to Gardendale Schools**

In 2011, Erwin Elementary School and Center Point Elementary School remained NCLB schools in need of improvement. Students in grades 6-8 were moved to a dedicated middle school named Erwin Middle School which also was designated as a school in need of improvement. Jefferson County opened a new Center Point High School. Because most of the students in the new high school were from Erwin Elementary, the new Center Point High School was designated as

---

[31] Currently, the 371 "rooftops" in the North Smithfield community contribute approximately 200 children to the Gardendale feeder pattern. (Doc. 1124, pp. 39-40; Doc. 1125, p. 238).

an NCLB school in need of improvement. (Doc. 973, p. 3). The Court allowed students from Center Point Elementary and Erwin Elementary to transfer to various non-Gardendale schools. (Doc. 973, p. 3). The Court allowed a maximum of 12 students from Erwin Middle School to transfer to Bragg Middle School. (Doc. 973, p. 3; Doc 974).

## 2012: The Seeds of the Gardendale Municipal School System

The City of Gardendale has contemplated separation from the Jefferson County public school system for more than two decades. (Doc. 1124, pp. 51-52; Doc. 1128, pp. 101-02, 119-20; *see also* Doc. 1131-43, pp. 1-2; Doc. 1131-44, p. 10; Doc. 1131-47, pp. 6, 8; Doc. 1131-50; Doc. 1131-51). Early feasibility studies did not support separation. (Doc. 1124, pp. 167-68; Doc. 1128, p. 120; Doc. 1131-50; Doc. 1131-51).[32]

In 2012, two Gardendale residents and a resident of Mount Olive renewed the effort to form a Gardendale municipal public school system. (Doc. 1124, pp. 170-71, 186, 191-92; Doc. 1131-35, p. 14; Doc. 1131-44, pp. 9-10).[33] Before undertaking the work necessary to form a separate school system, none of the organizers attempted to contact the Jefferson County Board of Education to discuss

[32] Although separation seems to have been a topic of conversation for more than 20 years, formal exploration of the feasibility of separation took place in 1999 and 2005. (Doc. 1124, pp. 168-69; Doc. 1128, p. 119; Doc. 1131-41, p. 12).

[33] The Mount Olive resident relocated his family to Gardendale when separation efforts began in earnest. (Doc. 1124, pp. 201-02; Doc. 1131-38, p. 7).

the schools located in Gardendale's municipal boundaries. None of the organizers tried to confer with Gardendale's representative on the Jefferson County Board of Education. (Doc. 1124, pp. 208-09; Doc. 1131-41, p. 19; Doc. 1131-44, pp. 7, 12-13; Doc. 1128, pp. 95, 109; *see generally* Doc. 1128, pp. 115-17).[34]

When asked to describe the deficiencies in the Gardendale schools that caused him to want to wrest those schools from Jefferson County's management, one of the organizers gave evasive responses and acknowledged that his children were doing well in school. (Doc. 1131-41, pp. 10, 13, 23). When asked to identify changes that the Gardendale system should make if allowed to separate, the organizer replied "general improvements of education." (Doc. 1131-41, p. 23).

Another organizer stated that his primary reason for supporting a separate system is that "historically in many areas, including Alabama, a smaller system with individual local control [] tend[s] to perform better academically than larger systems."[35] In addition, in the organizer's view, a local school system "seems to be a component for a vital community with higher-than-average growth and desirability." The organizer testified: "you have to separate" if you want "the

---

[34] This board member has a masters degree in education. Before he retired, he taught at Bragg Junior High and Fultondale High School, and he was the assistant principal at Gardendale High School. (Doc. 1128, p. 98).

[35] The organizer defined "local control" as control of funding, increased parent access to the district's superintendent, and expanded opportunities for engaging the community in the public school system. (Doc. 1124, pp. 144, 173).

ability to control your own revenue stream."  (Doc. 1131-44, pp. 10-11, 13; *see also* Doc. 1131-44, p. 12 (stating preference for "a smaller system to allocate its resources to its own benefit")).  The organizer noted that "a lot of folks [in Gardendale] are moving south of town" to areas with municipal school systems such as Vestavia Hills, Mountain Brook, Hoover, and Trussville.  (Doc. 1131-44, p. 13).

The third organizer shares the view that municipal districts equate with better-performing public schools.  He testified:  "whether you look in Jefferson County or whether you look across the State of Alabama or you look across the nation, [] the better performing public school systems are city-based systems and they're smaller where decisions are made at a very hyper-local level."  (Doc. 1124, p. 173; *see also* Doc. 1124, p. 188:13-14, p. 204:19-22).[36]

---

[36] As support for the proposition that schools in municipal systems perform better than schools in county systems, Gardendale cites a report that ranks North Alabama school systems by composite ACT Aspire test scores for third and eighth grade students.  Of the 23 school systems included in the report, the top five school systems are Mountain Brook City Schools, Vestavia Hills City Schools, Homewood City Schools, Hoover City Schools, and Trussville City Schools.  (Doc. 1129-3, p. 11; *see* Doc. 1124, p. 228).  The bottom five school systems also are municipal systems.  They are Birmingham City Schools, Fairfield City Schools, Tarrant City Schools, Bessemer City Schools, and Midfield City Schools.  (Doc. 1129-3, p. 11; *see* Doc. 1124, pp. 229-31).

The Jefferson County district ranks at 17 of the 23 school systems.  (Doc. 1129-3, p. 11; Doc. 1124, pp. 105-06).  The ranking does not identify specific Jefferson County schools, so it provides no insight into average ACT scores for Gardendale schools.  On its website, the City of Gardendale represents that the schools within the Jefferson County public school system that are located in Gardendale consistently rank at the top of the Jefferson County schools academically.  (Doc. 1124, p. 25 (citing http://cityofgardendale.com/site/?page_id=609, attached as Appendix D)).

To launch the effort to form a separate school municipal school system, the organizers took a number of steps. In September 2012, one of the organizers created a "Gardendale City Schools" Facebook page to generate discussion about the formation of a separate municipal school system. (Doc. 1124, pp. 191-92; Doc. 1131-40, p. 1; Doc. 1131-41, p. 16; Doc. 1131-44, p. 9; Doc. 1132-2, pp. 188-89; Doc. 1132-3, p. 314). He and the two other organizers were the administrators for the Facebook page. (Doc. 1131-44, pp. 14-15; Doc. 1132-2, pp. 142, 180). The Facebook page is a public page, meaning that anyone may access the page and read its contents; however, participants in conversations on the page have to be admitted by an administrator. (Doc. 1125, pp. 4-6; Doc. 1131-44, pp. 15-16). According to

Gardendale also points to the average ACT admission scores for the University of Alabama and Auburn and argues that the recent average ACT score of 19 for Gardendale high school students meets only the minimum ACT score for Alabama university admissions. (Doc. 1124, pp. 104, 108, 175, 178, 202-03). In discussing average ACT scores, Gardendale does not account for the fact that in 2014, the State of Alabama shifted its focus for high school students from college admissions to college admissions and career readiness to help prepare high school students who wish to enter the work force when they graduate from high school. Jefferson County has complied with the state's directive and developed strong career programs for those students who have no incentive to try to score well on the ACT because they are on a career track rather than a college track. (Doc. 1127, p. 140).

Gardendale's argument also overlooks the fact that students in Gardendale who want the best possible college preparatory experience have at their disposal the Jefferson County International Baccalaureate School at Shades Valley High School. In 2005, Jefferson County's IB program was ranked the best high school in the nation. (Doc. 1131-39, p. 36). More recently, the IB school was ranked as the best high school in the State of Alabama and the ninth best in the nation. (http://jcib.jefcoed.com, attached as Appendix E; Doc. 1124, p. 225; *see also* Doc. 1128, pp. 79-80). Jefferson County started operating the IB program in the Rosedale Community School, the black school that the Homewood Board of Education gave to the Jefferson County Board of Education when Homewood separated from the Jefferson County system. (Doc. 1128, p. 79; *see* p. 19, above). In the past few years, Jefferson County began operating a middle school IB program. That program attracts students from throughout the county. (Doc. 1127, p. 116).

an October 2012 news article, the Facebook page had 760 members.  (Doc. 1131-40, p. 1).

The Facebook page discussion began on September 12, 2012.  (Doc. 1132-2, p. 181).  The first statement from one of the separation organizers reads:

> There are a number of people who are discussing the possibility of forming a Gardendale school system. There are a [*sic*] benefits to such a proposal, such as true local control over our schools and the accompanying prospect for higher academic achievement and greater flexibility, better control over the geographic composition of the student body, protection against the actions of other jurisdictions that might not be in our best interests, the real prospect of higher property values over the longer term, a brand spanking new high school which would become ours should we form the school system, etc.

(Doc. 1132-2, p. 181, Sept. 12, 2012, 3:03 p.m.; *see also* Doc. 1131-40, pp. 1-2).[37]

Again on September 15, 2012 on the Gardendale Schools Facebook page, in the course of trading remarks with residents of Gardendale and Mount Olive, one of the organizers described various reasons for operating a separate municipal school system.  He commented on funding issues, test scores, municipal growth, and field trips.  (Doc. 1132-2, p. 185, Sept. 15, 2012, 7:12 p.m.).  For example, he stated: "Our classrooms are underfunded. . . . Without funded classrooms, we cannot attract the best teachers. . . . Our children haven't been on field trip [*sic*] in years because JeffCoEd is struggling."  (*Id.*).  He added:  "We are using buses to

---

[37] In his deposition, the organizer testified that his reference to the geographic composition of the student body concerned the areas that "traditionally have always fed Gardendale City Schools," including the North Smithfield community.  (Doc. 1131-44, p. 11).

transport nonresidents into our schools (without additional funding) from as far away as Center Point (there's your redistribution of wealth)." (*Id.*). The organizer commented: "A look around at our community sporting events, our churches are great snapshots of our community. A look into our schools, and you'll see something totally different." (*Id.*).

The next day, on September 16, 2012, in response to a remark from someone in the ongoing conversation, the organizer wrote:

> You're likely not aware that non-resident students are increasing at a [*sic*] alarming rate in our schools. Those students do not contribute financially. They consume the resources of our schools, our teachers and our resident students, then go home. I welcome those students, but they'll need to move to Gardendale or pay a transfer fee. Make sense?

(Doc. 1132-2, p. 186, Sept. 16, 2012, 10:21 p.m.). Other participants in the discussion echoed the organizer's remarks. There are multiple comments in the vein of "[o]ur schools are busting at the seams with students from other communities," and "they bus kids in from all over." (Doc. 1132-2, pp. 181, Sept. 12, 2012, 6:11 p.m. & 9:25 p.m.). One participant put it this way:

> did you know we are sending school buses to Center point [sic] and busing kids to OUR schools in Gardendale, as well as from Smithville! This is all due to the 'No child left behind act' that if a school doesn't make AYP they can go to another school within their county system. This law had good intentions but has really created a mess for the schools. Smithville kids have been bused here for years due to the desegregation from decades ago and that should have already been changed because we have a very diverse population now in our area. We are busting at the seams and can't continue on this path!

(Doc. 1132-2, p. 183, Sept. 13, 2012, 1:41 p.m.; *see also* Doc. 1128, pp. 125-26).[38]

The September 12, 2012 Facebook conversation included much debate about whether the community of Mount Olive would be annexed into Gardendale so that Mount Olive children could attend Gardendale schools. (Doc. 1132-2, pp. 181-89). One of the organizers wrote that "part of the [separation] plan to make it work

---

[38] The participants in the conversations on the Facebook page are individuals whom the three separation organizers/Facebook administrators admitted to the page and from whom the administrators/organizers sought remarks about a municipal school system—remarks to which the three administrators replied, and remarks that the administrators edited and deleted. (Doc. 1124, p. 192; Doc. 1125, pp. 4-6; *see also* Doc. 1132-2, p. 168, Oct. 4, 2012, 3:05 a.m. (administrator post stating that certain posts that "were trending towards getting chippy" were deleted and that the language of some posts was softened); Doc. 1132-2, pp. 143-153 (series of posts that discuss other posts that administrator deleted); Doc. 1132-2, p. 180). In fact, in one of his posts, a separation organizer/Facebook administrator stated:

> With regard to nobody in particular, unless you have specific factual information about racial motivation on the part of someone else here, think twice before you hit the post button when it comes to racism. Blanket allegations of that sort will be deemed a personal attack and deleted. I'm not saying every question about race is invalid, I am saying that simply making a charge that racism is the reason for something just because you think it might be is going to be a problem. That kind of thing only serves to poison the discussion. Basically, the level of discourse we seek to have here is that we would expect in a face-to-face conversation with our neighbor. If it can't be said in that manner, then I am sure there are other groups on Facebook that cater to a lesser level of discussion.
>
> This is not about race, it is about doing the best we can for our community and all members thereof, regardless of their skin color.

(Doc. 1132-2, p. 124, May 10, 2013, 9:22 p.m.). The Court believes that the statements on the Facebook page reliably convey the sentiments of separation supporters and opponents. To eliminate potential concerns regarding hearsay, the Court focuses its attention on the separation organizers' statements. The Court examines the balance of the remarks not for the truth of the matter asserted—indeed some of the statements about NCLB transfers and "Smithville kids" (an apparent reference to students from the North Smithfield community) are inaccurate—but for what the statements reveal about intent. *See, e.g., Jefferson v. Burger King Corp.*, 505 Fed. Appx. 830, 836 (11th Cir. 2013) (admitting employee complaints against plaintiff because they were offered not for their truth but to show employer's reasons for terminating plaintiff).

would include Mt. Olive." (Doc. 1132-2, p. 181, Sept. 12, 2012, 7:45 p.m.; *see generally* Doc. 1124, pp. 202, 211, 222-23). Another organizer wrote, "Mount Olive will one day be in Gardendale city limits. As a matter of fact, all of Jefferson County will one day be in the city limits of some municipality." (Doc. 1132-2, p. 181, Sept. 12, 2012, 7:55 p.m.). On September 13, 2012, there was some discussion about ways to retain in the Gardendale system students from the community of Brookside that had been a part of the Gardendale feeder pattern for years. (Doc. 1132-2, p. 179, Oct. 2, 2012, 4:50 a.m. & Oct. 3, 2012, 3:51 a.m.). There were no similar remarks concerning students from the North Smithfield community.

In addition to creating the Facebook page, the organizers of the separation effort approached Gardendale's mayor and the Gardendale City Council and requested a feasibility study. (Doc. 1124, pp. 171, 189, 191-92; Doc. 1128, p. 103; Doc. 1131-41, p. 12; Doc. 1131-44, p. 9; Doc. 1132-2, pp. 188-89; Doc. 1132-3, p. 314). With respect to the municipal action required to start a splinter district, one organizer stated: "the first order of business was to" have "conversations with the mayor at the time and the [city] council at the time, and we got their backing because any kind of official actions would obviously have to occur through the city . . . ." (Doc. 1124, p. 171). "At the end of the day, [city officials have] to drive the

official efforts, but it really became a groundswell of a movement and that was how the whole idea was born." (Doc. 1124, p. 188).

## August 2012: NCLB Transfers to Gardendale Schools

In 2012, Fultondale Elementary School was added to the list of schools in need of improvement in the Jefferson County public school system. (Doc. 976, p. 3). The Court allowed students from Center Point Elementary, Center Point High School, and Erwin Elementary School to transfer to various non-Gardendale schools. (Doc. 976, p. 3; Doc. 977). The Court allowed a maximum of 12 students from Erwin Middle School to transfer to Bragg Middle School. (Doc. 976, p. 4; Doc. 977). The Court allowed students from grades K-5 at Fultondale Elementary School to transfer to Snow Rogers Elementary School. (Doc. 976, p. 4; Doc. 977).

## October 2012: Gardendale City Council Commissions School Feasibility Study

In October 2012, the Gardendale City Council commissioned Dr. Ira Harvey to study the feasibility of a Gardendale municipal school system. (Doc. 1124, pp. 171, 191; Doc. 1132-2, p. 160). After the City Council voted to fund the feasibility study, a participant in the Gardendale Schools Facebook page asked if the feasibility study would address the impact of the federal desegregation order in this case. In responding to the question, one of the separation organizers stated:

> Would Gardendale be required to bring in minorities from outside of the municipal boundaries to achieve some sort of quota? No. The school system is for residents of Gardendale (whatever those boundaries end

up being and whatever that racial makeup is). The idea is that it might include an expansion to include an annexation of certain parts of Mount Olive.

(Doc. 1132-2, p. 167, Oct. 2, 2012, 10:53 p.m.).  The organizer acknowledged that he is not an expert in federal desegregation law and that Gardendale would have to hire a lawyer with experience in the field to answer questions about the 1971 desegregation order.  (Doc. 1132-2, p. 167, Oct. 3, 2012, 1:22 a.m.).

**April 2013: FOCUS Gardendale**

In April 2013, one of the separation organizers announced on the Gardendale City Schools Facebook page that the feasibility study soon would be completed, and a "citizens group" called FOCUS Gardendale was forming in anticipation of the feasibility study.  FOCUS stands for Future of Our Community Utilizing Schools. The president of the Gardendale Board described FOCUS Gardendale as a "grassroots" organization.  (Doc. 1131-35, p. 11).  An organizer wrote on the Gardendale City Schools Facebook page:

> we want to get together as many people as possible from BOTH Gardendale, and Mt. Olive to begin creating awareness, and to understand questions that may arise.  If you, or your friends are unsure where you stand, this meeting will give you the information you need. Please make plans to attend - this is a once in a lifetime opportunity for our community that will be impactful for generations to come.

(Doc. 1132-2, p. 158, Apr. 19, 2013, 1:34 a.m. (emphasis in post); *see also* Doc. 1124, pp. 196-97; Doc. 1131-41, pp. 13-14).[39]

FOCUS Gardendale held its first public meeting on April 22, 2013. (Doc. 1131-43, p. 1). Approximately 80 people attended the meeting. (Doc. 1131-43, p. 1; *see also* Doc. 1132-2, p. 139). According to a news article published the following day, there was much debate at the meeting about the annexation of Mount Olive. (Doc. 1131-43, p. 1).

A long Gardendale City Schools Facebook exchange followed the FOCUS Gardendale meeting. Comments made by one of the separation organizers confirm that there was a lot of discussion at the meeting and disagreement regarding inclusion of the Mount Olive community in the Gardendale municipal school system. (Doc. 1132-2, pp. 143-153).[40] One of the organizers of the separation effort contributed:

> Annexation creates a defined school district boundary. No annexation will leave lots of guesswork for MO and leaves MO exposed to decisions being made by people far removed from our community (Dept of Justice, Jeff Co, State of Ala, etc).

---

[39] FOCUS Gardendale is registered with the State of Alabama as a domestic non-profit corporation. Three of the six original directors of the corporation are founding organizers of the Gardendale separation. FOCUS Gardendale was incorporated on August 28, 2013, and it was dissolved on December 31, 2014. (Doc. 1131-36).

[40] The City of Gardendale has annexed a number of areas over the past 20 years, so annexation is an option that the city seems comfortable exercising. (Doc. 1132-7).

(Doc. 1132-2, p. 150, Apr. 23, 2013, 5:05 p.m.).[41]

The April 23, 2013 news article describing the first FOCUS Gardendale meeting reports that during the meeting, one of the separation organizers "compared the path that Gardendale is on currently with that of neighboring Center Point, two towns that share a common bond – neither levies property taxes, the only two cities of their size in Alabama that don't." (Doc. 1131-43, p. 1). The organizer reportedly stated: "It likely will not turn out well for Gardendale if we don't do this. We don't want to become what [Center Point] has." (Doc. 1131-43, p. 1).[42] In his deposition, the organizer acknowledged the remark but said that he was commenting on the fact that the cities of Gardendale and Center Point are similar in size but neither, at the time, had a municipal property tax. (Doc. 1131-41, pp. 21-22). The organizer testified that Center Point is "just a community that

---

[41] The lengthy Facebook exchange includes comments from individuals other than the FOCUS Gardendale organizers about the quality of the academic programs in the schools in the Gardendale feeder pattern, the demographics of Center Point and Adamsville, the number of students bussed into schools in the Gardendale feeder pattern from other areas of Jefferson County, and the fate of children from the community of Brookville and their parents' opposition to rezoning those students to the Minor High School feeder pattern if Gardendale separates. (Doc. 1132-2, pp. 143-153; *see also* Doc. 1132-2, pp. 126, 134). Consistent with the Court's previous statement (n. 38, above), the Court does not consider these statements for the truth of the matter asserted but only to evaluate the topics that people discussed and the way in which the topics shed light on the rationale offered for separation.

