# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LINDA STOUT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Intervenor,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:65-cv-00396-MHH** |
| | ) | |
| **JEFFERSON COUNTY BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **GARDENDALE CITY BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |

## SUPPLEMENTAL MEMORANDUM OPINION

The private plaintiffs have asked the Court to reconsider the remedy that the Court set out in its April 24, 2017 Memorandum Opinion in this case. Based on arguments that the plaintiffs present in support of their motion to reconsider, the Court concludes that it may not have adequately explained the rationale for the remedy. The Court thanks the private plaintiffs for giving the Court an opportunity to try to bring greater clarity to its decision. In this supplement to the April 24,

1

2017 opinion, the Court states in greater detail the reasons for the remedy, tying aspects of the remedy to the legal analysis that appears in pages 137-180 of the April 24 opinion. The Court then explains why the plaintiffs' arguments in support of their motion for reconsideration do not persuade the Court.

In a nutshell, under the particular circumstances of this case and on the record that the parties presented to the Court, the Court concluded that the Gardendale Board of Education committed an independent constitutional violation in which the Jefferson County Board of Education played no role. The Court also found that with respect to the Gardendale zone and the families from North Smithfield who are part of the Gardendale zone, the Jefferson County Board of Education has followed the student assignment and facility requirements in the 1971 desegregation order in good faith.

Given these findings, the Court had to fashion an equitable remedy that allows Jefferson County to continue its efforts to fully comply with the 1971 desegregation order while constraining Gardendale and compelling the Gardendale Board of Education to comply with the Fourteenth Amendment. To accomplish these competing obligations, the Court decided to allow the Gardendale Board to separate partially from Jefferson County under a new desegregation order that is tailored specifically to the Gardendale Board's constitutional violation. The remedy provides to the victims of racially discriminatory conduct and to the non-

culpable Jefferson County Board of Education and the 33,000 non-Gardendale students whom the Board serves the greatest level of protection that the Court believes is available under the current state of the law by securing for the Jefferson County Board the tools of desegregation that the Jefferson County Board has successfully implemented and providing to the families in North Smithfield the flexibility to choose the public schools that they believe will best serve their children.

The practical result may appear counter-intuitive, and the remedy admittedly is not ideal. But as the Court stated in the April 24 opinion, this situation is complex, and there are no ideal remedies. Of the available remedial options, the Court selected the option that it believes has the greatest ability to address all of the interests involved. The Court believes that the remedy urged by the private plaintiffs—outright denial of Gardendale's motion to separate—though warranted and effective in the early stages of this desegregation order's implementation, under the particular circumstances now presented, likely would produce a short-lived victory that ultimately would do more harm than good to Jefferson County's efforts to comply with the Fourteenth Amendment in the final stages of federal supervision.

## A. The Court's Equitable Remedy

The Court found that the private plaintiffs and the Department of Justice established that race motivated separation organizers and some Gardendale residents who support the formation of a municipal school district for the City of Gardendale. Given these findings, the private plaintiffs argue that the Court should dissolve the Gardendale Board and eliminate the municipal school system.

Had the Court recently entered a desegregation decree in this case, that would be the obvious and easy solution. Under those circumstances, the Court would know that the county, including Gardendale, would be subject to federal supervision for years, and the Court would have the ability to monitor the entire county, including Gardendale, for an extended period of time.

That is not the case here. Here, the desegregation order governing the Jefferson County Board of Education is 45 years old, and federal oversight of the Jefferson County Board of Education may be nearing an end, at least with respect to student assignments and facilities, two of the *Green* desegregation factors. To enable it to monitor student assignments (particularly zoning and interdistrict transfers) in the public schools in Gardendale in the years ahead and to make sure that Jefferson County retains the benefit of the Gardendale high school facility that Jefferson County built to facilitate desegregation, the Court decided to place the Gardendale Board under a new desegregation order that creates a fresh start for federal supervision of all aspects of the public schools in Gardendale.

Several legal principles converge to produce this result. The first concerns the nature of the remedy. The remedy is equitable. Equity requires the balancing of the interests of all of the parties who are affected by the remedy. While the interests of the victims weigh heavily in the analysis, the Court also must consider the interests of others, including bystanders, and the Court must choose from alternative options the remedy that the Court believes best fulfills the purposes of this desegregation litigation. (*See* Doc. 1141, pp. 22-27; 40-43) (discussing *Stout II* and *Swann*). Here, the bystanders are the 33,000 public school students in the Jefferson County district who live outside of Gardendale's municipal boundaries (and their parents) and the students who reside in the City of Gardendale whose parents supported separation for reasons that have nothing to do with race (some subset of the 2,250 public school students who reside within the City of Gardendale). (Doc. 1141, pp. 139 n. 79, 182-83). An equitable remedy must balance "individual and collective interests" and must be "reasonable, feasible and workable." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 31 (1971) (discussed in Doc. 1141 at p. 23).

The 33,000 students who live outside of Gardendale's municipal limits may be nearing the end of federal supervision of student assignments and facilities. As the Court explained in its opinion, the Supreme Court has held that a federal court's "'end purpose' in a public school desegregation case is 'to remedy the

[constitutional] violation and, in addition, to restore [to] state and local authorities' the control of their public schools." (Doc. 1141, pp. 54-55) (quoting *Freeman v. Pitts*, 503 U.S. 467, 489 (1992)). "Returning schools to the control of local authorities at the earliest practicable date is essential to restore [local authorities'] true accountability in our governmental system.'" *Freeman*, 503 U.S. at 490 (quoted in Doc. 1141, p. 55). The Eleventh Circuit Court of Appeals similarly has instructed the district courts in this circuit that "complete return to local control of school systems is the ultimate goal of all judicial supervision because [f]rom the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination, and desegregation decrees are not intended to operate in perpetuity." (Doc. 1141, p. 61) (quoting *N.A.A.C.P., Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 967 (11th Cir. 2001)) (internal quotation marks omitted).

In the Eleventh Circuit, a district court must release a school district from federal supervision when "a formerly dual school system" proves "that it has (1) complied in good faith with the desegregation decree, and (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable." (Doc. 1141, p. 60) (quoting *Duval County*, 273 F.2d at 966). The system also must demonstrate that the termination of federal court oversight will not "result in the dismantlement of the [desegregation plan] or any affirmative action by the [school board] to

undermine the unitary system." *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 241 (1991) (internal quotation marks omitted) (quoted in Doc. 1141, p. 50).

In *Freeman*, the United States Supreme Court held that a district court may consider a school district's request to be released from federal supervision on a gradual basis. *Freeman*, 503 U.S. at 490-92. The Supreme Court stated:

> We hold that, in the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations. While retaining jurisdiction over the case, the court may determine that it will not order further remedies in areas where the school district is in compliance with the decree. That is to say, upon a finding that a school system subject to a court-supervised desegregation plan is in compliance in some but not all areas, the court in appropriate cases may return control to the school system in those areas where compliance has been achieved, limiting further judicial supervision to operations that are not yet in full compliance with the court decree. In particular, the district court may determine that it will not order further remedies in the area of student assignments where racial imbalance is not traceable, in a proximate way, to constitutional violations.
>
> A court's discretion to order the incremental withdrawal of its supervision in a school desegregation case must be exercised in a manner consistent with the purposes and objectives of its equitable power. Among the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its

good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

In considering these factors, a court should give particular attention to the school system's record of compliance. A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations. And, with the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, and the practicability and efficacy of various remedies can be evaluated with more precision.

These are the premises that guided our formulation in *Dowell* of the duties of a district court during the final phases of a desegregation case: "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." 498 U.S., at 249–250, 111 S.Ct., at 637–638.

*Freeman*, 503 U.S. at 490-92.

In the report that it filed with the Court in February 2015, the Jefferson County Board of Education stated that it was "hopeful that, after comprehensive review of the district and its schools, the parties and the Court will agree that the district has achieved unitary status as to student assignment." (Doc. 998, p. 9). Jefferson County acknowledged that "a few of [its] schools have either a largely all white student population (such as those in the Corner attendance zone) or a largely all African American student population (such as those in the Center [P]oint

attendance zone)" but asserted that "most of the schools fall somewhere in the middle." (Doc. 998, p. 8).

The student assignment statistics for the Jefferson County district for the 2015-16 school year reflect that a number of schools have well-integrated student bodies, and a number of schools have student bodies that are predominantly white or predominantly black. (*See* Doc. 1129-2). The Eleventh Circuit has held:

> [i]f a school board can prove that . . . factors [which are not the result of segregation] have substantially caused current racial imbalances in its schools, it overcomes the presumption that segregative intent is the cause, and there is no constitutional violation. Where there is no constitutional violation, a school board is under no duty to remedy racial imbalances.

*Duval County*, 273 F.3d at 966 (quoted in Doc. 1141, p. 61). In addition, "even when remedying the effects of *de jure* segregation, the Constitution does not require rigid racial ratios." *Id.* at 967 (quoted in Doc. 1141, p. 61).

Thus, if the Jefferson County Board is able to prove that the racial imbalances in some of the schools in the district are not the consequence of segregative intent, then the Jefferson County Board will have no obligation to remedy those imbalances. And if Jefferson County also proves that it has complied in good faith with the desegregation order's provisions regarding student assignments and that it will continue to try to fulfill the aims of the desegregation order to the best of its ability even after the Court dissolves the order, then the

Court must determine whether it is appropriate to release Jefferson County from federal supervision of student assignments.

The record indicates that the Jefferson County Board has acted in good faith with respect to zoning and racial desegregation transfers in the Gardendale zone. The Court still has to examine whether the Jefferson County Board has complied in good faith with its zoning and desegregation transfer obligations throughout the entire district. The Court also must determine whether termination of supervision of student assignments would adversely impact Jefferson County's ability to fulfill its obligations with respect to other *Green* factors. The Jefferson County Board believes that at the end of this analysis, the parties and the Court will agree that the county "has achieved unitary status as to student assignment." In fashioning a remedy, the Court must be cognizant of that possibility.

With respect to facilities, in its 2015 report, the Jefferson County Board stated that although there "are still facility-related needs in the Jefferson County system," the Board's "most recent capital improvement initiative, made possible by a bond issue by the Jefferson County Commission, addressed most of the [county's] critical needs and made it possible to provide students in all communities with the benefit of attending modern, first class facilities." (Doc. 998, pp. 13-14). The Jefferson County Board stated that under the Court's supervision, "[n]ew high schools were constructed or major renovations were

undertaken in almost every zone that did not then have a modern high school." The Board asserted that it "is hopeful that partial unitary status might be appropriate" as to those facilities. (Doc. 998, p. 14).

Jefferson County's potential ability to obtain a release from federal supervision of student assignments and facilities in the near future weighed heavily in the Court's decision. If the Court were simply to deny Gardendale's motion to separate and the schools in the Gardendale zone were to remain under the control of the Jefferson County Board, and if, in the next year or two, the Jefferson County Board were able to prove that it is entitled under the law to a termination of supervision as to student assignments and high school facilities, then the Court would relinquish control over all zoning, racial desegregation transfers, and high school facilities in the Jefferson County system, including the Gardendale zone. If the Jefferson County Board is entitled under the law to be released from supervision of student assignments and high school facilities, then under equitable principles, the Court cannot withhold that relief and essentially punish the Jefferson County Board and the tens of thousands of families to whom the Jefferson County Board is responsible for a constitutional violation committed by some citizens in Gardendale. Equity will not permit that result.

Thus, if the Court were to deny Gardendale's motion to separate and then release Jefferson County from supervision of students assignments and facilities in

one or two years, then zoning, student transfers, and the high school in the Gardendale feeder pattern would be vulnerable again. The citizens of Gardendale who have tried to separate from Jefferson County for years would have the ability under Alabama law to try once again to take over the public schools in the City of Gardendale, and this time, there would be no federal desegregation order to protect zoning, interdistrict transfers, and the Gardendale high school facility. The struggle between the Jefferson County district and the Gardendale district would resume, and, under the circumstances of this case, Alabama law would allow the citizens of Gardendale to take free of charge a $50 million high school facility that the Jefferson County Board built for all of the students in Jefferson County to facilitate desegregation of the district's high schools. Again, the Court currently does not have before it information that allows it to determine just how close Jefferson County may be to the end of supervision of student assignments and facilities, but in fashioning an equitable remedy, the Court must take into account the realistic possibility that federal supervision of the Jefferson County Board with respect to zoning, transfers, and high school facilities may end within the next few years.[1]

---

[1] As the Jefferson County Board acknowledged in its 2015 report, some of its facilities still need improvement. Fultondale High School is an example of a facility in need of improvement. As the Court explained in its decision, resolution of the issue of control over the Gardendale High School facility may give the Jefferson County Board an opportunity to address the facilities issue relating to Fultondale High School. (*See* Doc. 1141, pp. 172-73; *see also* pp. 19-20 below).

The Court decided that the better option is to allow Gardendale to operate the two elementary schools in the City of Gardendale and to place the Gardendale Board under a new, separate desegregation order tailored to the misconduct that warrants federal oversight. (Doc. 1141, pp. 185-86). The Court may impose a desegregation order only on a school board; remedial orders in public school desegregation cases address official action. (*See* Doc. 1141, p. 55) (quoting *Freeman*, 503 U.S. at 495).[2] As the Court stated in its opinion, the new 2017 Gardendale desegregation order will require the Gardendale Board to redraw the boundaries for the two elementary schools and will include interdistrict transfer provisions. (Doc. 1141, pp. 185-86). In addition, if Gardendale operates those two schools in good faith for three years, then Gardendale may renew its motion for leave to operate a K-12 district. (Doc. 1141, p. 186). If the Court were to grant that motion based on the record that the Gardendale Board makes between now and then, then the Gardendale Board would have to raise tens of millions of dollars either to pay Jefferson County for the current Gardendale High School facility or to

---

[2] The Court recognizes that the evidence of racial motivation in this case demonstrates that the line between private action, for which there is no constitutional remedy in public school desegregation cases, and official action, for which there is a legal remedy, is far from clear; however, the Supreme Court's rule in this regard is settled: "Where resegregation is a product not of state action but of private choices, it does not have constitutional implications." *Freeman*, 503 U.S. at 495.

build its own high school facility.[3]  The Court anticipates that if, in three years, it were to grant a renewed motion for a K-12 district for the City of Gardendale, then the Court would supervise that district for a minimum of five years, meaning that the Gardendale district would be under federal supervision through at least the 2024-25 academic year.  There is a reasonable possibility that federal supervision of the Jefferson County Board, at least with respect to student assignments, will end years before then.  Borrowing the words of the Gardendale Board's motion to separate, the Gardendale district will be under the new 2017 desegregation order for "the indefinite future," creating for the citizens of Gardendale the very federal oversight that they had hoped to avoid by separating from Jefferson County.  That is an equitable result.

In balancing the equities, the Court determined that these consequences are feasible, fair, and reasonable.

---

[3] The Court has not set the amount of the payment yet because if the Court eventually approves a K-12 district in Gardendale, the Gardendale Board may decide to build its own high school.  The Court has ordered the parties to develop a facilities plan because the Jefferson County Board and the Gardendale Board must examine their options and develop plans for a potential complete separation.  The availability of those plans does not mean that a K-12 Gardendale district is a forgone conclusion.  The Court is simply mindful of the amount of time that may be needed to address each district's facilities needs.

**B. The Plaintiffs' Motion to Reconsider**

The private plaintiffs challenge the feasibility and efficacy of the equitable remedy and offer a number of arguments to support their contentions. The Court considers each argument in turn.

**1. Feasibility of the Equitable Remedy**

The private plaintiffs argue that the equitable remedy that the Court has fashioned is unworkable and will have a negative impact on Jefferson County's ability to fulfill its obligations under the 1971 desegregation order. The plaintiffs disagree with the Court's analysis of the practical considerations that prompted the Court to allow a partial separation.

The plaintiffs acknowledge that the Court found that the Gardendale district "violated the Equal Protection Clause anew" because the words and actions associated with Gardendale's separation effort sent a message of inferiority to black public school students, particularly those in North Smithfield and Center Point. (Doc. 1151, p. 18; *see also* Doc. 1141, pp. 175-80). The plaintiffs contend that "[t]he Court's remedy was obligated to address that identified constitutional violation." (Doc. 1151, p. 18).

That is precisely what the Court has done. The Court has ordered that the Gardendale District be placed under a brand new desegregation order—not a 45-year-old order that Supreme Court precedent requires the Court to dissolve "at the

earliest practicable date." *Freeman*, 503 U.S. at 490. Instead, the Gardendale Board will operate under a brand new desegregation order that is tailored to the constitutional violation in this case. The private plaintiffs believe that outright denial of Gardendale's motion to separate is the only proper remedy, and they reject each of the practical considerations that caused the Court to decide to fashion a new desegregation order. The Court is not persuaded by the private plaintiffs' arguments concerning those practical considerations.

### a. The Victims of Gardendale's Constitutional Violation

With respect to the harm to black students from North Smithfield and other areas outside of the City of Gardendale whom some of the residents of Gardendale wanted to exclude from their school district, the Court recognized in the April 24 opinion that as a practical matter, it does not have a tool available that will enable it to erase the message of inferiority conveyed by the conduct of the Gardendale Board and completely prevent children in North Smithfield and Center Point from experiencing that message again in the years ahead. If the Court were to deny separation outright, and the schools in the Gardendale zone were to remain under the control of the Jefferson County Board, then the students from North Smithfield would likely experience resentment from the Gardendale citizens who lost their

ability under Alabama law to separate. (Doc. 1141, pp. 181-82).[4] The message would be even louder from the families who sell their homes and leave Gardendale because they cannot have the municipal school system that they want. Emails that the Court received from Gardendale residents after the bench trial indicate that Gardendale residents already have made plans to move if the Gardendale Board cannot proceed with its plan to separate. (Doc. 1143-1, pp. 23-24; Doc. 1147-1, p. 2). The Court does not have the power under the law to prevent families from leaving Gardendale and moving to other municipal districts in Jefferson County.

Under these circumstances, the Court reasoned that it would be unfair to require students from North Smithfield to attend Bragg Middle School or Gardendale High School, the schools to which they currently are zoned. Therefore, the Court's remedy allows parents from North Smithfield to select the public school that they believe is best for their children. Under the Court's April 24 order, for the 2017-18 school year, parents and students in North Smithfield may select their top two preferences for schools in the Jefferson County district, and Jefferson County must place the students in one of those two schools and provide transportation to them. (Doc. 1141, p. 187). This is true even for elementary school students who live in North Smithfield, even though there has

_____

[4] No party in this case challenged the constitutionality of the provision of Alabama law that authorizes municipal separations, so the Court does not have a record that would enable it to examine this issue.

been no constitutional violation with respect to the elementary school for which they currently are zoned. (Doc. 1141, p. 187 n. 94). There are no restrictions on this choice. Unlike limits on majority-to-minority transfers in the 1971 desegregation order, there is no requirement that the school that a parent in North Smithfield selects improves the racial balance in the sending or receiving school. And unlike the majority-to-minority transfer provision in the 1971 desegregation order, the Court's remedy requires the Jefferson County Board of Education to make space available for children from North Smithfield in one of the two schools that their parents select. The order also provides that parents from North Smithfield must be part of the discussion about permanent zoning for students from North Smithfield. (*See* Doc. 1141, p. 188).

The plaintiffs argue that this remedy is not adequate. They assert:

At least now, Black residents of North Smithfield Manor have a voice on the [Jefferson County Board of Education], and its Superintendent visits their community and addresses their concerns. As the Court has noted, North Smithfield parents on the Gardendale School Board will have no voice. The class members are rightly frustrated and concerned that, in three years, Gardendale High School will either (1) not be available to them or (2) be available, but operated by the Gardendale Board of Education in which they have no representative voice and no expectations of fair treatment.

(Doc. 1151, pp. 9-10).[5]  This argument overlooks a number of aspects of the Court's remedy.

Under the Court's remedy, students from the community of North Smithfield will *never* have to attend a school administered by the Gardendale Board of Education.  Using the interdistrict transfer provision that will appear in the Gardendale desegregation order, parents of students from North Smithfield may choose to send their children to a school that the Gardendale Board of Education operates, but they never will be zoned for a school that the Gardendale Board of Education operates.  The Jefferson County Board of Education will operate Bragg Middle School and Gardendale High School for at least the next three years.  In three years, if the Gardendale Board files a renewed motion to operate a middle school and a high school, and the Court grants the motion, then the Gardendale Board will have to pay the Jefferson County Board for the Gardendale High School facility, supplying funds for Jefferson County to build a new high school facility, one that logically would serve students from Fultondale, Mount Olive, the City of Graysville, the community of Brookside, and the community of North Smithfield. Alternatively, if the Gardendale Board files a renewed motion to operate a middle school and a high school, and the Court grants the motion, then the Gardendale

---

[5] The Court assumes that the plaintiffs' reference to "North Smithfield parents on the Gardendale Board" is a mistake.  (Doc. 1151, p. 9).  Under Alabama law, there will be no parents from North Smithfield on the Gardendale Board.  (Doc. 1141, pp. 98, 120).

Board will have to build its own high school facility. That would leave the current Gardendale High School facility for students from Fultondale, Mount Olive, the City of Graysville, the community of Brookside, and the community of North Smithfield.

Either way, if parents from North Smithfield elect to have their community zoned for the Jefferson County high school feeder pattern that is geographically closest to the schools in the current Gardendale feeder pattern, then students from North Smithfield will have the opportunity to attend a new state-of-the-art high school facility that houses a desegregated student population. If parents from North Smithfield urge the Court to zone the North Smithfield community permanently for another feeder pattern like the Mortimer Jordan feeder pattern or the Corner feeder pattern, then students from North Smithfield still will attend a state-of-the-art facility, and they will improve the diversity of the student populations in either feeder pattern, helping Jefferson County to fulfill its constitutional obligation to maintain, to the best of its ability, desegregated schools, even after the conclusion of federal oversight of student assignments. That is an equitable remedy, and that remedy advances Jefferson County's ability to comply with the Fourteenth Amendment.

**b. The 33,000 Non-Gardendale Jefferson County Students**

With respect to the interests of the 33,000 non-Gardendale students in the Jefferson County school system and the Court's effort to balance their interests with the interests of the 2,250 students in Gardendale, the plaintiffs argue that any interests that non-Gardendale students have "must give way to Jefferson County's constitutional obligation to desegregate." (Doc. 1151, p. 10). In addition, the plaintiffs contend that the Court's resolution of the dispute concerning the Gardendale High School facility "hinders [Jefferson County's] ability to appropriately address facilities and student assignment in a comprehensive desegregation plan" because the Court's plan for the high school facility "delays relief for the Fultondale students" who currently go to school in a "dilapidated vestige of the former dual-system" and "who have already waited far too long for an equitable education experience." (Doc. 1151, pp. 10-11).

As for Jefferson County's obligation to desegregate, the evidence that the parties presented at trial indicates that in the past few years, Jefferson County has made strides toward fulfilling its obligations under the 1971 desegregation order. The private plaintiffs called witnesses at trial who testified that:

- Jefferson County has complied with its obligation to send students from the non-contiguous community of North Smithfield to Fultondale Elementary School, Bragg Middle School, and Gardendale High School. (Doc. 1128, pp. 6, 28, 39, 42-43).

- Jefferson County has been responsive to the interests of the parents in North Smithfield and has provided a strong education to students from North Smithfield. (Doc. 1128, pp. 7, 17-18, 33-34, 43, 52).

- Jefferson County has created a system of magnet vocational programs that facilitate desegregation. (Doc. 1127, pp. 136-144; 149, discussed in Doc. 1141 at p. 70)

- The Jefferson County Board hired a superintendent who in his more than 20 years of leadership in various schools systems has intentionally assembled diverse staffs by making diverse hiring a priority. (Doc. 1127, pp. 101-103).

- Jefferson County has appointed a desegregation administrator. (*See* Doc. 1127, pp. 105-106, 229).

- One of the first priorities for the desegregation administrator will be developing a recruitment and hiring plan to ensure consistency in the employment process and increase diversity in faculty and staff. (Doc. 1127, pp. 117-119).

- There are very few barriers (perhaps even none) to parents' access to the Jefferson County central office to address concerns. (Doc. 1127, p. 108).

- Jefferson County is working to ensure comparable curriculum offerings across schools, and if a specialized program does not exist in one school, then the district allows students to go to a school where those opportunities are offered. (Doc. 1127, p. 116).

- Jefferson County has a top-notch IB high school, and the district recently started a middle school IB program. (Doc. 1124, p. 225; Doc. 1127, pp. 116; Doc. 1131-39, p. 36, discussed in Doc. 1141, p. 80, n. 36).

- Jefferson County is in the process of completing a district-wide facilities assessment to address aging school buildings. (Doc. 1127, pp. 119-20).

- Jefferson County already is "making great strides to try and eliminate some of the discipline issues" in the county, and the desegregation administrator has plans to address racial disparities in discipline on a school-by-school basis. (Doc. 1127, pp. 232-34).

Jefferson County's recent annual reports to the Court reveal that Jefferson County has approved dozens of majority-to-minority transfers in each academic year, and Jefferson County has provided transportation for all of those transfer students. (Docs. 961-1, 966-3, 975-3, 978-10, 984-4, 999-10, 1033-4, 1106-10; *see* Doc. 1141, p. 142).

All of these steps are evidence of good faith and are examples of conduct that paves the way for the Jefferson County Board's release from federal supervision. The parties presented no evidence that indicates that Gardendale's separation will impede these areas of progress that the Jefferson County Board has made toward fulfilling its obligations under the 1971 desegregation order.

The April 24, 2017 opinion identifies two ways in which Gardendale's December 2015 plan of separation would harm Jefferson County's desegregation efforts. Under Gardendale's plan, students who were eliminated from schools in the Gardendale zone would attend schools with student populations that are much less racially diverse than the current student populations of the schools in the Gardendale zone. In addition, Jefferson County would lose the new $50 million

high school facility in Gardendale, and Jefferson County would not be compensated for the loss. (Doc. 1141, pp. 69, 72, 171-72).

The April 24 opinion scrapped Gardendale's separation plan. That plan is defunct. As stated above, if the Court eventually allows Gardendale to operate its own high school, then Gardendale will have to pay for the Gardendale high school facility or build its own, leaving the current $50 million facility in the Jefferson County system. Although the Court did not explicitly order it (because the Court does not know yet whether the Gardendale Board will operate a high school in the years ahead and because the Court will consult with counsel for all of the parties before ordering this), the Court unambiguously signaled that it envisions the creation of a new middle and high school zone comprised of students from Fultondale, Mount Olive, the City of Graysville, the community of Brookside, and the community of North Smithfield. (Doc. 1141, pp. 172-73, 188). As the Court stated, the student population of that middle and high school zone would be *more* diverse than the current student populations of Bragg Middle School and Gardendale High School. Thus, the new zone that the Court envisions would *advance*, not inhibit, Jefferson County's ability to fulfill its obligations under the 1971 desegregation order.

Under the law, the 33,000 students in Jefferson County who did not contribute to the constitutional violation by the Gardendale Board have the right to

continue to press forward to the end of federal supervision.  As the Court pointed out in its April 24 opinion, the majority in *Wright* recognized that: "[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society . . . ."  *Wright v. Council of City of Emporia*, 407 U.S. 451, 460 (1972) (quoted in Doc. 1141, p. 39).  In fashioning an equitable remedy, the Court must balance the interests of those who are near the finish line against those who are just beginning the task of proving their willingness to abide by the Fourteenth Amendment.

### c. Gardendale Citizens who Lack Racial Motivation

With regard to the Court's consideration of the fact that the record demonstrates that some Gardendale citizens support separation for reasons that have nothing to do with race (Doc. 1141, p. 183), the private plaintiffs argue that "the benign motives of some Gardendale citizens cannot, in any way, cure or counterbalance the impermissible effects of the proposed separation." (Doc. 1151, p. 12).  If the record were different from the record before the Court, the Court might agree.  But on the record in this case, the Court must respectfully disagree because the residents whom the Court had in mind are African-American.

Dr. Porterfield Miller, a former teacher and administrator in the Jefferson County school system, supports Gardendale's separation effort.  She is African-American.  (Doc. 1141, p. 99).  At trial, she testified that even though the

Gardendale City Council did not select her to serve on the Gardendale Board of Education, and even though she feels that the Gardendale City Council's decision was racially motivated, she still supports Gardendale's effort to operate a municipal school system. (Doc. 1125, pp. 14, 30-32).

Two Gardendale citizens who spoke in favor of separation at the conclusion of the bench trial are African-American. (Doc. 1128, pp. 188-193). One of those citizens stated that he and his wife enrolled the oldest of their three children in private school because they are not satisfied with the education available to their daughter in the Jefferson County system. This citizen and his wife would like to send their children to public school, and they support a municipal school system in Gardendale. The citizen stated that he and his wife:

> made the decision early on to send [their daughter] to private school for elementary education strictly because of, when we look at education, we look at the opportunities that the students have and also we look at test scores. And we did not feel that Jefferson County was doing an adequate job of giving her quality education.

(Doc. 1128, p. 188). He explained that his wife had visited schools in the Jefferson County district and schools in municipal districts, and "she saw the disparity then in the education, the level of education that the students were getting." (Doc. 1128, p. 189).

> As far as the test results, we've monitored those. We've looked at those. Things that stand out for us, again, we have one daughter that's in school right now that's very good in math and science. And the

recent test scores that were released from the ACT Aspire test show that for grades three through ten, Jefferson County was at 50 percent or below for students that were meeting or exceeding their grade level; whereas all of the smaller school districts -- Mountain Brook, Vestavia, Trussville, Homewood and Hoover -- were all well above that.

And we just feel that if Gardendale was given an opportunity to start their own system, then we could do better because it's a smaller system, because we would have more local control over it.

As many of the other parents have stated, we like Gardendale. We've enjoyed being there. Again, we've been there ten years. My oldest daughter, it's the only home she's ever known.

But if Gardendale is not allowed to separate, then we would have to exercise our options because we feel that we should be able to give her a quality education and all of the opportunities possible where we are. And we just don't feel that she's getting -- that if she were in Jefferson County that she would be given that opportunity.

(Doc. 1128, pp. 189-90).[6]

The second Gardendale citizen whom the Court had in mind stated:

I stand before you today as a parent, as a father of two little girls. I've got an 11 year old and an eight year old. They're both at Gardendale Elementary School, wonderful little girls. We love it. We love Gardendale. We moved to Gardendale ten years ago.

. . .

The thing that really, I guess, spoke to me today is the statement of kids would feel like outsiders. I can't speak for anyone else, but I can speak for myself. I would do everything in my power, if Gardendale is allowed to break away from Jefferson County, to make sure that no

---

[6] The transcript from the bench trial does not indicate that this citizen is African-American, but the Court made handwritten notes at trial, and those notes confirm that this citizen is African-American.

student feels like an outsider. I'm very involved there in the community. I serve there in the community. And I would do my very, very best to make sure no child feels like an outsider.

Four things I want to say, and I'm done. Our city: We love our city. It's a great city. I moved there, my family and I we moved there. We have been welcome there. I have great friends here that live in Gardendale, that live in Mt. Olive, that live in Cullman. It's a great city, and they have welcomed us.

Our schools: I love Gardendale Elementary. Flat out love it. I'm there a good amount of the time and would be there today, but I'm here. But it's a wonderful school.

Our future: After this trial, this is the thing that concerns me the most about this trial. After this trial, our city has to heal. There's been so many things that's been said that is not true. Does racism exist? Sure. It's everywhere.

But if we're making an issue where there's not an issue, we've got to heal. So I want my city to heal. I don't know what that looks like, but I know I would do everything in my power to make sure that my city heals.

Our kids: I teach my girls this, racism is taught. I want my kids to be judged by the content of their character and not the color of their skin.

My little girls, they do not see color. As a matter of fact, both of my little girls, their best friends are little blonde headed, blue eyed Caucasian girls that they love to death. They don't see color, and neither should we.

So our goal here, my goal and my wife's goal for our kids is to raise them, number one, to love the Lord their God. I know that some would not agree with me there, but that's our goal for our kids.

And our second goal is to make sure they have great character. And that's my whole deal here. I just want to make sure that they have great character and for my city to heal. Because, again, there's be [*sic*] so many things that's been said about racism that is not there.

And the last time I checked, I'm a black guy, and I'm up and down that city. I love that city. People there, they know me.

So, the only thing I say is it's a great place to live. And if it wasn't, I would have sold my house a long time ago.

(Doc. 1128, pp. 190-93).[7]

The Court recognizes that neither of the African-American parents who spoke at trial was under oath, but the Court observed both parents and has no question about the credibility of their statements.[8] Their statements are not evidence, but Dr. Porterfield Miller's testimony is, and the Court believes that it would be remiss if it were to ignore the statements of these Gardendale citizens in considering the proper remedy in this case. The two Gardendale parents are not in the same position as the parents of African-American students who live outside of the City of Gardendale, so their children are not the targets of the constitutional violation in this case, but these African-American parents have a right to pursue what they believe to be the best possible education for their children.[9] It is

_____

[7] Following the bench trial, the Court also received email messages from parents of African-American children. Those parents support Gardendale's separation. (Doc. 1143-1, pp. 8, 20). And as the Court discussed in fairly great detail in the April 24 opinion, Mr. Hill, a parent from North Smithfield, supports Gardendale's separation. (Doc. 1141, pp. 112-14).

[8] These statements could be reduced to admissible evidence if necessary.

[9] In writing about the black parents who spoke at the conclusion of the bench trial, the Court does not intend to create the inference that every white parent who spoke in favor of separation at the conclusion of trial was motivated by race. The record demonstrates that racial bias motivated some Gardendale citizens to support separation, but the record does not support the inference that every parent, black or white, who supports a municipal school district is motivated by race.

appropriate for the Court to consider the interests of these Gardendale citizens in fashioning an equitable remedy.

### d. Future Separation Efforts by Citizens of Gardendale

Finally, the plaintiffs argue that the Court should not be concerned about future separation efforts by citizens of Gardendale if the Court denies Gardendale's separation motion outright because "if Gardendale seeks to separate after the dissolution of the *Stout* Order, the independent constitutional violation found by this Court will provide the necessary grounds for the *Stout* Plaintiff class to seek appropriate judicial review and relief, including but not limited to enjoining the formation of a separate Gardendale school system." (Doc. 1151, p. 13). Perhaps, but the Court must weigh the possibility that the plaintiff class would not succeed in such an effort.

The plaintiffs' argument assumes that in a few years, the situation in Gardendale will be identical to the set of circumstances that produced the Court's finding that the Gardendale Board violated the Fourteenth Amendment. That is not a safe assumption. As the Court has discussed, if the Court denies Gardendale's motion to separate outright, the demographics of the City of Gardendale are likely to shift. Families with school-aged children who might stay in Gardendale could

---

The Court also recognizes that even if black students in Gardendale are not the direct victims of the message of inferiority conveyed by Gardendale's separation effort, they are impacted by the message as are all of the children in Jefferson County regardless of their race. Messages of racial inferiority from governmental bodies harm society as a whole.

use the next three years to position themselves to argue that whatever racial bias existed in 2017 no longer remains. They might not succeed, but then again, they might.

The Court's decision addresses and resolves the constitutional violation now, once and for all. In considering the interests of everyone affected by the Court's decision, the Court took into account the fact that this litigation has taken a toll on the entire Jefferson County district. From an economic perspective, the Jefferson County Board of Education has had to fund the Board's role in this litigation. Funds used to pay attorney fees for a resumption of litigation in a few years could be used, in the absence of renewed litigation, to pay for education services for all of the students in Jefferson County, nearly 50% of whom are African-American. From a desegregation perspective, the Jefferson County Board needs certainty as it moves into what it hopes will be the final stages of federal supervision. From a deterrence perspective, the Court's April 24 opinion sends the message that any community contemplating separation at the expense of Jefferson County's desegregation efforts will pay a high price and will have no guarantee that the community will be able to separate. The Gardendale Board of Education also has had to fund its role in this litigation, and all it has to show so far is provisional approval for the operation of two elementary schools. From a community perspective, the African-American father who spoke in favor of

separation was correct: Gardendale needs to heal from this dispute, and the Jefferson County district does too. It would be unwise and unfair for the Court to issue a decision that merely delays this dispute for another day.

## 2. Gardendale's Ability to Demonstrate Good Faith During the Three-Year Trial Period

The private plaintiffs argue that the Gardendale Board cannot establish a sufficient record of good faith in three years to be in a position to move for permission to operate a middle school and a high school because there are few tools that the Gardendale Board may use to desegregate the student populations of the elementary schools, and the Gardendale Board is unlikely to have openings that will allow the Gardendale Board to hire more African-American teachers. (Doc. 1151, pp. 13-14).

The Court addressed these matters in its April 24 opinion. The Court instructed the Gardendale Board to redraw the zone lines for Gardendale Elementary and Snow Rogers. (Doc. 1141, p. 185-86). Of the students who reside in the City of Gardendale and attended Gardendale Elementary during the 2015-16 school year, 217 were black and 649 were white. (Doc. 1129-7, p. 1). Of the students who reside in the City of Gardendale and attended Snow Rogers during the 2015-16 school year, seven were black and 155 were white. (Doc. 1129-7, p. 1). The decisions that the Gardendale Board makes when it redraws the zone lines

for Gardendale Elementary and Snow Rogers will influence the Court's future findings regarding good faith.

The Gardendale desegregation order will require interdistrict transfers. (Doc. 1141, p. 185). In the years ahead, the Court will be able to evaluate the interdistrict transfer policy that the Gardendale Board will have to adopt and the extent to which the Gardendale Board has enforced that policy. The Court also will have the ability to evaluate the extent to which transfer students feel welcome in Gardendale's elementary schools. To prove good faith in that regard, Gardendale's superintendent will have to require training for Gardendale's faculty and administrators, and the superintendent will have to adopt policies that promote a welcoming environment for transfer students.

With respect to faculty and administration, the private plaintiffs' reference to the requirements in the 1971 desegregation order is mistaken. As the Court has explained, Gardendale will be operating under a new desegregation order that will impose obligations on the Gardendale Board regarding racial diversity of faculty and administration. The way in which Gardendale's superintendent chooses to fulfill those obligations will bear upon the Court's evaluation of good faith, as will the choices that the superintendent and the Gardendale Board make with respect to all of the obligations that the Court will impose in the Gardendale desegregation order.

### 3. Adequacy of the Equitable Remedy

The private plaintiffs argue that the Court's remedy is inadequate for three reasons. The plaintiffs contend that *Stout I* forecloses any remedy other than outright denial of Gardendale's motion to separate. Alternatively, the plaintiffs argue that the Court's remedy does not cure the constitutional violation or provide sufficient deterrence to future constitutional violations. Finally, the plaintiffs submit that the Court's order exacerbates the message of inferiority conveyed by Gardendale's conduct. The Court addresses each argument in turn.

### a. Law of the Case

The plaintiffs contend that the Fifth Circuit established the law of the case concerning splinter districts in the 1971 *Stout* decision. (Doc. 1151, pp. 14-16). The "law of the case" is a legal doctrine.

> "Under the law of the case doctrine, both district courts and appellate courts are generally bound by a prior appellate decision in the same case." [*Alphamed, Inc. v. B. Braun Med., Inc.*, 367 F.3d 1280, 1285-86 (11th Cir. 2004)]. "The law of the case doctrine, self-imposed by the courts, operates to create efficiency, finality and obedience within the judicial system." *Litman v. Mass. Mut. Life Ins. Co.,* 825 F.2d 1506, 1511 (11th Cir. 1987).

> However, the law-of-the-case doctrine only bars consideration of "those legal issues that were actually, or by necessary implication, decided in the former proceeding." *Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1288 (11th Cir. 2000) (internal quotation marks omitted). Further, "[e]xceptions to this doctrine apply when substantially different evidence is produced, when there has been a

change in controlling authority, or when the prior decision was clearly erroneous and would result in manifest injustice." *Jackson v. Ala. State Tenure Com'n* [*sic*], 405 F.3d 1276, 1283 (11th Cir. 2005). Thus, "when the evidence and the inferences that may be drawn from [the record] change, the issue presented changes as well," such that "the law of the case is the law made on a given set of facts." *Id.*

*Newman v. Ormond*, 456 Fed. Appx. 866, 867 (11th Cir. 2012).

In its April 24 opinion, this Court discussed *Stout I*, writing that in

*Stout I*:

> [t]he Fifth Circuit authorized this Court to refuse to recognize splinter districts that "'hinder vindication of federal constitutional guarantees.'" 448 F.2d at 404 (quoting *N. Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971)). The Fifth Circuit stated:
>
>> where the form[ul]ation of splinter districts, albeit validly created under state law, have the effect of thwarting the implementation of a unitary school system, the district court may not, consistent with the teachings of [*Swann*], recognize their creation.
>
> 448 F.2d at 404. Explaining that it was concerned not only with discriminatory intent but also with disruptive effects, the Fifth Circuit stated: "The process of desegregation shall not be swayed by innocent action which results in prolonging an unconstitutional dual system. The existence of unconstitutional discrimination is not to be determined solely by intent." *Id.* at 404 n. 2.

(Doc. 1141, pp. 27-28).

In its April 24 opinion, the Court also explained that nearly one year after the Fifth Circuit decided *Stout I*, the United States Supreme Court weighed in on the issue of splinter districts in *Wright*. As the plaintiffs acknowledge in a footnote

in their motion for reconsideration, although the Fifth Circuit held in *Stout I* that a district court may not recognize a splinter district that hinders a parent district's effort to fulfill its obligations under a desegregation order, the Supreme Court subsequently held in *Wright* that a district court may exercise its discretion in deciding whether to authorize a splinter district.  (Doc. 1151, p. 15 n. 6).  The Court's discussion of *Wright* in the April 24 opinion is lengthy.  In pertinent part the Court wrote that in *Wright*:

> [t]he Supreme Court stated that if the proposed separation "would impede the dismantling of the dual system, then a district court, in the exercise of its remedial discretion, may enjoin [the separation] from being carried out."

(Doc. 1141, p. 36) (quoting *Wright*, 407 U.S. at 460).

With respect to a district court's remedial discretion, the Court explained that in *Wright*, the Supreme Court:

> conferred on district courts primary responsibility for evaluating all of the relevant factors relating to separation because "[t]he weighing of these factors to determine their effect upon the process of desegregation is a delicate task that is aided by a sensitivity to local conditions, and the judgment is primarily the responsibility of the district judge."

(Doc. 1141, p. 39) (quoting 407 U.S. at 466 (in turn citing *Brown v. Bd. of Educ.*, 349 U.S. 294, 299 (1955)).  As this Court noted, in *Wright*, the Supreme Court "favorably cited appellate decisions in this case and in *Lee v. Macon County Board of Education*, 448 F.2d 746 (1971)," decisions in which plaintiffs' counsel played a

significant role. (Doc. 1141, p. 36; Doc. 1151, pp. 14-15). But the Supreme Court held that district courts could exercise their discretion in weighing the factors concerning separation and "the local conditions." Consequently, although the Fifth Circuit "did not give the trial court a choice as to whether it 'may or may not' recognize [a] splinter district's creation," the Supreme Court did. (Doc. 1151, p. 15). Thus, there was a change in controlling authority.

Moreover, as this Court explained, in *Wright*, the Supreme Court held that "'a court supervising the process of desegregation' does not 'exercise its remedial discretion responsibly where it approves a plan that, in the hope of providing better 'quality education' to some children, has a substantial adverse effect upon the quality of education available to others.'" (Doc. 1141, p. 37 (quoting 407 U.S. at 463)). As this Court explained at pp. 2-4, 12-13, and 23 above, this Court has not approved Gardendale's separation plan. Instead, the Court rejected Gardendale's separation plan and ordered a host of remedial measures that will advance the Jefferson County Board's efforts to fulfill its obligations under the 1971 desegregation order.

Furthermore, in *Wright*, the Supreme Court "recognized that in the realm of public education, a desire for local control was understandable," and the Supreme Court "recognized the possibility that the city might be able to operate a municipal district after a unitary system in the county had 'been established and accepted.'"

(Doc. 1141, p. 39 (quoting 407 U.S. at 470). Importantly, only five justices believed that the City of Emporia's separation would impact the parent district's efforts to desegregate; four justices disagreed. (Doc. 1141, pp. 39-40). The separation effort in *Wright* began two weeks after the supervising district court entered a desegregation order. (Doc. 1141, p. 34). This Court believes that both the Eleventh Circuit Court of Appeals and the Supreme Court would find that the age of this case diminishes the likelihood that Gardendale's separation would impede the county's effort to fulfill its desegregation obligations.

Lastly, in deciding whether this Court must deny separation because of the Fifth Circuit's 1971 holding in *Stout I*, this Court believes that an appellate court would take into account the fact that this case has sat dormant for years. With the exception of occasional school construction or student assignment and transfer proposals, which generally were presented to the Court by the parties jointly, no activity has occurred. For decades, no party has made an effort to move this case towards resolution. Neither the plaintiffs nor the United States has filed a motion asking the Court to address inequities in the Jefferson County system that seem to be vestiges of *de jure* segregation (such as the faculty assignments), and no party has asked the Court to conduct an analysis of *Green* factors to determine what

work remains to be done to under the 1971 desegregation order.[10] As best the undersigned can tell, until 2014, this Court had not asked the parties for a report on the *Green* factors. The Court fully respects the rule that the Fifth Circuit announced in *Stout I* and recognizes that the rule fit the circumstances before the appellate court in 1971. The Court would follow *Stout I* without hesitation if the circumstances were the same today, but the Court believes that the appellate courts today would find that it would work a manifest injustice for this Court not to take the lack of activity in the case into account in determining a proper remedy. As the Eleventh Circuit stated in *Newman*, "the law of the case is the law made on a given set of facts," and the facts of this case have changed. *Newman*, 456 Fed. Appx. at 867.

For these reasons, the Court does not believe it its bound under the law of the case doctrine to follow the mandatory language in *Stout I*. The Court believes that it has complied with the Supreme Court's holding in *Wright* by exercising its discretion in light of all of the *Wright* factors and the local conditions in Jefferson County and Gardendale. As a practical matter, the Court's equitable remedy places the Gardendale Board in the same position as the Pleasant Grove Board: if

---

[10] Based on the Court's review of the docket in this case, it appears that the most recent motion for relief preceding the current dispute was filed in November 2003 by the plaintiffs. That motion concerned interdistrict transfers relating to the Leeds municipal district. (Docs. 838, 848). Before that, the United States filed a motion for relief in 1989. (Doc. 1, p. 47). The Court identified no motions for affirmative relief between 1989 and 2003, and no motions for relief from 2003 until this Court called for a review of the *Green* factors in 2014.

the Gardendale Board does not comply with this Court's orders in good faith, then the Court will have the authority to dissolve the board and return any school that the Gardendale Board controls to the county.

### b. Curing the Constitutional Violation and Deterring Future Violations

The Court already has explained many of the ways in which the remedial measures that the Court has ordered "closely fit the constitutional violation" and "place persons unconstitutionally denied an opportunity or advantage in 'the position they would have occupied in the absence of [discrimination.]'" (Doc. 1151, p. 18) (quoting *Milliken v. Bradley*, 433 U.S. 267, 280 (1977)); *see* pp. 3-14 above. The Court has not yet discussed the provision in the Court's order that states that the Gardendale City Council must appoint at least one African-American resident of the City of Gardendale to the Gardendale Board of Education by June 2017. This aspect of the Court's order places at least one African-American citizen in a position he or she would have occupied but for racial bias.

The Court's remedy also removes an advantage that some of the individuals who support separation wanted to achieve. Some of the individuals who support separation wanted to eliminate federal supervision of their schools. (*See* Doc. 1141, pp. 82, 87). Now, those citizens will experience active federal supervision under a brand new desegregation order.

Finally, the language of the Court's opinion has both a curative and a deterrent effect. As the Gardendale Board pointed out early and often, this is not 1971. Today, racism, though certainly not eradicated, is unacceptable to most, and businesses often will avoid communities that have reputations for racial discrimination. In 2017, a public finding of racial discrimination in a community has consequences. In 1965, the Jefferson County Board implemented this Court's first desegregation order "without consent or agree[ment]." (Doc. 1141, p. 12). The Court anticipates that Gardendale's effort to implement the 2017 Gardendale desegregation order will be entirely different.

For additional discussion of the deterrent value of the Court's April 24 opinion, see pp. 31, 39-40 above.

**c. The Message Conveyed by the Court's Order**

Certainly the most troubling aspect of the plaintiffs' argument for denial of Gardendale's motion to separate is the plaintiffs' contention that the equitable remedy that the Court fashioned exacerbates the message of inferiority that Gardendale's separation effort has conveyed. The Court understands how the plaintiffs might have interpreted the Court's order that way, and the Court regrets that its inadequate explanation of the scope of the remedy and the reasons for the remedy may have created that impression. The Court hopes that this explanation of its decision eases any doubts about the Court's concern for enforcing the

Fourteenth Amendment and allays any anxiety that the Court's April 24 opinion may have caused.

Plaintiffs acknowledge that the Court forcefully condemned Gardendale's conduct. The Court intended for the language of the April 24 decision to express that "[f]or Black schoolchildren in Jefferson County, the path to an equal education – and all that it signifies – has been a long and challenging one." (Doc. 1151, p. 23). The Court devoted many pages of analysis to illustrating that point. The challenge for this Court now is to balance the interests of the African-American students residing in Gardendale whose parents believe that separation will secure for their children the best possible public school education with the interests of African-American students who live beyond Gardendale's municipal limits and were the target of Gardendale's efforts to secure its municipal boundaries.

Like Dr. Porterfield Miller, the parents of African-American children who spoke in support of separation recognize that racism exists in Gardendale, but they choose to live in Gardendale, and they have asked this Court to give their children an opportunity to attend a municipal school system where these parents will have greater control over their children's education. Just as the Court reasonably inferred that the small group of individuals who were part of the Facebook remarks about students from Center Point and North Smithfield were not alone, the Court also reasonably infers that the parents of black students in Gardendale who have

come forward to ask this Court to permit Gardendale to separate are not alone. African-American children will constitute just over 20% of the student population of a Gardendale system that consists of Gardendale residents (not counting future interdistrict transfers). (Doc. 1141, p. 125). That is a sizeable number of students whose parents may support separation.

In weighing the equities of the situation, the Court must consider the message that it will send to these parents if the Court denies Gardendale's motion to separate outright. After decades of struggle, if the Court were to say no to these parents and give them the choice of having their African-American children attend a public school system that these parents consider deficient or of moving to a municipal system elsewhere in Jefferson County that will give these parents the control that they desire, what has the struggle done for these parents and their children? Should the Court disregard their choices? And isn't it possible that these children and their parents will do more to cure the despicable societal malignancy of racism than an order that drives a wedge in a community and creates new resentments? One of the parents of these children stood before the Court and said that he would do everything in his power to welcome African-American students who live outside of the City of Gardendale into schools in a Gardendale system. The Court will hold him to his word and will, by order if necessary, make certain that every parent in Gardendale does the same. Again, if

the effort fails, the Court has the authority to dissolve the Gardendale system just as it dissolved the Pleasant Grove system years ago.

The plaintiffs argue that decades have come and gone, and the Jefferson County Board still operates schools that are racially identifiable. (Doc. 1151, p. 23). On the record in this case, it appears that all of the parties and the Court bear some responsibility for the state of affairs in Jefferson County. Decades of inactivity by all of the parties and the Court have allowed vestiges of *de jure* segregation to linger unaddressed.[11] Those days are over.

The undersigned judicial officer first became involved in school desegregation litigation in 2013 when the Clerk of Court reassigned to the undersigned the case involving the City of Huntsville public school system. (*See* Doc. 282 in Case 63-cv-109). As the Court examined a contested student assignment motion, the Court found a record of insufficient compliance with the Court's desegregation order for the Huntsville school district. As in Jefferson County, there had been no comprehensive assessment of the *Green* factors. After an evidentiary hearing that lasted a number of days, the Court wrote an extensive opinion that detailed the lapses in compliance with the desegregation order in that

---

[11] The Court notes that all but one of the attorneys for the private plaintiffs and the United States are new to this case. The one attorney for the private plaintiffs who has prior involvement in the case represented the plaintiffs at a time when counsel for the plaintiffs fought diligently to obtain an equal education for black students in Jefferson County. He recently returned to this case as counsel for the private plaintiffs. Thus, none of the current attorneys for the plaintiffs or the United States bears responsibility for the inactivity in this case, and the Court does not mean to suggest otherwise by discussing the parties' inactivity over the years.

case. (*See* Doc. 364 in Case 63-cv-109). In its opinion, the Court ordered the parties in that case to mediation. Over many months, Chief Magistrate Judge Ott devoted tireless effort to help the parties negotiate a 92-page consent agreement that tailors the Huntsville school district's desegregation obligations to the current status of the district and provides a new path toward the end of federal supervision, per the dictates of binding Supreme Court precedent. The Court is actively involved in that district's desegregation efforts, and the Court has amended the desegregation consent decree when experience has proven that change is necessary. (*See* Docs. 350, 489, 490, 491, 509 in Case 63-cv-109).

The Court's experience in Huntsville led the Court to examine the record in the other school desegregation cases which have been assigned to it, including the action involving the school districts in Jefferson County. Unlike some school districts operating under a desegregation order, over the years, Jefferson County has filed required annual reports with the Court. The Court credits the Jefferson County Board for its efforts in that regard; the consistent reports are evidence of good faith. Those reports reveal that the county school system has failed to meet a number of its court-ordered desegregation obligations. Yet, those lapses have not been addressed.

It is not uncommon for school desegregation cases to sit idle for years, and the Court recognizes that any number of reasons may explain the parties' inaction. As one court observed:

> By operating under the status quo, school districts have little burden-mostly just remaining in compliance with previous court orders and filing reports. However, once the school district moves for unitary status, possible negative consequences abound: 1) the rejuvenated litigation may stir up long-dissipated community unrest; 2) closer adversarial and judicial scrutiny may reveal additional areas of inequality, resulting in the need for additional effort and expense from the school district; and 3) the legal proceedings could result in enormous legal and administrative expenses for already cash-strapped school districts.

*Coppedge v. Franklin Cty. Bd. of Educ.*, 345 F. Supp. 2d 567, 572 (E.D.N.C. 2004) (quoted in Doc. 364, p. 2 in Case 63-cv-109). As noted, at this juncture, it is neither practical nor worthwhile to try to determine why the parties and the Court have accepted the status quo in this case for so long. (Doc. 1141, pp. 183-84, n. 92).

To the extent that the Court bears responsibility for allowing vestiges of *de jure* segregation to linger unaddressed, the Court accepts that responsibility and has, since 2014, been in the process of attempting to fulfill its obligations to the families who attend the schools in the Jefferson County district by moving the parties toward a cooperative, negotiated consent decree that will match Jefferson County's desegregation obligations to the current state of affairs in the district. That effort is consistent with the Supreme Court's instruction that this Court and

the parties must "work[] continuously toward the ultimate objective-'restor[ing] state and local authorities to the control of a school system that is operating in compliance with the Constitution.'" *Coppedge*, 345 F. Supp. 2d at 572 (quoting *Freeman*, 503 U.S. at 489).[12]

It is inevitable that successful implementation of a desegregation order will herald the end of federal supervision, but dereliction of the Court's obligation to press school districts to fulfill their obligations for any reason only exacerbates "the denial of fundamental rights to many thousands of school children." *Alexander v. Holmes Cty. Bd. of Educ.*, 396 U.S. 19, 20 (1969) (quoted in Doc. 1141 at p. 16). The Court chooses to heed the Supreme Court's admonition in *Alexander* that dismantling segregated school systems with all deliberate speed is not fast enough and "is no longer constitutionally permissible." *Alexander*, 396 U.S. at 20 (quoted in Doc. 1141 at p. 16). This Court will remain, as it has for the past four years, vigilant and attentive to the work ahead.

---

[12] Counsel for the Gardendale Board and counsel the private plaintiffs have offered similar characterizations of the Court's motives in this desegregation action. As the Court noted in its April 24 opinion, counsel for the Gardendale Board contends that federal courts—presumably this Court included—are tired of school desegregation cases. (Doc. 1141, p. 4 (citing Doc. 1097, pp. 17-18, 30)). The private plaintiffs contend that this Court resurrected the dormant *Stout* action, only to speed it to a declaration of unitary status so that federal supervision of the Jefferson County district could come to an end. (Doc. 1151, pp. 1-2). Neither characterization is correct or fair given the time and the resources that the Court has invested in school desegregation cases over the past four years. This Court will supervise both the Jefferson County district and the Gardendale district until the vestiges of *de jure* segregation and institutional racial discrimination are eliminated, and the Court will ensure that each district complies with the Fourteenth Amendment in good faith.

The Court realizes that for some of the private plaintiffs and the families whom they represent, anything short of denial of Gardendale's motion is an unacceptable remedy. The Court has done its best to explain why it believes that outright denial would be a short-lived victory and would harm Jefferson County's efforts to comply with the Fourteenth Amendment in the long run. The Court does not view the equitable remedy in this case as a victory for Gardendale, and the Court is certain that no one in Gardendale sees it as such, given the fact that Gardendale's separation effort was motivated by a desire to eliminate federal supervision under the 1971 desegregation order. The equitable remedy in this situation is based on the set of circumstances presented to the Court in this instance, and the Court would not hesitate to deny a motion to separate under other circumstances. The Court also will not hesitate to roll back Gardendale's separation if Gardendale does not comply in good faith with the new desegregation order that the Court will enter.

The Court is willing to work with the parties to make practical adjustments to the remedial steps that the Court has ordered to facilitate implementation of the remedial measures, but the Court is not persuaded by the plaintiffs' arguments that outright denial of the Gardendale Board's motion to separate is the appropriate way to resolve this dispute.

The private plaintiffs requested oral argument on their motion for reconsideration. (Doc. 1151, p. 24). Before setting a hearing, the Court wished to provide the parties with a supplemental explanation for the equitable remedy announced in the April 24, 2017 decision. If the private plaintiffs still wish to present argument on their motion, then the Court will hear from the private plaintiffs.

**DONE** and **ORDERED** this May 9, 2017.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE