FILED
2021 Sep-03  PM 03:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **LINDA STOUT, SANDRA RAY,** <br> **LONNEL AND ALFORNIA CARTER,** <br> **RICKY AND ALENA REEVES, and** <br> **CARTRENA CARTER, on behalf of** <br> **themselves and others similarly situated,** | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| **UNITED STATES OF AMERICA,** | ) <br> ) |
| Plaintiff-Intervenor, | )    Civil Action Number <br> )    **2:65-cv-00396-MHH** |
| **v.** | ) <br> ) |
| **JEFFERSON COUNTY BOARD OF** <br> **EDUCATION,** | ) <br> ) <br> ) |
| Defendant, | ) <br> ) |
| **GARDENDALE BOARD OF** <br> **EDUCATION,** | ) <br> ) <br> ) |
| Defendant-Intervenor. | ) |

## MEMORANDUM OPINION

The private plaintiffs have moved to join the City of Gardendale as a defendant in this public school desegregation case for the limited purpose of collecting the $870,913.83 attorney fee award that the Court assessed against the Gardendale Board of Education. (Docs. 1267, 1285). The Court entered judgment on the fee award in May of 2020. (Doc. 1283). To date, the private plaintiffs have

recovered only $21,040.00 of the award, (Doc. 1301), leaving a principal balance of just under $850,000.00.

To satisfy the outstanding $849,873.83 judgment, the Gardendale Board of Education must ask the City of Gardendale to appropriate funds to the Board; the Board has no independent source of funding. Since the Court entered the judgment for fees, the Board has not asked the City to appropriate fees to satisfy the judgment because every member of the Board has resigned. The City is obligated, by state statute and municipal ordinance, to fill every vacancy on the Board, but the City has declined to act, allowing the ghost board to avoid the fee award. On a related note, the attorneys for the Gardendale Board of Education have filed a motion to withdraw because they say they have no one to represent. (Doc. 1277).[1] This opinion addresses this state of affairs.

Because the current obstacle to the private plaintiffs' effort to collect their fee award did not arise in a vacuum, this opinion begins with a summary of the legal and factual context for the private plaintiffs' motion for joinder. Against that backdrop, we will turn to the award itself to explain why the City's failure to act exacerbates the bad faith conduct that the fee award addresses. Next, we will consider whether the Court has available to it a tool that may enable the Court to

---

[1] The Board has no employees, officers, or agents because all have resigned. (Doc. 1259, p. 1, ¶ 2).

remove the obstacle to enforcement of the fee judgment.  Finally, we will discuss the private plaintiffs' request for additional fees.  We will weave into our examination of these issues the Board's attorneys' efforts to withdraw from this case.

## I.

The Gardendale City Council established the Gardendale City School System and created the Gardendale Board of Education pursuant to Alabama Code § 16-11-2.  (Doc. 1129-1, pp. 1–3).  Alabama Code § 16-11-2(b) provides:  "The general administration and supervision of the public schools and educational interest of each city shall be vested in a city board of education, to be composed of five members who shall be residents of the city, and who shall not be members of the city council or commission."[2]  Alabama law mandates staggered five-year terms for municipal school board members and states that, "[i]n the event of a vacancy in the membership of the city board of education by resignation or otherwise, the fact shall be reported to the city council or commission by the board, and the council or commission shall elect a person to fill the vacancy for the unexpired term."  ALA. CODE § 16-11-3.  In other words, when a city exercises its statutory authority to create a municipal school system operated by a municipal board of education, Alabama law requires the city

---

[2] For purposes of § 16-11-2, a "city" is an incorporated municipality "of 5,000 or more inhabitants." ALA. CODE § 16-11-1 (1975).

to keep all five seats on the Board filled.[3]  The municipal ordinance pursuant to which Gardendale's City Council created the Gardendale municipal public school system and the Gardendale Board of Education, Gardendale Ordinance 2014-007, mirrors the language of Alabama Code § 16-11-3, (Doc. 1129-1, p. 2, Section 3), making the obligation to fill vacancies on the Gardendale Board of Education mandatory under both state and municipal law.

When the Gardendale City Council created the Gardendale Board of Education on March 3, 2014, the City Council immediately filled the five seats on the Board.  (Doc. 1129-1, p. 2).  From the Board's inception, its members appeared devoted to extricating the municipal public school system not only from the Jefferson County Board of Education that had been running the four public schools within Gardendale's municipal boundaries but also from the federal desegregation order that has governed the Jefferson County system and the municipal districts that have separated from the county system since the desegregation order was entered in 1971.  (Doc. 226).  The effort to escape the requirements of the desegregation order

---

[3] As the Eleventh Circuit Court of Appeals recently reiterated, "'must,' like 'shall,' is a mandatory term that connotes a requirement."  *United States v. Watkins*, No. 18-14336, 2021 WL 3700295, *2  (11th Cir. Aug. 20, 2021) (quoting *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1279 (11th Cir. 2019)).  Thus, the word "shall" in § 16-11-3 means that a city council is required by state statute to fill vacancies on a municipal board of education.

was consistent with the sentiment that drove the formation of the Gardendale school district in the first place.[4]

In 2012, several Gardendale residents began "a grassroots movement" and "used social media to discuss the changing racial demographics of their schools as they campaigned for the creation of a city school board and new taxes to support the proposed school system." *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 991 (11th Cir. 2018). "[S]ecession leaders expressed 'a desire to control the racial demographics of the four public schools in the City of Gardendale and the racial demographics of the city itself.'" *Stout*, 882 F.3d at 1007 (quoting Doc. 1141, p. 138); (*see*, *e.g.*, Doc. 1141, pp. 81–82). In the eyes of the separation supporters, a municipal school system would allow the City of Gardendale to shed "the desegregation from decades ago [] that should have already been changed." (Doc. 1141, pp. 82–83 (quoting Doc. 1132-2, p. 183, Sept. 13, 2012, 1:41 p.m.); Doc. 1124, pp. 170–71, 186, 191–92; Doc. 1131-44, pp. 9–10, tpp. 34–40). Secession organizers "put the mayor and the council in a head lock until they came to their own conclusions that the school system had to happen." *Stout*, 882 F.3d at 997.[5]

---

[4] Much of the information that follows is well-developed in *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988 (11th Cir. 2018) and in Doc. 1141. In this opinion, we highlight the events that are most pertinent to the pending motions concerning the vacant Gardendale Board.

[5] The four schools within Gardendale's municipal boundaries included a brand new $ 51 million high school. The City of Gardendale had explored the possibility of separating from the Jefferson

In anticipation of separation, in September of 2013, the Gardendale City Council approved a 5-mill ad valorem tax to "be used for public school purposes," (Doc. 1298-1) (Gardendale Ordinance No. 2013-11), and voters in Gardendale approved a second 5-mill ad valorem tax in November of that year to "be used for public school purposes," (Doc. 1298-2) (Gardendale Ordinance No. 2013-17). *Stout*, 882 F.3d at 998; (Doc. 1124, pp. 21–22; Doc. 1125, pp. 58–59; Doc. 1130-3). Four months later, the Gardendale City Council established the Gardendale Board of Education and selected from a pool of 30 applicants five Gardendale citizens, all of them white, to fill the seats on the Gardendale Board. *Stout*, 882 F.3d at 998; Doc. 1124, pp. 21, 27–28; Doc. 1129-1, p. 2.[6]

---

County school system twice before, (Doc. 1124, pp. 51–52; Doc. 1128, pp. 101–02, 119–20), but had determined each time that separation was not feasible. (Doc. 1124, pp. 167–68; Doc. 1128, p. 120). The new high school moved the needle, making separation feasible.

The Gardendale City Council appointed two of the session organizers to the Gardendale Board of Education. (Doc. 1129-1, p. 2).

[6] In its opposition to the private plaintiffs' motion for joinder, the City states that "[i]t has never been adjudicated as having violated anyone's civil rights or otherwise attempting to do so." (Doc. 1296, p. 3). Though it is true that the City of Gardendale, so far, has not been a party to the Jefferson County school desegregation case and therefore has not "been adjudicated as having violated anyone's civil rights" in this case, the Court has noted in more than one opinion that the Gardendale City Council systematically excluded Black Gardendale citizens from the nascent school board. The Court explained that the City:

> received more than 30 applications for the five positions on the inaugural [Gardendale Board of Education]. (Doc. 1124, p. 28). From these applicants, the Gardendale City Council selected the five initial members of the board. (Doc. 1124, pp. 21, 27; Doc. 1129-1, p. 2). Each of the individuals whom the city council selected is white. (Doc. 1124, p. 28).

> . . .

A lawyer who represented the Hoover Board of Education, a municipal public school system that separated from Jefferson County in 1988, (Doc. 1141, pp. 46–47), had mentioned in hearings with the Court that he was advising the City of Gardendale, that the city was in the process of forming a splinter district, and that the city understood that "every aspect of its operation would have to be submitted to the court for review." (Doc. 1009, p. 28; *see also* Doc. 991, p. 17). A member of the Gardendale Board testified during the bench trial in this case that the members of the Gardendale Board engaged legal counsel "very early in the board formation

---

African-American citizens of Gardendale were among the 30 candidates for the Gardendale Board of Education. (Doc. 1124, p. 28). Dr. Sharon Porterfield Miller was one of the African-American applicants for the board. Dr. Porterfield Miller is the division chair of education at Miles College in Fairfield, Alabama. (Doc. 1125, pp. 7-8). Early in her career, Dr. Porterfield Miller worked for the Jefferson County Board of Education. She held a variety of positions in the Jefferson County school system, including second grade and kindergarten teacher, assistant principal, and principal. (Doc. 1125, pp. 8-10, 17-18).

The Gardendale Board of Education called Dr. Porterfield Miller as a witness during the bench trial in this matter because she favors a municipal school system. Dr. Porterfield Miller testified that she has more experience in the field of education than anyone on the Gardendale school board with the possible exception of another board member who is a college professor. (Doc. 1125, pp. 10, 30-32, 36). Dr. Porterfield Miller testified that she believes that race was a factor in the Gardendale City Council's decision not to select her as a member of the Gardendale school board. (Doc. 1125, p. 32).

(Doc. 1141, pp. 99–100) (footnotes omitted). "One of the white members of the Gardendale School Board worked for Dr. Porterfield Miller a number of years ago when Dr. Porterfield Miller was employed by the Jefferson County public school system. The board member was a teacher while Dr. Porterfield Miller was assistant principal of Fultondale Elementary. (Doc. 1125, pp. 14, 36)." (Doc. 1141, p. 100 n. 49). The evidence that race played a role in the City Council's decision not to select Dr. Porterfield Miller as a member of the Gardendale School Board was undisputed at trial and remains undisputed to date.

process.  And our attorney told us at that point, from the very beginning . . . that we were going to have to get approval from the Court. We understood that."  (Doc. 1124, p. 216; *see also* Doc. 1124, p. 217:14-17).

The Gardendale Board's initial attorney gave the board members sound advice; the 1971 desegregation order governing the Jefferson County public school district contains specific guidelines that municipal school systems must follow to separate from the county public school system.  (Doc. 226, pp. 8–9).  Nevertheless, to sidestep the desegregation order, the Gardendale Board hired new lawyers and filed suit in state court to compel Jefferson County to "'relinquish control of the public schools'" in the City of Gardendale to the Gardendale Board.  (Doc. 1267, p. 33) (quoting the Board's state court complaint).  After this Court enjoined the state court action, (Doc. 1003), the Gardendale Board dismissed the state court action, (Doc. 1012, pp. 10–12), and pursued control of the four public schools in Gardendale in this federal district court.

With that, the Gardendale Board's first attempt to avoid federal oversight came to an end, but the Board was not long-deterred.  In December of 2015, the Gardendale Board presented a separation plan to the Court in support of a motion to secede from the Jefferson County public school system, but the plan was only a draft; the Board had not voted to approve it.  *Stout*, 882 F.3d at 999; Doc. 1141, p. 115. The Board stated that it delayed approving the 2015 draft separation plan because

voting on the plan before the Court approved it "would put the cart before the horse." (Doc. 1097, p. 48). But binding precedent in *Ross v. Houston Independent School District* required the Gardendale Board as a nascent splinter district to, "at the outset, establish what its operations [would] be" and "express its precise policy positions on each significant facet of school district operation." 559 F.2d 937, 944 (5th Cir. 1977).[7] The Gardendale Board had to make a "definitive statement of its position" with respect to its obligations under the 1971 desegregation order. 559 F.2d at 944. In other words, under *Ross*, the Board was obligated to commit to a separation plan before it presented the plan to the Court for approval. The Gardendale Board opted to ignore this obligation.

Under the December 2015 draft separation plan, to fulfill the 1971 desegregation order's requirement that new municipal school systems in Jefferson County "with a black student percentage less than the percentage of black students then in" the Jefferson County system "make sufficient space available for black students from the county system in such number that, added to the number of black students included in the [] new school zone, equal[led] one-third of the white students included in the [] new school zone," (Doc. 226, p. 9), the Gardendale Board required "[a]ll students within North Smithfield Manor and Greenleaf Heights,

---

[7] Under Eleventh Circuit precedent, cases decided by the Fifth Circuit prior to October 1, 1981 are binding authority in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209–12 (11th Cir. 1981).

grades Kindergarten to 12, [to] attend the Gardendale schools," (Doc. 1131–2, p. 4). Under the 1971 desegregation order, in the Jefferson County system, public school students from the North Smithfield and Greenleaf Heights communities, predominantly Black communities outside of Gardendale's municipal limits, were zoned for Fultondale Elementary, Bragg Middle School in Gardendale, and Gardendale High School.

Under the December 2015 draft separation plan, North Smithfield students would move from a new Fultondale Elementary School facility to Gardendale Elementary, an older facility that already was overcrowded without the addition of elementary students from North Smithfield.  (Doc. 1141, p. 119).  Under the December 2015 draft separation plan, the parents of students from the North Smithfield community would be disenfranchised because as non-residents of Gardendale, the North Smithfield parents would not be able to vote for the members of the Gardendale Board or serve on the Gardendale Board.  (Doc. 1124, pp. 50, 166–67).  And students from the North Smithfield community would face an uncertain future because, under the December 2015 draft separation plan, the Gardendale Board could eliminate North Smithfield and Greenleaf Heights students from Gardendale's municipal system if ad valorem tax dollars did not follow the students, and even if tax dollars did follow the Black students, the Gardendale Board indicated it would maintain space for the students for the vague term of the

"indefinite future."  (Doc. 1124, pp. 46–47; Doc. 1131-1, p. 5; Doc. 1141, p. 122).

So the Board strategically avoided a meaningful commitment to the Black students

that it needed to separate from the Jefferson County public school district.[8]

This Court found that the Gardendale Board did not vote on the draft

separation plan because the Board hoped that its attorneys could persuade the Court

that the 1971 federal desegregation order no longer governed splinter districts like

Gardendale's municipal district.  (Doc. 1141, p. 149).  If the Court were to find that

the desegregation order did not apply to Gardendale, then Gardendale would not

need the students from North Smithfield to meet the splinter district student

assignment provision in the desegregation order.  And,

> [i]f Gardendale d[id] not need the students from North Smithfield to
> separate, then the board ha[d] no incentive to keep those students in the
> Gardendale system. By delaying a vote on the superintendent's
> December 2015 separation plan, the board [] allowed itself the
> flexibility to proceed with the December 2015 plan if necessary, revert
> to the March 2015 plan under which North Smithfield students would
> be phased out of the Gardendale schools, or choose yet another plan.

---

[8] The addition of the North Smithfield students to the draft plan that the Gardendale Board filed in
December 2015 came after the Gardendale Board realized that it could meet the student assignment
requirements of the 1971 desegregation order only by including the North Smithfield students in
the Gardendale municipal system.  The Gardendale Board's original draft plan of separation called
for the phase out of all North Smithfield students from Gardendale over a 13-year period.  *Stout*,
882 F.3d at 999; Doc. 1141, p. 118.

The December 2015 draft separation plan also included interdistrict desegregation transfers for
Black students living outside of the City of Gardendale, but the ostensible transfer option was
"subject to space availability" and without bus transportation "unless required by federal courts,"
(*Stout*, 882 F.3d at 999; Doc. 1129-10, pp. 5–6; Doc. 1141, p. 127).

(Doc. 1141, pp. 149–50).

The Gardendale Board's attorneys argued that "the Jefferson County School System is operating on a unitary basis and has since 1976, according to the Fifth Circuit, and that they have since 1976 successfully dismantled their dual system." (Doc. 1114, p. 13) (relying on *Stout v. Jefferson Cty. Bd. of Educ.*, 537 F.2d 800 (5th Cir. 1976)); *see Stout*, 882 F.3d at 1001.[9]   According to Gardendale's attorneys, because the 1971 desegregation order did not govern Gardendale's separation, the Court could enjoin the splinter district only if it found that the Gardendale Board itself had violated the Constitution.  See, *e.g.*, Doc. 1104, pp. 1–4 ("If the County system is and has been unitary since 1976, the separation of GBOE schools from the County cannot be enjoined under any reading of *Green* or *Wright*. GBOE cannot impair what has already been done."); Doc. 1124, pp. 4–5 ("[T]here is no legal basis and binding precedent for an injunction of Gardendale's separation absent a finding

---

[9] Though the attorneys for the Gardendale Board acknowledged that the task of requesting a formal end to federal supervision of the Jefferson County public school system belonged to the Jefferson County Board, (Doc. 1114, pp. 13–14), a finding that the Jefferson County Board had successfully dismantled its dual system, as a practical matter, would have heralded the end of federal supervision to the detriment of class members throughout the Jefferson County public school district.  The Gardendale Board's attorney pursued the argument that the Jefferson County Board had successfully dismantled its dual system of education even though Gardendale's superintendent had acknowledged in internal correspondence to the Gardendale Board that "if Jefferson County really does aim to gain Unitary Status there is going to be an excessive amount of work to be done across the entirety of the county."  (Doc. 1125, p. 298; Doc. 1131-23, p. 2).  As the Court has explained, "The Gardendale Board and its attorneys were willing to sacrifice the constitutional remedy that class members have waited 50 years to receive so that Gardendale could preserve its predominantly white community and operate its predominantly white public school system. This is bad faith conduct."  (Doc. 1267, p. 40).

of an independent constitutional violation by the Gardendale Board of Education, which is the burden of proof lying on the objectors, and they cannot possibly meet it.").[10]  This Court rejected the Gardendale Board's argument that it was not subject to the 1971 desegregation order.  (Doc. 1141, p. 154) (internal citations omitted). The Eleventh Circuit agreed.  *Stout*, 882 F.3d at 1009–10.

## II.

The Gardendale Board's repeated efforts to avoid federal oversight are consistent with the City's failure to fill vacancies on the Gardendale School Board. It appears that most of the members of the Gardendale Board resigned while the private plaintiffs' motion for attorney fees was pending.  The private plaintiffs filed their amended motion for fees in May of 2018.  (Doc. 1210).  As of July 17, 2018, the Board still had three members.  (Doc. 1242, pp. 1, 8).  The record does not indicate when the first member of the Gardendale Board resigned, but the last board member had resigned by November 14, 2019.  The Court did not receive notice of the resignations that occurred after July 17, 2018 until every seat on the Gardendale Board was vacant.  The Court issued a lengthy opinion granting the private plaintiffs'

---

[10] This Court found that the United States and the private plaintiffs proved that the Gardendale Board acted with discriminatory intent and that the plaintiffs established an independent constitutional violation.  (Doc. 1141, pp. 151, 180).  The Eleventh Circuit Court of Appeals reversed the finding of an independent constitutional violation, holding that "the Gardendale Board only *proposed* to violate the Fourteenth Amendment."  *Stout*, 882 F.3d at 1016 (emphasis in *Stout)*.

motion for a fee award in December of 2019 and entered judgment on the fee award on May 13, 2020.  (Docs. 1267, 1283).

In the year since the Board has been obligated to satisfy the judgment against it, the private plaintiffs' attorney has negotiated with the City's attorney for payment of the fee award but to no avail.  (Doc. 1284, pp. 4–5).  Absent cooperation from the City of Gardendale, the private plaintiffs can collect their fee only if the Gardendale Board of Education requests an appropriation of funds from the City, the City makes the appropriation, and the Board votes to use the appropriation to fund the judgment against it.[11]  For more than 18 months, the City has not selected Gardendale residents to fill the five vacancies on the Gardendale Board, (Doc. 1297, pp. 14–18), making it impossible for the Board to act.  By maintaining a municipal board of education as an entity, the City has kept open its option of separating from the Jefferson County school system.[12]  At the same time, by avoiding its statutory

---

[11] In the City's words,

> [t]he ad valorem tax proceeds collected by the Jefferson County Tax Collector and paid over to the City are **not** GBOE assets. Periodically, the City made appropriations of its ad valorem tax to the GBOE. However, those appropriations were made at the City's discretion; and, only after a GBOE request for funding. GBOE could not at any time demand from the City any ad valorem tax monies nor did the GBOE ever have any legal or equitable entitlement to them.

(Doc. 1296, p. 9) (emphasis in Doc. 1296).  To the City's knowledge, the Gardendale Board "has never had any [] source of revenues," other than "periodic appropriations" from the City.  (Doc. 1296, p. 3).

[12] The Eleventh Circuit has held that Gardendale may move forward with a municipal school district if the City "satisfies its burden to develop a secession plan that will not impede the

14

obligation to fill vacancies on the Board, the City has made it impossible for the private plaintiffs to satisfy their judgment against the Board.  That is a win-win for Gardendale, but not so for the private plaintiffs' attorneys who, without a fee award, will have donated thousands of hours of service to derail Gardendale's proposed constitutional violation.  *Stout*, 882 F.3d at 1016.

The City offers the private plaintiffs this conciliatory note:  "To the extent that the GBOE's assets may be insufficient to satisfy the Private Plaintiffs' judgment against it, the Private Plaintiffs will still possess a judgment lien that will have to be first paid and satisfied, including post-judgment interest, when and if the GBOE ever resumes its operations."  (Doc. 1296, p. 11).  This is another Gardendale promise tethered to the "indefinite future."

The Gardendale City Council and the constituents who drive the Council's decisions have sole ownership of the date on which the Gardendale Board will be repopulated, and the City can fill the vacancies on the Gardendale Board without plans to begin operating a public school system.  By statute, the City Council must fill those vacancies if it maintains the Gardendale Board of Education.  The City's conduct in avoiding the steps that would enable the Board to pay the fee award reinforces the finding of bad faith that underpins the award.

---

desegregation efforts of the Jefferson County Board. . . ." (Doc. 1267, p. 53 n.26 (quoting *Stout*, 882 F.3d at 1016)).

The Court entered the fee award under the bad faith exception to the American rule to satisfy the interests of justice and punish the Gardendale Board for its efforts to sidestep the 1971 desegregation order. (Doc. 1267, pp. 3–4). Among the factual findings underpinning the fee award is this one, affirmed by the Eleventh Circuit and binding as the law of the case: "secession leaders" in the City of Gardendale "expressed 'a desire to control the racial demographics of the four public schools in the City of Gardendale and the racial demographics of the city itself.'" (Doc. 1267, p. 8) (quoting *Stout IV*, 882 F.3d at 1007, in turn quoting Doc. 1141, p. 138). The Court noted that separation organizers looked for ways to include in their municipal system non-resident white neighbors from the Mount Olive community while eliminating non-resident Black students from North Smithfield, zoned for Gardendale schools under the 1971 desegregation order, and non-resident Black students attending schools in Gardendale on racial transfers pursuant to the 1971 desegregation order. (Doc. 1267, pp. 8–9, 12–13). The organizers wanted no part of the 1971 desegregation order, and the Board, once constituted, worked to achieve that goal. (Doc. 1267, pp. 30–42). That bad faith merited a sanction of fee-shifting. *Chambers v. NASCO*, 501 U.S. 32, 50, 53 (1991).

The Court also entered the fee award to punish the Board for the harm done to Black students attending public schools in Gardendale pursuant to the 1971 desegregation order, either by zoning or by desegregation transfer. (Doc. 1267, pp.

12–29).  The Court explained that the message of racial inferiority conveyed by the Gardendale Board was unmistakable:  "It is enough simply to recognize that in its refusal to speak to parents of class members from North Smithfield, the Gardendale Board treated those students as tokens to be numbered and included in a municipal district only if necessary to achieve a court-ordered racial quota. The message is one of fungibility, like so many commercial goods counted and exchanged." (Doc. 1267, p. 24).  In *Stout IV*, the Eleventh Circuit held that "the law and the record" support this Court's finding that "the secession movement communicated a 'message' that 'cannot have escaped the children in the [C]ounty.'"  (Doc. 1267, p. 26) (quoting *Stout IV*, 882 F.3d at 1012, in turn quoting *Wright v. Council of the City of Emporia*, 407 U.S. 451, 466, (1972)).  The fee award serves the interests of justice by addressing the oppressive message that the Gardendale Board's conduct conveyed to class members, especially class members living in North Smithfield and Center Point.

The City's refusal to abide by its statutory obligation and take the steps required to enable the Gardendale Board to pay the fee award amplifies the message of inferiority that warranted the award in the first place.  As the private plaintiffs have pointed out, the City appropriated more than $1 million to pay the Board's attorneys.  (Doc. 1297, p. 13).  The City is actively avoiding appropriations to pay the private plaintiffs' attorneys.  The clear message communicated by the City's

priorities and the City's and Board's efforts to avoid federal court orders designed to preserve class members' constitutional rights cannot have escaped the class members.

The message the City's conduct conveys to other government entities is equally loud and clear. Fee awards, whether statutory or common law, are available in civil rights litigation to ensure legal representation for victims of discrimination. The proposition that a city may refuse to fund a fee award against a municipal entity that depends upon the city council for appropriations opens a Pandora's Box. The City of Gardendale's actions in leaving the Gardendale Board of Education unstaffed and unfunded until the City decides to pursue a municipal school system again, all the while amassing ad valorem tax assessments to "be used for public school purposes," encourages other municipalities to thwart fee awards to dissuade attorneys from undertaking the expense of civil rights litigation. (Docs. 1298-1, 1298-2) (Gardendale Ordinance Nos. 2013-11 and 2013-17).[13]

Failure to pay the fee award in a timely manner guts the penalty that the Court imposed, leaving the bad faith of the Board unpunished and justice for the Black

---

[13] The City of Gardendale has been collecting the ad valorem tax that it passed for its municipal school system since 2013. *Campbell v. City of Gardendale*, ---So.3d---, 2020 WL 5268049, *1 (Ala. Sept. 4, 2020). In a hearing regarding the plaintiffs' motion for joinder, the attorney for the City of Gardendale explained that the revenue from the ad valorem tax is held in a bank account because there is now no reason to appropriate the funds. (11/21/2020 Minute Entry). The City of Gardendale retains exclusive control of the ad valorem tax revenue earmarked for public school purposes.

students harmed by the Board's conduct a hollow promise for another day.  If the Court were to accept the City's argument that satisfaction of the fee judgment can wait until the City decides to resume the Gardendale Board's operations, the Court would place the fee award within the control of the City and allow the City to hold payment of the fee award just out of reach of the private plaintiffs for as long as the City chooses.  The Court rejects the City's argument and opts to use available procedural tools to avoid this injustice and pave the way for enforcement of the fee judgment.

## III.

The solution to the challenge created by the City's refusal to fill the vacancies on the Gardendale School Board seems simple enough – a court order requiring the City to fulfill its statutory obligation to appoint members to the Board.  Such an order not only would open the door to satisfaction of the fee award to the private plaintiffs but also would restore the client that the Board's attorneys serve.  The City argues that the Court has no power to order the City to do anything because the City is not a party to this litigation.  True, the City is not a named party to this litigation, but the Court is not powerless to act.  The Court may exercise ancillary jurisdiction over the Gardendale City Council.

Ancillary jurisdiction is a form of supplemental jurisdiction.  A court may exercise ancillary jurisdiction to enable the court "to function successfully, that is,

to manage its proceedings, vindicate its authority, and effectuate its decrees." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379–80 (1994)).  To effectuate court orders, a district court may exercise jurisdiction over "a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances." *Peacock*, 516 U.S. at 356.  The concept is important because "[w]ithout jurisdiction to enforce a judgment entered by a federal court, 'the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.'" *Peacock*, 516 U.S. at 356 (quoting *Riggs v. Johnson County*, 6 Wall. 166, 187 (1868)).

There are limits to ancillary jurisdiction.  Ancillary jurisdiction cannot be used "in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Peacock*, 516 U.S. 357.  A district court "cannot guarantee payment of every federal judgment," but a district court may exercise ancillary jurisdiction in an existing action to protect a party's ability to recover a judgment, provided that the use of ancillary jurisdiction is not "entirely new and original." *Peacock*, 516 U.S. at 358–59 (quoting *Krippendorf v. Hyde*, 110 U.S. 276, 282–85 (1884) and *Dugas v. American Surety Co.*, 300 U.S. 414, 428 (1937)) (internal citations omitted).

In *Labette County Com'rs v. United States*, the plaintiff recovered a judgment against a town for interest on bonds issued by Labette County Board of County Commissioners in the name of the town pursuant to a state statute. 112 U.S. 217 (1884). The town was unable to pay the judgment, so the district court, by mandamus, ordered the county commissioners to levy a tax to raise funds to satisfy the judgment. 112 U.S. at 218. The county commissioners argued that the district court did not have jurisdiction to compel them to levy a tax to fund the judgment because the county commissioners were not a party to the judgment against the town. The Supreme Court held that the district court properly issued the writ "in aid of jurisdiction previously acquired" over the town and that the writ was "justified in such cases as the present as the only means of executing" the district court's judgment. 112 U.S. at 221. The Supreme Court stated: "it does not follow that because the jurisdiction in *mandamus* is ancillary merely that it cannot be exercised over persons not parties to the judgment sought to be enforced." 112 U.S. at 221. The Supreme Court continued:

> The question is whether the [county commissioners], to whom the writ is addressed, have the legal duty to perform, which is required of them, and whether the [judgment holder] has a legal right to performance from them, by virtue of the judgment he has already obtained. If so, then they are, as here, the legal representatives of the defendant in that judgment, as being the parties on whom the law has cast the duty of providing for its satisfaction. They are not strangers to it, as being new parties, on whom an original obligation is sought to be charged, but are bound by it, as it stands, without the right to question it, and under a

legal duty to take those steps which the law has prescribed as the only mode of providing means for its payment.

112 U.S. at 221.

The Supreme Court held that it was appropriate for the district court to issue an order in favor of the judgment holder and to leave to the county commissioners responsibility for fulfilling the steps necessary to raise the funds to satisfy the judgment. The Supreme Court held that the district court should not have to issue a new writ to compel each step needed to obtain the funds to pay the judgment; the single writ directed to the county commissioners, to be effective, "command[ed] all those whose co-operation [was] by law required" to perform their legal duties to secure the judgment. 112 U.S. at 224. "Otherwise," the Court stated, "the whole proceeding is liable to be rendered nugatory and abortive" because successive writs "would prolong the proceeding to such indefinite length as to deprive the writ of the very character of a remedy." 112 U.S. at 224–25.

Here, the Court has the power under the All Writs Act to order the Gardendale City Council, by writ, to take the steps necessary to have the Gardendale Board pay the fee judgment against it.[14] "The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action

---

[14] The All Writs Act provides: "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *U.S. v. New York Tel Co.*, 434 U.S. 159, 174 (1977) (citations omitted).  In *New York Telephone Co.*, the Supreme Court affirmed the district court's use of a writ directed to a non-party because without the third-party's assistance, there was "no conceivable way" in which the district court's underlying order "could have been successfully accomplished." 434 U.S. at 175.

The same is true here.  The Court entered judgment on an award of attorney fees as the remedy for the Board's bad faith conduct in the *Stout* litigation, and the City, by law, is the entity capable of and obligated to appoint members to the Board and appropriate funds to the Board to facilitate payment of the judgment.  The Gardendale City Council created the Board for purposes that violate this Court's desegregation order; the City Council retains control over the Board under Alabama law; and the City holds the exclusive power to take the steps necessary to fund the fee award judgment.  Therefore, the Court may exercise ancillary jurisdiction over the Gardendale City Council and issue a writ that will enable the Gardendale Board to fulfill its obligation under the judgment against it.

By separate order, the Court will order the Gardendale City Council to take the steps necessary to fund the judgment against the Gardendale Board.  The Court

anticipates that for a period of time, there will be members of the Gardendale Board. After the Gardendale Board satisfies the judgment in favor of the private plaintiffs, the Board shall provide written notice of satisfaction to the Court. When the Court receives that notice, the Court will dismiss the Gardendale Board as a party to this litigation, mooting the Board's attorneys' motion to withdraw.[15]

## IV.

The Court allowed the private plaintiffs to supplement their motion for attorney fees with evidence concerning the Board's conduct during the appeal to the United State Courts of Appeals for the Eleventh Circuit. (Doc. 1267, pp. 65–66). The private plaintiffs request additional fees to punish the Board for allegedly acting in bad faith in its cross-appeal, and the private plaintiffs ask for fees incurred during the parties' briefing of the attorney fee issue in this district court. (Doc. 1273; Doc. 1274).

As explained in the order awarding fees to the private plaintiffs, courts have discretion to award attorney fees "when the interests of justice so require," including when a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hall v. Cole*, 412 U.S. 1, 5, 15 (1973) (citing *Bell v. School Bd. of*

---

[15] The Eleventh Circuit Court of Appeals has held that "an artificial entity that can act only through agents[] cannot appear *pro se*, and must be represented by counsel." *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985). At no point in this litigation could the Board's current attorneys withdraw unless the Board retained new attorneys to replace them.

*Powhatan Cty.*, 321 F.2d 494 (4th Cir. 1963) (pre-§ 1988 public school desegregation case)).  The bad faith exception to the general rule that courts typically do not grant attorney fees, known as the American Rule, "serve[s] the same purpose as a remedial fine imposed for civil contempt," because "[i]t vindicate[s] the District Court's authority over a recalcitrant litigant." *Hutto v. Finney*, 437 U.S. 678, 691 (1978).

"In determining the propriety of a bad faith fee award, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'" *Rothenberg v. Security Management Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984) (quoting Michael D. Green, *From Here to Attorney's Fees: Certainty, Efficiency, and Fairness in the Journey to the Appellate Courts*, 69 CORNELL L. REV. 207, 279–80 (1984)).  If a district court finds that a party acted in bad faith, then the court must provide specific findings of facts to support the conclusion. *Rothenberg*, 736 F.2d at 1472 (citing FED. R. CIV. P. 52(a)).

The private plaintiffs cite two main ways in which they believe the Board acted in bad faith on appeal:  the Board represented that the Jefferson County Board of Education had achieved unitary status, and the Board "mischaracterized this Court's opinion when arguing at length that this Court had misapplied the Equal Protection Clause of the Fourteenth Amendment." (Doc. 1274, pp. 7–8).  The Court has reviewed the transcript of the oral argument before the Court of Appeals and the

parties' appellate briefs for evidence of bad faith.  (Doc. 1274-1; Doc. 1274-2; Doc. 1274-4; Doc. 1274-5; Doc. 1276).

The Court already has held that the Board acted in bad faith in arguing to the Court of Appeals that the Jefferson County Board had fully dismantled its dual system decades ago.  In its Statement of the Issues to the Court of Appeals, the Board wrote that "Jefferson County was held by [the Court of Appeals] to have fully dismantled its dual system 41 years ago." (Doc. 1274-2, p. 17).  The Board repeated this argument throughout its briefs.  (Doc. 1272-2, pp. 20, 31–32, 49–54; Doc. 1274-4, p. 18).  Because the Gardendale Board urged the Court of Appeals to find that the Jefferson County Board of Education had dismantled its dual system decades ago, despite explaining to this Court that it "abandoned" the argument prior to trial, (Doc. 1215, p. 15), the Court awarded the plaintiffs a fee award of $25,000 for the Board's bad faith in that respect.  (Doc. 1267, pp. 41, 65–66).  This amount already is included in the attorney fee judgment entered on May 13, 2020.  (Doc. 1283).

Otherwise, the Board did not pursue its cross-appeal in bad faith.  The Board argued in its briefs and during oral argument that this Court improperly imputed discriminatory intent to the Board by relying on, for example, public comments made on Facebook and the FOCUS Gardendale flyer.  The Gardendale Board also argued that the Court erred in finding that Black students' constitutional rights were violated when discriminatory actions by the Board conveyed a message of

inferiority.  (Doc. 1274-2, pp. 35–47; Doc. 1276, p. 45).[16]  In its cross-appeal, the Board was within its right to challenge this Court's factual findings and legal conclusions.  The Board failed in its argument regarding evidence of discriminatory intent, but the Board succeeded in persuading the Court of Appeals that this Court erred in finding that the Board had violated the constitutional rights of Black students.

The private plaintiffs may not recover fees for time devoted to seeking a fee award from the Board.  Though they did not succeed, the Board's arguments in opposition to a fee award were fair and had a sound basis in the law; the Board's arguments do not warrant a finding of bad faith.  And the Court cannot award fees against the Gardendale Board for the Gardendale City Council's failure to appoint

---

[16] During oral argument before the Eleventh Circuit Court of Appeals, when questioned about details of the Board's plan to separate from the Jefferson County Board of Education, the Board appeared to change its separation plan regarding the ability of students outside of Gardendale's municipal boundaries to attend Gardendale schools.  In plans presented to this Court, the Board initially suggested that transfer students would have to pay a substantial tuition fee to attend Gardendale schools.  (Doc. 1133-5).  The most recent draft of the plan submitted to the Court did not include the tuition provision.  (Doc. 1040-1).  But, because the Board never adopted a plan, the superintendent of the Board was unable to say at the trial which of the plans the Board would be willing to implement and whether tuition would be required for transfer students.  (Doc. 1125, p. 293).  During oral argument, the attorney for the Board remarked that the Gardendale Board would be "quite happy to not charge tuition" for these students.  (Doc. 1276, p. 32).  Judges on the appellate panel cautioned that the Board appeared to "amend[] the plan in front of" them and that the plan had been "a bit of a moving target."  (Doc. 1276, pp. 32–33).

The Court cannot say with certainty that the Board's wavering regarding the plan before the Court of Appeals was intended to obfuscate the plan or otherwise strategically abandon troubling parts of the plan.  But the record demonstrates that the Eleventh Circuit addressed the potential change of course directly without effort from counsel for the private plaintiffs.  Therefore, this brief interchange does not warrant an additional award of fees.

residents to fill the prolonged vacancies on the Board.  Though the City Council and the Board are closely related, so much so that the Board depends on the City for its operations, the two entities are separate, and the Court cannot punish one for the conduct of the other.  If there were to be a fee award based on the Gardendale City Council's abdication of its statutory obligation to fill Board vacancies, the fees must be assessed against the City, not the Gardendale Board.  The private plaintiffs have not requested an award of fees against the City.

## CONCLUSION

For the reasons stated above, the Court will exercise ancillary jurisdiction over the Gardendale City Council and will, by mandamus, order the City Council to take the steps required to satisfy the fee judgment against the Gardendale Board of Education.  In the writ of mandamus, the Court also will prohibit the Gardendale City Council from dissolving the Gardendale Board of Education before the fee judgment against the Board is satisfied.  The Court directs the Clerk to please TERM Docs. 1277, 1284, and 1285.

**DONE** and **ORDERED** this September 3, 2021.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE