1          UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ALABAMA
2                SOUTHERN DIVISION

3

4 LINDA STOUT, et al.,          *

5          Plaintiffs,          *    2:65-cv-396-MHH

6      vs.                      *    August 15, 2023
                                     11:00 a.m.
7 JEFFERSON COUNTY BOARD        *
  OF EDUCATION, et al.,
8                               *    Birmingham, Alabama
          Defendants.
9                               *

10 * * * * * * * * * * * * * * * * * * * * * * * *

11       **TRANSCRIPT OF HEARING VIA VIDEO CONFERENCE**
     **BEFORE THE HONORABLE MADELINE HUGHES HAIKALA**
12            **UNITED STATES DISTRICT JUDGE**

13 * * * * * * * * * * * * * * * * * * * * * * * *

14

   For the Plaintiffs:     Alexsis M. Johnson
15                          Molly Masten Cain
                            GeDa' Lea Jones Herbert
16                          NAACP Legal Defense & Ed. Fund

17 For Intervenor           Veronica Percia
   Plaintiffs:             Kelly Gardner
18                          United States Department of Justice

19 For the Defendant:      Whit Colvin

20 Also Present:           Dr. Walter B. Gonsoulin, Jr.
                           Dr. Laura Ware
21                         Alaizah Koorji
                           Clayton Pierce
22                         Michelle Starke

23 Court Reporter:         Leah S. Turner, RMR, CRR
                           Federal Official Court Reporter
24

25

This cause came to be heard and was heard on the 15th day of August 2023, before the Honorable Madeline Hughes Haikala, United States District Judge, holding court for United States District Court, Northern District of Alabama, Southern Division, in Birmingham, Alabama.

Proceedings continued as follows:

P R O C E E D I N G S

THE COURT: Good morning, everyone. We are here today in case 65-396. This is Carter versus Jefferson County Board of Education.

We met on July 31st to talk about the next steps in this case. At the conclusion of our conversation I asked the parties to spend a little time conferring with one another to help the Court craft a scheduling order for the months ahead. I'm excited to hear what you all came up with, so let me start, please -- Mr. Colvin, you usually lead the conversation. Is that the plan for today?

MR. COLVIN: It can be, as I see my colleagues chuckling on the screen.

THE COURT: And let me interrupt you real quickly before you begin, please.

Dr. Gonsoulin, I've seen over the past couple of days stories on the evening news about the opening of Fultondale High School. It looks like your students are excited about their new home. So I just wanted to congratulate you on the opening of that new school.

DR. GONSOULIN: Thank you very much, Judge.

1    THE COURT:  You're welcome.

2    All right.  Mr. Colvin?

3    MR. COLVIN:  So, Your Honor, LDF did submit sort of

4   a proposed schedule and sent that around in the last -- I

5   can't remember.  It was either late yesterday or early this

6   morning.  But we've just now had a chance to sort of take a

7   look at that, but I think that was something they wanted to

8   discuss with the Court.

9    We talked about two different tracks.  The Court

10  asked us to think about a scheduling order in context of how

11  to develop the consent decree and how to next step from the

12  legal proceedings, but also for the Board to be thinking about

13  what it could be doing in the meantime to go ahead and make

14  some of the progress that it anticipates and is expected while

15  we're going through that negotiation process.

16    The parties spent a good bit of time talking through

17  those two separate but connected items, recognizing that some

18  of the development of the consent decree will depend on the

19  analysis, internal analysis, that the Board has to do to

20  figure out especially particularly with respects to an

21  assignment.  They're sort of intertwined, but not completely,

22  if that makes sense.

23    And the Board has -- we've developed a list of what

24  we call, we've termed, quick wins.  Quick wins, things that we

25  could be doing which wouldn't depend necessarily on a

comprehensive plan, but which we knew areas where we knew that we needed to make progress and we're happy to share. All those were not included in LDF's proposal because some of them are just -- they're subject-matter specific and they are small items, but items that nonetheless have to be done.

I would be happy for -- I want to respect whatever protocol there is with my colleagues, especially if LDF would like to be present their own thoughts on that. And DOJ, of course, too. I hate to present their work, if that makes sense.

THE COURT: Sure. Why don't I hear about the proposal that has been circulated. Who is going to take the lead for LDF today?

MS. JOHNSON: I am, Your Honor. Just to make sure I'm understanding the proposal that Whit was referring to, I think he is talking about the proposed timeline, which we have submitted to the other parties just for their consideration, but we also have a separate proposal that actually includes different -- many of the same as the District's quick wins but it's a slightly longer list, as I understand it.

We put that list together based on the District's initial proposal that we received on July 28. We pulled all of the steps that the District outlined that it would plan to take in 2023 and the first six months of 2024, and then we made some additional recommendations to that list just to make

1  sure that each of the steps the District had proposed would

2  actually achieve some desegregative purpose and desegregative

3  effect.

4         We shared that proposal with DOJ just to ensure that

5  they didn't have any objections and then shared that list with

6  the District before meet and confer on Friday.  We haven't had

7  a chance to discuss that full list.

8         We didn't get through it at the meet and confer, and

9  we haven't received any written response to our

10  recommendations from the District.  So we have, I guess, not

11  necessarily competing lists, but overlapping lists that are of

12  different lengths.

13         And then our proposed timeline corresponds with what

14  we saw as the main priorities from that initial list of

15  proposals that we received from the District that we annotated

16  and included additional recommendations for.

17         THE COURT:  All right.  Help me understand, please,

18  Ms. Johnson, what goals the private plaintiffs and the United

19  States propose for the Board to accomplish this year before we

20  talk about a timeline for negotiations toward a consent order.

21         MS. JOHNSON:  Sure.  I can speak to what we would

22  describe as our top priorities.  And just to be clear, all of

23  the proposals that we pulled from the District's initial

24  July 28th PowerPoint are things that we would be happy for the

25  District to do.  We certainly aren't asking them to refrain

1 from doing that full list of things if they can.

2       But we did identify the main priorities being --

3 this is actually our additional proposal that was outside of

4 the District's PowerPoint, is we would like to see projections

5 for the student assignment piece.

6       Our concern is that before we build an entire

7 student assignment plan, we want to make sure that there's a

8 strong foundation for the maps that are being used and the

9 calculus that comes into how representative each cluster is or

10 the groupings of schools are.

11       And so we would like to see, in addition to just

12 some data on how the Signature Academy's program performed in

13 this first year, some projections for what impact the District

14 expects its proposals at the elementary school, middle school,

15 and high school level will have in the coming years and in the

16 long-term.  And once we have those projections, it seems like

17 the parties will be in a much better place to actually

18 negotiate the nitty-gritty of the rest of the student

19 assignment plan.

20       Our other priorities would be:  For discipline, we

21 would like to see the District hire a discipline expert and

22 begin reviewing the code of conduct and identifying in this

23 fall semester any discrete changes that can be made in the

24 short-term that might have a positive impact on race based

25 disparities.

1        The District also proposed revisions to a personnel

2   plan, and plaintiffs agree that that's a priority.  We think

3   that especially given the teacher shortage across the country,

4   not only should the District have a plan to recruit diverse

5   faculty but a robust plan to retain the faculty that they

6   already have employed.  And in addition -- I think those are

7   the main priorities.

8        There are a few additional priorities, factors where

9   the District didn't include a plan in their proposal.  That

10  includes just asking the District to have some proposal for

11  funding.  We also asked for data tracking when it comes to

12  extracurriculars.  But I think that that covers the high level

13  main priorities for private plaintiffs.

14       THE COURT:  All right.  Thank you, Ms. Johnson.  Who

15  is speaking for the United States today?

16       MS. PERCIA:  Veronica Percia, Your Honor.

17       THE COURT:  Do you have anything you want to add to

18  Ms. Johnson's bullet points?

19       MS. PERCIA:  I think the only thing we would have

20  to -- in terms of the projections, I think a big part of the

21  projections in the student assignment is collecting

22  information through surveys, and so I think that that was just

23  an element of that data collecting for student assignment.

24       In general, the District should be collecting the

25  data it needs to make more important decisions in a few

different areas.

And another area that we highlighted for them that we would really like to see more information across the District is their advanced programming, particularly advanced math in the middle school, as well as gifted and talented.

They have a lot of data there, but my understanding is that they are prepared to also come up with a plan for implementation and get that implemented this year. So that was in addition to what LDF discussed already.

And I think that's the only additional things outside of what has been put forth.

THE COURT: Okay. Thank you.

Mr. Colvin, do you want to respond to any of the points that the private plaintiffs or DOJ has made?

MR. COLVIN: Sure, Your Honor. We did want to add those are -- while we may not see exactly eye to eye on all of the content in those areas, I think those general subject matter areas, there were things that we discussed and things that we proposed. So the District is prepared to move forward in the areas that were described.

The timing is still a question on some of these things, I think. And understandably the private plaintiffs and the department want us to move very swiftly on some things, and we want to move as quickly as we can but also deliberately and responsibly.

1    For example, as Ms. Percia has said, to make

2  projections we have to collect data, which requires surveys

3  and it requires someone to build surveys and requires someone

4  to interpret surveys.  And so some of the windows for

5  developing that survey model, that statistical model, from

6  which we can responsibly make projections may require some

7  outside help; likely will; unless Your Honor wants me to do

8  it, and I can assure you I will not qualify as a statistician

9  under the expert rules for the Court.

10    And so some of that may take a little bit longer

11  than perhaps is expected by the parties, because ultimately if

12  the idea is for us to come up with a plan that's based -- I

13  mean, at some point on the back end, I think the parties will

14  be saying, well, why are you making these projections and what

15  are they based on and where is the science.

16    So in that case, we have to have those scientists

17  help us with that.  It just takes a little bit of time.  And I

18  think the suggestion was made that we could have that all done

19  by like the third week in September.  And hiring an expert

20  requires approval, requires us to find an expert, more

21  approval, bring someone up to speed, make sure they have time.

22    So some of those windows are a little tight, but in

23  general we don't have disagreement.

24    The code of conduct, for example, we did propose

25  that we would be making -- that we would be willing to go

1 ahead and begin working on some changes in the fall,

2 particularly looking hard with respect to class three,

3 exclusionary discipline and the alternative school.

4 But in terms of a complete overhaul of the code of

5 conduct, with as many schools and stakeholders and communities

6 that we serve, you know, we don't know that we will be able to

7 do a code of conduct revision in the fall. We have projected

8 that to be done in the spring with a fall 2024

9 implementation.

10 So there's some little things like that. And then

11 some things that we were going to add. For example, we don't

12 have a good system in place for tracking extracurricular

13 participation. We need that. We don't have a good system in

14 place for approval, centralized approval process for

15 extracurricular activities.

16 That was one of the things that we proposed as sort

17 of a quick win, something we could do in the fall and begin

18 that process.

19 So there's some things that the District will add

20 regardless of whether they are in an order or any sort of

21 agreement anyway just because we need to do those things.

22 Training in the capital planning process, for example. So

23 there's some initiatives throughout all of the different green

24 factors that we can be working on in the fall.

25 But these big ones, discipline and student

1     assignment, those have been the big ones all along, and still

2     are, and the ones that require the most time and creativity

3     and data.

4          THE COURT:  Well, they also, at least on the

5     discipline side, require some funding.  Has the Board talked

6     about funding that it can direct toward the work that needs to

7     be done in this case?  Because Ms. Johnson suggested that it

8     would be appropriate for the board to hire an expert to work

9     on a new discipline plan.

10          Is the Board in a position to do that financially?

11          MR. COLVIN:  Your Honor, we had discussed and

12     proposed -- we felt like to do this right, we would need an

13     expert to help with the discipline revisions that were in

14     place.  That is something whether it's budgeted or whether we

15     just have to find the funds for it, the District is certainly

16     committed to bringing in some help on that front.

17          We understand that that's something that it's a

18     really big area and we need some expert help on that to make

19     sure that it's not just our ideas but we're also bringing

20     ideas from experts that have seen things work in other areas

21     as well.

22          And Dr. Gonsoulin says we are in a position

23     financially to be able to make that happen.

24          THE COURT:  All right.  Is there any reason for the

25     Board not to set as a goal for itself identifying and

1    retaining an expert to work on a discipline package within the

2    next six weeks?

3         MR. COLVIN:  Your Honor, six weeks feels a little

4    tight just to make sure that we can find the right people.

5    You are going to want to bring them here and let them

6    understand what the District is about and have some

7    conversations.

8         Then once that happens, you're talking about

9    development of contracts and approval, formal approval by the

10   Board of Education.  That's how this Board does things, they

11   approve all contracts.  So six weeks might be a little tight

12   on that.

13        I mean, the plaintiffs can work diligently toward

14   that, but not to make the window so tight that the District

15   has to make a choice that may not be the right one.

16        THE COURT:  One of the things that may be helpful to

17   the Jefferson County Board of Education is reaching out to

18   other districts, particularly in the state, that have done

19   similar work.

20        I'm supervising the Huntsville Board of Education.

21   They have worked with an expert to help them develop their new

22   discipline plan and that has been in place now for several

23   years.  In the Hereford case, the Board if it wished could

24   reach out to the lawyers for the Board of Education in the

25   City of Huntsville.

1    I also recall -- and Ms. Percia can correct me if

2   I'm wrong; Ms. Gardener as well -- that I think the DOJ has

3   some experts that it works with routinely in this field and so

4   they may be a good resource for the board in terms of locating

5   and having some initial conversations with an expert.

6        Is that right, Ms. Percia?

7        MS. PERCIA:  Yes.  Definitely.  And certainly in

8   other desegregation cases -- our expert obviously would not be

9   advising the Board, but he can certainly recommend people or

10  connect the Board with experts in the area.  And we have done

11  that in other desegregation cases.

12       THE COURT:  I hear what you're saying, Mr. Colvin,

13  about the importance of identifying an expert who is going to

14  be the right fit for this particular District, because every

15  District is different.  But there are districts that have

16  similarities in terms of scope and some of the challenges of

17  the differences that are at play in Jefferson County and the

18  need to make a plan that fits all schools even though the

19  schools have some different personalities and all that.

20       I think six weeks is an appropriate place to start.

21  If the Board is able to demonstrate that they are working hard

22  but they still haven't been able to identify an expert within

23  that six-week window, then the Board can certainly ask for

24  additional time.

25       It may be that the Board has that person or that

1   firm in place within six weeks but needs a little bit of extra

2   time to get the official paperwork done to formally create a

3   relationship with the person, but we need someplace to start.

4   So let's make six weeks that someplace on that topic, please.

5         MR. COLVIN:  Sure.

6         THE COURT:  In terms of the surveys that Mr. Colvin

7   mentioned, any thoughts from the private plaintiffs or DOJ

8   about ways to start building those tools in an efficient

9   manner?

10        MS. JOHNSON:  Your Honor, we do have some additional

11   thoughts on how we can work together on the surveys.  We would

12   be glad to have input on the surveys.  We have worked with

13   experts in the past and can retain an expert to help us in the

14   District craft appropriate language for the surveys and talk

15   through the logistics of actually getting the surveys out.

16        We have also proposed some -- when it comes to the

17   actual projections, we can have a conversation before the

18   District starts to gather the necessary data about what

19   metrics might make the most sense and what information our

20   expert would need that they think is appropriate.

21        So we are happy to have those interim conversations

22   before they actually get started with the surveys or making

23   their projections.

24        MR. COLVIN:  Your Honor, that would be very --

25        THE COURT:  Okay.

1    MR. COLVIN:  I apologize, Your Honor.

2    THE COURT:  Mr. Percia, did you want to follow up?

3    MS. PERCIA:  No.  I think there's precedent.  The

4  District did survey with respect to the academy programs and

5  we had provided feedback on some of those surveys when they

6  surveyed for that program, so I think there is at least a

7  template in place for how to do some of those surveys and get

8  interest, interest based on the responses from those surveys.

9    My recollection, Whit, is that there was an expert

10 you all were working with to help you with that.  I don't know

11 if that person is still retained.  But we would be happy to do

12 that process again with respect to the new programs that are

13 being contemplated.

14   MR. COLVIN:  Dr. Prytz did do those surveys for the

15 District, but she, I understand, has retired since that time

16 and may not be available, so we find ourselves sort of looking

17 in another direction.

18   What would be helpful to the District -- and I

19 appreciate Ms. Johnson sharing those thoughts.  As we approach

20 that understanding what metrics are going to be looked at by

21 the parties as they analyze this predicted model, we could go

22 ahead and begin identifying the bones of that model much like

23 we did where you can understand what it looks like and sort of

24 set up some methodologies, and that may lead to -- obviously

25 then you get the surveys and you plug it in and we have to

1   build it.

2          But having an expert do that, it makes it easy on

3   the front end where we're not discussing what the expert did

4   or didn't do correctly on the back end after we have done it.

5   And that will save us some time, too, hopefully.  So that

6   would be helpful.

7          THE COURT:  Help me understand, please, what the

8   parties' discussions over the past couple of weeks have been

9   about a timeline for negotiating terms of a consent order.

10          MR. COLVIN:  Your Honor, I believe we -- we really

11  talked about fall to continue providing these proposals, the

12  back and forth, and I think they have both our submission

13  dates, the District's submission dates, and an opportunity to

14  respond back by the parties.

15          And then I think the latest proposal was to begin

16  in-person negotiations on the consent decree about the

17  beginning of the year, January through about April, and that

18  the hope was to have a joint proposed consent order by the end

19  of April of next year I think was the latest timeline that I

20  saw.  Is that correct of the parties?

21          MS. JOHNSON:  Yes, that's correct, Whit.  Your

22  Honor, we initially started with a six-month proposal timeline

23  and realized that because plaintiff parties wanted to have

24  some feedback on some of the interim steps by the District,

25  that we should maybe extend that a bit.

1    So the current proposal from private plaintiffs

2 extends, assuming we receive the outstanding data from the

3 District on August 18th, to April 30th as the deadline to

4 submit a joint proposed consent order to the Court.

5    THE COURT:  Okay.  Do the parties anticipate amongst

6 themselves a hearing regarding the joint proposal in April?

7    MR. COLVIN:  Your Honor, we haven't discussed that

8 at this point.  But I think the District would be -- if it's

9 joint and we are all agreeing to it, then I think the District

10 would be okay with an order entry without a hearing, assuming

11 there are no points of contention, which if it's joint, there

12 wouldn't be.

13    THE COURT:  Anything from the private plaintiffs?

14    MS. JOHNSON:  I would say we would agree.  Assuming

15 that we can come up with a joint proposal, we don't

16 necessarily see a need for a hearing.  Because we haven't

17 started negotiations in earnest and we're still awaiting some

18 data, it's hard to say whether or not there will be any points

19 of contention if not multiple.  So I think it's hard to say

20 whether or not we would expect to have a hearing at this

21 point.

22    THE COURT:  Ms. Percia, anything for the United

23 States?

24    MS. PERCIA:  I think regardless of whether there's a

25 point of contention or not, we defer to the Court as to

1    whether it would be beneficial to have a hearing on any of the

2    issues.

3         THE COURT:  Well, I think it will be -- it probably

4    is premature to make a decision about that.  I just ask the

5    parties to be aware that in these school cases, when a hearing

6    is needed, I think it's important to have one during the

7    school year.

8         If we schedule a hearing during summer months, of

9    course every hearing we have is public and any stakeholder who

10   wishes to attend should have the opportunity to attend, and

11   scheduling a hearing during the summer months makes it

12   difficult for people who may have an interest in the case to

13   attend the hearing.

14        So I'm just mindful of the fact that if the parties

15   don't have a formal proposal to present to the Court until

16   April 30th, it will be difficult if we need a hearing to have

17   one before the end of this school year.

18        So I think probably the best thing to do -- let me

19   ask the parties to continue their conversations about the

20   proposal that the LDF put forward last week, and once you all

21   have finalized your discussions, if you're able to reach an

22   agreement, present a joint proposed scheduling order to the

23   Court no later than next Friday.

24        If you aren't able to reach agreement on everything,

25   propose jointly, please, whatever you have agreed on and then

1 state separately each party's position with respect to the

2 areas where there is disagreement, and we'll go ahead and get

3 a scheduling order entered with an anticipated status

4 conference toward the end of this semester to see where the

5 parties' work is and help us make sure that everyone is on

6 track for the spring semester as well for the work that you

7 all propose to undertake in the spring semester.

8          Is there anything else that would be helpful for us

9 to discuss today?

10     MS. JOHNSON:  Your Honor, I have just a followup

11 question about the joint proposed scheduling order.

12          Given the concern that you raised about the timing

13 with April 30th as a deadline, would you like for us to move

14 that deadline up in our proposed joint scheduling order, or is

15 it okay to use April 30th?

16     THE COURT:  I think if that's the realistic date

17 that the parties have discussed, we probably need to stick

18 with that date, but it would be helpful if the date were

19 earlier, even April 15th, gives us a little more a window of

20 opportunity if we need to have a hearing.

21          But I think with a status conference in November,

22 that will be the time that we'll have a better sense of

23 whether things are moving along at the pace you all

24 anticipated so that you'll really be able to have a sense of

25 whether you have a joint proposed consent order in April of

next year or whether you can have one by February of next year or whether it looks like you may need more time beyond April of 2024.

So work in that April time frame, please, to set your deadline and we'll use our November meeting to see how realistic that deadline appears to be.

MS. JOHNSON:  Understood.  Thank you, Your Honor.

THE COURT:  Any other questions or suggestions?

MR. COLVIN:  Not from the District at this time, Your Honor.

THE COURT:  All right.  Very good.  Well, thank you for your time today.  Thank you for continuing to work with each other to come up with the path forward.

If you all need us, just let us know.  We will be happy to set a telephone call or another Zoom conference with you all.  Take care.  Be well.

(End of proceedings.)

<u>C E R T I F I C A T I O N</u>

    I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**