FILED
2024 May-22  AM 08:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

1      UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ALABAMA
2              SOUTHERN DIVISION

3              2:65-cv-00396-MHH

4   LINDA STOUT, et al.,

5          Plaintiffs,

6   vs.

7   JEFFERSON COUNTY BOARD OF EDUCATION, et al.,

8          Defendants.

9   * * * * * * * * * * * * * * * * * * * * * * * * * *

10     REPORTER'S OFFICIAL TRANSCRIPT OF TELEPHONE CONFERENCE
                  MAY 16, 2024
11

12     BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
              UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18  COURT REPORTER:
    Carrie M. Robinson, RMR, CRR, CRI
19  Federal Official Court Reporter
    1729 Fifth Avenue North
20  Birmingham, Alabama  35203
    (205)278-2063
21

22

23

24
    (Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.)

```
 1                    A P P E A R A N C E S

 2

 3        ARIELLE HUMPHRIES

 4        ALEXSIS M. JOHNSON

 5        KATHRYN CARDEN SADASIVAN

 6        MOLLY MASTEN CAIN

 7        MICHAEL SKOCPOL

 8        U. W. CLEMON

 9        WHIT COLVIN

10        CHRIS PAPE

11        VERONICA PERCIA

12        NATANE SINGLETON

13        ZAHRAA ZALZALA

14        MICHELLE STARKE

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2  May 16, 2024                              2:11 p.m.
 3          THE COURT:  Good afternoon, everybody.  This is
 4  Judge Haikala.  We are here in Case 65-396.  This is the Stout
 5  case.  And I apologize to you-all.  I was getting ready to
 6  jump on the call and a judge walked in and I needed to visit
 7  for just a minute.  So I apologize for keeping you-all
 8  waiting.
 9          The Court asked if we could have a conversation
10  about the work that the parties have been doing on some
11  interim provisions as you-all work toward negotiating a
12  consent order.  And I have reviewed everything.  I had just
13  maybe a couple of typos, I think, on the faculty and staff,
14  and I have reviewed the gifted program language that the
15  parties have negotiated and have no concerns substantively
16  there.  But the racial desegregation transfer, transportation
17  offering section, the bottom line is that I just find this
18  extremely difficult to follow and have concern about how it
19  will be implemented because it just -- it seems complicated,
20  so I wanted to see if maybe we could talk through it and
21  you-all could break it down for me and help me understand
22  exactly how this works.
23          MR. COLVIN:  Your Honor, this is Whit Colvin.  I
24  probably will get the laboring a little bit on this one, I
25  would imagine, and agree that the process that the board
```

1   currently has in place for evaluating transfers, much less the

2   transportation component, is -- it is not simple.  It is

3   difficult to understand, and it is frankly time-consuming to

4   implement as well.  It's -- you know, it is what we have in

5   place, so it is what the district has to follow; but,

6   essentially, instead of the traditional, you know, M-to-M

7   formula that we are all more used to, the district uses a

8   formula which, essentially, is based on how each transfer

9   impacts the racial composition of each school and takes into

10  account the -- it's almost like a customized M-to-M program,

11  and the reason it was put in place like that is because at the

12  time, the district was different demographically.  It was

13  about 75 percent white, 25 percent African-American.  And so

14  building it sort of around that district profile instead of a

15  strict M-to-M seemed to make sense at the time.

16          Since then, the demographics have shifted where, you

17  know, the district is 52 percent African-American now, so that

18  lends itself to a simpler approach which the parties are

19  all -- we traded some proposals and are planning to pursue a

20  simpler approach.

21          Ultimately, in fashioning sort of a plug-in

22  transportation, like a Band-Aid solution for this year, the

23  district -- really our team attempted to come up with

24  something that would make sense from a limited transportation

25  perspective but without biting off more than the district

1  could chew.  And by doing so, it focused on the schools that

2  were in sort of the most need of enhanced desegregation

3  efforts from a transfer perspective, and that is those schools

4  that were more than, plus or minus, 15 percent from the

5  district-wide average.  And then everything sort of rotated

6  around that.  That was the first step of eligibility for these

7  transportation options, and then it was a matter of charting

8  it out and seeing what the different approaches would do and

9  seeing -- you know, it is kind of a results-oriented approach,

10  moving backwards into the formula.  And so that's what we

11  ended up with.

12          The -- sorry, Your Honor.

13          JUDGE CLEMON:  I'm sorry, Whit.  Go ahead.

14          MR. COLVIN:  Judge, go ahead.

15          THE COURT:  I didn't say anything.  I think that was

16  Judge Clemon -- or maybe you meant Judge Clemon.  I don't

17  know.

18          MR. COLVIN:  I'm sorry, Your Honor.  I still have a

19  very difficult time calling him U.W., Your Honor, even though

20  he doesn't mind, right.

21          JUDGE CLEMON:  Are you finished?

22          MR. COLVIN:  Yes, I am.  Go ahead.

23          JUDGE CLEMON:  Judge, the private plaintiffs take

24  the position that the standard majority-to-minority provision

25  should apply to any proposed new consent decree, and the

1  position is based on the fact that the present system simply

2  doesn't work.  And we are trying to negotiate now with the

3  school board so they will come nearer to the objective of the

4  standard majority-to-minority provision.  That's in Singleton

5  and indeed was initially in this case until there was some

6  changes.  But we are very -- we are very dissatisfied with the

7  current transfer provisions and hope to see substantial

8  changes as a result of our negotiations.

9            THE COURT:  Okay.  Thank you, Judge Clemon.

10           Mr. Colvin, do you want to drill down, then, on the

11  transportation language?

12           MR. COLVIN:  Sure.

13           THE COURT:  I understand your explanation of the

14  complications that the district is dealing with because of the

15  current process for M-to-M transfers, but it is what it is for

16  this next school year --

17           MR. COLVIN:  It is, correct.

18           THE COURT:  -- and the transportation language that

19  the parties have submitted is meant to provide some

20  transportation in this next academic year.  But, again, I am

21  struggling to understand.

22           I understand the purpose of the 15-percent language

23  that is in Subsection 2 of the middle and high school and

24  elementary school provisions.

25           MR. COLVIN:  Right.

 1            THE COURT:  But it all gets -- it seems to get a

 2    little more complicated as you go along through the options.

 3    And let me back up and just say:  My understanding is for

 4    an -- for a student to qualify for transportation, either a

 5    middle school or high school student under Subsection 2 or an

 6    elementary school student under Subsection 3, the student has

 7    to meet, one, two, three, and four or five.  Is that right?

 8            MR. COLVIN:  That's correct, Your Honor.

 9            THE COURT:  Okay.  All right.  I am going to hand it

10    back over to you and see if you can help me sort through this,

11    please.

12            MR. COLVIN:  And part of it, Your Honor, is that,

13    you know, under the current transfer -- under the current

14    transfer order, there are actually two types of desegregation

15    transfers.  There is what I would call a more traditional

16    desegregation transfer where a transfer would have the effect

17    of moving both the sending and receiving school closer to the

18    district-wide average.

19            THE COURT:  Right.

20            MR. COLVIN:  And we have called that "RD-1

21    transfers" over the years.

22            There's also a second type of transfer.  We call

23    that an "RD-2 transfer," and that's a transfer which will move

24    either the sending or receiving school closer to the

25    district-wide average but won't actually do that for the other

 1   school.

 2           THE COURT:  Right.

 3           MR. COLVIN:  But in that case, it would not move the

 4   other school beyond a, plus or minus, 15-percent range for the

 5   district-wide average, and that was designed in part to allow

 6   transfers really between some hypersegregated schools way back

 7   in 2002.  And -- but what it has done, as the demographics

 8   have changed, is it has created a much bigger pool of

 9   potential eligible transportation -- I mean, eligible

10   transfers.  And it has enabled kids really just to go back and

11   forth between schools that are actually very alike

12   demographically.

13           A perfect example is McAdory Elementary School and

14   McCalla Elementary School, which used to be Greenwood

15   Elementary School.  It's very, very similar in racial

16   composition, but because the transfer necessarily would help

17   one school or help -- or one of the schools is going to move

18   closer to the district-wide average, whether a kid comes there

19   or leaves between those schools, and because they are in that

20   tight range where it doesn't -- the transfers won't cause

21   the -- either of the schools to go outside that range, it

22   almost -- it means that all the children there are eligible to

23   move back and forth between them.  And that clearly was not

24   what was intended.

25           And so back to Judge Clemon's point, that is why the

1  district is looking forward to having further discussions

2  about how all of this needs to change as well to become more

3  simple and more effective.

4          So back to your question, though, which related to

5  transportation.  So under that, using that -- the provision

6  that you referred to, under 2, so a student will be eligible

7  for transportation if the student is awarded a racial

8  desegregation transfer.  So the very first thing that the

9  district will do is analyze whether the student would be

10  eligible to receive a transfer -- a transfer or not.  And

11  obviously, these are -- transportation is only available for

12  students that would otherwise receive a transfer.  So that's

13  Step 1.

14          Step 2 is to look at the particular school and see

15  whether that school is beyond that 15 percent range from the

16  district-wide average.  And using the appendix, the schools

17  that are identified -- that say "NA," you know, in the second

18  column -- I don't know if Your Honor has that as well --

19          THE COURT:  I do.

20          MR. COLVIN:  -- but those are the schools -- those

21  are the schools that are within that 15-percent range.  So

22  because they are within that 15-percent range, students from

23  those schools wouldn't be eligible for transportation under

24  this plan.

25          The third thing, then, is that the awarded transfer

1  would have to essentially help both schools from a

2  desegregation perspective, so it would have to move both

3  schools closer to the system-wide average, meaning it would

4  need to fall in that RD-1 category.  So only those

5  transfers or students that received those transfers would be

6  eligible for transportation.

7           And then the last two revisions are -- the first

8  three sort of determine who can -- who can potentially get

9  transportation, and then four and five actually determine or

10  address where the student can get transportation to.  And so

11  Number 4 is that the receiving school is in the same Signature

12  Academy cluster in the student's -- as the student's home

13  school.

14          So that's where we started.  We have the four

15  different clusters in Jefferson County, and that was designed

16  to make sure we didn't end up with a distance problem and we

17  didn't end up with so many bus routes that we could not

18  accommodate the kids.

19          Because the district has been running transportation

20  routes within these Signature Academy clusters already, they

21  are a step ahead on that.  So we know what is doable.  We know

22  what is not.  We know which patterns work.  And potentially

23  the idea would be to attempt to utilize at least part of those

24  routes for the Signature Academy clusters that are already in

25  place to allow kids to get on the bus there and actually use

1  those same routes to go between schools within that Signature

2  Academy cluster.  And so we could actually -- in that way, we

3  could use additional capacity that's already there instead of

4  having to hire new bus drivers and put more buses on the road.

5           And the bus driver issue is the real issue.  It is

6  that we have got a statewide crisis when it comes to bus

7  drivers, and getting people to actually get behind the wheel

8  and drive the kids to school is the -- is a major issue for

9  standard bus routes.  Adding bus routes, obviously, it can

10 potentially compound the problem.

11          So that's what Number 4 was designed to do.  And

12 then Number 5, what we found was that the limitations that

13 were associated with just those cluster zones, that it didn't

14 always provide a meaningful opportunity for a student to go

15 somewhere.  And so as a result, we began to add some schools.

16 And as the parties discussed the chart and how -- and,

17 frankly, I tried to come up with some other rules or some

18 other -- another framework that would kind of cover all of

19 those scenarios, and it became obvious that was going to be

20 too difficult.  And I think one of the other parties

21 suggested:  Well, why don't we just refer to the chart itself

22 since we have got it already there?  And so that's what -- so

23 we added Number 5 then as well which refers to Appendix A and

24 provides choices.

25          So some of those choices on Exhibit A or Appendix A

1  will be outside of those Signature Academy cluster zones.  And

2  so to account for that, that's why it just -- it made more

3  sense to point to the document itself.

4          So with elementary schools, it's all the same except

5  for Factor 4.  And that is, instead of using the Signature

6  Academy zones, the reference was made there to the high school

7  feeder patterns that that elementary school is in.  And the

8  reason for doing it that way was just the geographical

9  proximity was going to be closer in the feeder patterns that

10  there are -- you know, the Signature Academy zones can be

11  pretty big, even though they are not as big as the district.

12  And so I think the concern was we needed to limit -- limit

13  transportation time on the bus and also, because there are way

14  more elementary schools than there are middle school and high

15  schools, it would also become more difficult logistically.

16  And so as with the middle and high schools, once we made that

17  list based on that factor, there were some areas where the

18  opportunities weren't as great as they needed to be, and they

19  wouldn't impact desegregation as much as we felt like they

20  needed to be.

21          And so just like with the middle and high schools,

22  it began to layer on and add some schools that made sense.

23  And so then that same reference to Appendix A was added there

24  as opposed to trying to create a one-size-fits-all rule that

25  would apply in every circumstance.

```
 1              THE COURT:  All right.  Let me ask a couple of
 2   questions, please.  First of all, thank you for walking me
 3   through that and helping me understand what the parties in
 4   this proposal are attempting to accomplish.
 5              I haven't looked back at a report to try to distill
 6   these numbers, but can you tell me, Mr. Colvin, whether the
 7   approved racial desegregation transfers in the district tend
 8   to be more for middle and high school students or more for
 9   elementary school students, or is it fairly equally
10   distributed among grade levels?
11              MR. COLVIN:  Oh, goodness, Your Honor.  I could get
12   that information fairly easily.  I have spreadsheets in front
13   of me.  I don't have it broken down that way.  My supposition
14   is that that would be -- that that would be the case.  But I'm
15   just not positive.  I don't know -- I don't know the exact
16   answer to that question.
17              THE COURT:  Meaning that you don't --
18              MR. COLVIN:  I could find it out.
19              THE COURT:  When you say "that would be the case,"
20   you mean that the latter suggestion that the approved
21   transfers are probably fairly even across grade levels?
22              MR. COLVIN:  I think they are fairly -- I would --
23   my impression would be that they would be -- my gut says that
24   they are fairly evenly distributed.
25              THE COURT:  Okay.
```

1          MR. COLVIN:  But I don't know that for sure.

2          THE COURT:  Okay.  This next question is based on my

3    understanding that, assuming a student has been approved for a

4    transfer, the student's transfer satisfies the percentage

5    criteria in Paragraph 2 and the criteria in Paragraph 3 about

6    both schools moving closer to the goals for desegregation.  We

7    know that -- if I understand the schools identified in

8    appendix A with -- that are not labeled "NA," we know that any

9    student who satisfies Criteria 1 through 3 and is assigned a

10   transfer to, for example, Erwin Middle School, North

11   Jefferson, Rudd Middle -- or excuse me.  No, sorry.  Rudd is

12   NA -- Clay-Chalkville Middle, that no matter where that

13   student is coming from, that student qualifies for

14   transportation under Subsection 5, right?

15         MR. COLVIN:  Your Honor, I think yes.  I am looking

16   real quickly.  I think we have that opposite, actually.  I

17   think --

18         THE COURT:  Okay.

19         MR. COLVIN:  The school name is supposed to be where

20   students are coming from.  The potential school -- the third

21   column is supposed to identify schools that transfers are

22   available to from student -- for students from that school.

23   And so yeah, that's correct.  And it is written correctly.  It

24   is just a little bit confusing, and we could probably use

25   another label in Appendix A to make that clear.

1           But where it says "school name," those are schools

2   that transfers are -- or transportation is available from.

3           THE COURT:  Okay.

4           MR. COLVIN:  So using your example, I think --

5           THE COURT:  I'm sorry, Mr. Colvin.  So Paragraph 5

6   says the receiving school --

7           MR. COLVIN:  It does.

8           THE COURT:  -- is listed in Appendix A.  So the

9   school --

10          MR. COLVIN:  It does.

11          THE COURT:  Okay.

12          MR. COLVIN:  It does.  That's referring to Column 3,

13  and we could probably have used more precise language there.

14          THE COURT:  Okay.

15          MR. COLVIN:  But that -- you know, Factor 5 actually

16  refers to the schools that would be in that third column which

17  says --

18          THE COURT:  Gotcha.

19          MR. COLVIN:  -- potential schools to which student

20  can transfer with transportation.

21          THE COURT:  Okay.  So in any event, the schools in

22  Paragraph 3, then, that are listed by name and don't have "NA"

23  underneath them -- or excuse me, to the right of them, those

24  are all schools that no matter the home school, if the student

25  has qualified for transportation under Subparts 1, 2, and 3,

1  they will receive transportation to those schools, even if the

2  school is not part of the Signature Academy academy cluster --

3          MR. COLVIN:  Right, that's correct.

4          THE COURT:  -- in which the home school is located

5  or not part of the feeder pattern for elementary school

6  students.

7          MR. COLVIN:  Correct, correct.

8          THE COURT:  Okay.

9          MR. COLVIN:  It's sort of -- 5 is sort of a

10  catch-all.  So Column 1, that school name, those are schools

11  that would be referred to that would -- that would really be

12  referenced by -- in that list that we are talking about by

13  Item 2.  So those are the schools that -- where Item 2 would

14  refer to those.  And then 4 and 5 would be -- 3, 4, and 5

15  really would be referred to or would point to those schools in

16  Column 3; working together, 3, 4, and 5.

17          THE COURT:  All right.  So I understand that the

18  plaintiff's position per Footnote 1 of the parties' proposal

19  is that the district should offer transportation for all

20  students who qualify for an M-to-M transfer.  And in asking

21  this next question, the Court is not trying to narrow the

22  scope of the students who would qualify for transportation.

23  Again, I'm just trying to understand how this all works.

24          If the parties just eliminated Paragraph 4 and kept

25  Paragraph 5, would that change the scope of the students who

1  would be eligible for transportation?

2          MR. COLVIN:  Your Honor, from the district's

3  perspective, it would not.  It would -- it would not because

4  all of the schools that would -- that would -- that are

5  referenced, so to speak, in Factor 4 are also included in the

6  chart.

7          THE COURT:  Okay.  That's what -- that's what I

8  wondered.  So I don't understand why Paragraph 4 is necessary

9  if the plaintiffs agree with your statement, Mr. Colvin.  And

10 I am going to hear from the plaintiff next.  I just want to

11 understand your position.

12         MR. COLVIN:  I would agree with you, Your Honor.

13 The reason that Paragraph 4 -- Paragraph 4 is where this

14 author, at least, sort of started.  That's where the idea

15 started, and instead of supplanting that idea with

16 Paragraph 5, we added it on as sort of in -- the district did

17 in the heat of last-minute discussions, I suppose.  But I

18 would agree, because all of the schools that are reflected or

19 that result from the analysis under Factor 4 are also in the

20 chart, I don't think 4 is necessary for this plan to be

21 effective.

22         THE COURT:  Okay.  All right.  Who wants to follow

23 up for the private plaintiffs, please?

24         MS. CAIN:  Hi, Your Honor.  This is Molly Cain for

25 the private plaintiffs.

1    Your Honor, our position is that the district should
2    be providing transportation for all M-to-M transfers and that
3    the desegregation transfers should be true M-to-M and a space
4    should be provided for those students, which the case law
5    supports.  But we agreed to these interim terms before the
6    Court as a step in the right direction in order to get the
7    district to start providing some transportation because it has
8    not yet before provided any transportation for these
9    desegregation transfers.  So we do not necessarily agree with
10   the district, with these choices, or the terms provided to the
11   Court or made due to demographic changes.

12    But yes, as Judge Clemon noted, we would like
13   desegregation transfers to become true majority-to-minority
14   transfers.  And then we would also like the district to
15   increase advertisement of the options to parents and guardians
16   because, as the Court noted, these -- you know, these interim
17   terms are complicated, and we are hoping that future terms
18   become less complicated as opportunities get expanded.  But we
19   think it is imperative that the district clearly communicate
20   its transportation offerings to students and families for this
21   year and for future years.  But we are also glad to see in
22   these interim terms that the district is eliminating the
23   special requirements for students regarding grades,
24   discipline, and attendance.

25    So in total, we think this is a good opportunity for

1   them for there to be some transportation options for the

2   upcoming school year, but we don't think the work is done

3   here.

4           And then regarding your question about the

5   redundancy in Paragraph 4 and 5, we are relying on the

6   district's good faith that the chart is accurate and includes

7   the feeder pattern and the other options this will provide.

8   And so, you know, given the district has said that that is a

9   redundancy, we agree with the district on that point.

10          And we are happy to answer any of Your Honor's

11  questions.

12          THE COURT:  Okay.  Thank you.

13          Ms. Percia, do you have anything to add for the

14  United States?

15          MS. PERCIA:  No.  Your Honor, the only thing I would

16  add, I agree that we did not have an opportunity to review

17  Appendix A in terms of its accuracy with respect to, you know,

18  whether it would be moving student populations in the way that

19  would be consistent with the RD-1 transfers, so I think that's

20  part of the reason we have this cobbled-together order, but to

21  the extent that the district can confirm and we have an

22  opportunity to confirm that those schools are all, you know,

23  the appropriate schools to be in this chart, you know, it

24  certainly would be much simpler just to have the charts.  But

25  I -- just to give you a sense of how we ended up where we are.

1  So there's that piece.

2          And then the second piece is just that, you know,

3  one of the reasons that the United States was okay with this

4  proposal at this point is because, although it is very, very

5  complicated, fortunately no parent is going to have to try to

6  untangle what this means prior to making a decision about

7  whether to apply for a transfer because all of those transfer

8  applications are already in.  I think one of the things we

9  want to focus on is streamlining the messaging to families

10  that they understand what is available to them and what kinds

11  of transportation will be provided.  And so we are very

12  focused on coming to some sort of an agreement that can be

13  very clearly communicated to families about their options.

14  And that's really all I have to add for now unless you have

15  questions.

16          THE COURT:  No.  Thank you, Ms. Percia.

17          So, you know, I think you hit the nail on the head

18  in terms of the Court's concern about the complexity of these

19  transportation requirements.  And the Court understands that

20  these are interim.  They are for the '24-'25 school year, and

21  part of what the parties are negotiating in the context of a

22  broader consent order proposal for all of the Green factors is

23  a revised M-to-M transfer process and related transportation

24  process, that if the plaintiffs are able to accomplish what

25  they would like to accomplish, it would be a simple rule that

1  says:  If you qualify for an M-to-M transfer, then the

2  district will provide transportation.

3         The Court understands that that is still under

4  negotiation, and the district may see things differently at

5  least for the time being.

6         So the communication piece, though, the Court

7  understands that the district for the '24-'25 school year is

8  going to apply the existing M-to-M transfer policy, so there

9  will be RD-1 and RD-2 transfers pursuant to that policy.

10        When parents learn that transportation is available

11 and -- but it is only available to certain students who

12 receive transfers, a couple of things may happen.  I don't

13 have a crystal ball, but I anticipate that a couple of things

14 might happen.

15        Parents could have the reaction that if their child

16 was successful in receiving -- or being approved for a

17 transfer application but is not offered transportation, the

18 parent could see that as, you know, well, maybe I just won't

19 accept the transfer then, whereas they ordinarily would if

20 everybody was in the same boat in terms of transportation.

21 And the parent might see it as:  This isn't -- you know, the

22 district is trying to chill some of these transfers.

23        And, you know, for parents who receive

24 transportation, I can't imagine that there would be much

25 pushback unless the parent has an elementary school student

1  who is eligible for transportation and a high school student

2  who isn't or a middle school student who isn't and then the

3  parent is trying to figure out:  How did I land here?

4        The communication piece is going to be, I think,

5  particularly difficult, and that assumes that the -- that this

6  formula is implemented correctly, so that means a lot of work

7  over the summer to make sure all of the students who are

8  approved for transfers are properly given transportation or

9  not, consistent with this proposed policy.

10        So I'm just wondering how the district anticipates

11  managing all of that.

12        MR. COLVIN:  Your Honor, it will have to be managed

13  carefully, clearly.  I think like you -- like you have said,

14  it's going to require a good bit of work, some of it manual.

15        The good news is they have been collecting

16  information along with the transfers about whether there's

17  interest in transportation.  And so they -- the good news, I

18  suppose, from the perspective -- the messaging perspective or

19  the managing perspective is that the majority, about -- the

20  last count was 60-something percent, indicated that they

21  weren't interested in transportation at all.

22        And so, you know, that leaves that other 40 percent,

23  and there were two other options that, you know, they would be

24  interested in the transfer but only if transportation was

25  provided to that school and then that they would -- that they

1  would be interested in transportation to the point that they

2  would be interested in an alternative school if it was

3  available as long as transportation was provided.

4          So we have a little bit of a head start on that at

5  least in terms of being able to gauge interest and get us

6  started on the communication piece.

7          But, yeah, it will have to -- it's not the easiest

8  to manage, but they are up to the task.

9          MR. PAPE:  Your Honor, also -- you know, we have

10 heard the -- this is Chris Pape for the board.  We have heard

11 the plaintiff's position about the expansion of

12 transportation, and I think the district views this sort of

13 interim step, these -- kind of building towards this as a way

14 to determine feasibility, especially as we get into the next

15 school year and we are looking at proposed consent order terms

16 that will go beyond what -- or that will have changes that

17 will go beyond what we already are offering in these

18 interim -- in these interim terms.

19          So I guess we think that this is a helpful exercise,

20 both in making sure we get the communication right for the

21 families for the reasons that Mr. Colvin has just explained

22 and the Court has identified but also in helping the district

23 determine just how far and how feasible, you know, the

24 transportation options will become as we finalize the actual

25 proposed consent order for the Court's review.

 1          THE COURT:  Thank you, Mr. Pape.

 2          So what I heard both Ms. Cain and Ms. Percia say is

 3   that the plaintiffs would like some confirmation that the

 4   schools listed in Paragraph 3 of Appendix A are the schools

 5   for which students would be eligible for transportation if

 6   they are awarded a transfer to those schools.

 7          So the first question:  Does the district have any

 8   objections providing confirmation to the plaintiff parties

 9   with respect to the schools in paragraph -- or excuse me,

10   Column 3?

11          MR. COLVIN:  Absolutely not, Your Honor.  We

12   would -- in fact, that was one of the things that I was going

13   to say that before we drop -- drop Factor 4, we would -- you

14   know, I want to go back through them too and just make

15   absolutely sure that one wasn't left off or that there wasn't

16   a mistake.  So we will need to scrub that as well but welcome

17   both the United States and the plaintiffs' parties to do the

18   same thing and verify that what's on that list is what is

19   intended to be.

20          THE COURT:  Okay.  Then assuming that that list is

21   accurate or will be made accurate with a little more

22   examination, would the district feel comfortable in its

23   publication of information about transportation offerings for

24   M-to-M transfer students actually providing this list -- not

25   this chart but just saying:  These are the schools to which

1  transportation will be provided pursuant to an interim

2  agreement among the parties?

3       MR. COLVIN:  Your Honor, we haven't -- we haven't

4  discussed that with the district, but from my perspective, I

5  don't see why that would be any sort of issue, and I would

6  think it would be helpful.  You know, I mean, I think what it

7  would say is, you know, if you are eligible for a racial

8  desegregation transfer from Center Point High School that you

9  could -- you would be offered transportation to these three

10 schools:  Mortimer Jordan, Pinson Valley, Fultondale.

11       Is that what you had in mind, too, something like

12 that?

13       THE COURT:  Well, what I had in mind was not

14 exactly -- your suggestion may be better than mine, but what I

15 was thinking was:  The parents are going to find out about the

16 transfers, and they are not -- how many options do students

17 typically have for the transferring school?  Do they have only

18 one option, or do they have several?

19       MR. COLVIN:  No.  They would have several.  Well, it

20 depends on the school.

21       THE COURT:  Okay.

22       MR. COLVIN:  But let's use Center Point High School,

23 for example, you know, that has a majority black population,

24 would be eligible for the three schools that we listed, plus

25 Gardendale, plus Oak Grove, plus Corner.  So there would be --

1 there would be some other schools as well that would be

2 transfer options.

3          And under potentially an RD-2 analysis, that second

4 category, those students would be eligible for even more

5 schools.  But since we wouldn't be -- that's part of the --

6 part of the difficulty in messaging, like on a prospective

7 basis, is you have to explain so many factors --

8          THE COURT:  Right.

9          MR. COLVIN:  -- and so many, sort of, qualifications

10 that it becomes -- it may start to look like the interim terms

11 that we submitted to the Court.  And we don't want that

12 because I don't think parents would understand it.

13          THE COURT:  No.  So -- all right.

14          MR. COLVIN:  And the other thing that it does,

15 because this does all revolve around the race of the students

16 and certain students -- for example, white students from

17 Center Point High School would not be eligible for either a

18 transfer out or a -- or transportation, it necessarily would

19 require in a chart that you say:  You know, these students get

20 to do this but other students don't, and we are not -- there's

21 no objection to that, but it makes messaging even more

22 difficult.

23          THE COURT:  Yeah.  Okay.  I've got you.

24          MR. PAPE:  Your Honor, and to the --

25          MR. COLVIN:  So -- go ahead, Chris.

1          MR. PAPE:  In reviewing the chart as we have been

2    discussing, I actually feel like I need to talk it through

3    with Whit, but because of the evolution of how these terms

4    were negotiated, that final column that says either "feeder

5    pattern" or "cluster zone" may actually be irrelevant now, and

6    they may be able to make this less of a cumbersome table

7    since -- if we are able to strike that provision that talks

8    about the signature and the feeder and rely only on the

9    appendix, then this chart probably could be cleaned up to help

10   with some of the messaging to make it a little easier for

11   people to know how the transfers work for their school.

12          THE COURT:  Okay.  Well, let me just leave it with

13   you-all based on what was discussed so far today and ask you

14   to give this a little more thought and see if there are ways

15   to simplify both the proposal and the messaging so that we can

16   hopefully -- this is supposed to be a step in the right

17   direction for the district.  And, Mr. Pape, to your point, it

18   gives the district an opportunity to explore how

19   transportation offerings for M-to-M transfer students will be

20   managed in the district.  But the Court is trying to

21   anticipate and avoid confusion and problems that could arise

22   early in the school year so that this doesn't become a big

23   issue that the school is trying to -- or, excuse me, that the

24   district is trying to untangle and that the plaintiffs are

25   trying to manage with their clients.

1        So I think we are all sort of thinking along the

2   same lines.  If I haven't been clear in anything that I have

3   expressed, please ask questions.  And if there's anything else

4   that you-all want to bring to the Court's attention based on

5   what we have discussed so far, please jump in.

6        MS. CAIN:  Your Honor, this is Molly Cain for the

7   private plaintiffs.  We just wanted to note that, you know, we

8   very much appreciate the Court's questions and the Court's

9   attention on providing or making sure that these terms are

10  understandable for the parents and the community.  You know,

11  the Court -- the district has acknowledged in previous

12  appearances that desegregation transfers are an underutilized

13  tool, and so we really do think that them being as clear as

14  possible will help them to be utilized more, which is why our

15  position was and remains that transportation should be

16  provided for all because we do think that that is easier.  So

17  we do appreciate that the district will use this year to see

18  how transportation options will work and how much is actually

19  needed, how much parents need.  And so we just wanted to make

20  sure before we wrapped up that we got clarity from the Court

21  about -- and the district about if there's deadlines in mind

22  for the district, one, confirming that the chart is accurate;

23  and, two, do you have a deadline in mind for a revised version

24  of these terms?

25       THE COURT:  Mr. Colvin, what seems feasible from the

1  district's perspective in terms of, first, confirming the

2  information on Appendix A and then determining whether at a

3  minimum Subparagraph 4 can be eliminated to simplify the

4  process?

5          MR. COLVIN:  I think we can get through the

6  Appendix A in the next day or two.  That's not difficult work.

7  You know, it just takes sitting around a table and just kind

8  of checking each other's work.  And then if that -- once

9  that's done, that will then in turn, you know, mean that we

10  can eliminate four once that confirmation is done.  We would

11  want both the Department of Justice and the plaintiff parties

12  to have an opportunity to do the same thing just to, again, to

13  check our work.  But, I mean, we can have that done by the end

14  of the week, the district can.

15          THE COURT:  Okay.  Ms. Cain, how about if the Court

16  asks the parties to submit a revised proposal by the end of

17  next week?  Does that give the plaintiffs enough time from

18  your perspective to work with the district and make sure that

19  everyone is on the same page with an updated proposal?

20          MS. CAIN:  Your Honor, if the district is able to

21  get our -- get their confirmation to us by the end of the week

22  like they just said, that makes sense to us, I believe.

23          THE COURT:  Okay.  Ms. Percia, what about for you?

24          MS. PERCIA:  Yes, that would be fine.

25          THE COURT:  Okay.  All right.  What else should we

1  discuss while we are together?

2          JUDGE CLEMON:  Well, remember that tomorrow is the

3  17th anniversary of Brown.

4          THE COURT:  Thank you, Judge Clemon.  That's right.

5  What are you doing to recognize the anniversary, Judge Clemon?

6          JUDGE CLEMON:  Well, I am speaking to the group at

7  the Civil Rights Institute in about two hours.

8          THE COURT:  Oh, wonderful.

9          All right.  Well, very good.  Thank you-all for your

10 time today.  I look forward to seeing an updated draft on the

11 transportation proposal either at the end of next week or the

12 beginning of the following week once the parties have

13 conferred.

14          Thank you-all for your time today.

15      (Proceedings adjourned at 3:05 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

    I certify that the foregoing is a correct transcript to the best of my ability from the record of proceedings in the above-entitled matter.

    So certified on this date, May 21, 2024.


Carrie M. Robinson, RMR, CRR, CRI
Federal Official Court Reporter