```
                UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ALABAMA
                      SOUTHERN DIVISION


LINDA STOUT, et al.,           *

          Plaintiffs,          *    2:65-cv-396-MHH

     vs.                       *    January 10, 2025
                                    1:00 p.m.
JEFFERSON COUNTY BOARD         *
OF EDUCATION, et al.,
                               *    Birmingham, Alabama
          Defendants.
                               *

* * * * * * * * * * * * * * * * * * * * * * * * *

        TRANSCRIPT OF TELEPHONE CONFERENCE
   BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
            UNITED STATES DISTRICT JUDGE

* * * * * * * * * * * * * * * * * * * * * * * * *


For Plaintiffs:     U.W. Clemon
                    Alexsis Johnson
                    Molly Cain



For U.S.:           Natane Singleton



For Defendants:     Whit Colvin
                    Chris Pape



Court Reporter:     Leah S. Turner, RMR, CRR
                    Federal Official Court Reporter
```

1    This cause came to be heard and was heard on the 10th day of January 2025, before the Honorable Madeline Hughes
2    Haikala, United States District Judge, holding court for United States District Court, Northern District of Alabama,
3    Southern Division, in Birmingham, Alabama.

4    Proceedings continued as follows:

5    P R O C E E D I N G S

6    THE COURT:  This is Judge Haikala.  How are you all
7    doing?  Because we are all functioning remotely today, I
8    appreciate everyone being available despite the snow day
9    today.
10   Let me go through, please -- and, Leah, I see you're
11   on the line.  Thank you.
12   Let me see who else we have, please.  Who do we have
13   on the line for the private plaintiffs, please?
14   JUDGE CLEMON:  U.W. Clemon.
15   MS. HUMPHRIES:  Arielle Humphries.
16   MS. JOHNSON:  Alexsis Johnson.
17   MS. CAIN:  Molly Cain.  And that's everyone for the
18   private plaintiffs.
19   THE COURT:  How about for the United States, please?
20   MS. SINGLETON:  Natane Singleton, and I think I'm
21   the only person, Judge, on the call for the United States.
22   THE COURT:  Okay.  Terrific.  And I heard
23   Mr. Colvin.  Who else do I have, please, for the District?
24   MR. PAPE:  Chris Pape is also on the call, Judge.
25   THE COURT:  Thank you.  All right.  Very good.  We

1  are here in case 65-396.  This is the Stout versus Jefferson
2  County Board of Education Case.
3          The parties have submitted to the Court draft
4  provisions for a consent order that concern extracurricular
5  activities, student discipline, and magnet programs.  I asked
6  the parties to please have a conversation about these drafts.
7          I don't have anything on the extracurricular
8  activities.  I had just one note on the student discipline.
9  Most of my questions for you all concern the magnet program
10 language.
11         My only question on student discipline has to do
12 with pages 5 and 6 on the training piece of this.  Starting on
13 page 5 in Section F -- and I'm really just interested in
14 consistency here, unless you all have a reason for the
15 different language.
16         In Subsection F at the bottom of page 5, the
17 District indicates that it will develop an annual training
18 program for faculty and instructional staff, bus drivers, and
19 school level administrators, and then if you go down to
20 Subsection H -- I'm sorry.  I may be looking at the wrong
21 subsection.
22         In Subsection H it provides that the District will
23 provide training to faculty, staff, administrators, including
24 school resource officers.  I think it would be nice to have
25 consistent language that includes school resource officers in

1  Section F on page 5 and includes bus drivers in Section H, but
2  there may be a reason that the language is slightly different
3  in those two subsections.
4         So if there is, let me hear what y'all were thinking
5  on that, please.
6         MR. COLVIN:  Your Honor, this is Whit Colvin.  I
7  don't think -- we did this awhile ago, but I don't recall that
8  difference being purposeful.  I think that may have just been
9  the way that the language developed out and sort of evolved,
10 but I don't see any reason from the District's perspective why
11 we wouldn't be able to use consistent language in both
12 paragraphs unless one of the other parties has another thought
13 on it.
14        MR. PAPE:  I agree with you, Whit.
15        MS. CAIN:  This is Molly Cain for the private
16 parties.  Yes, we agree with that, that it could be included
17 in both provisions.
18        MS. SINGLETON:  And this is Natane Singleton for the
19 United States, and we also agree.
20        THE COURT:  Okay.  Thank you.
21        All right.  Then let's talk, please, about the
22 magnet program language.  Just out of curiosity, I wanted to
23 ask -- starting on page 2, there's discussion about the JCIB
24 High School and Middle School programs remaining where they
25 are until the dedicated IB facility is completed at

1  Fultondale.  What is the current timeline on that, please?
2          MR. COLVIN:  Your Honor, I think we just spoke with
3  the District this morning and not about that in particular,
4  but in the course of that conversation -- and I should have
5  followed up with Dr. Ware, but it's my understanding that it
6  may be ready by the beginning of the next school year.
7          Chris, was that your -- I just gathered that from
8  the conversation.  We could double-check on that, but I think
9  it's moving along at a pretty quick pace, about like what's
10 expected, and it will be sooner rather than later.  But we can
11 confirm that for the Court.
12         THE COURT:  Okay.  Thank you.
13         All right.  Can you tell me a little bit more
14 about -- looking at the proposed magnet school plan language
15 on page 5, there's a list of considerations that the
16 consultants will address.  And so what is the District's
17 thought on cost for any school construction, on costs for
18 transportation?
19         Is the District entering into this work with sort of
20 a blank slate and the thought is you'll get all the
21 information from the consultants and then compare what they
22 give to you what your financial situation is and decide what
23 the District is best able to do that way?  Or are you giving
24 the consultants a budget and saying, here is what we have?
25         Just help me understand how the District envisions

1  that process working, please.
2          MR. COLVIN:  Your Honor, we will need to -- we can
3  follow up, the District, on that as well, but it's my
4  understanding that the District has already received an
5  innovation -- it's not a grant.  It's really an appropriation
6  from the State legislature to put in place some innovative
7  programs.
8          And I want to say it was three million dollars,
9  something like that.  And that's being used to front-end fund
10 a good bit of this planning work.  We will be using that to
11 hire -- when you get down in the magnet program provisions, it
12 talks about a District administrator, for example.
13         So we've got those funds that are available for
14 these programs and we know that that's there.
15         The District is committed to seeking other funds,
16 including grant funds.  One of our magnet experts is --
17 actually, we have three, four, five on that team, and that's
18 what they do in part, is help evaluate grants and write
19 grants.
20         Some of the funding is unknown because we will have
21 to seek it.  The District is prepared to -- the District is
22 prepared to use -- to supplement with whatever funds it needs
23 to to get these programs up and running, but some of that is a
24 bit of a moving target and will depend in part on -- will
25 depend in part on what sort of programs develop and what the

1  experts recommend.

2          Part of what they will be looking at is -- I mean, I
3  already know this; we've talked about, is costs and budgets,
4  and so we don't have those -- we don't have a budget on the
5  front end, except for what I've already described, but that's
6  going to be developed as part of all this.

7          Obviously feasibility is incredibly important.  You
8  can dream big and plan big, but then if you can't pay for it,
9  then it's kind of all for naught.  We understand that those
10 practical realities are part of what the consultants are going
11 to help analyze and develop ultimately.

12         And, Your Honor, if I may, while I'm thinking about
13 it, I did just send Dr. Ware a text, and it looks like January
14 of '26 is when the building is prepared to be -- is
15 anticipated to be complete.  So it's a mid-year completion.  I
16 think they will be trying to figure out whether they want to
17 move in -- you know, sort of a mid-semester move-in is tough,
18 so I don't know whether they will go ahead and do it in that
19 January or whether that will wait for the fall, but I suspect
20 they will be ready to get in it as quickly as they can.

21         THE COURT:  And I apologize.  I forgot that I put
22 myself on mute.  Did either of the plaintiffs have any remarks
23 regarding Mr. Colvin's discussion of the financial aspect of
24 the planning for the magnet program?

25         MS. SINGLETON:  This is Natane Singleton.  No, I

1  don't have any comment on that.
2          MS. HUMPHRIES:  And this is Arielle Humphries.  No,
3  not at this time.  I think we expect that as they are
4  developing the plan, they will be able to share more of those
5  details.
6          THE COURT:  All right.  Thank you.  So moving on,
7  please, to -- I'm on page 7 now.  The consultants and the
8  magnet leadership team will develop a magnet school plan that
9  has certain criteria set out here.  The first is that the
10 magnet school plan articulates and incorporates a mission and
11 vision for the District-wide magnet program that reflects the
12 District's desegregation goals.
13         I can't remember, so I'm not asking this to be
14 facetious or sarcastic, but has the District created an
15 express set of desegregation goals that you're referring to
16 here?
17         MR. COLVIN:  Your Honor, these are, I think, the
18 desegregation goals that were actually set out throughout the
19 whole consent decree, but no, not -- you know, independent of
20 what's in this decree, I'm not aware of any specific
21 desegregation goals.
22         Now, you know, the goals of this case and the goals
23 set forth in the District's strategic plan in terms of
24 educational opportunities are aligned in many respects.  I
25 mean, they are not different in any respect, but when I say

they are aligned, they get to the same place and do the same things in certain respects.

So we do have those things in place, but not a specific sort of list of desegregation goals at this point separate and apart from the orders in this case and the other policies and procedures that have been approved over the last several decades, and then those goals that will be -- and measures that will be reflected in an ultimate comprehensive decree that will be before the Court.

THE COURT: Well, then maybe there's a way to revise that language somewhat. I'm just thinking off the top of my head. You all are better at this than me, but maybe the language could say something along the lines of articulates and incorporates a mission and vision that advances the District's work toward fulfilling its obligations under this action, something along those lines.

Y'all just think about that a little bit, please.

And then in Section B the plan talks about gradual implementation of a District-wide magnet program such that within five years from the entry of the consent order, the District has scaled implementation of magnet programs to the full extent required to discharge its desegregation obligations.

Is that language intended to communicate that there's essentially a rebuttable presumption that five years

1  after the consent order is entered, that the District will be
2  released from supervision of student assignment based on this
3  magnet program and any other work that the District does?
4          MR. COLVIN:  Not from the District's perspective,
5  Your Honor.
6          THE COURT:  It's just a five year timeline for full
7  implementation of the magnet program that will be developed?
8          MR. COLVIN:  Yes, ma'am.  That's to allow us to --
9  you know, you kind of have to add -- we may have to add a
10 grade at a time to allow a little time for planning and then
11 full -- you know, to get up to scale.
12         And then as we understand it -- although we
13 understand that we will need to operate those programs in good
14 faith and show compliance with the decree before the parties
15 would be in a position to come back to the Court about any
16 sort of declaration on this particular item.
17         THE COURT:  Okay.  Thank you for that clarification.
18         This is a terminology question.  What do you all
19 mean by whole school elementary magnet schools?
20         MR. PAPE:  Your Honor, this is Mr. Pape for the
21 District.  We're talking about kind of whole school versus
22 essentially a school within another school or a program within
23 a school.  The notion would be that the entire school would
24 receive the magnet school -- or would have access to that
25 magnet school programming.

So it's kind of every student that's at that school is a magnet student, as opposed to maybe a program that we have in some of the other cases where there's an overall high school and then a subset of the students there participate in an arts magnet. That's usually considered more of a program within a school as opposed to like a whole school model where every student is participating in the magnet.

THE COURT: Okay. Thank you.

So then jumping to page 9, put a little more meat on the bones, please, for Subsections K and L about enrollment in the whole school magnets, please.

MR. COLVIN: Well, Your Honor, obviously the District has not -- we will work with our experts on developing essentially a lottery or a selection process, but this is one of the things that -- and when you combine that with L, that's one of the things that is a challenge with the whole school magnet process, but it's one that we are committed to tackling; and that is, unless you build a brand new school that's in a place that doesn't belong to any community or doesn't include kids already, regardless of what you do, if you're talking about taking existing schools and turning them into a whole school magnet, it certainly has the potential of -- I mean, it changes the school for the kids who have already been going there and the parents potentially who move there or who live in that community and who are proud of

1  it.
2          So what we're really talking about doing is looking
3  at being able to fill that school with kids from throughout
4  the District so as to promote desegregation, but also figure
5  out a way to make sure that the kids who are already in that
6  school have a chance to be there as well, and they don't lose
7  their school; but also that if there are parents in that
8  community who you said, you know what -- for example, a STEM
9  school is great, but my kids are really not interested in that
10 and I would really rather have my kid go to a traditional
11 elementary school, that we provided an option, an alternate
12 option, for those families as well.
13         So that's really what K and L together say on a
14 practical level.  And we don't have this totally programmed
15 out because some of this is what we'll be working through with
16 experts.  There are examples and there are ways to do this
17 well and with fidelity.
18         And Dr. Gonsoulin's approach on this has always been
19 to show great respect for families and for students as to the
20 choice as to where they choose to go to school and the
21 programs that their kids are enrolled in, and so we will be
22 looking to hit that happen medium and try to make sure that
23 all our kids are taken care of in the way that the families
24 both desire and, frankly, expect.
25         THE COURT:  Is it fair to say that this aspect of

1  the magnet program proposed language was one that required a
2  lot of negotiation?
3           MR. COLVIN:  I think that's a fair way to describe
4  it.  I will defer to the other parties as to what they think,
5  but we did -- I think together we -- yes, we wrestled with the
6  concepts of what the magnet programs would look like and the
7  idea of whole school magnets, which I think the experts think
8  is at least at the elementary level may be the best way to
9  approach things but also with the knowledge that we don't have
10 empty school buildings to put these schools in, and so
11 regardless, there will have to be arrangements made.
12          We are going to have to figure out how to take our
13 existing framework and shape it to fit these concepts in; and
14 in doing so -- because it's different, and there are
15 transitions, and we want to do so by being very respectful of
16 families and the choices that they have made.
17          MR. PAPE:  I just want to add, I do think that it's
18 fair to say that kind of the abstract level when we're looking
19 at these concepts for the whole school magnet, it's fair to
20 say that I think our teams of experts probably all have
21 different views on what level may be the best practice or what
22 would be the most successful.  And so we were really trying to
23 ensure that we did not foreclose the ability for the experts
24 to have to weigh in on the best way to do this while also
25 still recognizing all the things that Whit was just discussing

about Dr. Gonsoulin's view for the school community.

So that's also, I think, what the Court has seen and baked into this language and giving us that flexibility to find a sweet spot to meet the expert recommendations with the expectations that the District in respect to the various communities that might be impacted.

JUDGE CLEMON: Your Honor, from the private plaintiffs' point of view, I think it is fair to say that it is going to require quite a bit of negotiations between the parties on this issue.

THE COURT: Thank you. So this is the area in which -- you know, I hope everything goes extremely smoothly and that things unfold in a very productive way as the parties implement these provisions, but this is where I see perhaps one of the bigger areas for some challenges down the road.

Hopefully the work that the consultants will do with the survey instrument and the focus group will help the District sort of pinpoint any problems that could arise with this whole school program and these enrollment issues, but on the one hand I can see the families who live in the intended zone for a current school that will be converted to a whole school magnet, they may all want to stay in their current school and they will be happy with the magnet program, and then you have a capacity issue in terms of adding students from other schools to meet the desegrative goals of the magnet

```
 1   program.
 2          The flip side, of course, is that if you have a lot
 3   of families who don't want to stay, then you have issues with
 4   enrolling those families in other schools, and the magnet
 5   program isn't as robust as it needs to be.  So I just
 6   recognize -- I'm not suggesting that anything should be
 7   foreclosed, but hopefully those planning tools with the focus
 8   groups and the surveys will help the District make some really
 9   good decisions on the front end.  I know that's what you all
10   want, too.
11          MS. HUMPHRIES:  Your Honor, this is Arielle
12   Humphries for the private plaintiffs.  I think these tasks are
13   kind of all the considerations that we've put into the
14   terms -- a little more general at this point as the District
15   continues to develop its plan, and I think from private
16   plaintiffs' perspective, a couple of things.  We discussed in
17   this process a lot depends on what school, which sites they
18   are considering, what the capacity of that school is, what the
19   demographics are, what the demographics of the surrounding
20   area looks like.
21          So it's hard to know what's going to be the best
22   process to achieve the desegregation goals about having that
23   information about what specific magnet sites are, and that's
24   still being developed, and I think also that this will be a
25   process that can be quite intensive, based on conversations
```

1   with our experts, about what it requires to inform people
2   about the magnet school and the administration of the
3   applications and the admissions and all of that.  And so I
4   think it's going to be a lot more to come based on what
5   specific schools are chosen, what the specific themes are, and
6   once we have a little more clarity on the direction of the
7   specific magnet program.
8            THE COURT:  Thank you.
9            Ms. Singleton, anything for you on that?
10           MS. SINGLETON:  Thank you, Your Honor.  Just that we
11  appreciate the Court addressing these issues and we agree that
12  this will require ongoing negotiation and are hopeful that the
13  consultants will be a benefit in that process.
14           THE COURT:  All right. Thank you.  Okay.  I think
15  those were all of the questions and thoughts that I had.  Is
16  there anything that you all would like to discuss or bring to
17  my attention or to one another's attention?
18           MR. COLVIN:  Just, Your Honor, I would say that you
19  may be wondering how the progress is on the other terms.
20           I hope none of the other parties disagree with me,
21  but I think we are making good progress and we've all been
22  working very hard and are not just optimistic, but we are
23  prepared to meet the deadlines that the Court has set out for,
24  you know, deliverable of the next two sections and then
25  ultimately the rest of the decree.

1                    It has been a lot of hard work, but I think we're
2    all on the same page and are willing to put forth the effort
3    to get this done.  No major bumps in the road yet and don't
4    anticipate there will be any.
5           THE COURT:  Great.  All right.  Well, thank you all
6    for your time.  If you need anything else from me on the
7    magnet, extracurricular, or discipline, let me know, please,
8    but otherwise with those minor comments, I think those look
9    good.
10          Mr. Pape, I jumped on the call, I think, as you all
11   were talking about some of the snow events.  How much snow did
12   y'all get up in Huntsville?
13          MR. PAPE:  Your Honor, it looks like over four
14   inches, four or five.  It was coming down pretty hard for most
15   of the morning and now it has sort of petered off, but they
16   say it's going to pick back up this afternoon.  It's looking
17   nice, but I have a suspicion it will be messy over the next
18   two days as it dries and freezes, but it looks pretty right
19   now.
20          THE COURT:  Good.  I bet all of the kids are having
21   a great time building snowmen and sledding and doing all the
22   stuff you get to do when you have this kind of snow.  So
23   that's fun.
24          MR. PAPE:  Oh, yes.  I saw someone sledding down the
25   hill as Whit and I were meeting earlier with one of our

```
 1   clients on Zoom.  So they're definitely having a good time.
 2            THE COURT:  All right.  Thank you all so much for
 3   your time, everybody.  Stay warm and safe and have a good
 4   weekend.  Y'all take care.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T I O N

    I hereby certify that the foregoing transcript in the above-styled cause is true and accurate.

*[signature: Leah S. Turner]*

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**