[42] *See also* (Doc. 1132-2, p. 143, Apr. 23, 2013, 3:37 a.m.) (Gardendale Schools Facebook comment that asks: "would you like to live in Center Point or Adamsville? Wake up, it's closer than you may think. I encourage you to ride around those areas, maybe even Pinson or Huffman and think about how quickly an area's demographics change. This is about a community wanting progress, not regress. Reality.").

did not take education into its own hands to make it the best that it can be." (Doc. 1131-41, p. 21).

According to 2010 census data, the city of Center Point has a total population of nearly 17,000 citizens, 62.9% of whom are African-American and 32.6% of whom are Caucasian. (2010 Census data, Appendix F). Center Point is part of the Center Point/Erwin/Pinson school zone. (Doc. 998-7, p. 2). There are four schools in the Center Point High School feeder pattern: Center Point Elementary, Erwin Intermediate, Erwin Middle, and Center Point High. (Doc. 998-7, p. 2). For the 2015-16 academic year, Center Point Elementary had a student population that was 92.52% black and 2.14% white; Erwin Intermediate had a student population that was 94.29% black and 1.05% white; Erwin Middle had a student population that was 97.46% black and 0.51% white; and Center Point High School had a student population that was 96.27% black and 1.20% white. (Doc. 1033-1). In raw numbers, there were 606 black students and 14 white students in Center Point Elementary; there were 628 black students and 7 white students in Erwin Intermediate; there were 576 black students and 3 white students in Erwin Middle; and there were 800 black students and 10 white students at Center Point High School. (Doc. 1033-1; *see also* Doc. 1124, pp. 288-89).

As the following map illustrates, Center Point abuts the southeastern edge of Gardendale, and Center Point sits between Gardendale and Trussville.

**Jefferson County -- Percent Black Under-18 by School District (2010 Census)**



(Doc. 1131-6, p. 6). The following map demonstrates that as of the 2000 census, Center Point had the highest concentration of black students of any elementary zone in the Jefferson County public school system.

## Percent Black Under-18 by Elementary Attendance Zone (2010 Census)



(Doc. 1131-6, p. 16).

According to 1970 census data, Center Point had a total population of 15,675 individuals, 15,627 of whom were white and 30 of whom were black. (*See* 1970 Census Data, Appendix G). In 1970, Center Point Elementary had an enrollment of 1,006 white students and 12 black students. (Doc. 1, p. 20, Jefferson County Annual Report 1970-71 school year; *see generally* Doc. 1128, p. 124). In short, Center Point has shifted from a

predominantly white city to a predominantly black city since the Court issued the 1971 desegregation order, and the student bodies in Center Point's public schools which formerly were almost entirely white have become almost entirely black.

In 1971, the City of Gardendale was whiter than it is today. (Doc. 1128, p. 124). Twenty years ago, the student population in Gardendale was 92% Caucasian and 8% African-American. Today, approximately 20% of the student population within Gardendale's municipal limits is African-American. (Doc. 1128, pp. 131-32).

## May 2013: Dr. Harvey Opines that a Gardendale District is Feasible

On May 14, 2013, Dr. Harvey presented the results of his feasibility study at a Gardendale town hall meeting. Dr. Harvey concluded that separation was possible, in large part because a Gardendale municipal school system would inherit the virtually-brand new Gardendale High School facility debt-free. (Doc. 1131-24 (May 14, 2013 Harvey Report), p. 37; *see also* Doc. 1124, pp. 24-25, 168, 172; Doc. 1131-32, p. 4; Doc. 1131-42, p. 12). Dr. Harvey said that Gardendale's unique opportunity to obtain a brand new high school without charge is "totally remarkable." (Doc. 1124, pp. 24-25; *see also* Doc. 1131-32, p. 4). Dr. Harvey included Mount Olive Elementary School in his feasibility analysis even though that school is not within Gardendale's current municipal boundaries. (Doc. 1131-24, pp. 37-38).

### Summer and Fall 2013: FOCUS Gardendale Begins Campaign to Pass Ad Valorem Tax to Fund the Gardendale Municipal School System

After Dr. Harvey announced the results of his feasibility study, FOCUS Gardendale spearheaded a campaign to raise taxes to support the Gardendale school system. (Doc. 1124, p. 197; Doc. 1131-41, p. 15). FOCUS Gardendale members met with each member of the city council to persuade the council members to vote for the municipal district and pass a five mill ad valorem tax. (Doc. 1131-41, p. 17; Doc. 1124, p. 189). Trial evidence indicates that one of the separation organizers sent an email message in which he reported that he and another organizer "put the [Gardendale] mayor and the [Gardendale City] council in a head lock until they came to their own conclusions that the school system had to happen." (Doc. 1124, p. 212).

FOCUS Gardendale members also consulted State Senator Scott Beason. Senator Beason lives in Gardendale. (Doc. 1124, pp. 189-90; Doc. 1131-41, p. 17; Doc. 1131-47, p. 11). The FOCUS Gardendale members discussed with Senator Beason the process for potentially annexing the community of Mount Olive into the City of Gardendale. (Doc. 1124, p. 190). Senator Beason prepared legislation designed to accomplish this task. (Doc. 1131-47, p. 12). On the Gardendale City Schools Facebook page, one of the separation organizers advised residents of Mount Olive that if they wanted to be included in the new Gardendale School system, they

would need to contact Senator Beason and the Mayor of Gardendale.  (Doc. 1132-2, p. 119, May 15, 2013, 3:32 p.m.).

The Gardendale City Council approved a 5 mill ad valorem tax in September 2013.  (Doc. 1124, pp. 21, 92; Doc. 1130-3, pp. 1-2).  FOCUS Gardendale worked diligently to persuade the citizens of Gardendale to vote to approve an additional 5 mill ad valorem tax.  (Doc. 1124, p. 197; Doc. 1128, p. 104).  Members went door-to-door encouraging Gardendale's citizens to support the tax.  (Doc. 1124, p. 197; Doc. 1131-44, pp. 18, 20).

As part of the effort, FOCUS Gardendale published a flyer that bears the banner, "What path will Gardendale choose?"  (Doc. 1096-2, p. 2; Doc. 1128, p. 123; Doc. 1132-13, p. 2).  The flyer has a picture of a white elementary school student. (*Id.*).  The top of the flyer lists a number of cities in Jefferson County that have not formed municipal school systems.  (*Id.*).  Those cities are Adamsville/Forestdale, Hueytown, Pleasant Grove, and Center Point.  (*Id.*).  The cities have well-integrated or predominantly black populations.  (Doc. 1128, p. 123).[43]  The flyer then lists cities

---

[43] According to the 2010 census, Adamsville was 52.3% white and 44.9% black; Forestdale was 26.2% white and 71.4% black; Hueytown was 70% white and 27.2% black, Pleasant Grove was 53.7% white and 44.8% black; and Center Point was 33.5% white and 63.6% black. (*See* Appendix F (Center Point); Appendix H (Adamsville); Appendix I (Forestdale); Appendix J (Hueytown); Appendix K (Pleasant Grove)).  For the 2013-14 school year, the student population at Adamsville Elementary was 31.69% white and 59.69% black. The student population at Hillview Elementary (located in Forestdale) was 1.09% white and 93.12% black. The student population at Hueytown Elementary was 52.46% white and 39.79% black.  The student population at Hueytown Middle was 58.38% white and 36.60% black.  The student population at Hueytown High was 50.97% white and 43.27% black.  The student population at

that "chose to form and support their own school system." (Doc. 1096-2, p. 2; Doc. 1128, p. 123; Doc. 1132-13, p. 2). Those cities are Homewood, Hoover, Vestavia, and Trussville. (*Id.*). All of those cities currently are predominantly white, and they have been predominantly white since 1970.[44] The flyer characterizes the latter group of communities as "some of the best places to live in the country." (Doc. 1132-13, p. 2). One of the private plaintiffs testified that given the high concentration of black students in the schools in cities in the top list, the flyer, in her view, communicated: "[i]f you do not want the undesirables and the problem children, you'd best be forming your own [school] system." (Doc. 1128, p. 49).

Another document related to the tax referendum is titled: "Creating a Gardendale City School System – FREQUENTLY ASKED QUESTIONS." (Doc. 1131-32). In answer to the question "What are the benefits of local control?", the document states:

- Increased financial flexibility for curriculum electives to ensure our students are skilled in technology for the 21st century workplace
- Opportunities for innovation in encouraging students to pursue the study of mathematics and science

---

Pleasant Grove Elementary was 25.31% white and 71.12% black. The student population at Pleasant Grove Middle was 26.97% white and 72.77% black. The student population at Pleasant Grove High was 25.41% white and 73.67% black. (Doc. 984-1, p. 1).

[44] According to the 2010 census, Homewood was 74.6% white and 17.3% black; Hoover was 75.1% white and 14.8% black; Vestavia Hills was 90.4% white and 3.8% black; and Trussville was 90.3% white and 6.6% black. (*See* Appendix L (Homewood); Appendix M (Hoover); Appendix N (Vestavia Hills); Appendix O (Trussville)).

- The goal of every student having strong educators through excellence in hiring practices
- Adding teachers who specialize in equipping students with the skills to learn to read for comprehension of content in a variety of genres, how to write with meaning and how to think deeply and critically
- Place higher value on community service and civic participation
- Reduce student to teacher ratios to improve individual student instruction
- Policy development and outcomes that benefit the student
- A greater community feel makes parents feel more comfortable when interacting with teachers and administrators
- Closer student-faculty relationships result in improved student performance
- Focus on incentives with local businesses to encourage our students to pursue healthy, active adult lives

(Doc. 1131-32, p. 2). The document also states that the Gardendale municipal system will acquire the new high school "without cost" and that "[t]he debt to be assumed by the proposed Gardendale City School system is extremely small." (Doc. 1131-32, p. 4). Quoting Dr. Harvey's observations in the feasibility study, the document adds that Gardendale is in an "unprecedented" situation. (Doc. 1131-32, p. 4).

The vote on the ad valorem took place on November 12, 2013. (Doc. 1130-3). The citizens of Gardendale voted to impose another 5 mills to provide additional funding for the school system. (Doc. 1124, pp. 21, 92). One Gardendale Board member testified that there was overwhelming support in the City of Gardendale for the Gardendale municipal school system. (Doc. 1124, p. 244). Another board

member testified that "[n]early 70 percent of [Gardendale's] citizens voted in favor" of the additional five mills of ad valorem tax. (Doc. 1124, p. 92). The record demonstrates that just over 3,500 of Gardendale's nearly 10,000 registered voters participated in the vote on the tax referendum; 2035 individuals—58% of the citizens who voted (i.e., just over 20% of Gardendale's eligible voters)—supported the tax. (Doc. 1128, pp. 106-07, 128-29; Doc. 1130-3, p. 1; Doc. 1131-35, p. 21). The City of Gardendale has collected the additional ad valorem tax since 2014. (Doc. 1124, pp. 21-22; Doc. 1125, pp. 58-59).[45]

## March 2014: The Gardendale  City Council forms the Gardendale  Municipal School System

On March 3, 2014, the Gardendale City Council adopted an ordinance that established "a public school system for the City of Gardendale, Alabama, to be known as the Gardendale City School System." (Doc. 1129-1, p. 1). The ordinance also created the Board of Education for the Gardendale City School System. (Doc. 1118, ¶ 23; Doc. 1124, p. 20; Doc. 1129-1, pp. 1-3).[46]

## April 2014: Gardendale City Council Appoints Members of Board of Education

---

[45] According to the U.S. Census Bureau's 2010-2014 American Community Survey 5-Year Estimates, the median home value in in Gardendale is $160,800. (Doc. 1118, ¶ 28). A Gardendale citizen who owns a house with an appraised value of $160,000 will pay an additional $160 in ad valorem tax in light of the City Council's 5 mill increase and the citizens' 5 mill increase.

[46] The ordinance became effective April 1, 2014. (Doc. 1124, p. 49; Doc. 1129-1, p. 2, Section 5).

Alabama Code §16-11-2(b) states that "[t]he general administration and supervision of the public schools and educational interest of each city shall be vested in a city board of education, to be composed of five members who shall be residents of the city, and who shall not be members of the city council or commission." ALA. CODE. §16-11-2(b) (1975). Consistent with that statute, the municipal ordinance that created the Gardendale Board of Education provides that the members of the board must "be residents of the City of Gardendale." (Doc. 1129-1, p. 1, Section 2). The Gardendale City Council received more than 30 applications for the five positions on the inaugural board. (Doc. 1124, p. 28). From these applicants, the Gardendale City Council selected the five initial members of the board. (Doc. 1124, pp. 21, 27; Doc. 1129-1, p. 2). Each of the individuals whom the city council selected is white. (Doc. 1124, p. 28).

Two members of the Gardendale Board testified at trial, and the president of the school board testified by deposition. Their collective complaints about Gardendale's schools are that classes in Gardendale Elementary are too big, and test scores are too low. (Doc. 1124, pp. 175-78, 202-04; Doc. 1131-35, p. 9). None of these board members voiced his concerns to a Gardendale school principal or to a member of the Jefferson County Board of Education. (Doc. 1124, pp. 208-09; Doc. 1131-35, pp. 9-11). The president of the board acknowledged that he was not

involved in his children's schools, and he had no opinion about Jefferson County's management of the schools in the Gardendale feeder pattern. (Doc. 1131-35, p. 7).

African-American citizens of Gardendale were among the 30 candidates for the Gardendale Board of Education. (Doc. 1124, p. 28). Dr. Sharon Porterfield Miller was one of the African-American applicants for the board.[47] Dr. Porterfield Miller is the division chair of education at Miles College in Fairfield, Alabama. (Doc. 1125, pp. 7-8). Early in her career, Dr. Porterfield Miller worked for the Jefferson County Board of Education. She held a variety of positions in the Jefferson County school system, including second grade and kindergarten teacher, assistant principal, and principal. (Doc. 1125, pp. 8-10, 17-18).[48]

The Gardendale Board of Education called Dr. Porterfield Miller as a witness during the bench trial in this matter because she favors a municipal school system. Dr. Porterfield Miller testified that she has more experience in the field of education

---

[47] Dr. Porterfield Miller graduated from Aliceville High School in 1973. Aliceville High School is located in Pickens County, Alabama. When Dr. Porterfield Miller graduated from Aliceville High School in 1973, she was one of three African-American students in the high school. (Doc. 1125, pp. 15-16).

[48] When she began teaching in 1977, the Jefferson County K-6 elementary school in which she taught had two African-American students. (Doc. 1125, p. 18). When Dr. Porterfield Miller became vice principal at Fultondale Elementary in 1995, three out of approximately 80 faculty and staff were African-American. (Doc. 1125, pp. 19-20). Dr. Porterfield Miller left Fultondale Elementary in the 1990s to become the principal of Brighton Elementary. Brighton is a black school. While she was principal, all of the teachers, save two or three, were African-American. (Doc. 1125, p. 20). After the turn of the century, the Jefferson County Board appointed Dr. Porterfield Miller as principal of Lipscomb Elementary School, another black school. All but five of the 40+ teachers were African-American. (Doc. 1125, p. 21).

than anyone on the Gardendale school board with the possible exception of another board member who is a college professor. (Doc. 1125, pp. 10, 30-32, 36).[49] Dr. Porterfield Miller testified that she believes that race was a factor in the Gardendale City Council's decision not to select her as a member of the Gardendale school board. (Doc. 1125, p. 32).[50]

## Summer 2014: Gardendale Board Hires Gardendale Schools Superintendent

To launch the fledgling Gardendale City School System, the Gardendale Board examined the work that other municipal districts in Alabama had undertaken to complete the separation process, and the Board brought in various experts for

---

[49] One of the white members of the Gardendale School Board worked for Dr. Porterfield Miller a number of years ago when Dr. Porterfield Miller was employed by the Jefferson County public school system. The board member was a teacher while Dr. Porterfield Miller was assistant principal of Fultondale Elementary. (Doc. 1125, pp. 14, 36).

[50] After the Gardendale City Council formed the Gardendale School Board, the city council established an advisory board for the school board. The city council selected the members of the advisory board. The city council appointed Dr. Porterfield Miller and two of the organizers of FOCUS Gardendale to the Gardendale Advisory Committee. (Doc. 1131-44, pp. 6, 8). The advisory committee was designed conceptually to serve as a "sounding board" for the Gardendale Board of Education, but the committee was not active. It did not meet with the Board. It did not receive updates from the Board. It did not communicate with the community, and it was not involved in initiatives or projects of any kind. (Doc. 1131-41, pp. 5-6, 18; *see also* Doc. 1131-44, pp. 7-8).

The Advisory Committee "morphed into" the Gardendale City Schools Foundation, a 501(c)(3) corporation. (Doc. 1125, pp. 11, 31-33; Doc. 1131-41, pp. 5-6). The president of the foundation is one of the separation organizers. (Doc. 1131-41, pp. 5-6, 18). The Foundation raises money for the Gardendale public schools. (Doc. 1131-41, p. 7). The Gardendale City Council did not pick the members of the Foundation Board. (Doc. 1131-41, p. 9). The Foundation members rarely meet. (Doc. 1131-41, p. 7). As of March 2016, the Foundation had raised $15,000 and distributed $11,000 to teachers in Gardendale's four public schools. (Doc. 1131-41, pp. 7-8).

training.  (Doc. 1124, pp. 91, 116).[51]  The Board also retained a consulting firm and began a national search for a superintendent for the Gardendale district.  (Doc. 1124, p. 89).

In the summer of 2014, the Gardendale Board selected Dr. Patrick Martin as the Superintendent for the Gardendale City School system.  (Doc. 1124, p. 90; Doc. 1125, p. 215).[52]  Dr. Martin has served in that capacity since August 4, 2014. (Doc. 1125, p. 159).[53]

To communicate with the members of the Gardendale Board, Dr. Martin created a document that he called the "Superintendent's Weekly Board Update." In one of his first updates, Dr. Martin focused on technology and education.  He provided information about the correlation between technology and graduation

---

[51] When he initially described the experts with whom the Gardendale Board consulted concerning the creation of the Gardendale municipal district, a Gardendale board member indicated that those experts included a consultant for diversity training.  On cross-examination, the board member acknowledged that the Board did not meet with a diversity consultant until October 2016.  (Doc. 1024, pp. 117-18).

[52] During the interview process, the Gardendale Board did not ask Dr. Martin about his understanding of the desegregation order in this case or his experience working in a district that was subject to a desegregation order.  (Doc. 1125, pp. 221-22; Doc. 1133-3).  Dr. Martin has no prior experience working under a desegregation order.  (Doc. 1125, pp. 222, 224, 272).  Before hiring Dr. Martin, the Gardendale Board studied the demographics of the school districts where Dr. Martin previously worked.  None of those public school districts was more than fifteen percent African-American.  (Doc. 1124, p. 221; Doc. 1125, p. 224).  In his experience as an administrator, Dr. Martin has never hired an African-American teacher or administrator.  (Doc. 1125, p. 338).  Over his 17-year career as an educator, Dr. Martin has worked with hundreds of teachers, none of whom was African-American.  (Doc. 1125, p. 339).

[53] During the same time period, Dr. Craig Pouncey became superintendent of the Jefferson County public school system.  (Doc. 1127, pp. 96-97).

rates and the correlation between education levels and income levels. (Doc. 1131-21).

In a "Weekly Board Update" from the fall of 2014, Dr. Martin explained that he occasionally would provide information that might help the Board "understand the lens through which the Plaintiff Parties may view our Separation." (Doc. 1131-19, p. 12; Doc. 1131-20, p. 2). Dr. Martin stated that he was reading a book called *Stuck in Place: Urban Neighborhoods and the End of Progress Toward Racial Equality*.[54] He quoted a passage from a study conducted in 1973 that reported that "a truly large and growing number[]" of African-Americans were moving into the middle class, so that "a majority of black Americans – a slender majority, but a majority nonetheless" had become members of the middle class. (Doc. 1131-20, pp. 2-3). Then Dr. Martin provided these observations from the authors of *Stuck in Place*:

- [t]he claims made by [the authors of the 1973 study] were somewhat exaggerated, as they were based on a definition of middle-class status that included essentially any family living outside of deep poverty.

- What is surprising is how stable the distribution of African Americans has been over time. At the start of the 1970s, roughly 39 percent of African Americans were the poorest quartile – that is, the bottom 20 percent – of the U.S. income distribution. Now, at the end of the 2000s, about 33 percent of African Americans are among the poorest fifth of the U.S. population.

_____

[54] Patrick Sharkey, *Stuck in Place: Urban Neighborhoods and the End of Progress Toward Racial Equality* (2013).

- A recent study shows that white children raised in families in the middle of the income distribution earned, on average, about $74,000 annual income as adults, almost $20,000 per year more than their parents (in adjusted dollars). Black children raised in families in the same segment of the income distribution earned about $45,000 income per year, $9000 less than their parents. Much of the progress that was the source of such optimism a generation ago has been lost in the current generation.

(Doc. 1131-20, p. 3).

## September 2014: Draft Transfer Policy

In the fall of 2014, Dr. Martin drafted an interdistrict transfer policy and proposed the policy to the Gardendale Board. The draft policy included a provision permitting racial desegregation transfers. Those transfers were conditioned on the payment of tuition and the availability of space in Gardendale's schools for transfer students. (Doc. 1133-5, p. 1). The 2014 draft plan states that tuition must be paid in full by August 1 of the school year, personal checks may not be used to pay tuition, and a transfer is good for only one year; transfer students must re-apply every year. (Doc. 1133-5, p. 2). The plan states that transportation will not be provided to transfer students. (Doc. 1133-5, p. 2). The president of the Gardendale Board provided comments to Dr. Martin regarding the draft policy. With respect to the racial desegregation provision, the board president wrote: "Legal team to review and confirm its applicability/appropriateness for GBOE." (Doc. 1133-5, p. 4). The board president did not question the necessity of other transfer provisions. (*Id.*).

In a later iteration of the transfer plan, tuition for non-Gardendale residents was set at $3,600. (Doc. 1133-5, pp. 6-9). Once again, personal checks could not be used to pay the tuition fee. (Doc. 1133-5, p. 8). The next draft of the policy (dated October 2014) set tuition at $1,500. (Doc. 1133-5, p. 13). The provision regarding racial desegregation transfers moved to the end of the list of transfer categories, and the text for that provision appeared in red. (Doc. 1133-5, p. 12). In subsequent drafts of the transfer plan (all bearing December 2014 dates), the racial transfer provision moved higher in the list of transfer categories, and non-resident tuition was set at $1,800 or $1,850. (Doc. 1133-5, pp. 14-27). The parents who would be assessed this tuition would have no say in the operation of the Gardendale School system because, as noted, only Gardendale residents may serve on the Gardendale Board of Education and vote in municipal elections for those who are responsible for the school system. (Doc. 1128, p. 38).

**November 2014: *Stout* Status Conference**

On November 12, 2014, the Court held a status conference with counsel for the Jefferson County Board, the private plaintiffs, and the United States to discuss the status of the Jefferson County Board of Education's compliance with the 1971 desegregation order.[55] (November 12, 2014 Minute Entry). During the conference, the Court confirmed that the Jefferson County Board had not obtained

---

[55] On February 10, 2014, the Clerk reassigned case number 65-cv-396 to the undersigned judicial officer. (Doc. 981).

a declaration of unitary status as to any of the *Green* factors. (Doc. 991, p. 11). Counsel for a number of the splinter districts in Jefferson County acknowledged that the efforts to obtain unitary status over the preceding decade had been impacted by the Trussville and Leeds separations, "as those systems changed the demographics of Jefferson County." (Doc. 991, p. 11). At the conclusion of the status conference, the Court ordered the parties to submit a joint report stating the parties' respective positions concerning Jefferson County's satisfaction of the *Green* factors. (Doc. 991, pp. 13-14).

Counsel for the Hoover Board of Education participated in the status conference. At the time, counsel for the Hoover Board also was representing the Gardendale Board of Education. (Doc. 991, p. 17). Shortly after the status conference, counsel for the Gardendale Board of Education provided Dr. Martin and the members of the Gardendale Board of Education with a copy of the 1971 desegregation order. (Doc. 1125, pp. 226-27, 262).

The parties filed their status report on February 6, 2015. (Doc. 998). The Court held a status conference with the parties on February 20, 2015. (*See* Doc. 989; Doc. 992; February 20, 2015 staff minute entry). Counsel for the private plaintiffs, the United States, the Jefferson County Board of Education, and the Hoover City Board of Education attended the conference. The Court discussed with all of the parties the possibility of negotiated proposed consent decrees that

would create a roadmap to the end of judicial supervision for both the Jefferson County and Hoover City school systems. (Doc. 1009, pp. 74-77, 83-85). During the status conference, the attorney for the Hoover City Board of Education indicated that he also represented Gardendale and mentioned that Gardendale had formed a school system and was attempting to negotiate the terms of separation from Jefferson County with the State Superintendent of Education. (Doc. 1009, pp. 4, 28-29, 34-37). Then-counsel for Gardendale acknowledged that Gardendale understood that "every aspect of its operation would have to be submitted to the court for review." (Doc. 1009, p. 28).[56]

## March 2015: Gardendale Moves to Intervene

On March 12, 2015, the Jefferson County Board of Education filed a supplemental report regarding matters related to the formation of the Gardendale City school system. (Doc. 1001). In the report, Jefferson County explained that the State Superintendent had issued a final decision with respect to Gardendale's proposed separation; however, "on the most important issues (relating to facilities and attendance), the State Superintendent effectively deferred a permanent decision pending the outcome of further negotiations." (Doc. 1001, p. 2). In his

---

[56] A member of the Gardendale Board testified that the Board engaged legal counsel "very early in the board formation process. And our attorney told us at that point, from the very beginning . . . that we were going to have to get approval from the Court. We understood that." (Doc. 1124, p. 216; *see also* Doc. 1124, p. 217:14-17). The Board member testified that he understood the significance of the federal desegregation order in this case for any splinter systems created while the desegregation order is in place. (Doc. 1124, pp. 218-19).

final decision, the State Superintendent acknowledged that his decision was subject to the Court's jurisdiction in this case and that this Court has "the authority to review and/or modify [the State Superintendent's decision] to ensure compliance with federal desegregation laws and the orders of [the Court]." (Doc. 1001-27, p. 3).[57]

On March 13, 2015, Gardendale, represented by a new team of lead attorneys, filed a motion to intervene as a defendant in this action. (Doc. 1002). On March 18, 2015, the Court conditionally granted Gardendale's motion to intervene and, pursuant to 28 U.S.C. §§ 1651 and 2283, the Court enjoined a state court lawsuit in which Gardendale asked the state court to direct Jefferson County to relinquish control of the public schools located within the Gardendale municipal school district. (Doc. 1003). The Court set a hearing for March 24, 2015 to give Gardendale an opportunity "to discuss how the state court complaint evince[d] good faith compliance with this Court's *Singleton* order and with the separation discussion during the February 20, 2015 hearing in this matter." (Doc. 1003, p. 5). During the March 24, 2015 hearing, counsel for Gardendale stated that Gardendale would voluntarily submit the issue of Gardendale's proposed separation to this Court and dismiss the state court action. (Doc. 1012, pp. 10-12).

---

[57] On March 2, 2015, the State Superintendent issued a revised final decision that did not change the "substantive content" of his previous decision. (Doc. 1001-28, p. 1). The revised final decision also acknowledged that the decision was subject to this Court's jurisdiction. (Doc. 1001-28, p. 4).

**March 31, 2015: Gardendale Presents its Initial Separation Plan**

On March 31, 2015, Gardendale sent to the other parties in this action a proposed plan of separation. (Doc. 1124, p. 42; Doc. 1125, p. 233). Under Gardendale's initial plan of separation, all of the students who attend the four schools in the Gardendale feeder pattern but are not residents of the City of Gardendale would be phased out of the Gardendale municipal system over a period of 13 years. (Doc. 1124, pp. 43, 110; Doc. 1125, p. 233; Doc. 1131-19, pp. 20-21).[58] Thus, students from Mount Olive, Graysville, Brookside, North Smithfield, and any other student who did not reside within Gardendale's municipal limits would be phased out of the Gardendale system. (Doc. 1124, pp. 111-12).[59] These students were designated as transition-zone students.[60]

According to Dr. Harvey's feasibility study, for the 2012-2013 academic year, there were 1,002 students in the Gardendale feeder pattern who were not

---

[58] A Gardendale Board member characterized the 13-year phase-out as an effort "to do everything we could reasonably do to maintain the greater Gardendale community as a part of our schools." (Doc. 1124, p. 110).

[59] The initial separation plan did not propose tuition for non-Gardendale students during the 13-year grandfather period. The month before Gardendale presented the plan to Jefferson County, the private plaintiffs, and the United States, Dr. Martin received emails in which Gardendale citizens expressed concern about the anticipated absence of a tuition requirement for non-residents. One individual stated that (s)he would not have voted for the tax increase if (s)he had known that non-residents would not have to pay tuition. Another citizen asserted that (s)he had been "misled into voting in favor of this tax increase." (Doc. 1133-1, p. 4).

[60] If that plan were implemented, the African-American student population in Jefferson County would grow from 47.2 to 48.7 percent. (Doc. 1125, pp. 123-24).

residents of the City of Gardendale. (Doc. 1131-24, p. 40; Doc. 1131-25, p. 17). More than half of those students—537 students, to be exact—were from the town of Mount Olive. (Doc. 1131-25, p. 17).[61]

**April 2015: Motion for Substitution of Private Plaintiffs**

In April 2015, the private plaintiffs filed an unopposed motion to substitute new named plaintiffs in this action because the original named minor plaintiffs no longer attend nor are eligible to attend schools in Jefferson County. (Doc. 1023). On May 4, 2015, the Court granted the motion. (Doc. 1024). Three of the new named plaintiffs reside in the North Smithfield community. (Doc. 1124, pp. 39-40, 83).

**September 11, 2015: Site Visit**

On September 11, 2015, Dr. Martin, a Gardendale attorney, and Gardendale's demographics expert joined representatives of the Justice Department for a tour of 11 schools in the Jefferson County system. (Doc. 1125, p. 301; Doc. 1133-24; Doc. 1145, p. 5). The group visited Bottenfield Middle School, Bragg Middle School, Brookville Elementary School, Fultondale High School, Gardendale Elementary School, Gardendale High School, Minor High

---

[61] For the 2012-13 school year, of the 873 students at Gardendale Elementary, 31 students were from outside of the Gardendale/Mount Olive area; of the 193 students at Snow Rogers Elementary, 5 students were from outside of the Gardendale/Mount Olive area; of the 884 students at Bragg Middle School, 211 students were from outside of the Gardendale/Mount Olive area; of the 1,112 students at Gardendale High School, 238 students were from outside of the Gardendale/Mount Olive area. (Doc. 1131-24, pp. 31, 33, 35-36; Doc. 1131-25, p. 17).

School, Mortimer Jordan High School, Mount Olive Elementary School, North Jefferson Middle School, and Snow Rogers Elementary School. (Doc. 1131-23, p. 2). Two of those schools, Bottenfield Middle and Minor High, have student populations that are predominantly black. One of the schools, Fultondale High, is fully integrated. The other schools that the team visited have student populations that are predominantly white. Of the predominantly white schools, the student populations of Gardendale Elementary, Bragg Middle, and Gardendale High currently are the most integrated. (Doc. 1131-23, p. 2).

After the tour, Dr. Martin described the school visits in a "Weekly Board Update." (Doc. 1131-23). Dr. Martin stated:

> Our team's takeaways from the week are that (1) if Jefferson County really does aim to gain Unitary Status there is going to be an excessive amount of work to be done across the entirety of the county, and (2) we need to do everything to make sure we are not lumped into that process.

(Doc. 1125, p. 298; Doc. 1131-23, p. 2). Dr. Martin testified that Gardendale did not want its bid to separate to become tangled in the time-consuming process of obtaining a declaration of unitary status. (Doc. 1125, p. 301). At trial, Jefferson County Superintendent Craig Pouncey acknowledged that Jefferson County has not developed a complete desegregation plan yet. (Doc. 1127, p. 120).

**November 2015:** *Stout* **Status Conference**

At Gardendale's request, the Court set a conference on November 10, 2015 to discuss the status of the parties' negotiations regarding Gardendale's initial plan of separation. (Doc. 1030, pp. 1-2; Docs. 1031, 1032). At the conference, the parties asked the Court to enter a scheduling order so that the parties could engage in formal discovery. (Doc. 1045, pp. 8, 10-12, 16-17).

During the status conference, counsel for the United States expressed concern about the impact that the March 2015 separation plan would have on the "transition students" who, under Gardendale's proposal, would be phased out of the four schools in the Gardendale feeder pattern. Based on geography and transportation times, counsel for the United States anticipated that approximately two-thirds of the white transition students and just under one-third of the black transition students would be re-zoned for the Mortimer Jordan High School feeder pattern. Approximately two-thirds of the black transition students would be zoned for the Minor High School feeder pattern.

This potential consequence of Gardendale's March 2015 separation plan was problematic because like Gardendale High School, Mortimer Jordan High School is a contemporary state-of-the-art facility that offers a robust curriculum. As of November 2015, the student population at Mortimer Jordan was 90% white, and the graduation rate exceeded 90%. (Doc. 1045, pp. 12-14). Minor High School offered "a starkly different experience in terms of the kind[s] of educational

opportunities that are available to students there [and] the facility itself" which was built in 1988. (Doc. 1045, pp. 13-14). At the time, the student population at Minor was 89% African-American, and the graduation rate was below 70%. (Doc. 1045, p. 14). Data for the transferee middle schools was very similar to the high school data. (Doc. 1045, pp. 14-15). Therefore, the majority of white transition students would be re-zoned to schools that were predominantly white, and the majority of black students would be re-zoned to schools that were predominantly black, and the small number of black students who were re-zoned from the moderately integrated student bodies at Bragg and Gardendale High to the schools in the predominantly white feeder pattern would become a more prominent minority in their new schools.[62]

Counsel for the Gardendale Board suggested that the impact of the separation on African-American students might be dissipated if the parties were able to negotiate an agreement that would place the students from the North Smithfield community in Gardendale's schools. (Doc. 1045, pp. 19-20).

Bryant Hill, the president of the North Smithfield Civic League, attended the status conference and became concerned about the possibility that students from North Smithfield would be zoned for the Minor High School feeder pattern. (Doc.

---

[62] At the bench trial in this case, Gardendale's expert confirmed that under the separation plan that Gardendale presented to the Court, high school students who were re-zoned from Gardendale High would attend high schools that are much less racially diverse. (Doc. 1125, pp. 138-39).

1124, p. 44). Mr. Hill's children attended Bragg Middle and Gardendale High under the management of the Jefferson County Board, and his children excelled. Mr. Hill testified that his children were treated fairly, and the Jefferson County School Board addressed and resolved any problems that arose. (Doc. 1124, pp. 37-38, 41). Mr. Hill wants students from the North Smithfield community to attend the schools in the Gardendale feeder pattern regardless of whether Jefferson County or the City of Gardendale operates those schools. (Doc. 1124, pp. 44-45, 73).[63]

---

[63] At the bench trial, Mr. Hill expressed support for Gardendale's separation from Jefferson County. The Gardendale Board called Mr. Hill in his capacity as president of the North Smithfield/Greenleaf Heights Civic League, presenting him as a representative of all of the citizens in that community. For several reasons, the Court regards Mr. Hill's testimony as testimony provided in an individual capacity rather than a representative capacity. First, it is undisputed that Mr. Hill decided to support the Gardendale separation without consulting the members of the civic league. (Doc. 1124, p. 84). Second, the record contains disputed testimony about the extent of North Smithfield's citizens' participation in the civic league and the extent to which the civic league is an active organization. Estimates of meeting attendance range from 8 residents to 25 residents. (*Compare* Doc. 1124, p. 63 *with* Doc. 1128, pp. 30, 44). It also is undisputed that three of the private plaintiffs in this action reside in the North Smithfield community, and all three of those plaintiffs oppose Gardendale's separation. (Doc. 1124, p. 39-40, 63; Doc. 1128, pp. 6, 16, 23, 31, 33, 39, 47). Mr. Hill acknowledged that he has a single agenda: he wants the school-aged students in the North Smithfield community to remain in the Gardendale feeder pattern regardless of which school board controls the schools because he wants the children in the North Smithfield community to have access to the excellent education that his children received in the Gardendale schools. (Doc. 1124, p. 73). That sentiment—that the children in the North Smithfield community should have access to an excellent academic program—is consistent with the concerns of the private plaintiffs. The Court credits that aspect of Mr. Hill's testimony as representative of the interests of the North Smithfield community. Mr. Hill testified that he is "in favor of the Stout case" because the Court's oversight provides greater certainty regarding the zoning of the students in the North Smithfield community. (Doc. 1124, pp. 45, 63).

Mr. Hill learned about Gardendale's plan to phase out North Smithfield students for the first time at the November 2015 status conference. Mr. Hill and Dr. Martin met in late March or April of 2015, but they did not discuss Gardendale's separation plan. Mr. Hill described the spring visit as a "meet and greet." (Doc. 1124, pp. 42-43). Sometime in the spring of 2015, Mr. Hill invited Dr. Martin to attend North Smithfield civic league meetings to discuss Gardendale's proposed separation, but Dr. Martin did not accept the invitation. No one from Gardendale attended one of the community meetings in North Smithfield or communicated with North Smithfield parents about the city's plan to separate and phase out North Smithfield students from Bragg and Gardendale High. (Doc. 1124, p. 53; *see* Doc. 1128, pp. 14, 16, 33-34, 52).[64]

At the bench trial in this matter, Dr. Martin testified that he could not visit with parents from the North Smithfield community because he had not visited with parents from the City of Gardendale.[65] (Doc. 1125, p. 249). Although Dr. Martin

---

[64] Gardendale Board members testified that they have been willing to negotiate in good faith with communities outside of Gardendale's city limits "since day one. We have not yet had a party that was willing to negotiate with us." (Doc. 1124, pp. 109-10). The record belies this statement.

The Superintendent of the Jefferson County school system, Dr. Craig Pouncey, has met with parents in the North Smithfield community a number of times to discuss Gardendale's proposed separation. (Doc. 1127, p. 108; Doc. 1128, pp. 33-34, 52). Dr. Pouncey also has met with parents from the Brookside and Mount Olive communities. (Doc. 1127, p. 108).

[65] Mr. Hill's youngest child will complete his senior year in Gardendale High School during the 2016-17 academic year. Therefore, the Court credits Dr. Martin as having met with one parent from the North Smithfield community. (Doc. 1124, p. 36; Doc. 1125, p. 243).

may not have had a formal community meeting with parents from the City of Gardendale, Dr. Martin's weekly superintendent reports indicate that he routinely attended events in Gardendale that involved parents of Gardendale students, and he encouraged the members of the Gardendale Board to join him.  (Doc. 1131-20, p. 1; Doc. 1131-21, p. 1; Doc. 1131-23, p. 1; Doc. 1131-26, p. 1).  It is reasonable to infer that Dr. Martin interacted with Gardendale parents at those events and spoke with parents about the anticipated municipal school system; indeed, the superintendent reports suggest that he attended the Gardendale community events for that very reason.

## December 2015: Gardendale Files its Motion to Operate a Municipal School System

Gardendale filed a motion to operate a municipal school system on December 11, 2015.  (Doc. 1040).  Gardendale attached to its motion a proposed plan of separation that Dr. Martin drafted.  (Doc. 1040-1; Doc. 1125, p. 322; Doc. 1131-2).  Unlike the March 2015 plan, the December 2015 separation plan calls for students from North Smithfield to be zoned for Gardendale schools from kindergarten through high school.  (Doc. 1125, pp. 163, 214).  To date, the Gardendale Board has not voted to approve the December 2015 separation plan. (Doc. 1124, pp. 153-54).

The December 2015 separation plan provides that the "Attendance Zone" for the Gardendale system "shall be the city limits of the City" of Gardendale.  (Doc.

1131-2, p. 4).[66]  The plan defines "Gardendale students" as "[t]hose students residing within the corporate limits of the city." (Doc. 1131-2, p. 2). There are 118 students who reside in the western area of Gardendale's municipal limits who currently are zoned for the Mortimer Jordan feeder pattern. Under the December 2015 plan, those students may opt to remain in their current feeder pattern or they may move into the Gardendale system. (Doc. 1125, pp. 165-67).

The plan establishes a Gardendale "Transition Zone." That zone is comprised of "students in the county who have historically attended Mt. Olive Elementary School and Brookville Elementary School and then matriculated through Bragg Middle School and Gardendale High School." (Doc. 1131-2, p. 3; *see* Doc. 1125, pp. 174-75). The "Transition Zone" also is comprised of "students living within the Gardendale City limits who have attended Snow Rogers Elementary School and then North Jefferson Middle School and Mortimer Jordan High School." (Doc. 1131-2, p. 3). The second class of transition students—those who live within Gardendale's city limits and currently attend Snow Rogers Elementary, North Jefferson Middle, and Mortimer Jordan High School—may

[66] Gardendale's proposed plan of separation is styled: "Agreement By and Between the Gardendale City Board of Education and the Jefferson County Board of Education." (Doc. 1131-2, p. 1). The Jefferson County School Board did not agree to Gardendale's proposed terms of separation. (Doc. 1125, p. 321).

choose to remain in that feeder pattern or move to the Gardendale municipal feeder pattern. (Doc. 1125, p. 182; Doc. 1131-2, pp. 4-5).[67]

The first class of transition students—students from Mount Olive and Brookside and any areas other than North Smithfield which lie outside of Gardendale's city limits and who attend elementary schools outside of Gardendale's city limits (i.e., Mount Olive Elementary, Brookville Elementary or Fultondale Elementary)—have the option of remaining in their current feeder patterns until they graduate from Gardendale High School. The separation plan states:

> In order to provide continuity to the students affected by this Agreement, the Parties shall establish a Transition Zone comprised of that part of the Gardendale School Zone that lies outside of the corporate limits of the City and the North Smithfield Manor and Greenleaf Heights communities. All students who, as of the 2016-2017 school year, reside in the Transition Zone and either attend or are slated to attend (when they reach the appropriate age) grades 6 through 12 at the Gardendale Schools will begin to transition to schools operated by the County Board on a grade-by-grade basis.

---

[67] The December 2015 separation plan contains language that seems contradictory. It states in paragraph II.C.2 that all Gardendale Students, meaning all students who live within Gardendale's city limits, "shall attend the Gardendale Schools," meaning Snow Rogers Elementary (or Gardendale Elementary), Bragg Middle, and Gardendale High. (Doc. 1131-2, p. 4). In legal documents, "shall" is a mandatory term that translates to "must." Then, in paragraph II.C.4.a, the plan gives students living within Gardendale's city limits who currently are zoned for Snow Rogers, North Jefferson, and Mortimer Jordan the option of remaining in those schools or moving to the Gardendale feeder pattern. (Doc. 1131-2, pp. 4-5). Dr. Martin explained that during the 13-year transition period, Gardendale residents on the Snow Rogers/North Jefferson/Mortimer Jordan track have the option of staying on that track or changing to Gardendale Schools, but after the transition period, all students residing within Gardendale's city limits must attend Gardendale schools. (Doc. 1125, p. 185).

(Doc. 1131-2, pp. 4-5). The plan then provides a chart that explains how the transitions would phase these students out of Gardendale's schools over a 13-year period. (Doc. 1131-2, p. 5).

The first "transition zone" for students who live outside of Gardendale's city limits applies only to students in grades 6 through 12. There are just under 70 students who currently live outside of the Gardendale city limits and are zoned for Snow Rogers Elementary or Gardendale Elementary. Those students are not included in the first transition zone. Under the December 2015 separation plan, those elementary school students will be re-zoned for the 2017-18 school year to Mount Olive Elementary, Brookville Elementary, or Fultondale Elementary. (Doc. 1125, pp. 177-79).[68]

The plan also contains provisions regarding "North Smithfield Manor and Greenleaf Heights Students." The plan identifies the North Smithfield students as "[t]hose County Students who reside in the communities of North Smithfield Manor and Greenleaf Heights. These students are further defined by the community footprint served by the North Smithfield Manor and Greenleaf Heights Fire District as of the 2015-2016 school year." (Doc. 1131-2, p. 3). The plan states that "[a]ll students within North Smithfield Manor and Greenleaf Heights, grades Kindergarten

---

[68] It is not clear from the December 2015 separation plan or from the trial testimony whether these students would then have the option of returning to Bragg Middle and Gardendale High during the 13-year transition period or whether they will be excluded permanently from the Gardendale schools under the December 2015 separation plan.

to 12, shall attend the Gardendale schools." (Doc. 1131-2, p. 4). Thus, the plan immediately rezones elementary students residing in the North Smithfield community from Fultondale Elementary to Gardendale Elementary; there is no transition period for elementary school students from the North Smithfield community, even those who would be entering their last year at Fultondale Elementary. (Doc. 1125, pp. 131-32, 168). Gardendale Elementary already is over-capacity and will become more so under Gardendale's proposed separation plan. (Doc. 1125, pp. 144-45, 168, 184).[69]

---

[69] One of the themes that appears throughout the Gardendale Facebook page is the fact that elementary classrooms at in the Gardendale feeder pattern are overcrowded. (Doc. 1132-2, pp. 181, 183). The record demonstrates that only classrooms at Gardendale Elementary have more than 20 students; classrooms in Snow Rogers Elementary are not overcrowded. (*See* Doc. 1131-10, pp. 4-5, 8). Participants in the Facebook conversations attribute overcrowding to No Child Left Behind transfer students and students assigned to schools because of the desegregation order in this case. (Doc. 1132-2, p. 181, Sept. 12, 2012, 6:11 p.m.).

Under the 1971 desegregation order, no students are assigned to Gardendale Elementary other than students from Gardendale's municipal limits and majority-to-minority transfer students. (Doc. 226, pp. 2, 7). The Court did not allow No Child Left Behind transfers to Gardendale Elementary; the Court ordered NCLB elementary students to attend Snow Rogers Elementary. (*See* pp. 67-68, 76-77, 85, above). From the 2009-10 school year until the 2016-17 school year, there were as few as zero M-to-M transfer students at Gardendale Elementary and as many as 16 M-to-M transfer students. Between 2011, when Gardendale began its separation effort, and 2016, there were no more than seven M-to-M transfer students at Gardendale Elementary in any given year. (*See*, p. 142, below).

Under the December 2015 separation plan, absent restructuring of the grade levels in Gardendale's schools, Gardendale Elementary will be over-utilized. (Doc. 1125, p. 125-26). Gardendale Elementary will have a 112% utilization rate in the first year of operation under the Gardendale Board, and the school would remain at the level through the 2029-30 academic year. (Doc. 1125, pp. 143-44). Bragg Middle School will have a 105% utilization rate in the first year of operation under the Gardendale Board and a 97% utilization rate in year eight. (Doc. 1125, pp. 142-43). Thus, none of the overcrowding that Facebook participants complain about will be resolved by the December 2015 separation plan. Moreover, black students from North Smithfield who are compelled under the December 2015 plan to attend a Gardendale elementary

No one from Gardendale consulted the parents of North Smithfield students about the mandatory elementary school rezoning. (Doc. 1124, pp. 52, 68; Doc. 1125, p. 273). Should the Court permit the Gardendale Board to separate pursuant to the December 2015 plan, parents from the North Smithfield community will have no formal say in the operation of the Gardendale schools because they will not be able to vote for the members of the school board, and they cannot serve on the Gardendale Board of Education because they are not Gardendale residents. (Doc. 1124, pp. 50, 166-67).[70] Thus, parents from the North Smithfield community will immediately lose the voice that they currently have in the operation of their children's schools, and after the grandfather period, parents of students from the North Smithfield community would be the only parents in the Gardendale system who would not have an electoral voice in the operation of the school system. (Doc. 1125, p. 261). Dr.

_____

school will move from Fultondale Elementary, a facility built in 2006, to Gardendale Elementary or Snow Rogers. Both of the Gardendale Schools are older and the student bodies are less diverse than the student body at Fultondale Elementary.

[70] There were a number of questions at trial concerning the ability of North Smithfield residents to vote for members of the Gardendale Board of Education. It appears that the Gardendale City Council may appoint future members of the board, just as the City Council appointed the inaugural board. (Doc. 1125, p. 260). The distinction is without a difference because by state and municipal law, residents of North Smithfield may not vote for the members of the Gardendale City Council. (Doc. 1125, p. 250, 261).

Both the Gardendale superintendent and a member of the Gardendale Board testified that the Gardendale school system would treat students who live outside of Gardendale's municipal boundaries equally, and those students' parents would have equal access to the Gardendale superintendent, but Gardendale currently has no formal policies that embody these concepts. (Doc. 1124, pp. 144-45, 157; Doc. 1125, p. 234-35, 350-51).

Martin concedes that this inability to participate in the school system could have desegregation implications. (Doc. 1125, p. 261).

The inability of North Smithfield parents to participate in the operation of the Gardendale system is particularly problematic because Gardendale's separation plan contains no language that obligates Gardendale to educate students from the North Smithfield community for a particular length of time. The separation plan states that students from the North Smithfield community are *eligible* to attend schools in the Gardendale system as long as the Jefferson County Board remits county ad valorem taxes for the North Smithfield students to the Gardendale Board. (Doc. 1131-2, p. 4 ("Eligibility of North Smithfield Manor and Greenleaf Heights Students to attend the Gardendale Schools shall continue as long as those Local Taxes and Revenue described in Section II.M of this Agreement shall apply to North Smithfield Manor and Greenleaf Heights Students in the same manner that they do to Gardendale Students."), p. 13-14). In its motion for approval of the December 2015 plan of separation, the Gardendale Board states that North Smithfield students will be able to attend Gardendale schools for the "indefinite future." (Doc. 1124, pp. 46-47; Doc. 1131-1, p. 5).

As of the first day of the bench trial in this matter, the Gardendale Board had not explained to the residents of North Smithfield the meaning of the phrase "indefinite future." (Doc. 1124, pp. 47-48, 70, 72). Dr. Martin testified that North

Smithfield students could attend Gardendale schools "forever" as long as Jefferson County pays Gardendale the ad valorem school taxes for the students as required by the desegregation order, an order that the Court will dissolve upon a finding that Jefferson County has fulfilled its obligations under the order in good faith. (Doc. 1125, p. 174; *see* Doc. 226, p. 8, §V (a)).[71] A member of the Gardendale Board similarly testified that students from North Smithfield could attend Gardendale schools "so long as the tax dollars for the students for the North Smithfield community follow those students to Gardendale." (Doc. 1124, p. 111). The lack of clarity about the fate of the students in the North Smithfield community has been unsettling and disruptive. Mr. Hill stated that for the past four years, parents and students in the North Smithfield community have worried constantly about where the students will attend public school. (Doc. 1124, pp. 74-75).

As noted above, Gardendale's attorney first suggested that Gardendale may wish to retain students from the North Smithfield community in the Gardendale system at the November 2015 status conference when counsel for the United States raised concerns about the desegregation implications of alternative zoning options for those students. (*See* p. 112, above). Dr. Martin testified that he added language to the 2015 separation plan that required North Smithfield students to attend Gardendale

---

[71] As the Court explains below, the Gardendale Board argues that Jefferson County already has fulfilled its obligations with respect to student assignments so that the Court should no longer oversee those assignments. (*See* pp. 151-54, below).

schools based in part on concerns that Dr. Martin heard from Mr. Hill regarding educational continuity (i.e., to avoid having students move from Fultondale Elementary, a Jefferson County school with its calendar and student handbook, to a Gardendale school with a different calendar and handbook). (Doc. 1125, pp. 169-70, 237-38, 262; Doc. 1131-19, p. 25).[72]

Dr. Martin also testified that he added the North Smithfield students to the Gardendale municipal district "to honor the [desegregation] order." (Doc. 1131-9, p. 25; *see also* Doc. 1125, pp. 235-38). Dr. Martin understood that under the order's provisions concerning splinter districts, the student population of a separating district must have a black student enrollment equal to at least one-third of the separating district's white student enrollment. (Doc. 1125, p. 238; *see* Doc. 226, p. 9, § V(c)). Without the African-American students from North Smithfield, Gardendale would not be able to comply with that desegregation order provision. Currently, according to Gardendale's statistics, students from North Smithfield constitute nearly 30% of

---

[72] In trying to develop talking points regarding the December 2015 separation plan, the COO of the Gardendale school district pointed out that requiring North Smithfield students to attend a Gardendale elementary school rather than Fultondale Elementary would "avoid the confusion of having to divide the ad valorem tax for the North Smithfield community [between Jefferson County and Gardendale] and to provide comprehensive education for the students in that community for Kindergarten through graduation." (Doc. 1133-6, p. 3). Gardendale's position regarding educational continuity for North Smithfield students cannot be reconciled with the fact that under the December 2015 separation plan, all of the students in the first transition zone— i.e., students who live outside of Gardendale's city limits and attend Mount Olive Elementary or Brookville Elementary—will move from a Jefferson County calendar and student handbook to a Gardendale calendar and handbook when they transition from their elementary school to Bragg Middle School.

the black student population at Bragg Middle School and more than 25% of the black student population at Gardendale High School. (Doc. 1129-7, pp. 4-5).

On December 8, 2015, the COO of the Gardendale school system sent Dr. Martin an email describing a way to communicate to the Court and the public the decision to include students from the North Smithfield community in the separation plan. (Doc. 1125, p. 240). The proposed communication begins: "The Gardendale Board of Education, in its effort to separate from the Jefferson County School System, acknowledges the fact that it must follow the guidelines set up by the Stout versus Jefferson County Board of Education [case] to become a splinter school district." (Doc. 1133-6, p. 2). The proposed communication goes on to explain that the Vestavia municipal school system included a black community in its district, and that district has been operating with students from the black community for 45 years. The COO compared the Vestavia system to the Pleasant Grove system which was not successful in its bid for separation because it would not accept black students from surrounding communities, as this Court ordered. (Doc. 1133-6, p. 2).

With respect to the ratio provision in the desegregation order which requires a splinter system to "make sufficient space available for black students from the county system in such number that, added to the number of black students included in the [] new school zone, equals one-third of the white students included in the [] new school zone," the COO wrote:

Gardendale city schools would meet the criteria for the section on the new school zones by including the students from North Smithfield in its system. The number of students in Gardendale Resident Only School System would be 472 black students out of 2149 total students (2014–2015 school year) for a percentage of 21.9% black population. With the addition of North Smithfield students, the number of students goes up to 687 black students out of 2364 total students (2014–2015 school year) for a percentage of 29% black population, which is higher than the 25% threshold established in the Stout case. Gardendale City Schools would remain under this arrangement as long as the percentage of its black population is less than the black population of Jefferson County as a whole, which is currently 47.07% (2015–2016 school year).

(Doc. 1133-6, p. 3). The following chart demonstrates, in specific numbers of students, the way in which the addition of the North Smithfield students to the Gardendale system allows the Gardendale Board to satisfy the desegregation order's student demographic requirement for splinter systems:

| Gardendale Proposed Separation: K-5 Grade Counts separated by City Area and N. Smithfield Manor Enclave | | | | | |
|---|---|---|---|---|---|
| Area | Black | White / Other | Total | Percent Black | Percent White / Other |
| North Smithfield Manor / Greenleaf Heights Fire District | 82 | 1 | 83 | 99% | 1% |
| Gardendale City Area | 219 | 881 | 1100 | 20% | 80% |
| Proposed Gardendale District Total | 301 | 882 | 1183 | 25% | 75% |

| Gardendale Proposed Separation: 6-8 Grade Counts separated by City Area and N. Smithfield Manor Enclave | | | | | |
|---|---|---|---|---|---|
| Area | Black | White / Other | Total | Percent Black | Percent White / Other |
| North Smithfield Manor / Greenleaf Heights Fire District | 61 | 0 | 61 | 100% | 0% |
| Gardendale City Area | 126 | 408 | 534 | 24% | 76% |
| Proposed Gardendale District Total | 187 | 408 | 595 | 31% | 69% |

| Gardendale Proposed Separation: 9-12 Grade Counts separated by City Area and N. Smithfield Manor Enclave | | | | | |
|---|---|---|---|---|---|
| Area | Black | White / Other | Total | Percent Black | Percent White / Other |
| North Smithfield Manor / Greenleaf Heights Fire District | 65 | 0 | 65 | 100% | 0% |
| Gardendale City Area | 161 | 555 | 716 | 22% | 78% |
| Proposed Gardendale District Total | 226 | 555 | 781 | 29% | 71% |

Source: 2015-16 JCPS student live-in counts

(Doc. 1131-3, p. 6; *see also* Doc. 1133-6, p. 4).[73]

---

[73] A member of the Gardendale Board offered another rationale for including North Smithfield students in the Gardendale district. He testified that the Gardendale City Council charged members of the board to do everything they could to maintain the student population that attended Gardendale schools pre-separation. The Board realized that under Alabama law, the City would be able to fulfill this goal by annexing Mount Olive and maybe even Brookside, though Brookside is an independent city, but the City of Gardendale would not be able to annex North Smithfield because North Smithfield is not contiguous to the City of Gardendale (meaning that no boundary of the City of Gardendale abuts a boundary of the North Smithfield community). Therefore, to comply with the City Council's instructions, the Board decided to include North Smithfield in the Gardendale District and phase out students from the communities of Mount Olive and Brookside who, presumably, could then come back into the Gardendale system via annexation. (Doc. 1124, pp. 111-13; *see also* Doc. 1124, pp. 134-35).

The December 2015 separation plan does not account for students who currently attend schools in the Gardendale feeder pattern via transfers. (Doc. 1125, pp. 282-83, 313-15, 321). Therefore, African-American students who attend schools in Gardendale via racial desegregation transfers would have to return to the schools in their local feeder pattern. (*Id.*). Shortly before the bench trial in this case, Dr. Martin began revising the interdistrict transfer policy that he drafted in the fall of 2014.[74] The current draft of the policy includes racial desegregation transfers. (Doc. 1129-10, pp. 5-6). According to the current draft of the transfer policy, racial desegregation transfers are conditioned on the availability of space for transfer students. (Doc. 1129-10, p. 5). Under current circumstances, that means that students who attend Gardendale Elementary and Bragg Middle School via racial desegregation transfers will not be able to return to those schools because those schools will be at or above capacity under the December 2015 plan. (*See* n. 69, above). The draft transfer policy also provides that transportation will not be available "unless required by federal courts." (Doc. 1129-10, p. 6). The Gardendale Board has not reviewed or approved the current draft of the transfer policy. (Doc. 1125, p. 319; Doc. 1129-10, p. 6).[75]

---

[74] The transfer policy in the record is still in draft form. The last section of the policy contains ellipses, marking an incomplete thought that will be finished at a later date. (Doc. 1129-10, p. 6).

[75] Dr. Martin testified that he would seek board approval for the transfer policy if the Court were to approve Gardendale's request for separation. (Doc. 1125, p. 319-20).

## December 2015: Community Reaction to the Revised Gardendale Plan for Separation

A member of the Gardendale Board testified that Gardendale residents communicated to him that they were very supportive of the plan to include students from the North Smithfield community in the Gardendale municipal district for the indefinite future. (Doc. 1124, p. 244-45). A December 2015 email message addressed to Dr. Martin indicates that some Gardendale residents are not happy. (Doc. 1133-2). The text of the message is as follows:

> As I'm sure you are aware, the recent news about North Smithfield has generated a lot of negative comments on social media. I just wanted you, your Staff and the Board to know [my wife] and I are praying for all of you as you seek God's guidance. We pray He will give you wisdom, encouragement and perseverance. Hope you have a Merry Christmas. Romans 8:28

(Doc. 1133-2; *see also* Doc. 1128, pp. 112-14 (describing complaints that it is unfair for North Smithfield students to attend Gardendale schools without having to pay the 10 mill fee that Gardendale residents must pay)). Dr. Martin neither shared this email with members of the Gardendale Board nor communicated to board members that he had received information that suggested that residents of Gardendale had reacted negatively to the inclusion of students from North Smithfield in the Gardendale system. (Doc. 1125, pp. 344-46).

The concerns expressed in this email message are consistent with comments posted on the Gardendale City Schools Facebook page shortly after the Gardendale

Board presented the revised separation plan to the Court. After a number of people commented that they would have changed their vote on the ad valorem tax if they had known that students from North Smithfield would be included in the Gardendale municipal system, one of the separation organizers commented:

> I'm not sure I am in full agreement on a permanent inclusion, myself, but I also recognize that there are practical considerations attached to being in Jefferson County, Alabama, where a decades long desegregation lawsuit is in effect. I have not spoken with anybody at the board about the recent developments, and I am not sure at this stage if they will be discussing a whole lot privately. I suspect that this move was in response to a concern regarding maintaining current racial balance, but perhaps I am guessing incorrectly. This is not happening in a vacuum, there is an ongoing required DOJ review and the well-poisoning lawsuit filed by Puncey [*sic*] and the JeffCoEd board.
>
> I might note that if [the] Jefferson County Board of Education were truly concerned with racial balance rather than the money that comes with students, they might have made a little better progress in the decades since the court order was issued. I find it rather ironic to see them at the plaintiffs['] table in a courtroom. They seemed to only be concerned about the matter when the prospect of losing money from this split arose. Somebody has to pay their ever-growing crop of assistant superintendents and foot the bill for their large pep rallies at Bartow Arena. But I digress.
>
> It is your own decision as to whether or not you want to hit the panic button. With regard to thirteen years of grandfathering, that is as long as I think I have seen. That gives Mt. Olive and other unincorporated areas and Gardendale both a little bit of time. I think the Gardendale school board has made it clear in the past their preferences regarding the traditional feeder areas, and we have seen the county board resist that. If you want to criticize the Gardendale BOE, that is your choice, but I believe nobody gets everything they want all the time. I think this is a complex issue and that simple solutions are probably not going to be in the cards.

. . .

I am not disagreeing with you regarding diversity in the city or the children within it. But because of the desegregation order, the courts have broad oversight within the county. When I said this is about a balance not just within the city limits but within the school, I meant the question of balance extends beyond the city limits, it extends county school system-wide. It [a]ffects our ability to get the approval that we will require in order to move forward. See [the] response below regarding previous separations and similar actions.

As far as I can tell, Gardendale is already more diverse than several other county schools. I am not saying viewing the separation through the lens of a particular diversity goal imposed from without necessarily is or is not a legitimate or fair point for a litigant or regulator to make, or if I even agree that the county and its residents should still be answering to Washington and federal judges on this issue forty years down the line. I am simply saying that it is a reality that the GBOE has to deal with. I can assure you that they didn't just decide to gift a perpetual attendance zone to an area that they are not getting the extra 10-mil on because of a whim. This has the hallmarks of a specific, technical, tactical decision aimed at addressing a recognized road block to breaking away. Again, this is supposition on my part, and I wouldn't know what quarter drove this decision if I am actually on target.

I don't have to be happy with every move that is made, and they haven't called me up and asked for my approval. The board and their legal counsel are diligently pursuing breaking away from the county system. As for me, so long as I am confident that they are doing their best and are not defeating the underlying purpose of forming a new system, I am going to have to extend them a little bit of latitude.

. . .

If the GBOE should become cash-strapped, I am not at all convinced that marginally different revenue levels per student from North Smithfield will be either the cause or the solution. The GBOE appears to be going down a path that has led to successful separations before.

> You and I may not think that it is particularly fair to accept an out-of-district area not subject to our control or taxation as a price to pay to gain approval for separation, and we would be within reason to feel that way. The extent to which fair has anything to do with it depends on how you weigh your priorities in deciding whether it is too bitter a pill to swallow or if the ultimate treatment goal, i.e. separation, is worth it.
>
> None of this means that I don't see the potential for some issues that would need to be hammered out in a final agreement.

(Doc. 1132-2, p. 8). Dr. Martin testified that only two individuals had complained at Gardendale Board of Education meetings about students attending Gardendale schools without paying the 10 mill ad valorem tax, and neither of those individuals was a resident of Gardendale. (Doc. 1125, p. 342).

The reaction of the North Smithfield community to the proposed separation has not been positive. The North Smithfield community has held a couple of meetings to discuss the proposed separation. No one from the North Smithfield community spoke in favor of Gardendale's separation at those meetings. Rather, everyone who spoke at those meetings opposed the separation. (Doc. 1128, pp. 14-16, 31, 46). Three of the named plaintiffs who reside in the North Smithfield area testified at trial. None supported Gardendale's separation, even under the current plan that includes children from North Smithfield. (Doc. 1128, pp. 6, 16, 23, 31, 33, 39, 47).

One plaintiff testified:

We always say we are about the children. But if it's really about the children, we're going to do the best thing for the children. The best thing for the children would not be to just consider them only when it becomes evident that there's a desegregation case that is here and that was totally unrecognized or even considered initially, you know, until someone was forced to do this, to look at this.

And I know it will be a hostile situation there because . . . of the way the citizens of Gardendale feel about it. I mean, what I'm reading, what I see when I go to shop in Gardendale, they express themselves they never would have voted to separate had they known all the facts. They would not have done that because it's not right to be there.

(Doc. 1128, pp. 47-48). Expanding on her concerns about the potential for a hostile environment for students from North Smithfield post-separation, the plaintiff remarked:

I felt like we would be just allowed to go and our children will be forever, forever be scrutinized and looked at as outsiders and you're a token, allowed to go here to our school because we have to. And it's not fair to our children. It's not fair to any of these children.

(Doc. 1128, p. 51).

Addressing the impact of the inclusion of students from North Smithfield in the December 2015 plan, an African-American Jefferson County administrator stated that those students are:

not going to feel fully a part of that system because, in the beginning, they were not in the plan and then in the next phase they were in the plan. And now we're deciding if they are – the students that are pulled in, do they think they're going to be there just simply to make a race factor. So it's a lot of factors that could really give a lasting impression to those students.

(Doc. 1127, p. 250).  The administrator stated that the North Smithfield students would "always be outcasts" in the Gardendale municipal school system.  (Doc. 1127, p. 250).

**2015-16 School Year Demographics**

For the 2015-16 academic year, the Jefferson County Board reported an average daily membership of 35,988 enrolled students, of whom 17,095, or 47.5%, were black and 15,665, or 43.5%, were white.  (Doc. 1129-2; *see also* Doc. 1131-10; Doc. 1118, ¶ 24).[76]

For the 2015-16 academic year, Gardendale Elementary had a student population that was 24.20% black and 70.65% white, Snow Rogers Elementary had a student population that was 5.43% black and 85.33% white, Bragg Middle School had a student population that was 29.21% black and 67.19% white, and Gardendale High School had a student population that was 26.54% black and 71.06% white.  (Doc. 1129-2).

**April 4, 2016:  The City of Graysville and the Town of Brookside Move to Intervene**

On April 4, 2016, the City of Graysville and citizens from the unincorporated Mount Olive community filed a motion for limited intervention.  (Doc. 1056).  On April 5, 2016, the Town of Brookside filed a motion for limited

---

[76] Average daily membership is the average number of students who have attended class during the first 20 days after Labor Day of a given school year.  (Doc. 1125, p. 45).

intervention. (Doc. 1057). The Court allowed these communities to intervene for purposes of trial. (Doc. 1121; Doc. 1128, p. 167).

**April 2016: The Court and the Parties Visit Jefferson County Schools**

On April 14, 2016 and April 15, 2016, the Court visited a number of Jefferson County schools along with counsel for the parties. The Court visited all of the schools in the Gardendale feeder pattern. The Court also visited Mortimer Jordan High School, Minor High School, Fultondale High School, Bottenfield Middle School (now Minor Middle School), North Jefferson Middle School, Fultondale Elementary School, Brookville Elementary School, and Mt. Olive Elementary School.

**June 2016: Litigation Over Gardendale's Proposed Separation Continues**

On June 15, 2016, the parties filed a joint report notifying the Court that they were unable to reach an agreement regarding Gardendale's proposed plan of separation and that the parties would file briefs outlining their respective positions as required by the Court's scheduling order. (Doc. 1073). On June 15, 2016, Gardendale filed a separate report asking the Court to set a hearing on a date which would allow the Court sufficient time to determine whether it would approve Gardendale's request to operate a municipal school system by the start of the 2017-18 school year. (Doc. 1074, p. 2).

**November 2016:** *Stout* **Pretrial Conference**

The Court held a pretrial hearing on November 18, 2016. At that hearing, counsel for Gardendale indicated that they planned to argue at trial that "current conditions today, using the language from our reply brief, no longer justify federal court ongoing supervision of the County Board of Education" so that Gardendale should be allowed to separate. (Doc. 1114, p. 12). Counsel for Gardendale argued: "our position is that the time has come for the Court to put an end to this case because of the facts being what they are today in 2016." (Doc. 1114, p. 12).[77] Gardendale relied in part on a report that the parties filed when the Court was attempting to discuss with the parties the negotiation of a consent agreement that would provide a roadmap to the conclusion of federal oversight after full and faithful implementation of the agreement. (Doc. 998; Doc. 1114, p. 12). In that report, Jefferson County asserted that it believed that it might be close to or might fully qualify for release from federal oversight on some of the *Green* factors. The private plaintiffs and the United States responded that they were in the process of

---

[77] On August 19, 2016, Gardendale filed an answer to the original complaint in this action. (Doc. 1090). In the answer, Gardendale asserted that:

> to the extent that Plaintiffs or any other party or intervenor asserts that [Gardendale's] operation of its schools would affect [Jefferson County's] compliance with the September 8, 1971 Order of this Court, [Gardendale] responds that any actions or omissions by [Jefferson County] that this Court has previously found to be in violation of the Fourteenth Amendment have been fully remedied, and that the school system of Jefferson County is unitary, not dual, and has been for some time, under binding precedent that has intervened since the entry of the 1971 Order.

(Doc. 1090, ¶ 8).

investigating Jefferson County's position. (Doc. 998, pp. 10-13, 23; Doc. 1114, p. 22).

The Court explained that Gardendale's anticipated trial argument presented a logistical challenge because to give the private plaintiffs and the United States a fair opportunity to respond to such an argument, the Court would have to allow the private plaintiffs and the United States to explore all of the *Green* factors, which was the process that the Court had just begun when Gardendale filed its motion for separation. The Court pointed out that it put that effort on hold and instead re-directed the parties on an expedited discovery path regarding Gardendale's proposed separation. (Doc. 1114, pp. 15-16, 30-31). Counsel for the private plaintiffs argued that Gardendale's attempt to prove at trial that Jefferson County was at or near "unitary status" would enable Gardendale to "mak[e] assertions that we would not have the information to rebut in any way, which would deeply prejudice our case." (Doc. 1114, p. 23). The Court offered Gardendale the option of delaying the hearing on its motion for separation so that the parties could explore the extent to which Jefferson County has fulfilled its obligations under the desegregation order. (Doc. 1114, pp. 24-31). Gardendale declined the opportunity and chose instead to proceed to trial. (Doc. 1114, pp. 33-34).[78]

---

[78] Although it was not a central theme at trial, the trial record contains evidence that suggests that the Jefferson County Board of Education has work to do before it may petition the Court for release from federal supervision. For instance, the trial record indicates that only 16.7 % of the

**December 2016: *Stout* Bench Trial**

The Court conducted a bench trial on Gardendale's motion on December 1-2 and December 7-9, 2016. (*See* Doc. 1110; December 1, 2016 staff minute entry; December 2, 2016 staff minute entry; December 7, 2016 staff minute entry; December 8, 2016 staff minute entry; December 9, 2016 staff minute entry). Following the trial, the parties filed supplemental briefs, and the Court took Gardendale's motion to separate under submission.

**DISCUSSION**

In its brief in support of its motion to separate, the Gardendale Board asserts that "[t]his dispute is not about segregation. . . . Nor is this dispute about racism." (Doc. 1097, p. 2). Quoting *Shelby County v. Holder*, the Gardendale Board adds that "'[b]latantly discriminatory evasions of federal decrees are rare'" and that "there is no evidence or inference that [the Gardendale Board's] effort to operate its own schools is a response to any desegregation decree or an attempt to evade any order of this Court." (Doc. 1097, pp. 29 (quoting *Shelby County*, 133 S. Ct. at 2621), 39; *see also* Doc. 1097, pp. 38, 61-63). The Board continues: "it is

_____

teachers in the Jefferson County system are African-American, and many of those teachers are assigned to predominantly black schools. (Doc. 1128, pp. 86-87). The record also suggests that a declaration of unitary status may not have been a priority for some of the county's board members and former school superintendents. (*See* Doc. 1128, pp. 86-89). Evidence of that nature would impact the Court's assessment of the county's good faith implementation of the desegregation order in this case. The current president of the Jefferson County Board of Education and Jefferson County's current superintendent have indicated that they are committed to moving the Jefferson County system toward a declaration of unitary status. (Doc. 1127, pp. 105, 115; Doc. 1128, pp. 118-19).

impossible to suppose that [the Gardendale Board] is trying to avoid an Order that Gardendale has lived under for 45 years." (Doc. 1097, p. 41). The record contradicts these assertions.

For the reasons stated below, the Court finds that race was a motivating factor in Gardendale's decision to separate from the Jefferson County public school system. More specifically, a desire to control the racial demographics of the four public schools in the City of Gardendale and the racial demographics of the city itself motivated the grassroots effort to separate and to eliminate from the Gardendale school zone black students whom Jefferson County transports to Gardendale schools under the terms of the desegregation order. The Court also finds that Gardendale has not established that its separation will not impede Jefferson County's effort to obtain a court order dissolving the *Stout* desegregation order. More broadly, the equitable principles that govern school desegregation cases weigh against separation. The Court explains each of these findings in turn.

### A. Separation as a Means to Control Racial Demographics

The record demonstrates that some Gardendale citizens are concerned because the racial demographics in Gardendale are shifting, and they worry that Gardendale, like its neighbor Center Point, may become a predominantly black city. These citizens prefer a predominantly white city. One participant on the Gardendale Schools Facebook page put the matter plainly: "would you like to live

in Center Point or Adamsville? . . . think about how quickly an area's demographics change." (Doc. 1132-2, p. 143, Apr. 23, 2013, 3:37 a.m.; *see* p. 88 n. 42, above). These citizens believe that a local school system will help reduce white flight and stem the demographic shifts that the city has experienced. (*See* pp. 88, above). These citizens supported separation because they hoped that Gardendale's operation of a municipal school system would enable Gardendale to eliminate from the schools in the Gardendale feeder pattern African-American transfer students from communities like Center Point and African-American students from North Smithfield who attend Gardendale schools pursuant to the *Stout* desegregation order. (*See* pp. 82-83, above).[79]

The very first published statement from one of the separation organizers argued for separation because a municipal system would give Gardendale "better control over the geographic composition of the student body" of the four public schools in Gardendale. (Doc. 1132-2, p. 181, Sept. 12, 2012, 3:03 p.m.). Currently, the *Stout* desegregation order dictates the "geographic composition" of the Gardendale zone, and the geographic composition of the Gardendale zone includes North Smithfield, a black community. The desegregation order also

---

[79] As discussed below, the Court does not assume that every citizen who favors a municipal school system is concerned with racial demographics. Some individuals who participated in the conversations on the Gardendale Schools Facebook page expressed concern about the racial overtones of comments from other citizens. The low turnout for the 5 mill tax referendum and the narrow margin of approval for the 5 mill tax assessment (p. 97, above) suggest that not every citizen in Gardendale supports separation or shares the views of citizens who wish to control the racial composition of the public schools in Gardendale.

authorizes black students from communities outside of the City of Gardendale, cities like Center Point, to attend schools in the Gardendale zone pursuant to majority-to-minority transfers. The organizers prefer a smaller geographic footprint, one that consists only of students from Gardendale's municipal limits and from the community of Mount Olive, a predominantly white community. In the words of a separation organizer who the Gardendale City Council appointed to the Gardendale Board of Education, "part of the [separation] plan to make it work" was to "include Mt. Olive." (Doc. 1132-2, p. 181, Sept. 12, 2012, 7:45 p.m.). Consistent with this remark, when Dr. Harvey conducted the feasibility study for a municipal public school system in Gardendale, Dr. Harvey included Mount Olive students in the study; he did not include other communities. (*See* p. 92, above).

Separation organizers were particularly interested in eliminating from the schools in the Gardendale zone transfer students from other communities. One organizer stated: "We are using buses to transport nonresidents into our schools (without additional funding) from as far away as Center Point (there's your redistribution of wealth)." (Doc. 1132-2, p. 185, Sept. 15, 2012, 7:12 p.m.). He added: "A look around at our community sporting events, our churches are great snapshots of our community. A look into our schools, and you'll see something totally different." (Doc. 1132-2, p. 185, Sept. 15, 2012, 7:12 p.m.). A day later, that organizer reiterated: "non-resident students are increasing at a[n] alarming rate

in our schools. Those students do not contribute financially. . . . I welcome those students, but they'll need to move to Gardendale or pay a transfer fee."  (Doc. 1132-2, p. 186, Sept. 16, 2012, 10:21 p.m.).[80]  Other supporters of separation were even more direct.  One commented: "did you know we are sending school buses to Center point [*sic*] and busing kids to OUR schools in Gardendale, as well as from Smithville!"  (Doc. 1132-2, p. 183, Sept. 13, 2012, 1:41 p.m.).  (S)he added: "[w]e are busting at the seams and can't continue on this path!"  (Doc. 1132-2, p. 183, Sept. 13, 2012, 1:41 p.m.).

The author of the "OUR schools" comment attributed the bussing and capacity issues to No Child Left Behind transfers, but the record demonstrates that almost all of the transfer students who ride busses to Gardendale schools are students who transfer to Gardendale schools under the majority-to-minority transfer provision of the desegregation order.  Over the years, the Court authorized NCLB transfers only to Snow Rogers, a school with plenty of capacity to accept transfer students, and Bragg Middle, a school to which the Court limited NCLB transfers because of capacity issues.  The Court has not authorized NCLB transfers to Gardendale Elementary or to Gardendale High School.  (*See* pp. 67-68, 76-77,

---

[80] The organizer's remarks reflect the position shared by many Gardendale residents that race-neutral notions of economic fairness justify the exclusion of non-residents from Gardendale's schools.  One of the fundamental purposes of desegregation is to give all public school students the opportunity to receive an education without regard to financial considerations.  The financial expense of desegregation, to the extent that it may be calculated, must be borne by society as a whole, and a child's right to attend a desegregated school is not conditioned on the student's ability to pay.

85, above). The following chart, distilled from Jefferson County's annual desegregation reports, illustrates the number of racial desegregation transfers to Gardendale schools during the years relevant to Gardendale's separation effort:

**Desegregation Transfers into Gardendale Schools from 2009-2010 to 2016-2017**

| Racial Desegregation Transfers by year | Gardendale Elementary School | Snow Rogers Elementary School | Bragg Middle School | Gardendale High School |
|---|---|---|---|---|
| 2009–2010 | 7 | 2 | 16 | 12 |
| 2010–2011 | 16 | 1 | 21 | 22 |
| 2011–2012 | 4 | 2 | 15 | 15 |
| 2012–2013 | 1 | 5 | 8 | 22 |
| 2013–2014 | 0 | 3 | 1 | 22 |
| 2014–2015 | 0 | 2 | 1 | 14 |
| 2015–2016 | 2 | 2 | 3 | 19 |
| 2016–2017 | 7 | 2 | 7 | 14 |

(Derived from Docs. 961-1, 966-3, 975-3, 978-10, 984-4, 999-10, 1033-4, 1106-10).

Thus, the children in schools in Gardendale for whom Jefferson County provides transportation who look "totally different" from the children who attend churches in Gardendale or play on ball fields there are students from the North Smithfield community whom the Court zoned for Bragg Middle School and Gardendale High School and transfer students from areas like Center Point who attend Gardendale schools pursuant to the terms of the *Stout* desegregation order. All of the students from North Smithfield and all of the students who attend a

Gardendale school via desegregation transfers are African-American. So are the NCLB transfer students from Center Point.

To eliminate these students from the schools in the Gardendale feeder pattern and maintain the geographic integrity of the Gardendale zone, the organizers recognized that they had to translate their grassroots effort into official action. (*See* pp. 84-85, above). They did just that.

### 1. Transfer students

In every year relevant to Gardendale's separation effort, between 17 and 60 students have attended Gardendale schools via desegregation transfers. It is undisputed that under the December 2015 desegregation plan that Gardendale's superintendent prepared, any student who currently attends a Gardendale school on the basis of a court-ordered transfer will be eliminated immediately from the Gardendale municipal school system. (Doc. 1125, p. 282; Doc. 1129-7, p. 7) (Gardendale trial exhibit stating that "[t]he students that transfer into Gardendale Zone Schools would return to their assigned schools"). The "Transfers" column in Gardendale's trial exhibit 7 illustrates graphically the elimination of transfer students from the Gardendale municipal system. (Doc. 1129-7, p. 1).

The record demonstrates that toward the end of 2014, Dr. Martin drafted an interdistrict transfer policy and circulated one of the early drafts of the policy among the members of the Gardendale Board of Education. The proposed transfer

policy contained a racial desegregation transfer provision. The president of the Gardendale Board responded to this desegregation transfer provision with the comment: "Legal team to review and confirm its applicability/appropriateness for GBOE." (Doc. 1133-5, p. 4). The board president did not ask Gardendale's legal team to review any of the other transfer categories in the draft policy. (Doc. 1133-5). All of the subsequent drafts of the racial desegregation transfer provision predicated transfers on the availability of space in the school to which a transfer was requested, eliminating—at least under current circumstances—Gardendale Elementary and Bragg Middle as potential transferee schools. Various drafts of the transfer plan also imposed substantial tuition fees on certain categories of transfer students, including racial desegregation transfers, and stated that parents would have to pay tuition by some means other than personal check. (Doc. 1133-5). The Court reasonably infers that these conditions are designed to minimize or eliminate racial desegregation transfers.

The current draft transfer policy that Gardendale presented to the Court at trial removes the tuition requirement for racial desegregation transfers but retains the caveat that these transfers are "subject to space availability." (Doc. 1129-10, p. 5). In addition, "[t]ransportation is not provided for any transfer student unless required by federal courts." (Doc. 1129-10, p. 6). The absence of transportation would discourage transfers. The evidence also establishes that the Gardendale

Board has not voted on a transfer policy. (Doc. 1125, pp. 283-93; Doc. 1129-10, pp. 2, 6) (characterizing current draft of policy as a "proposed" policy that the Gardendale Board has not yet adopted; the last section of the policy contains ellipses, indicating an unfinished policy). As a result, at trial, Dr. Martin was unable to say which, if any, of his draft transfer policies the Gardendale Board ultimately would be willing to implement. (Doc. 1125, p. 293). This violates the instruction in *Ross* that a proposed splinter district "must express its precise policy positions on each significant facet of school district operation," including "interdistrict pupil assignments." *Ross*, 559 F.2d at 944.[81]

This official action—or lack thereof—dovetails with the separation organizers' expressed interest in eliminating from the schools within Gardendale's municipal limits students who are bussed into Gardendale from other areas of Jefferson County. Significantly, the transfer chart on page 142 illustrates that the public discussion among Gardendale residents that was critical of transfer students correlates with a nearly 50% decrease in the number of racial desegregation

---

[81] In its brief in support of its motion for separation, the Gardendale Board faults the other parties for its failure to vote on the transfer policy and states that voting on the policy before this Court approves Gardendale's motion to separate "would put the cart before the horse." (Doc. 1097, p. 48). In fact, voting on the policy would comply with the law and exhibit good faith. As the Supreme Court held in *Wright*, Gardendale's failure to formulate and adopt concrete policies leaves "open to question" the "persuasiveness of the 'quality of education' rationale" that Gardendale offers for its separation effort. *Wright*, 407 U.S. at 468. The record demonstrates that the Gardendale Board waited until the eleventh hour to formulate many policies concerning the operation of a municipal system. Gardendale first presented those policies to the other parties ten months after Gardendale filed its separation plan, six months after the close of discovery, and just over one month before the bench trial on its motion to separate was scheduled to begin. (Doc. 1114, pp. 35-37; Doc. 1115, pp. 1-2).

transfer students at Gardendale Elementary and Bragg Middle School. There always have been few racial desegregation transfers to Snow Rogers Elementary, and the racial transfers to Gardendale High School display more of a roller coaster effect, varying from a low of 12 racial desegregation transfers to a maximum of 22 desegregation transfers.

Only racial desegregation transfers have dropped significantly in any Gardendale school during the years relevant to Gardendale's separation effort. The other transfer categories have experienced no significant fluctuations over the relevant time period. The following chart illustrates, by way of example, the total number of transfers into Gardendale Elementary from 2009-10 to 2016-17. Charts for all four Gardendale schools are attached as Appendix P.

**Gardendale Elementary School Transfers from 2009-10 to 2016-17**

| Year | African-American Racial Desegregation Transfers | African-American Employee Transfers | African-American Hardship Transfers | White Hardship Transfers | Hispanic Hardship Transfers |
|------|------|------|------|------|------|
| 2009-2010 | 7 | 5 | 0 | 0 | 0 |
| 2010-2011 | 16 | 12 | 0 | 3 | 2 |
| 2011-2012 | 4 | 11 | 0 | 1 | 3 |
| 2012-2013 | 1 | 7 | 0 | 1 | 2 |
| 2013-2014 | 0 | 9 | 0 | 1 | 2 |
| 2014-2015 | 0 | 11 | 0 | 4 | 0 |
| 2015-2016 | 2 | 3 | 0 | 1 | 0 |
| 2016-2017 | 7 | 7 | 0 | 0 | 0 |

(Derived from Docs. 961-1, 966-3, 975-3, 978-10, 984-4, 999-10, 1033-4, 1106-10). Without more information, the Court cannot say that public criticism of transfer students caused the decline in racial desegregation transfers at Gardendale Elementary and Bragg, but the correlation is unmistakable. The Court will discuss the message conveyed by the separation effort in greater detail below.

### 2. North Smithfield Students

In its September 1971 desegregation order, this Court held that the following schools would compose the Gardendale High School feeder pattern: Snow Rogers Elementary School, Mount Olive Elementary School, Gardendale Elementary School, George Rogers Vocational School (which later became Bragg Middle School), and Gardendale High School. (Doc. 226, p. 2). The geographic boundary of the Gardendale zone extended to the south to capture the North Smithfield community. (Doc. 226, Attachments H-3 and H-4; Doc. 1129-9). Thus, while most of the students residing in the City of Gardendale have attended the schools in the Gardendale zone for decades, causing Gardendale's citizens to think of those schools as "OURS," those schools also have belonged to the children of Mount Olive and North Smithfield and all of the other extra-municipal students zoned for Gardendale schools for the past 45 years. Those students rightfully consider Bragg Middle and Gardendale High as their schools too. In 1971, to comply with *Alexander* and *Singleton*, the Court placed students from the North Smithfield

community in the Gardendale feeder pattern by design to help desegregate student assignments at Bragg and Gardendale High.

Under Gardendale's initial separation plan from March 2015, students from North Smithfield would be eliminated from the schools in the Gardendale feeder pattern over a 13-year period. White and black students from other areas outside of Gardendale's municipal limits also would be phased out, but separation organizers had planned from the outset to recapture the bulk of those white students through annexation of part or all of the Mount Olive community. Separation organizers and supporters expressed no interest in adding students from North Smithfield back into the Gardendale system following separation, and the March 2015 separation plan offered no pathway that would enable the North Smithfield students to continue their education in Gardendale schools. (*See* pp. 115-16, above).

Gardendale recalculated after it realized that the elimination of the North Smithfield students might jeopardize the separation effort. Gardendale's counsel suggested that an adjustment might be necessary during the November 10, 2015 status conference in this case. (Doc. 1045, pp. 18-20). Following the status conference, Gardendale's director of operations did the math and realized that Gardendale could not satisfy the student assignment requirement for splinter districts in section V(c) of the desegregation order with only the live-in population

in Gardendale's city limits, so he recommended inclusion of North Smithfield students to meet the student assignment standard. Dr. Martin agreed, and he and his team revised the separation plan, adding all public school students from North Smithfield to the Gardendale municipal school system. (*See* pp. 115-16, above). In the words of one of the separation organizers, the new December 2015 separation plan has "the hallmarks of a specific, technical, tactical decision aimed at addressing a recognized road block to breaking away." (Doc. 1132-2, p. 8, Dec. 16, 2015, 2:34 a.m.).

The December 2015 separation plan states that students from North Smithfield will be eligible to attend Gardendale schools as long as tax proceeds follow the students to Gardendale. (Doc. 1131-2, pp. 4, 14). The Gardendale Board's motion for approval of the separation plan states that students from North Smithfield "will be able to attend Gardendale Schools for the indefinite future." (Doc. 1040, p. 5). But the Gardendale Board has not voted on the separation plan. (Doc. 1124, pp. 150-54). That too "has the hallmarks of a specific, technical, tactical decision." Rather than make a commitment to the students in North Smithfield, the Gardendale Board has been waiting to see whether its attorneys could persuade the Court that the 1971 desegregation order does not govern Gardendale's separation. (*See* Docs. 1097, 1104, 1136 and pp. 151-54, below). If Gardendale does not need the students from North Smithfield to separate, then the

board has no incentive to keep those students in the Gardendale system. By delaying a vote on the superintendent's December 2015 separation plan, the board has allowed itself the flexibility to proceed with the December 2015 plan if necessary, revert to the March 2015 plan under which North Smithfield students would be phased out of the Gardendale schools, or choose yet another plan.

Significantly, until the bench trial in this case, neither the Gardendale Board nor Dr. Martin had explained to the citizens of North Smithfield what the phrase "indefinite future" meant. Dr. Martin and a board member have testified that they understand the phrase to mean that North Smithfield students may attend the Gardendale schools as long as their ad valorem tax dollars flow to the City of Gardendale's school system. (Doc. 1124, p. 111; Doc. 1125, p. 174). But the desegregation order is the mechanism that makes those tax dollars flow to Gardendale. Upon dissolution of the desegregation order, absent an agreement between Gardendale and Jefferson County, students from North Smithfield would have no assurance that Gardendale would allow them to continue to attend Gardendale schools. The president of the Gardendale Board acknowledged in his deposition that he does not know what will happen to students from North Smithfield when the *Stout* desegregation order no longer is operative. (Doc. 1131-35, p. 30). To date, the Gardendale Board has not made a meaningful, binding commitment to the children in North Smithfield. (Doc. 1131-35, p. 30).

The Gardendale Board's failure to vote on an inter-district transfer policy or a separation plan that provides a pathway to Gardendale schools for North Smithfield students, coupled with Gardendale's plan to annex part or all of the predominantly white community of Mount Olive, is consistent with the intent of citizens who wish to prevent further shifts in Gardendale's racial demographics. The record demonstrates that the Gardendale Board is trying to evade the Court's desegregation order because some citizens in Gardendale want to eliminate from Gardendale schools the black students whom Jefferson County transports to schools in Gardendale.

## B. Gardendale Has Not Demonstrated that a Municipal Separation will Not Impede Jefferson County's Attempt to Fulfill its Obligations under the Desegregation Order.

### 1. The 1971 Desegregation Order Still Governs this Action.

Before considering the desegregation order's requirements for splinter districts and the impact of Gardendale's proposed separation on Jefferson County's efforts to comply with the desegregation order, the Court first addresses Gardendale's argument that this Court no longer may supervise student assignments in the Jefferson County school district because in *Stout II*, the Fifth Circuit Court of Appeals accepted Judge Pointer's finding that Jefferson County had dismantled its prior dual system of public education and declared the county system "unitary." (Docs. 1097; 1104; 1114, pp. 9-16; 1124, pp. 4-7; 1136, pp. 1-

2).  Gardendale argues that because Jefferson County already has satisfied the *Green* student assignment factor, *Wright* and *Ross* do not apply in this case, and this Court may not enjoin Gardendale's separation absent proof of a new constitutional violation.[82]

Gardendale's argument rests on the type of semantic exercise that the Supreme Court cautioned against in *Dowell*.  As discussed above, in *Stout II*, the Fifth Circuit Court of Appeals accepted Judge Pointer's finding that the dual system of student assignments in Jefferson County had been "fully dismantled." (*See* p. 41, above).  The Fifth Circuit used the term "unitary" to describe student assignments in Jefferson County.  (*See* p. 41, above).  But the Fifth Circuit did not release Jefferson County from federal supervision with respect to student assignments or any other *Green* factor.

The Fifth Circuit labelled student assignments in the Jefferson County district "unitary" because the student populations of many of the schools in the district no longer were racially segregated.  As the Supreme Court recognized years later in *Dowell*, lower courts frequently used the term "unitary" inconsistently, and "a school district could be called unitary and nevertheless still contain vestiges of past discrimination."  498 U.S. at 245; p. 52, above.  The *Stout*

---

[82] The Court believes that its finding with respect to the discriminatory motive for Gardendale's separation is adequate to warrant remedial action, but the Court addresses Gardendale's alternative arguments for the sake of completeness.

*II* opinion leaves no doubt that the Fifth Circuit found that the vestiges of past discrimination remained in the Jefferson County district with respect to student assignments. After considering student assignments in the all-black and all-white schools in the Wenonah zone and in Jefferson County generally (where, the Fifth Circuit said, desegregation was limited "as a matter of practicality"), the Fifth Circuit held that "partly in view" of the presence of one-race schools in the Jefferson County district, the school district "must continue under the scrutiny and surveillance of the district court." 537 F.2d at 803. The Fifth Circuit recommended that this Court expand—not curtail—its use of desegregatory tools like majority-to-minority transfers to attempt to desegregate the remaining one-race schools in the district. *Id.*

The Fifth Circuit also made no express finding that the Jefferson County school district had adhered to the goals of the desegregation order in good faith so that the county could be expected to continue to fulfill those goals after dissolution of the desegregation order. The Fifth Circuit was complimentary of the parties, stating that in the five years that the 1971 desegregation order had been in place, "great progress" had been made, "aided by increasing good faith and mutual confidence on all hands," 537 F.2d at 801; but the Fifth Circuit was troubled that a number of one-race schools remained in the district and said that the situation was "to be deplored." *Id.* at 803. The Fifth Circuit reluctantly affirmed Judge

Pointer's decision to deny the plaintiffs' request to re-zone those schools to desegregate the student populations of the schools. Thus, there was nothing remotely akin to a declaration of unitary status in *Stout II*.

The record demonstrates that neither this Court nor any other has released the Jefferson County district from federal oversight of student assignments or any other *Green* factor. (Doc. 1127, pp. 105, 115, 120). Jefferson County concedes the point. (Doc. 991, p. 11). As counsel for a number of the municipal splinter districts in Jefferson County pointed out at the November 2014 status conference in this case, the parties have not actively discussed the topic of dissolution of the desegregation order because they have been busy over the past 10 years addressing municipal separations that altered the racial demographics in Jefferson County. (Doc. 991, p. 11). After touring the schools in the Jefferson County system, Gardendale's superintendent reported to the Gardendale Board that the county school board has "an excessive amount of work" to do "across the entirety of the county" to obtain unitary status, and he recommended that the Gardendale Board "do everything to make sure we are not lumped into that process." (Doc. 1125, p. 298; Doc. 1131-23, p. 2). The Court is satisfied that it still has the authority under the 1971 desegregation order to oversee student assignments and proposed separations of splinter districts in Jefferson County.

As an alternative to its argument that the Jefferson County school system already has been declared unitary, at least with respect to student assignments, Gardendale argues more broadly that desegregation orders are outmoded and that enforcement of longstanding desegregation decrees represents federal overreach and interference in matters that are purely local. Gardendale asserts that federal courts improperly use desegregation orders to set education policy. (*See, e.g.,* Doc. 1097, pp. 24-25). In support of its argument, Gardendale highlights an ambitious desegregation order that bears little resemblance to the 1971 *Stout* desegregation order and efforts to enforce desegregation orders in school districts that already had been declared unitary or never had been subject to federal oversight in the first place. (*See* Doc. 1097, pp. 23-29 (discussing *Jenkins III* and *Parents Involved*); *see* pp. 56-58 & n. 22, above (discussing *Jenkins III* and *Parents Involved*); *see also* Doc. 1136-1, p. 2 (citing *Holton v. City of Thomasville Sch. Dist*., 425 F.3d 1325, 1328-29 (11th Cir. 2005) ("Notably, this case differs from the other school desegregation cases that have come before us in recent years, in that the City of Thomasville School District has never operated under any court-imposed desegregation order or other court supervision. Indeed, this lawsuit is the first desegregation suit ever brought against the District. Because no court has ever imposed a desegregation order on the District, we face whether it is appropriate to do so for the first time now."))).

Implemented as it was in a district that avoided desegregation for 15 years by adopting a variety of ineffective "freedom of choice" plans, the 1971 desegregation order in this case represented a significant departure from prior student assignment plans because the order used zoning to compel the desegregation of the student bodies of white and black schools. The order provides specific benchmarks with respect to only a few of the *Green* factors and offers tremendous latitude to the Jefferson County Board of Education, allowing the board to select the means by which it will fulfill the requirements of the desegregation order. Unlike the ambitious, expensive court-mandated programs from which the Supreme Court ultimately withdrew support in *Jenkins III*, there are no provisions in the order that address curriculum, mandate particular programs, or otherwise interfere with the policy responsibilities assigned to the superintendent and the Jefferson County Board of Education. Since this Court entered the 1971 desegregation order, the Jefferson County Board has operated the schools in Jefferson County with little active oversight from this Court.[83] The record does not support an argument that the desegregation order in this case is

---

[83] As the student body demographics of the schools in the Jefferson County system demonstrate (*see* Appendix Q), this Court has made no effort to obtain racial balance in the county schools. Gardendale asserts that "the Objectors' drive in this case [is] for racial 'balancing' and 'diversity.'" (Doc. 1097, p. 25). Nothing in the record supports the assertion about racial balancing. To the extent that the Objectors support the desegregation of student and teacher assignments, which necessarily leads to racial diversity, the Objectors advocate only for enforcement of the desegregation order.

overreaching or that the Court has interjected itself in local matters in an attempt to set education policy.

It is self-evident that the desegregation order in this case is decades-old, but age alone does not render the order unenforceable. The Supreme Court established a standard for the dissolution of desegregation decrees that authorizes a district court to end supervision after a school district has fulfilled the requirements of a desegregation order in good faith, has demonstrated that it will continue to avoid constitutional violations after the conclusion of federal oversight, and has been adjudicated eligible for dissolution of the desegregation order "through the proper judicial procedures." *Dowell*, 498 U.S. at 245, 249 (citation and internal quotation marks omitted); *see also Duval County*, 273 F.3d at 965-67.

This Court had begun the process of evaluating the Jefferson County school district when Gardendale proposed its initial separation plan in March 2015. By that time, this case had been reassigned to the undersigned judicial officer, and the Court had met with the parties to discuss with them the process the Court envisioned for moving the Jefferson County school district toward the conclusion of federal supervision. (*See* pp. 104-06, above). The Court suspended that process because the parties had to devote their resources to addressing Gardendale's motion for separation. At the pretrial conference, the Court gave Gardendale the opportunity to delay a hearing on its motion for separation for one year so that the

parties and the Court could determine whether Jefferson County currently is eligible for release from supervision on one or more of the *Green* factors. (Doc. 1114, pp. 24-26). Gardendale declined the opportunity. The Court reasonably infers from Gardendale's litigation strategy and from the Superintendent's statement that Jefferson County has to do "an excessive amount of work" to fulfill the obligations of the desegregation order that Gardendale does not genuinely believe that Jefferson County currently is eligible for a release from federal supervision.[84]

Thus, the Court finds that the 1971 desegregation order is valid and operative in this action. Though the *Stout* desegregation order remains in force, the Court finds that the splinter district provision concerning student assignments

---

[84] Before leaving the topic of the age of the desegregation order in this case, the Court would be remiss if it did not acknowledge that time is a relative concept. For black children who waited until 1865 to be recognized as United States citizens (with the ratification of the 13th amendment) and then waited until 1971 to be admitted into white classrooms in Jefferson County public schools, the 46-year-old desegregation order in this case must seem relatively young. That is not to say that 46 years hasn't been too long for black children to wait for the goals of the desegregation order to be realized. It is simply to recognize that in the grand scheme of things, the age of the desegregation order in this case likely means something very different to the victims of the constitutional violation that gave rise to the school desegregation order in the first place.

In discussing the completion of federal oversight, the Court is not deaf to the voices that express concern about the end of federal supervision. (*See, e.g.*, Doc. 1124, p. 45). The good faith requirement that the Court has discussed addresses these concerns. A district court cannot release a public school district from federal oversight if the school board has not demonstrated to the district court that the board will continue to avoid constitutional violations after supervision ends. And the Eleventh Circuit's reminder in *Duval County* that the courtroom door does not lock behind a public school district as it leaves the courthouse hopefully incentivizes school districts to maintain desegregated school systems to the best of their abilities. 273 F.3d at 976-77.

violates Supreme Court precedent concerning racial ratios. That provision states that a splinter system must "make sufficient space available for black students from the county system in such number that, added to the number of black students included in the [] new school zone, equals one-third of the white students included in the [] new school zone." (Doc. 226, p. 9). As discussed above, the Gardendale Board can meet this student assignment requirement only if the Board includes students from North Smithfield in the Gardendale municipal district; Gardendale cannot meet the student assignment requirement if it includes in the Gardendale school district only students within Gardendale's municipal boundaries. (*See* pp. 148-49, above). But the Supreme Court and the Eleventh Circuit Court of Appeals have held that rigid mathematical racial quotas are not appropriate in desegregation orders. (*See* pp. 24-25, 42, above).

As the Court has discussed, it does not appear that the ratio requirement regarding splinter districts in the *Stout* order was designed to achieve particular racial ratios in Jefferson County's schools but instead was included in the order to deter splinter districts. This is consistent with the Supreme Court's directive in *Green* that a district court has a "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Green*, 391 U.S. at 438 n. 4. But the Court has found no exception in the case law to the prohibition against racial ratios in student

assignments. Therefore, the Court will not enforce the ratio requirement in the 1971 desegregation order as written. The Court will require only that the schools in splinter districts have reasonably desegregated student populations or that the board of education for a splinter district have an appropriate plan to achieve desegregation of the student populations in the schools in the district. With the exception of Snow Rogers, the student populations of the schools in the Gardendale zone are reasonably desegregated, considering only the students residing within Gardendale's municipal limits.

The Gardendale Board acknowledges that it has not yet fulfilled the desegregation order's requirement that a splinter district "attain the percentage of black faculty and black staff members that exist in the county system at the time of the formation of the new system." (Doc. 226, p. 9; Doc. 1097, p. 13; Doc. 1125, pp. 195-96). Currently, only 4% of the faculty and staff in the schools in the Gardendale feeder pattern are African-American; the Jefferson County Board's workforce is 18% African-American. (Doc. 1097, p. 13; Doc. 1118, ¶26). The racial composition of the faculty of the schools in the Gardendale feeder pattern for the years relevant to Gardendale's attempted separation is as follows:

**Gardendale Faculty Data from 2009-2010 to 2016-2017**

| Year | Gardendale Elementary | Snow Rogers | Bragg Middle | Gardendale High |
|------|----------------------|-------------|--------------|-----------------|
| 2009-2010 | 51 white, 2AA 96.2%W | 16.7W, 0AA 94.4%W | 41.3W, 3AA 90.2%W | 64.4W, 1AA 98.5%W |
| 2010-2011 | 54.1W, 2AA 96.4%W | 15.7W, 0AA 94% W | 41.9W, 2AA 91.3%W | 61.4W, 3AA 95.3%W |
| 2011-2012 | 53W, 2AA 96.4%W | 14.2W, 0AA 90.5% W | 41W, 2AA 91.1%W | 62.4W, 2AA 96.9%W |
| 2012-2013 | 55.1W, 1AA 98.2%W | 15.7W, 0AA 100% W | 41W, 3AA 89.1%W | 61W, 2AA 96.8%W |
| 2013-2014 | 54.8W, 1AA 98.2%W | 15.5W, 0AA 100% W | 41W, 4AA 87.2%W | 61W, 2AA 96.8%W |
| 2014-2015 | 50W, 0AA 100%W | 17W, 0AA 100% W | 40W, 4AA 87%W | 73W, 2AA 97.3%W |
| 2015-2016 | 56.5W, 0AA 96.6%W | 13.5W, 0AA 100% W | 37W, 5AA 88.1%W | 59W, 5AA 92.2%W |
| 2016-2017 | 56W, 1AA 98.3%W | 14W, 0AA 100% W | 36W, 6AA 83.7%W | 60W, 5AA 92.3%W |

(Derived from Docs. 961-1, 966-4, 975-5, 978-2, 984-2, 999-2, 1033-2, 1106-2).

Gardendale's superintendent testified that he has plans for increasing the number of black teachers in the Gardendale schools. (Doc. 1125, pp. 196-200). Because the faculty data for the Gardendale schools is based on Jefferson County's hiring and retention practices, were all things equal (i.e., if there were no evidence of racial motivation and if Gardendale's proposed separation would not negatively impact Jefferson County's effort to satisfy the requirements of the *Stout* desegregation order), the Court would consider giving Gardendale's superintendent the opportunity to implement his plans for all of the schools in the Gardendale zone. Though the record demonstrates that the superintendent never has hired a

black teacher in his career, the Court would allow some leeway were it not for the other hurdles to separation.[85]

### 2. Gardendale Has Not Demonstrated that its Separation Will Not Impede Jefferson County's Effort to Satisfy its Obligation to Eliminate the Vestiges of Past Discrimination to the Extent Practicable.

Gardendale's proposed separation does not satisfy the requirements of *Wright* and *Ross*.  Under *Wright* and *Ross*, a proposed splinter district cannot separate by proving only that the student bodies in the schools in the new district will be racially desegregated.  Instead, when the proposed splinter district has "always been a part" of a larger district that formerly was segregated by law, the splinter district must demonstrate that its operation will not harm the parent district's effort to fulfill its obligation to eliminate the vestiges of segregation to the extent practicable.  *Wright*, 407 U.S. at 459.  If Gardendale's separation would "impede the dismantling of the dual system" in Jefferson County, then this Court may enjoin the separation.  *Id.* at 460.  As a matter of law, even if some of the justifications that Gardendale has offered for separation are legitimate, the "existence of a permissible purpose cannot sustain an action that has an impermissible effect."  *Id.* at 462.  And where, as here, one of the reasons offered

---

[85] Although the Court has not done a complete analysis, at first blush, it appears that the schools in the Jefferson County district are racially identifiable based on faculty and staff assignments.  If this impression is correct, then to satisfy the *Green* faculty factor, the Jefferson County Board of Education will have to develop a plan to address faculty and staff assignments at the schools in the county district.

for separation is "the hope of providing better 'quality education' to some children," namely those in the splinter district, the Court may not approve the separation plan if the plan will have "a substantial adverse effect upon the quality of education available to others." *Id.* at 463.

Consistent with *Wright*, to determine whether Gardendale has carried its burden, the Court examines anticipated post-separation racial demographics, facilities and the programs available in those facilities, and the message that Gardendale's proposed separation sends to African-American students who have attended schools in the Gardendale zone pursuant to this Court's desegregation order.

### a. Post-Separation Racial Demographics

In deciding whether to enjoin the operation of the Gardendale district, the Court must examine the post-separation racial composition of the student populations in the splinter district and in the parent district. *Wright* explains that in doing so, the Court may look beyond the statistics that Gardendale has offered and consider collateral consequences of a municipal separation. In this regard, Gardendale is mistaken when it suggests that the Court should evaluate the racial composition of the municipal district using student population statistics immediately following the separation. The Court is concerned with the final racial composition of the splinter district and the parent district at the conclusion of the

lengthy grandfather period that Gardendale proposes. The Court also is concerned

with the specific impact on students who will have to be rezoned because of

Gardendale's separation.

By Gardendale's numbers, the municipal system will be more desegregated

at the conclusion of the grandfather period because during that 13-year period,

Gardendale will phase out more white students than black students. (Doc. 1129-7,

p. 1). Gardendale's statistics are not a reliable indicator of the racial composition

of the Gardendale district in the years following separation because Gardendale's

post-separation enrollment statistics do not account for the fact that Gardendale has

plans to annex portions of Mount Olive into the city. (Doc. 1124, pp. 30-31; Doc.

1126, pp. 18, 64-66; *see also* Doc. 1131-6, p. 36).[86] According to 2010 census

data, Mount Olive is 97.7% Caucasian and 1.0% African-American. (Doc. 1126,

p. 65; Doc. 1131-6, p. 36). The overwhelming majority of Mount Olive students

are white. (Doc. 1126, pp. 18, 65, 67; Doc. 1131-6, p. 36). Gardendale also

anticipates expansion to the north of the city. Those potential areas for annexation

also are predominantly white. (Doc. 1131-6, pp. 36-38).

---

[86] These plans are so concrete that in his feasibility study, Dr. Harvey included the Mount Olive community in his analysis of the new Gardendale district. (*See* p. 92, above). Annexation plans for some properties contiguous to Gardendale are so certain that Gardendale's superintendent provided to Gardendale's expert on student assignments a list of just over 100 students who live in areas that Gardendale has identified for potential annexation. (Doc. 1125, pp. 117, 186). The City of Gardendale has annexed property into the city in every decade since 1990. (Doc. 1126, pp. 49-51, 100-01). On the record before the Court, it is reasonable to infer that Gardendale will continue to annex property into the city.

Thus, the student population in a Gardendale municipal district is likely to have a higher percentage of white students and a lower percentage of black students than Gardendale's statistics suggest. If Gardendale were to annex the entire Mount Olive community, black student residency in Gardendale would fall from 20.8 percent to 15.2 percent. (Doc. 1126, p. 69). Based on current sentiment, it seems unlikely that Gardendale will annex all of Mount Olive at this time, but there is a great deal of instability in the area generally speaking. As a practical matter, the proposed 13-year grandfather period makes the ultimate racial composition of the Gardendale district difficult to forecast because so much may change over 13 years.

The record demonstrates that Gardendale's separation would cause the overall student population in the Jefferson County district to become 1.8% more black if the Gardendale system consists only of students residing within Gardendale's municipal limits. (Doc. 1126, pp. 17, 92). If North Smithfield students are zoned for a Gardendale municipal system, then the overall student population in the Jefferson County district would become 1.5% more black. (Doc. 1126, p. 99). On the other hand, if Gardendale annexes portions of Mount Olive and other predominantly white communities, the concentration of black students in the Jefferson County system will increase. (Doc. 1126, pp. 18, 92-93).

Although a 1.5% to 1.8% shift in racial demographics may seem insignificant at first blush,[87] it is appropriate for the Court to consider that shift in the context of the cumulative impact of municipal separations and annexations on Jefferson County's ability to fulfill its obligations under the desegregation order. The student populations of the cities of Homewood, Hoover, Vestavia, Leeds, and Trussville were predominantly white at the time of separation. Each has annexed predominantly white communities post-separation, most significantly Vestavia's annexation of Cahaba Heights in 2003. (Doc. 1126, pp. 30, 44).

As discussed above, these separations and annexations have altered the racial composition of the Jefferson County student population continually since 2000. (*See* pp. 46-47, 64-67, above). The student population of each municipal district remains predominantly white. (*See* Doc. 1131-6, p. 6). The annexed areas produce significant tax income, so that the loss of those areas negatively impacts Jefferson County's resources. The series of municipal separations in Jefferson County has repeatedly shifted the geographic, demographic, and economic characteristics of the Jefferson County district, making it difficult for this Court to find a baseline from which to measure the success of Jefferson County's efforts to

---

[87] *But see Burleson v. Cty. Bd. of Election Comm'rs of Jefferson Cty.*, 308 F.Supp. 352, 356 (E.D. Ark. 1970) (enjoining secession of a splinter district in part because the separation would "substantially increase the racial imbalance" of the parent district by causing a 2% increase in the black student population and a 2% decrease in the white student population), *aff'd*, 432 F.2d 1356 (8th Cir. 1970).

comply with the desegregation order and causing Jefferson County to constantly have to recalibrate its efforts. This factor weighs against separation.

The direct impact of the separation on students eliminated from the Gardendale zone is clear: students will move from schools that are somewhat desegregated to schools that are extremely segregated. Bragg's current student population is 67.19% white and 29.21% black; Gardendale High School's student population is 71.06% white and 26.54% black. (Doc. 1129-2, p. 1). According to Gardendale's expert demographer, if the Court allows Gardendale to separate under the terms of the December 2015 plan, then Bragg Middle School students who do not reside within Gardendale's city limits or in North Smithfield will attend either Bagley K-8 (now Corner Junior High School) or North Jefferson Middle School. (Doc. 1125, p. 136).[88] For the 2015-2016 school year, Bagley K-8's student population was 99.59% Caucasian. (Doc. 1129-2, p. 1). North Jefferson Middle School's student population was 91.39% Caucasian. (Doc. 1129-2, p. 1). Gardendale's expert demographer considered an alternative proposal

---

[88] On July 25, 2016, the Court approved Jefferson County's request to reconfigure Bagley which previously was a K-8 school. Bagley is now an elementary school serving students in grades kindergarten through fourth grade. (Doc. 1088, pp. 3-4). Corner Junior High is now the middle school to which Bagley elementary school students matriculate. (Doc. 1088, p. 4). Gardendale's expert demographer conducted his analysis before the Court approved the grade reconfiguration (Doc. 1125, pp. 147-48), but the grade reconfiguration does not change the expert's testimony that Bragg students would be assigned to less racially diverse schools because like Bagley K-8, the racial composition of the new middle school remains over 99% Caucasian. (*See* Doc. 1088, p. 4; *see also* Doc. 1078, pp. 5-6).

under which Bragg Middle School students who do not live within Gardendale's city limits would attend Bottenfield Middle (now Minor Middle) School. (Doc. 1125, p. 137). Bottenfield Middle School's student population is 85.33% African-American. (Doc. 1129-2, p. 1). Thus, both black and white middle school students who do not reside within Gardendale's city limits will lose the opportunity to attend a somewhat segregated school, but the burden of separation falls most heavily on the black students because they will move from a relatively diverse middle school student body to a school where they will be part of a very small minority community or to a predominantly black middle school. (Doc. 1125, pp. 136-139, 296-97; *see Harris by Harris v. Crenshaw Cty. Bd. of Educ.*, 968 F.2d 1090, 1097 (1992) ("To comply with constitutional mandates, the burden of desegregation must be distributed equitably; the burden may not be placed on one racial group."). According to Gardendale's statistics, 256 students would be eliminated from Bragg Middle School; 40 of those students are black. These numbers do not include transfer students or students from North Smithfield. (Doc. 1129-7, p. 1).

High school students displaced under Gardendale's proposal likewise would attend less racially diverse schools. Under Gardendale's primary plan, students who currently attend Gardendale High School but do not live within Gardendale's city limits would attend either Corner High School or Mortimer Jordan High

School. (Doc. 1125, p. 138). Corner High School's student population is 97.81% Caucasian. (Doc. 1129-2, p. 1). Mortimer Jordan's student population is 90.57% Caucasian. (Doc. 1129-2, p. 1). Gardendale's expert demographer considered an alternative proposal under which students would attend Minor High School. (Doc. 1126, p. 139). Minor High School is 86.93% African-American. (Doc. 1129-2, p. 1). Again, black high school students would bear the burden of Gardendale's separation. According to Gardendale's statistics, 366 students would be eliminated from Gardendale High School; 56 of those students are black. These numbers do not include transfer students or students from North Smithfield. (Doc. 1129-7, p. 1).

Black students who attend Gardendale schools on racial desegregation transfers but will be excluded from those schools under Gardendale's plan will either return to their home school where their race is in the majority or attend a new transferee school that is not as conveniently located to their home and is less diverse than the schools in the Gardendale system.

### b. Quality and Siting of Gardendale Schools

Under *Wright* and *Swann*, the Court must consider the location of schools within the parent and splinter districts and the relative quality of those schools. Although Gardendale Board members disparaged Gardendale High School at the bench trial in this matter, managing only the observation that the school has nice

curb appeal, the high school facility is the crown jewel of the Gardendale schools and one of the premier school facilities in the Jefferson County system. As one of the organizers stated at the outset of the separation effort, one of the boons of separation would be the city's acquisition of "a brand spanking new high school." (Doc. 1132-2, p. 181, Sept. 12, 2012, 3:03 p.m.). As discussed, Gardendale High School was one of several new schools that Jefferson County built in 2010 using the proceeds of a Jefferson County sales tax. (*See* p. 69, above). In his feasibility study, Dr. Harvey recognized that Gardendale's ability under Alabama law to take a brand new high school free of charge put Gardendale in an "unprecedented" situation that was "totally remarkable." (Doc. 1131-32, p. 4).

As discussed, Gardendale High School houses a sophisticated career tech program that serves as a magnet program, attracting students from across the county. (*See* pp. 70-71, above). When it sited Gardendale High School within Gardendale's municipal boundaries and placed a magnet program in the school, the Jefferson County Board accommodated the members of the Gardendale community who wanted the school built in their city. The Jefferson County Board also complied with *Swann*'s requirement that school districts "see to it that future school construction and abandonment are not used and do not serve to perpetuate

or re-establish the dual system." 402 U.S. at 21.[89]  Because Gardendale High School is a receiving school for students from the non-contiguous community of North Smithfield under the terms of the desegregation order and a recipient of many majority-to-minority transfer students because of its proximity to neighboring African-American communities, it was appropriate for Jefferson County to build a new high school in Gardendale.  Thus, the Jefferson County Board mimicked conduct that the Eleventh Circuit described approvingly in *Duval County*. *See* 273 F.3d at 976 (noting that school board strategically built new schools in areas that would promote an increase in the desegregation of the district's schools because the areas were conducive to "black student mobility" and "naturally integrated housing patterns").

Given these circumstances, it is not surprising that the private plaintiffs and the United States agreed to the Gardendale location for the new high school and that the Court approved the new school site.  The new Gardendale High School is appropriately regarded as one of Jefferson County's desegregatory tools.

If Jefferson County has to forfeit Gardendale High School under Gardendale's separation plan, then the Jefferson County Board of Education will have to build a new high school at a cost of approximately $55 million.  (*See* p. 72,

---

[89] Under the December 2015 separation plan that Dr. Martin drafted, the Gardendale district would accept interdistrict transfers to the vocational program contingent on the payment of tuition.  (Doc. 1125, p. 277; Doc. 1131-2, p. 7).  Students who attend the magnet program under Jefferson County's supervision do not pay tuition.

above; Doc. 1127, p. 137). That is $55 million that Jefferson County will not be able to use to fund other facilities or programming.

If Jefferson County has to build a new school, it may decide to replace Fultondale High School. Doing so would advance Jefferson County's efforts to fulfill its obligations under the desegregation order. Fultondale is one of the remaining facilities in Jefferson County that previously housed an all-black school. Fultondale High School is old and in poor condition; the campus is not remotely comparable to the Gardendale High School campus. (Doc. 1126, p. 63; Doc. 1132-9).

But there is another way that Jefferson County may address the inadequate Fultondale High School facility. If the Court allows Gardendale to separate but prohibits Gardendale from taking the new high school facility, then, because Fultondale is situated near Gardendale (*see* map on p. 74), Jefferson County may relocate Fultondale students to the new high school facility in Gardendale and combine students from Fultondale with students from the communities of Mount Olive, Brookside, Graysville, and North Smithfield. The new high school would still boast a successful career tech magnet and would be able to serve as a receiving school for M-to-M transfers. Moreover, the facility probably has the capacity to enable Jefferson County to convert some classrooms to junior high classrooms, thereby compensating for the potential loss of the Bragg Middle School facility to

a municipal Gardendale system. Because Fultondale High's student population is nearly racially balanced (*see* Doc. 1129-2), if the Fultondale student population were housed in a brand new facility that combined students from a number of racially diverse communities, attracted other students from hyper-segregated communities with the career tech magnet, and served as a welcoming receiving school for M-to-M transfer students, then the school easily could become one of Jefferson County's strongest examples of good faith implementation of the *Stout* desegregation order. This would be a much better use of the facility than the use Gardendale proposes because under Dr. Martin's December 2015 separation proposal, the new high school facility will have only a 54% utilization rate. (Doc. 1125, p. 126). To better use the facility, the Gardendale Board would either have to annex areas to expand the student body or reconfigure the high school to add middle school grades to it.

Unlike Gardendale High School, the other three schools in Gardendale are older and in need of repair. Some of the elementary schools outside of Gardendale's municipal boundaries that feed into Bragg Middle School are newer and in better condition than Gardendale's two elementary schools. Gardendale estimates that it will have to invest $10 million over the next few years to repair and upgrade the elementary and middle schools. (Doc. 1124, pp. 99-100).

More broadly, and perhaps more importantly, Bragg Middle School and Gardendale High School, and Gardendale Elementary to a lesser degree, have played an important role in Jefferson County's desegregation efforts. Data demonstrates that African-American students have attended those schools via majority-to-minority transfers, promoting desegregation through this voluntary tool. (*See* p. 142, above). The schools in Gardendale have received large numbers of transfer students because Gardendale is adjacent to a number of African-American communities, and the transportation that Jefferson County provides is relatively convenient for students who are willing to leave their local school zone. If the Gardendale schools no longer are available for majority-to-minority transfers, then students from African-American communities will have to travel longer distances to take advantage of this transfer opportunity. This may chill students' willingness to transfer and, as a practical matter, reduce or eliminate the usefulness of this desegregatory tool.

This factor weighs in favor of enjoining separation or allowing separation but enjoining the Gardendale system from taking the new high school facility when the municipal district separates.

### c. Timing of and Message Conveyed by Separation

Finally a district court must consider the timing of the decision to separate and the message that separation will send to black students impacted by the

proposed separation. 407 U.S. at 465-66. Gardendale argues that the timing of its separation weighs in its favor because the proposed separation does not come on the heels of a court order imposing desegregation obligations on the City of Gardendale. This argument overlooks the fact that Gardendale has been trying to separate from the county system for decades. More importantly, as the Court has found, the separation is motivated by Gardendale's desire to define the geographic limits of the district and exclude from the district children who attend Gardendale schools by court order. Citizens in Gardendale do not want to separate because they fear the consequences of an impending desegregation order. Rather, Gardendale has experienced the consequences of the desegregation order in this case, and at least some of the citizens who support separation have had enough. Those citizens have watched the demographics in Gardendale change, and they want to curb that change.

During Gardendale's separation effort, both words and deeds have communicated messages of inferiority and exclusion. The message cannot be lost on children who live in North Smithfield. Words on a public Facebook page that say to North Smithfield students zoned to Bragg and Gardendale High for nearly 50 years that these are "OUR schools" and you should have been removed from them years ago (Doc. 1132-2, p. 183) communicate plainly to black students from North Smithfield the message that these schools are not yours, and you are not

welcome here. The assertion by a separation organizer on the Gardendale Schools Facebook page that given that the Gardendale Board "still is answering to Washington and federal judges," he could assure Gardendale residents that the Gardendale Board "didn't just decide to gift a perpetual attendance zone to an area" that would not be paying the Gardendale ad valorem tax "on a whim" and that inclusion of North Smithfield students in the Gardendale system "has the hallmarks" of "a specific, technical, tactical decision" communicates to black middle and high school students from North Smithfield the clear message that Gardendale has required them to be part of the city's school system only to serve the city's purposes. The organizer described the inclusion of the children from North Smithfield as "the price" that Gardendale had "to pay to gain approval for separation." (Doc. 1132-2, p. 8, Dec. 16, 2015, 4:21 a.m.). Under the original separation plan, Gardendale would have eliminated those students from the Gardendale municipal system.

The message is magnified for black children from Center Point. After Center Point's neighbor to the east, Trussville, separated from the Jefferson County school system, eliminating the most convenient receiving schools for M-to-M transfer students from Center Point, Jefferson County redirected those children to schools in Gardendale, Center Point's neighbor to the west. Gardendale citizens' public rejection of transfer students, particularly those from Center Point (Doc.

1132-2), surely leaves a strong message in the minds of children from Center Point. They must feel that they are unwelcome in predominantly white communities.

And if pictures speak louder than words, then a flyer bearing a photograph of a white student that asks Gardendale voters if they would rather live in an affluent white city or a formerly white city that now is well-integrated or predominantly black communicates an unambiguous message of inferiority. (*See* Appendix R). There is no way to downplay or sidestep the harm that such a message conveys. Any arguable ambiguity in the flyer is resolved by blatant public statements from separation organizers that "we don't want to become" what Center Point has become, and we need separation to provide "better control of the geographic composition of the student body."

Counsel for the Gardendale Board has emphasized that these statements were not made by members of the Gardendale Board, but no member of the Gardendale Board has said anything, at least not publicly. No member of the board has disavowed the belittling language of exclusion used by separation organizers and supporters. No member of the Board has reached out to students from North Smithfield to say "you have been a part of these schools for 50 years, and we welcome you and want you to be part of them for 50 more." The silence is deafening.

During the separation process, actions were as loud as words. From the outset of the separation effort, separation organizers, including an organizer who became a board member, actively recruited the white community of Mount Olive for the Gardendale school system. None of the organizers engaged parents from North Smithfield. Dr. Martin attended many Gardendale community events to interact with Gardendale parents, but he refused an invitation to meet with parents of students from North Smithfield, ostensibly because he had not had such a meeting with Gardendale parents. Without conferring with parents of students from North Smithfield, in his December 2015 separation plan, Dr. Martin made inclusion of those students in the Gardendale system mandatory after Gardendale's director of operations recognized that the Gardendale system would not be able to meet the desegregation order's student assignment requirement for splinter districts if Gardendale relied only on students living within the city's municipal boundaries. And then Dr. Martin ignored reports that citizens in Gardendale were upset when they learned that North Smithfield students would be allowed to remain in Gardendale's schools, and he failed to appreciate the stigma that students from North Smithfield would bear if they were included in the new municipal system against the wishes of the citizens who are funding the system through ad valorem tax assessments. Armed with this information, he remained silent, failing to communicate with the Gardendale Board and with parents from North Smithfield.

The Court believes that Dr. Martin's conduct was unintentional because he has no prior experience working in a racially diverse school district or complying with a desegregation order. The Court also believes that Dr. Martin learned a lot at the bench trial, and the Court recognizes that Dr. Martin was trying to educate himself about the concerns of the private plaintiffs in the months leading to the bench trial. (*See* pp. 102-03, above).

During the separation process, the Gardendale Board's silence was matched by its inaction. As discussed, the Gardendale Board has not voted on a separation plan or anything else having to do with transfer students or students from North Smithfield, even preliminarily. (Doc. 1124, pp. 150, 153-54). The Gardendale Board has made no commitment to the students in North Smithfield. The record demonstrates that children in that community have wondered for years where they will go to school. (Doc. 1124, pp. 74-75). The Gardendale Board's representation in its motion to separate that students from North Smithfield may attend Gardendale schools for the "indefinite future" was just that—indefinite. As of the bench trial in this case, the term was undefined. North Smithfield students are living in limbo, thanks to the Gardendale Board's failure to take any action that would bind the Board to provide an education to students in North Smithfield.

Gardendale argues that "courts must open their eyes to the conditions of the present." (*See* p. 4, above). The message from separation organizers and from the

Gardendale Board is unmistakable. The Court may not turn a blind eye to that message. The message is intolerable under the Fourteenth Amendment. As the Supreme Court recently stated in *Pena-Rodriguez v. Colorado*, "[i]t must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons." 137 S. Ct. 855, 867 (2017). The messages of inferiority in the record in this case assail the dignity of black school children.

### d. *Wright*, *Ross*, and Equity

Even if one were to accept Gardendale's argument that the *Wright/Ross* factors apply only in the brief window of time after a court issues a desegregation order, the Court may still examine post-separation demographics, facilities, and the message that separation conveys under binding precedent. As the Supreme Court explained in *Swann*, equitable principles govern school desegregation cases. The Supreme Court directed district courts to evaluate school construction and student assignments when considering whether to craft an equitable remedy. (*See* p. 23, above). In *Brown I*, the Supreme Court explained that official action that perpetuates racial stigma (i.e., the message that black students are inferior to white students) violates the Fourteenth Amendment and warrants an equitable remedy.[90]

---

[90] Furthermore, even if the Court were to find that the desegregation order should be dissolved immediately, Gardendale's proposed separation still would be subject to the Equal Protection Clause of the Fourteenth Amendment. *See Dowell*, 498 U.S. at 250.

### e. Practical Considerations

Given these findings, the Court would be within its discretion if it were simply to deny Gardendale's motion to separate. Were it not for a number of practical considerations, the Court would do just that. As was the case in *Stout II*, though some of the circumstances surrounding Gardendale's attempt to separate are deplorable, a number of practical considerations counsel against wholesale denial of Gardendale's motion.

The first concerns the members of the plaintiff class directly impacted by Gardendale's attempt to separate—the black children who do not live in the City of Gardendale but attend the schools in Gardendale under the terms of the desegregation order. The Court is particularly concerned about the students from North Smithfield who are zoned for Gardendale schools. Gardendale residents have complained that it would be unfair for the Court to disallow Gardendale's separation when the Court has permitted other municipal separations over the years. If the Court denies Gardendale's motion to separate, families who remain in Gardendale and attend Gardendale schools under Jefferson County's management may blame students from North Smithfield for Gardendale's inability to operate a municipal system. This puts students from North Smithfield in a catch-22. No matter which system operates the schools in Gardendale, absent a concerted effort by school leaders and members of the Gardendale community, while the memory

of Gardendale's separation effort is fresh, students from North Smithfield may feel unwelcome in Gardendale schools. This is a tragic consequence of the way in which the Gardendale Board attempted to separate.

The second practical consideration has to do with the status of the schools in the county system. The Court must balance the interests of the more than 33,000 non-Gardendale students (and their parents) in the Jefferson County district against the interests of the 2,250 Gardendale students whose parents wish to separate. (Doc. 1118, ¶ 24; Doc. 1129-7, p. 1). As soon as Gardendale's motion is resolved, the Court must return to the task of determining whether Jefferson County has eliminated the vestiges of past *de jure* segregation in good faith to the extent practicable and demonstrated that it will avoid future constitutional violations to the best of its ability so that the Court may release the Jefferson County school district from federal supervision. Were the Court to find in the next year, for example, that the Jefferson County Board has, to the extent practicable, eliminated the vestiges of segregation from student assignments, then the Court could release Jefferson County from federal supervision of student assignments, but the Court would be reluctant to do so if the Gardendale zone remains in the Jefferson County district, given the evidence of racial motivation in this case. If the Court approves

a municipal separation, then the Court may tailor supervision to the particular needs of the county district and the municipal district.[91]

The third practical consideration pertains to families in Gardendale who support a municipal separation for reasons that have nothing to do with race. In *Wright*, the Supreme Court recognized that the "[d]esire for direct control over decisions vitally affecting the education of one's children" logically spurs advocacy for local control of school systems. 407 U.S. at 469. All parents want the best possible education for their children, and there is nothing inherently wrong with preferring a small local district to a large county district. While good, legitimate intentions are not necessarily enough to warrant separation under *Wright* given the countervailing need for a conclusion of federal supervision in the county system, per *Swann*, when fashioning an equitable remedy, the Court must "balance[e] [] the individual and collective interests" involved. 402 U.S. at 16. Therefore, the Court must, to the extent practicable, honor the wishes of parents who support a local system simply because they want greater control over their children's education.[92]

---

[91] The Court currently does not have the information that it will need to determine when Jefferson County may be in a position to petition the Court to release the county's schools from oversight in the area of student assignments or any other *Green* factor. The Court offers this practical consideration in contemplation of a range of possible outcomes when the Court returns to the process of assessing Jefferson County's compliance with the desegregation order.

[92] The Court understands the frustration that these parents feel because this federal desegregation action stands between them and the public school system they prefer. There are a host of reasons

The fourth practical consideration concerns the interests of students from the community of Mount Olive, the town of Brookside, and the City of Graysville. They too have a stake in the outcome of this litigation. While students in their position often experience the fallout from a municipal separation, the Court, in the exercise of its equitable discretion, may consider the interests of those students, particularly as their interests relate to the new Gardendale High School.

Finally, the Court recognizes that there are no easy answers for the current situation. In a district like Jefferson County that was so resistant to desegregation that the Court had to order non-contiguous zoning, the process of finalizing federal oversight is complex. Difficult discussions must be had about the best zoning options for students as federal supervision comes to a close. History teaches that communities, left to their own devices, re-segregate fairly quickly, in some cases sending the very messages of inferiority that the Supreme Court attempted to address in *Brown*. The families of students who for years have boarded busses to attend schools outside of their neighborhoods must be consulted and must be part of the conversation about the best way to move forward. In doing the complicated work of dissolving a desegregation order, a court must ensure that the dying embers of *de jure* segregation aren't once again fanned into flames.

---

why this action may still be pending. It would be a counterproductive task at this juncture to stop to identify those reasons because the Court must evaluate the *Green* factors before releasing Jefferson County from supervision. The remedy that the Court has fashioned takes into account the age of this case.

**CONCLUSION**

Having considered the record in its entirety, binding precedent from the United States Supreme Court and the Eleventh Circuit, and the practical implications of the available remedies, the Court orders as follows:

1. The Court grants in part and denies in part Gardendale's motion for separation. For the 2017-2018 school year and until this Court orders otherwise, the Gardendale Board of Education may operate Gardendale Elementary School and Snow Rogers Elementary School. The Jefferson County Board of Education shall take the steps necessary to convey these school facilities to the Gardendale Board of Education so that the Gardendale Board may operate those schools for the 2017-18 academic year. Gardendale Elementary and Snow Rogers Elementary shall be zoned for students residing within the municipal boundaries of the City of Gardendale.

2. Counsel for the private plaintiffs and for the United States shall confer with counsel for the Gardendale Board of Education and develop and submit to the Court within 60 days a proposed desegregation order tailored to the specific circumstances of the Gardendale City Schools System. The proposed order shall contain provisions relating to interdistrict transfers, and the proposed order shall redraw the lines for

Snow Rogers and Gardendale Elementary to address capacity issues at Gardendale Elementary.

3. Should the Gardendale Board of Education operate Gardendale Elementary and Snow Rogers in good faith compliance with the anticipated desegregation order, then in three years, the Court shall consider a renewed motion for operation of a Gardendale municipal system for grades Kindergarten through 12. During the first 12 months of the three-year period of supervision, the private plaintiffs, the United States, the Jefferson County Board of Education, and the Gardendale Board of Education shall develop a proposed facilities plan for all of the students who currently are zoned for Bragg Middle School and Gardendale High School. That facilities plan must either place the Gardendale High School facility in the Jefferson County system under a new name, or it shall place the high school facility in an anticipated K-12 Gardendale district with an appropriate payment to the Jefferson County Board of Education or the Jefferson County Commission to help fund an alternative high school facility for Jefferson County. The facilities plan

shall include provisions for facilities for middle school students, either by reconfiguring existing facilities or building new ones.[93]

4. Elementary students from the community of North Smithfield shall be zoned for Fultondale Elementary for the 2017-18 academic year.[94] The Jefferson County Board of Education shall allow middle and high school students who reside in North Smithfield to attend a school of their choice for the 2017-18 academic year. Jefferson County shall develop an election form that allows middle and high students from North Smithfield to list their first and second choice for placement, and Jefferson County shall accommodate, to the extent practical, as many first choices as possible. Every middle and high school student shall be given either his/her first or second choice for placement. Jefferson County shall provide transportation for students who reside in North Smithfield. The private plaintiffs, the United States, and the Jefferson County Board of

---

[93] If, after three years, the Court approves a K-12 Gardendale municipal district, the Court will not approve a 13-year grandfather period. Though the lengthy grandfather period may be well-meaning, it places too much stress on both the parent and the splinter districts.

[94] If they wish, elementary students from North Smithfield may request a transfer to a school other than Fultondale Elementary. The Court anticipates that there are likely to be few such requests because elementary students from North Smithfield currently are zoned for Fultondale Elementary, and Fultondale Elementary is a fairly modern school. The Court orders the Jefferson County Board to make space available where necessary to accommodate transfer requests from elementary students in North Smithfield, and the Court orders the Gardendale Board to make space available if students from North Smithfield ask to transfer to Gardendale Elementary or Snow Rogers Elementary. Gardendale City Schools must provide transportation to any North Smithfield student who elects to attend a Gardendale school.

Education shall confer and submit a joint proposal for permanent zoning for students who reside in North Smithfield.

5. For the 2017-2018 school year and until this Court orders otherwise, the Jefferson County Board of Education shall operate Bragg Middle and Gardendale High School. Students who reside within the municipal limits of the City of Gardendale shall continue to attend Bragg Middle School and Gardendale High School until the Court orders otherwise. Tax proceeds shall follow students from the City of Gardendale who attend Bragg Middle School and Gardendale High School per the terms of the 1971 *Stout* desegregation order.

6. Within 60 days, the Gardendale City Council shall appoint at least one African-American resident of the City of Gardendale to the Gardendale Board of Education.

7. Elementary school children who reside in the community of Mount Olive, the town of Brookside, and the City of Graysville shall remain in their current elementary school zones and shall attend Bragg Middle School and Gardendale High School until the Court orders otherwise. As the parties negotiate the terms for a possible K-12 separation for the Gardendale City School system for the 2020-21 academic year, the parties shall confer with parents from all affected communities.

8. Within 30 days, the Jefferson County Board, the private plaintiffs, and the United States shall submit a proposed timeline for the discovery necessary for an evaluation of the Jefferson County school district under each of the *Green* factors.

9. The Court shall enter all other orders necessary for the implementation of these orders after consulting with the parties.

The Court has fashioned these remedies for a number of reasons. The Court is giving the Gardendale Board of Education an opportunity to demonstrate good faith. To date, the Gardendale Board has fallen short, but it is a new board with limited training. The Court is giving the Gardendale Board the opportunity to operate elementary schools because skills learned in elementary school prove to be the best predictors of future academic success. This should give Gardendale residents the assurance that they will have local control as their children learn fundamental skills in elementary school. Parents of middle school and high school students who reside in Gardendale and are dissatisfied with Bragg Middle School and/or Gardendale High School have available to them the Jefferson County IB Middle School program and the Jefferson County IB High School program. The latter is consistently ranked the best high school program in the State of Alabama. The Court also notes that if parents who reside in the City of Gardendale have a concern about Bragg Middle and/or Gardendale High School, they have a unique

opportunity to make that concern heard because the current president of the Jefferson County Board of Education is a Gardendale resident.

The facilities plan provision in the Court's order accounts for the significant role that the new Gardendale high school facility plays in Jefferson County's desegregation efforts. It accounts for the fact that Jefferson County designed and built the facility to serve all high school students in Jefferson County, and Jefferson County has successfully attracted a racially and geographically diverse student body to the school through the county's good faith efforts to comply with the desegregation order. The treatment of the high school facility also comports with basic notions of fairness.

**DONE** and **ORDERED** this April 24, 2017.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE